No. 22-16268

# In the United States Court of Appeals for the Ninth Circuit

WINSTON R. ANDERSON, CHRISTOPHER M. SULYMA,
and all others similarly situated,
*Plaintiffs-Appellants,*

v.

INTEL CORPORATION INVESTMENT POLICY COMMITTEE, INTEL RETIREMENT
PLANS ADMINISTRATIVE COMMITTEE, FINANCE COMMITTEE OF THE INTEL
CORPORATION BOARD OF DIRECTORS, CHRISTOPHER C. GECZY, RAVI JACOBS,
DAVID S. POTTRUCK, ARVIND SODHANI, RICHARD TAYLOR, TERRA CASTALDI,
RONALD D. DICKEL, TIFFANY DOON SILVA, TAMI GRAHAM, CARY KLAFTER,
STUART ODELL, CHARLENE BARSHEFSKY, SUSAN L. DECKER, JOHN J. DONAHUE,
REED E. HUNDT, JAMES D. PLUMMER, FRANK D. YEARY, STACY SMITH, ROBERT
H. SWAN, TODD UNDERWOOD, AND GEORGE S. DAVIS,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 19-cv-04618 (The Hon. Vince Chhabria)

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

R. JOSEPH BARTON
BARTON & DOWNES, LLP
1633 Connecticut Avenue NW
Suite 200
Washington, DC 20009
(202) 734-5458

MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

*(Counsel continued on inside cover)*

February 7, 2023

*Counsel for Plaintiffs-Appellants*

GREGORY Y. PORTER
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
(202) 463-2101

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street
Suite 1250
San Francisco, CA 94111
(415) 573-0336

JOSEPH CREITZ
CREITZ & SEREBIN LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
(415) 269-3675

# **TABLE OF CONTENTS**

Table of authorities ................................................................. iii

Introduction ........................................................................... 1

Jurisdictional statement .......................................................... 5

Statement of the issues ........................................................... 5

Pertinent rules and statutes .................................................... 6

Statement of the case ............................................................. 6

    I.     Statutory background ................................................. 6

    II.    Factual background ................................................ 10

          A.    By the end of the 2008 financial crisis, financial experts knew that hedge funds and private equity are risky investments that often underperform the broader market ........ 10

          B.    Despite the Intel fiduciaries' awareness that exponentially increasing the allocation of plan assets to hedge funds and private equity would result in poor performance and high costs, they nonetheless opt for this strategy beginning in 2009. ........................................................... 13

          C.    The Intel fiduciaries' asset-allocation decisions radically deviate from those of other plan fiduciaries and investment managers ................................................ 15

          D.    Intel's plans perform worse and incur higher costs than comparable funds and retirement plans ................................... 18

          E.    The Intel fiduciaries' investments in hedge funds and private equity benefit the company at the expense of plan participants ........................................................ 21

    III.    Procedural history ................................................ 23

Summary of argument ......................................................... 25

Standard of review ............................................................... 29

i

Argument ................................................................................................29

I.    The district court erred in dismissing the plaintiffs' claims that the Intel fiduciaries breached their duty of prudence by investing billions of dollars of plan assets in hedge funds and private equity ...........................................................................29

    A.    The plaintiffs plausibly alleged that the Intel fiduciaries acted imprudently both by initially allocating plan assets to non-traditional investments and by failing remove those investments despite their high costs and poor performance ...........................................................31

    B.    Nothing in ERISA's text or purposes supports the district court's threshold "meaningful benchmark" pleading requirement .............................................................................35

    C.    Even if meaningful benchmarks are required, the plaintiffs plausibly alleged them here ..........................................43

II.    The plaintiffs plausibly alleged that the Intel fiduciaries breached their fiduciary duty of loyalty by making investments that benefitted their venture-capital arm, Intel Capital, at the expense of plan participants ..................................................50

III.    The district court's dismissal of the plaintiffs' failure-to-monitor and co-fiduciary liability claims should be reversed ...........................58

Conclusion .............................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Allen v. GreatBanc Trust Co.*,
  835 F.3d 670 (7th Cir. 2016) ................................................................. 32

*Baird v. BlackRock Institutional Trust Co., N.A.*,
  403 F. Supp. 3d 765 (N.D. Cal. 2019) .................................................. 45

*Becker v. Wells Fargo & Co.*,
  2021 WL 1909632 (D. Minn. May 12, 2021) ......................................... 44

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ................................................. 32, 52, 55

*Concha v. London*,
  62 F.3d 1493 (9th Cir. 1995) ............................................... 32, 35, 56

*Cryer v. Franklin Templeton Resources*,
  2017 WL 818788 ( N.D. Cal. Jan. 17, 2017) ......................................... 52

*Cunningham v. Cornell University*,
  2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ........................................ 49

*Davis v. Salesforce.com*,
  *Inc.*, 2022 WL 1055557 (9th Cir. 2022) ............................................. 35

*Davis v. Washington University in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ................................................. 40, 41, 42

*Dover v. Yanfeng US Automotive Interior Systems I LLC*,
  563 F. Supp. 3d 678 (E.D. Mich. 2021) ................................................ 47

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ..................................................... 7, 8, 31, 39

*Garnick v. Wake Forest University Baptist Medical Center*,
  2022 WL 4368188 (M.D.N.C. Sept. 21, 2022) ....................................... 49

*Howard v. Shay*,
  100 F.3d 1484 (9th Cir. 1996) ..................................................... 1, 7, 55

*Hughes v. Northwestern University*,
142 S. Ct. 737 (2022) ......................................................................8, 31

*In re Biogen, Inc. ERISA Litigation*,
2021 WL 3116331 (D. Mass. July 22, 2021) ...................................49

*In re LinkedIn ERISA Litigation*,
2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) ................................49

*In re MedStar ERISA Litigation*,
2021 WL 391701 (D. Md. Feb. 4, 2021) ..........................................49

*In re Omnicom ERISA Litigation*,
2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021) ...................................49

*In re Prime Healthcare ERISA Litigation*,
2021 WL 3076649 (C.D. Cal. July 16, 2021) ..................................49

*In re Syncor ERISA Litigation*,
516 F.3d 1095 (9th Cir. 2008) ........................................................37

*In re Tracht Gut, LLC*,
836 F.3d 1146 (9th Cir. 2016) ........................................................49

*Intel Corp. Investment Policy Committee v. Sulyma*,
140 S. Ct. 768 (2020) ......................................................................23

*Karpik v. Huntington Bancshares Inc.*,
2019 WL 7482134 (S.D. Ohio Sept. 26, 2019) .............................44

*Kayes v. Pacific Lumber Co.*,
51 F.3d 1449 (9th Cir. 1995) ..........................................................55

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..........................................................54

*Kirschbaum v. Reliant Energy, Inc.*,
526 F.3d 243 (5th Cir. 2008) ..........................................................37

*Kong v. Trader Joe's Co.*,
2022 WL 1125667 (9th Cir. 2022) .................................................35

*Kopp v. Klein,*
    894 F.3d 214 (5th Cir. 2018) ................................................................ 25

*Krueger v. Ameriprise Financial, Inc.,*
    2012 WL 5873825 (D. Minn. Nov. 20, 2012) .......................................... 52

*Leigh v. Engle,*
    727 F.2d 113 (7th Cir. 1984) ..................................................... 9, 28, 55, 56

*Massachusestts Mutual Life Insurance Co. v. Russell,*
    473 U.S. 134 (1985) ................................................................................ 9

*Meiners v. Wells Fargo & Co.,*
    898 F.3d 820 (8th Cir. 2018) ..................................................... 40, 41, 42

*Meinhard v. Salmon,*
    164 N.E. 545 (NY. 1928) .................................................................. 8, 55

*Mertens v. Hewitt Associates,*
    508 U.S. 248 (1993) .............................................................................. 6

*Miller v. Astellas US LLC,*
    2021 WL 1387948 (N.D. Ill. Apr. 13, 2021) .......................................... 52

*Moreno v. UtiliQuest, LLC,*
    29 F.4th 567 (9th Cir. 2022) ............................................................... 47

*Mujica v. AirScan Inc.,*
    771 F.3d 580 (9th Cir. 2014) ............................................................... 29

*Nachman Corp. v. Pension Benefit Guaranty Corp.,*
    446 U.S. 359 (1980) .............................................................................. 9

*NLRB v. Amax Coal Co.,*
    453 U.S. 322 (1981) .............................................................................. 9

*Pegram v. Herdrich,*
    530 U.S. 211 (2000) ............................................................................ 50

*Pilkington PLC v. Perelman,*
    72 F.3d 1396 (9th Cir. 1995) .................................................. 8, 50, 54, 56

*Porteous v. Cap. One Services II, LLC,*
  809 F. App'x 354 (9th Cir. 2020) ............................................................. 49

*Ross v. Blake,*
  578 U.S. 632 (2016) ............................................................................... 35

*Sacerdote v. N.Y.U.,*
  9 F.4th 95 (2d Cir. 2021) ................................................. 32, 34, 35, 48

*Secretary of Labor v. Fitzsimmons,*
  805 F.2d 682 (7th Cir. 1986) .................................................................. 9

*Sheppard v. David Evans & Associates,*
  694 F.3d 1045 (9th Cir. 2012) .............................................................. 29

*Snyder v. UnitedHealth Group, Inc.,*
  2021 WL 5745852 (D. Minn. Dec. 2, 2021) ......................................... 47

*Srein v. Frankford Trust Co.,*
  323 F.3d 214 (3d Cir. 2003) ................................................................. 37

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011) .............................................................. 49

*Stegemann v. Gannett Co., Inc.,*
  970 F.3d 465 (4th Cir. 2020) .................................................. 36, 42, 43

*Sweda v. University of Pennsylvania,*
  923 F.3d 320 (3d Cir. 2019) .................................................. 34, 43, 48

*Tatum v. RJR Pension Investment Committee,*
  761 F.3d 346 (4th Cir. 2014) ........................................................ 27, 37

*Terraza v. Safeway Inc.,*
  241 F. Supp. 3d 1057 (N.D. Cal. 2017) ................................................ 45

*Tibble v. Edison International,*
  575 U.S. 523 (2015) ........................................................................ *passim*

*Toomey v. DeMoulas Super Markets, Inc.,*
  2020 WL 3412747 (D. Mass. Apr. 16, 2020) ........................................ 42

*Trustees of Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.,*
  572 F.3d 771 (9th Cir. 2009) ................................................................... 36

*Varity Corp. v. Howe,*
  516 U.S. 489 (1996) ..................................................................... 9, 38

*Williams v. Gerber Products Co.,*
  552 F.3d 934 (9th Cir. 2008) ............................................................. 29

*Wilson v. Craver,*
  994 F.3d 1085 (9th Cir. 2021) ............................................................ 37

*Wright v. Oregon Metallurgical Corp.,*
  360 F.3d 1090 (9th Cir. 2004) ......................................................... 7, 31

**Statutes**

28 U.S.C. § 1291 .................................................................................. 5

28 U.S.C. § 1331 .................................................................................. 5

29 U.S.C. § 1104 ........................................................................ *passim*

29 U.S.C. § 1105 ................................................................................. 58

29 U.S.C. § 1132 .................................................................................. 5

**Other Authorities**

George G. Bogert,
  *The Law of Trusts & Trustees* § 541 (3d ed. 2009) ................................. 37, 38

Deborah Gage,
  *Intel Capital's Arvind Sodhani: Unique Companies 'Rarer and Rarer',*
  Wall Street Journal (Nov. 4, 2014) ........................................................ 21

Dean Takahashi,
  *After almost 35 years and 1,400 investments, Intel's investment chief says farewell,*
  VentureBeat (Nov. 3, 2015) ................................................................. 22

Restatement (Third) of Trusts § 90 ......................................................... 31

U.S. Gov't Accountability Office,
   *Guidance Needed to Better Inform Plans of the Challenges and Risks of Investing in*
   *Hedge Funds and Private Equity* (August 2008).......................................................12, 16

## Regulations

29 C.F.R. § 2550.404a-1................................................................................................36

## INTRODUCTION

Under the Employment Retirement Income Security Act, fiduciaries of retirement plans owe rigorous duties to plan participants and beneficiaries. These "duties are the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996). A fiduciary must be prudent when making investment strategy, selecting and removing investments, and otherwise managing plan assets. And a fiduciary must also act solely and exclusively in the interest of participants and beneficiaries.

This case is about the Intel fiduciaries' breach of their duties. Following the 2008 financial crisis, the fiduciaries conducted a novel "experiment with nearly $14 billion in worker retirement money": They decided to heavily invest Intel's retirement plans' assets in hedge funds and private equity. Regulators, investment experts, and the financial press all warned that these investments were ill-suited for defined-contribution plans like Intel's. Hedge funds and private equity are less regulated and riskier than traditional investments like stocks and bonds, which is why they are off-limits to nearly all retail investors. And they are far more costly—the fees charged by hedge-fund and private-equity-fund managers can be more than ten times those charged by mutual funds. These funds not only delivered poor returns in the decade leading up to the 2008 financial crisis—consistently underperforming the broader market, the S&P 500, and even "boring old Treasury bills"—but they also failed to deliver on the promise of downside protection as the crisis unfolded.

1

For this reason, almost all large defined-contribution plans and retirement funds invested *no* assets in hedge funds and private equity. And even the small number that did so allocated only a tiny fraction of assets to these non-traditional investments.

But Intel's fiduciaries took a different course with their workers' retirement savings. Between 2009 and 2013, they radically increased the allocation of plan assets to hedge funds, private equity, and other non-traditional investments—by more than 1,000%. As a result of the fiduciaries' unprecedented strategy, the default option in Intel's 401(k) plan, the company's proprietary "target date fund," allocated around 30% of its assets to these non-traditional investments. And more than *half* of Intel's other primary retirement-plan option, its "global diversified fund," was invested in hedge funds and private equity. This novel asset-allocation approach, commentators observed, amounted to "institutional gambling" with employees' assets.

The fiduciaries' bet did not pay off. As a result of their decision to invest in hedge funds and private equity, the Intel plans paid higher fees in exchange for higher risk and lower returns. Yet the fiduciaries did not change course, even after it became clear that their chosen investments were underperforming cheaper and more popular alternatives. Tens of thousands of plan participants lost hundreds of millions of dollars in retirement savings.

Former Intel workers filed this ERISA action to hold Intel's fiduciaries accountable for breaching their fiduciary duties. In their 162-page complaint, the plaintiffs presented detailed allegations describing the risks and costs of heavily investing defined-contribution plan assets in hedge funds and private equity—all of which were known to Intel's fiduciaries at the time they adopted their asset-allocation strategy. They described how plan fiduciaries for similarly situated plans and asset managers for target-date and diversified funds allocated very little, if any, assets to these investment classes. And they alleged that, as a result, Intel's funds underperformed dozens of comparable investment funds—as well as common financial benchmarks like Morningstar categories and Dow Jones indices. Yet Intel's fiduciaries still refused to deviate from their market-defying strategy.

These allegations are more than enough to plausibly show that the Intel fiduciaries breached their duty of prudence. The district court, however, refused to credit the allegations. Instead, it dismissed the claims based only on its view that the plaintiffs had not adequately alleged "meaningful benchmarks" against which to compare the Intel funds.

That was reversible error. Nothing in ERISA requires that plaintiffs satisfy—at the pleading stage—a threshold "meaningful benchmark" requirement. Under the statute, a fiduciary breaches the duty of prudence by failing to exercise the care that a prudent investor "acting in a like capacity . . . would use in the conduct of an

enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). That's exactly what the plaintiffs alleged here: the Intel fiduciaries' decisions sharply deviated from those made by fiduciaries for similarly sized defined-contribution plans and asset managers who provided these strategies to the market—that is, "enterprises of a like character and with like aims."

The district court, however, held the plaintiffs to a heightened, atextual standard: They had to allege that Intel's funds compared unfavorably to other funds employing similar strategies for "similar aims, risks, and rewards." But the plaintiffs' claims are premised on the fact that *no* other similarly situated plan or target-date fund used these reckless asset-allocation models, which is precisely *why* the Intel's fiduciaries were imprudent. The district court's rule, in other words, immunizes the most brazenly atypical and risky investment strategies, because those are the least susceptible to "benchmarking." That is the opposite of what ERISA was intended to do.

But even if benchmarks were required, the district court's ruling was wrong. The plaintiffs alleged numerous alternatives that are commonly accepted in the financial industry, some of which the Intel fiduciaries *themselves* offered as benchmarks in plan disclosures. The district court, however, determined—based on its own parsing of the funds' strategies and prospectuses—that these alternatives were not

sufficiently "similar" to Intel's funds to serve as adequate comparators and therefore were not "meaningful." That is not permitted at the pleading stage.

The court committed the same basic error as to the plaintiffs' duty-of-loyalty claim. It refused to credit allegations that the Intel fiduciaries' decision to allocate billions of dollars of plan assets to hedge funds and private equity benefited the company and its venture-capital arm, Intel Capital, by steering funding to co-investors in technology startups in which Intel had already invested. The district court's improper fact-finding cannot be squared with Rule 8's pleading standard, which requires courts to accept plausible allegations and draw all inferences in the plaintiffs' favor. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had exclusive subject-matter jurisdiction over this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court granted Intel's motion to dismiss the plaintiffs' class claims on January 8, 2022, 1-ER-5, and dismissed the plaintiffs' remaining individual claim on July 25, 2022, 1-ER-3. The plaintiffs filed their timely notice of appeal on August 17, 2022. 4-ER-579.

## STATEMENT OF THE ISSUES

**1.** Did the district court err in dismissing the plaintiffs' claims for breach of ERISA's duty of prudence where the plaintiffs plausibly alleged that—in contrast to

managers of all comparable defined-contribution plans and investment funds—the Intel fiduciaries imprudently allocated billions of dollars in plan assets to costly and poorly performing hedge funds and private-equity funds?

**2.** Did the district court err in dismissing the plaintiffs' claims for breach of loyalty where the plaintiffs plausibly alleged that the Intel fiduciaries invested plan assets in hedge funds and private equity to benefit the company and its venture-capital arm, Intel Capital, at the expense of plan participants?

## PERTINENT RULES AND STATUTES

The pertinent rules and statutory provisions are set forth in a statutory addendum to this brief. See 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### I. Statutory background

ERISA is a "comprehensive and reticulated statute" that protects the interests of participants and beneficiaries in private-sector employee benefit plans. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993).[1] Congress enacted ERISA "to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). "To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of

---

[1] Unless otherwise indicated, all internal citations, alterations, and quotation marks are omitted.

6

the benefit would be defeated through poor management by the plan administrator." *Id.* at 115.

At the heart of its protective framework, ERISA codifies two demanding fiduciary duties—loyalty and prudence—which impose "strict standards" of trustee conduct "derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014); *see* 29 U.S.C. § 1104. "These duties are the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

First, ERISA requires prudence. The duty of prudence requires individuals with authority or control over plan assets to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Generally, "[a] court's task in evaluating a fiduciary's compliance with [the prudence] standard is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004). The duty of prudence does not apply solely to the trustees' initial selection of investments; it also imposes "a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). And "[b]ecause the content of the duty of

prudence turns on the circumstances . . . prevailing at the time the fiduciary acts," "the appropriate inquiry will necessarily be context specific." *Dudenhoeffer*, 573 U.S. at 425; *see Hughes v. Nw. Univ.*, 142 S. Ct. 737, 740 (2022) (rejecting any reliance on a "categorical rule" as "inconsistent with the context-specific inquiry that ERISA requires").

ERISA also imposes a rigorous duty of loyalty on fiduciaries. The statute's "command to fiduciaries is unequivocal: fiduciaries must act *solely in the interest* of the participants and beneficiaries and *for the exclusive purpose of* providing benefits to participants and their beneficiaries." *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401 (9th Cir. 1995) (quoting 29 U.S.C. § 1104(a)(1)(A)(i)) (emphasis in original). This statutory duty reflects the heightened standard of loyalty imposed on trustees under common law. As Judge Cardozo explained nearly a century ago, "[m]any forms of conduct permissible in a workaday world for those acting at arm's length[] are forbidden to those bound by fiduciary ties." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.). "A trustee is held to something stricter than the morals of the market place"; "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Id.*

Thus, "[w]here the potential for conflicts is substantial, it may be virtually impossible for fiduciaries to discharge their duties with an eye single to the interests of the beneficiaries, and the fiduciaries may need to step aside, at least temporarily,

from the management of assets where they face potentially conflicting interests." *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984). At the very least, "[w]here it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *See id.*

Congress imported these high duties into ERISA for a very good reason: "to prevent the great personal tragedy" that occurs when employers promise their employees retirement benefits but fail to deliver them. *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 374 (1980). As the Supreme Court observed, the "the crucible of congressional concern" motivating ERISA's enactment was "mismanagement of plan assets by plan administrators." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985). And ERISA's duties of loyalty and prudence are central to preventing this mismanagement. *See Varity Corp. v. Howe*, 516 U.S. 489, 511–12 (1996) (noting that the law's fiduciary obligations "relat[e] to the plan's financial integrity" and "reflec[t] a special congressional concern about plan asset management"). These "fiduciary standards" thus "'must be enforced with uncompromising rigidity.'" *Sec'y of Lab. v. Fitzsimmons*, 805 F.2d 682, 700–01 (7th Cir. 1986) (quoting *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329–34 (1981)).

## II. Factual background

This case involves two ERISA plans sponsored by Intel.[2] After the 2008 financial crisis, Intel's fiduciaries managed these two plans and their asset-allocation funds differently than peer plans and funds. Whereas almost all fiduciaries for multi-billion-dollar defined-contribution plans allocated virtually no assets to private-equity and hedge funds, Intel's fiduciaries invested billions in those strategies. As a result of that unprecedented asset-allocation approach (and the fiduciaries' subsequent refusal to revisit it even when it was failing), plan participants paid dramatically more in fees even while their funds underperformed comparable retirement funds—not to mention the broader market. In the end, Intel's peculiar investment decisions caused the plans and their participants to lose hundreds of millions of dollars of retirement savings.

### A. By the end of the 2008 financial crisis, financial experts knew that hedge funds and private equity are risky investments that often underperform the broader market.

Hedge funds and private-equity funds are actively managed investment funds that are marketed as alternatives to traditional investments such as stocks, bonds, and mutual funds. Because they are so risky, hedge-fund investments are restricted

---

[2] The defendants in this case are Intel's investment committee (which manages and controls the assets of the plans), administrative committee (which makes disclosures to plan participants), and finance committee (which oversees the other two committees), as well as the individual committee members. For the sake of simplicity, unless otherwise indicated, we refer to the defendants collectively as the Intel fiduciaries.

to "accredited investors," i.e., high-net worth individuals or institutional investors whom regulators have determined can afford the greater risk of losses. 3-ER-629. Private equity is another "alternative" investment, in which managers invest pooled funds in privately held companies. 3-ER-641. Managers of both hedge funds and private-equity funds usually follow the "two-and-twenty" compensation structure, where they receive a fee of two percent of all assets under management and twenty-percent of fund profits. 3-ER-636. These fees—up to ten times more than those charged by traditional investment funds like mutual funds, *id.*—are premised on the promise of market-beating returns in up and down markets.

But in the aftermath of the 2008 financial crisis, the supposed benefits of these asset classes for defined-contribution plans were recognized to be overstated, if not illusory. Even earlier studies of hedge funds' performance—including in widely published outlets like *The Economist*—revealed that their returns (after subtracting fees) did not meaningfully outpace the performance of index-tracking mutual funds. 3-ER-659 (discussing 2006 articles). Other reports at the time, including one published by Vanguard in 2006, detailed how hedge funds generally do not mitigate market risk to the extent expected by investors. 3-ER-661–62. And, as early as August 2008, federal regulators warned that hedge funds and private equity were risky investments—especially for retirement plans—in light of their significant use of leverage; costly fee structures; lack of transparency; valuation risk; and liquidity

limitations. *See* 3-ER-626 (citing U.S. Gov't Accountability Office, *Guidance Needed to Better Inform Plans of the Challenges and Risks of Investing in Hedge Funds and Private Equity* (August 2008), https://perma.cc/57AK-J82L, at 22–28, 33–37) ("GAO 2008 Rpt.").

Post-financial-crisis data confirmed that hedge funds had underperformed traditional equity and bond investments. From 1998 to 2010, hedge funds as a category produced fewer risk-adjusted returns than a broad bond-market index, a broad stock-market index, and a traditional 60%/40% blend of equities and bonds. 3-ER-617–20. Other analyses similarly demonstrated that, between 2001 and 2010, "[i]nvestors in a simple portfolio of stocks and bonds earned more than [hedge-fund] investors, while paying lower fees, with no need for complicated due diligence, and without the need to sacrifice liquidity." 3-ER-631. The data told a clear story: "[S]ince 1998, the effective return to hedge-fund clients has only been 2.1% a year, half the return they could have achieved by investing in boring old Treasury bills." 3-ER-666. And this likely overstated the funds' performance: Hedge fund returns are self-reported, and industry indices routinely exclude the significant number (nearly 10%) of hedge funds that fail each year. 3-ER-660–61.

Given this track record, by 2009, investment professionals were aware that hedge-fund managers were being paid higher fees and taking greater risks with little to show for it. As the authors of a 2009 article explained, "the real alpha of hedge fund investors is close to zero," because hedge funds' "returns [we]re reliably lower

than the return on the S&P 500 index, and [we]re only marginally higher than the risk-free rate as of the end of 2008."[3] Ilia D. Dichev & Gewn Yu, *Higher risk, lower returns: What hedge fund investors really earn*, 100 Journal of Financial Economics 248 (July 20, 2009) (cited at 3-ER-663). Or, as *The Economist* put it several years earlier: Hedge-fund managers were receiving "[a]lpha pay for beta performance." 3-ER-659.

**B.    Despite the Intel fiduciaries' awareness that exponentially increasing the allocation of plan assets to hedge funds and private equity would result in poor performance and high costs, they nonetheless opt for this strategy beginning in 2009.**

This case involves two of Intel's ERISA plans: its 401(k) savings plan and its retirement plan. The 401(k) savings plan is a defined-contribution plan, "meaning that participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525. The retirement plan is also a defined-contribution plan providing benefits based on market performance, but (unlike its 401(k) plan) for most of the class period participants did not have the ability to choose the investments. 3-ER-572–73.

Beginning in 2009, Intel's fiduciaries decided to adopt radical new asset-allocation strategies for Intel's target-date funds (known as TDFs) and its diversified

---

[3]    In investing, "alpha" refers to the return on an investment that is incrementally more than a specified benchmark, like the S&P 500.

fund (known as a GDF).[4] They massively increased these funds' allocations in hedge funds, private equity, and other non-traditional assets like commodities, at the expense of traditional asset classes like domestic equities and bonds. 3-ER-580. From 2009 to 2013, the fiduciaries increased the diversified fund's allocation to non-traditional investments from $214 million to almost $2.33 billion—an 1,088% increase.



3-ER-580–81. The Intel fiduciaries did the same for Intel's TDFs. In 2011, they increased hedge fund allocations and other non-traditional asset allocations to 23%, up from almost none. 3-ER-581. By the end of 2011, the 401(k) plan had invested $680

---

[4] A target-date fund is "a hybrid investment that pursues a long-term investment strategy by holding a mix of asset classes such as stocks, bonds, and cash equivalents that is readjusted to become more conservative over the time horizon of the fund, as the fund approaches the date indicated in its name." 3-ER-624. Unlike a target-date fund, a diversified fund's asset allocation remains roughly the same during the life of the investment. 3-ER-545, 574.

million in hedge funds, up from a million only two years before—a massive increase. 3-ER-657.

Plan disclosures suggest that these unusual allocations were supposed to increase diversification and reduce risk, especially in down markets. But "allocations to hedge funds do not increase diversification of asset classes," 3-ER-627, and there are many less risky ways to diversify a plan's portfolio. Yet there is no evidence that the fiduciaries considered these alternative, less risky ways of managing plan assets.

What was clear, even at the time, was that, by deciding to use "expensive, opaque and potentially risky hedge funds in its main 401[k] investment options[]," the Intel fiduciaries had "embarked, essentially, on an experiment with nearly $14 billion in worker retirement money for more than 63,000 participants." 3-ER-581–82. As one financial commentator observed in early 2014, Intel's plans "have been infiltrated by hedge funds." 3-ER-581 And the fiduciaries' decision to invest heavily in such funds and other non-traditional investments, he continued, amounted to "institutional gambling with employees['] assets." *Id.*

### C. The Intel fiduciaries' asset-allocation decisions radically deviate from those of other plan fiduciaries and investment managers.

As a result of the Intel fiduciaries' allocation strategy, hedge-fund and private-equity investments made up a disproportionately large percentage of the assets in Intel's funds. By 2014, for example, the Intel 2030 TDF had approximately 21% of its

assets allocated to hedge funds and 5% to commodities—far exceeding comparable target-date funds, which typically have no allocation to hedge funds at all. 3-ER-623–35. Other 2030 TDFs offered by major investment-management firms like Vanguard allocated on average less than 3% of their assets to *any* non-traditional investments (*i.e.*, those other than stocks and bonds). 3-ER-623. Yet Intel's 2030 TDF, for example, allocated 32% to non-traditional investments, two-thirds of which were hedge funds. 3-ER-624–25.

The GDF's asset-allocation model was even more lopsided. It consistently allocated over 50% of fund assets to "alternative" investments such as hedge funds, private equity, and commodities. 3-ER-625. Almost all similar funds, by contrast, allocated no assets to hedge funds or private equity. *Id.*

There are good reasons why the vast majority of defined-contribution plan fiduciaries and fund managers don't allocate substantial plan assets into hedge funds and private equity. As federal regulators specifically warned pension plans in 2008, "hedge fund investments pose investment challenges beyond those posed by traditional investments." GAO 2008 Rpt. at 22; *see also id.* at 33–37 (identifying similar challenges for private equity).

For starters, many hedge funds employ investment strategies to maximize short-term gains—in contrast to the long-term objectives of plan managers. 3-ER-629. These strategies commonly involve the use of leverage "through various means

16

such as borrowing, shorting or the use of derivatives," which can result in "deep and permanent" losses. 3-ER-629, 635, 640. Traditional investment structures, like mutual and index funds, are highly restricted from resorting to leverage or derivatives. 3-ER-628–29. And because hedge funds and private equity more strictly constrain access to invested capital, investments in these non-traditional assets are far less "portable" and "liquid" than traditional funds—preventing retirement plans from redeeming their investments in the event of losses. 3-ER-630, 635. Finally, hedge funds and private-equity funds charge far higher fees than more traditional funds, which "have a significant negative impact on net investment returns." 3-ER-636–37, 641–44.

To justify these risks and disadvantages, hedge funds and private equity must either outperform bull markets or provide downside risk protection. They do neither, as the Intel fiduciaries must have known. Nevertheless, unlike peer fiduciaries and fund managers, they decided between 2009 and 2011 to dramatically increase their allocation of plan assets into hedge funds and private equity. And they doubled down on this approach in the following years—even though hedge funds and private equity continued to underperform the broader market. 3-ER-627–28, 3-ER-665–66, 4-ER-669.

**D.** **Intel's plans perform worse and incur higher costs than comparable funds and retirement plans.**

The outcome of the fiduciaries' unprecedented asset-allocation strategy was unfortunate but not surprising: The Intel funds performed worse than comparable funds while charging higher fees. As a result, plan participants lost hundreds of millions of dollars in retirement savings.

Even before their radical shift into hedge funds and private equity, Intel's funds charged higher fees to participants than comparable funds. 3-ER-586 But after the Intel fiduciaries adopted their new asset-allocation model between 2009 and 2011, the Intel plans' investment expenses skyrocketed. 3-ER-586–87. By 2014, the Intel TDFs' expense ratio was more than double the average for target-date funds; and the GDF's ratio was nearly four times the average for non-target-date balanced funds. 3-ER-587–96, 610. Some specific Intel funds deviated even further from the market: Intel Target Date 2015 and 2020 Funds, for example, "were up to 956% more expensive than comparable investment alternatives offered by Vanguard." 3-ER-592–93. In fact, the Intel TDFs "are the most expensive target date funds in the country for large plan investors." 3-ER-595.

These high fees did not result in superior investment performance. To the contrary: From 2011 to 2018, Intel's TDFs consistently underperformed comparable mutual funds provided by major firms like Vanguard and Fidelity, as well as

18

"category benchmarks" for target-date funds published by Dow Jones, S&P, and Morningstar. 3-ER-597–604.



**Figure 4**

3-ER-598. The GDF similarly underperformed. Over a ten-year period ending in 2014, it performed worse than 90% of its peers in the Morningstar fund category (with assets over $100 million). 3-ER-609–10. And it continued to underperform comparable and cheaper alternatives—like the Vanguard and American Funds. 3-ER-612. The diversified fund also underperformed the benchmarks that Intel's fiduciaries themselves used in fund documents and fact sheets. 3-ER-606–07.

| | Intel | Morningstar Lifetime | S&P Target Date | Dow Jones Target |
|---|---|---|---|---|
| Retirement | 2.93 | 4.10 | 3.12 | 5.50 |
| 2015 | 1.31 | 2.31 | 2.25 | 3.87 |
| 2025 | 0.29 | 0.95 | 0.90 | 2.25 |
| 2035 | -1.26 | 0.52 | 0.33 | 1.22 |
| 2045 | -1.47 | 0.48 | -0.27 | 0.88 |
| Average of above: | 0.24 | 1.67 | 1.35 | 2.78 |
| Difference | | (1.43) | (1.10) | (2.54) |

This underperformance cost plan participants millions. "Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of benefits available at retirement." 3-ER-585. A typical Intel plan participant would have hundreds of thousands of more dollars of retirement savings

if Intel fiduciaries had selected prudent target-date and balanced funds for Intel employees' retirement savings. 3-ER-604–06.

**Figure 5**



Investment Balance in 2045
with Annual Contributions of 15K

3-ER-605.

The Intel funds' underperformance "can be traced to [the fiduciaries'] unusual asset allocation decisions." 3-ER-610. Intel's retirement plans hold billions of dollars of assets—indeed, its 401(k) savings plan "stands in the top 0.1% of over 530,000 401(k) plans in plan assets." 3-ER-586. But, instead of using its "massive bargaining power" to "negotiate low-cost investment alternatives," *Id.*, the company inexplicably chose to invest its plans' assets into costly private-equity and hedge funds that produced sub-market returns. 3-ER-612–13.

20

### E. The Intel fiduciaries' investments in hedge funds and private equity benefit the company at the expense of plan participants.

Although retirement-plan participants were harmed by this disproportionate investment of plan assets into hedge funds and private equity, Intel—and more specifically, its venture-capital arm, Intel Capital—benefited.

One of the "oldest and largest corporate venture arms in the world," Intel Capital invests hundreds of millions of dollars a year in an array of technology startups, many of which complement or further Intel's core businesses. Deborah Gage, *Intel Capital's Arvind Sodhani: Unique Companies 'Rarer and Rarer'*, Wall St. J. (Nov. 4, 2014), https://perma.cc/53NV-RWJD; *see* 3-ER-647–48. In making such investments, Intel Capital partners with "co-investing companies"—typically, hedge funds, private-equity funds, and venture-capital firms. 3-ER-648. These funds co-invest in a particular startup with Intel Capital during the initial round of raising "seed capital" and provide "sequential funding"—later investments as the startup needs additional funds to grow. 3-ER-647–48.

Many of Intel Capital's co-investing partners—major hedge funds and private-equity firms like the Carlyle Group, Bain Capital, TPG, and BlackRock—are the same funds in which Intel invested its retirement-plan assets. 3-ER-648–51 (listing 18 such funds). These investments provided important benefits to Intel. When other investors piled money into Intel Capital's portfolio companies, for instance,

Intel reduced the risk of its own venture investments, because the startups obtained additional financing to enable their growth. At the same time, it often realized greater investment gains—because the subsequent investments by other firms typically valued the startup at a higher price than Intel Capital's initial investment. 3-ER-648–52.

The Intel executives primarily responsible for directing Intel Capital's investments were also responsible for directing Intel's retirement plans' investments. *Id.* Arvind Sodhani, a defendant and plan investment fiduciary, developed the idea for Intel Capital and served as Intel Capital's president for nearly a decade. *See* Dean Takahashi, *After almost 35 years and 1,400 investments, Intel's investment chief says farewell*, VentureBeat (Nov. 3, 2015), https://perma.cc/YQY6-ULVP. Ravi Jacob, another individual finance committee defendant, similarly wore "two hats" as plan investment fiduciary and Intel's Corporate Vice President Treasurer responsible for the company's external investments (including through Intel Capital). 3-ER-648–52.

The numerous benefits that Intel received from investing in hedge funds and private equity suggests that the retirement plans' investment committee "used the [retirement plans'] assets to promote the investment interests of Intel Capital and Intel at the expense of the participants." *Id.* When a confidential witness met with several committee members to inquire about the Intel funds' poor performance and atypical investment strategy, the members refused to divulge information about the

hedge funds in which they invested—and why they selected the funds that they did. 3-ER-652–53.

## III. Procedural history

Winston Anderson is a former Intel employee who worked at the company for fifteen years and is a fully vested participant in both Intel's 401(k) savings plan and its retirement plan. He filed this case in 2009 challenging the Intel fiduciaries' mismanagement of their plans and their breaches of ERISA's fiduciary duties. Soon after filing, the case was stayed pending the Supreme Court's decision in a related ERISA lawsuit making similar allegations, *Sulyma v. Intel Corp.*, which the Court resolved in the plaintiffs' favor. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768 (2020) (concerning the "actual knowledge" requirement in ERISA's statute of limitations). After remand, *Sulyma* was consolidated with this case. ECF 91.

The Intel fiduciaries filed a motion to dismiss the plaintiffs' consolidated complaint, which the district court granted. 1-ER-44. The district court agreed with the plaintiffs that "plausible allegations of self-dealing or conflicts of interest, combined with plausible allegations of higher-than-average fees and poor performance suffered by investments, are sufficient to state a claim for breach of the duty of prudence under ERISA." 1-ER-64–65. But, as relevant here, it found that the plaintiffs' allegations of poor performance and excessive fees were not plausible because they failed to allege "adequate benchmarks against which to compare the

23

Intel Funds." 1-ER-59; *see also* 1-ER-61 (noting that the plaintiffs "failed to adequately plead factual allegations to support their claim that [they] provided a meaningful benchmark against which to compare the fees incurred by the Intel Funds"). The court also found that the plaintiffs failed to plausibly allege that fiduciaries in 2011 would be aware of the risks of hedge-fund and private-equity investments. 1-ER-63–64. And it determined that the plaintiffs' allegations about Intel's conflicted interests were "conclusory." 1-ER-64–65. The court therefore dismissed the plaintiffs' claims with leave to amend. 1-ER-72.

The plaintiffs filed an amended complaint detailing how the Intel funds underperformed and charged higher fees than comparable alternatives. 3-ER-585–613, 655–57. Not only did these alternatives include common benchmarks like published indices, Morningstar categories of peer-group funds, and specific peer alternatives within a given asset class, but they also included benchmarks provided to plan participants in reports commissioned by the Intel fiduciaries. 3-ER-583–85, 595–99, 603–08. The amended complaint significantly expanded on how, by 2011, there was widespread knowledge in the financial industry about hedge funds' and private equity's risks, high costs, and poor performance. 3-ER-626–28, 633–35, 638–40, 661, 663–66. And the complaint added additional detail on how the fiduciaries' investment decisions benefited the company and Intel Capital at the expense of plan participants. 3-ER-647–54.

The fiduciaries again moved to dismiss. ECF 117. And once again, the district court granted the motion. 1-ER-5. *First*, it dismissed the plaintiffs' prudence-based claims. Despite the plaintiffs' substantial amendments in response to the court's previous order, the court still found that the plaintiffs did not identify a "meaningful benchmark" against which to compare the Intel funds. 1-ER-21–30. In so ruling, the court refused to credit the plaintiffs' allegations that the Intel fiduciaries' initial decision to allocate disproportionate assets to hedge funds and private equity was imprudent. 1-ER-30–31.

*Second*, the district court found that the plaintiffs failed to state any claims for breach of the duty of loyalty. In the court's view, such a claim required allegations "that the Investment Committee's decisions were made *because of* self-dealing." 1-ER-33 (emphasis added) (citing *Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018)). The allegations here, the court concluded, "at most, support a potential conflict of interest, not a real conflict." *Id.* at 33.

The court therefore dismissed the plaintiffs' claims for breach of ERISA fiduciary duties, as well as derivative failure-to-monitor and co-fiduciary liability claims. This appeal followed.

## SUMMARY OF ARGUMENT

**I.A.** The plaintiffs plausibly alleged that the Intel fiduciaries breached their duty of prudence. ERISA requires fiduciaries to act as a prudent person would act

"in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). And when it comes to plan investments, fiduciaries have both a duty to "exercise prudence in selecting investments at the outset" and a "continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 575 U.S. at 529.

The Intel fiduciaries breached both duties here. *First*, they imprudently decided to allocate billions of dollars of plan assets to hedge funds, private equity, and non-traditional investments—unlike any other similar plan fiduciaries and managers of similar funds—despite widespread industry knowledge that these investments were too risky and costly for defined-contribution plans, and also unlikely to produce higher returns or provide downside protection. *Second*, the fiduciaries breached their continuing duty to monitor by failing to revise their asset-allocation model as the hedge-fund and private-equity investments continued to underperform and charge high fees.

These allegations plausibly show that the Intel fiduciaries failed to prudently investigate the merits of their asset-allocation strategy. Indeed, courts have frequently held that such allegations are sufficient to state a claim for breach of the duty of prudence under ERISA. That's especially the case because, absent discovery, ERISA plaintiffs typically lack information to make "direct allegations" about the fiduciaries' misconduct; circumstantial allegations are enough.

26

**B.** Instead of accepting the complaint's allegations, the district court dismissed the prudence claims solely based on its belief that the plaintiffs had not plausibly alleged a "meaningful benchmark" against which to compare the Intel plans' performance. But nothing in ERISA imposes this threshold pleading requirement.

To the contrary, the statute's text makes clear that the prudence standard is flexible and context-specific; "evaluating the prudence of an investment decision requires a totality-of-the-circumstances inquiry." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014). This inquiry cannot be reduced to a categorical pleading rule. Requiring all ERISA plaintiffs to show a meaningful benchmark no matter the context, as the district court ruled, would allow the most brazenly imprudent investment strategies to escape liability.

This case shows why. The plaintiffs' theory of breach is that the fiduciaries adopted an asset-allocation approach that radically deviated from all other similarly situated plans and funds. The absence of a comparator, in other words, *demonstrates* why the fiduciaries acted imprudently. But, under the district court's logic, that absence means that the plaintiffs are categorically barred from bringing a prudence claim at all. That result cannot be squared with ERISA's text or purposes.

**C.** Even on its own logic, the district court's ruling was flawed. The plaintiffs extensively alleged numerous comparators, including benchmarks that the Intel fiduciaries had used in their own disclosures about the plan. These included target-

27

date funds and diversified funds that shared many attributes with Intel's funds, common financial benchmarks like Morningstar fund categories and Dow Jones indices, and similarly sized corporate defined-contribution plans.

But the district court refused to accept these allegations and draw all factual inferences in favor of the plaintiffs. Instead, it vetted each benchmark for sufficient similarity to Intel's funds—based on its own review of the funds' aims and strategies. That searching analysis cannot be squared with Rule 8's liberal pleading standard. Nor can the district court's improper factfinding be reconciled with the weight of precedent holding that whether alleged benchmarks are "meaningful" is a fact-intensive inquiry that is not appropriate at the motion-to-dismiss stage.

**II.** The district court similarly erred in dismissing the plaintiffs' claims for breach of the duty of loyalty. ERISA requires fiduciaries to act solely and exclusively in the interest of plan participants and beneficiaries. Here, the plaintiffs alleged that the fiduciaries invested in hedge funds and private equity to benefit Intel and its venture-capital arm, Intel Capital, at the expense of participants. The district court refused to accept these allegations, instead impermissibly drawing factual inferences in the fiduciaries' favor, not the plaintiffs'. It also held the plaintiffs to the incorrect standard, effectively requiring them to prove that the sole aim of the fiduciaries was to benefit Intel. But that standard—which would be impossible for most ERISA plaintiffs to meet without discovery—conflicts with ERISA's command that

fiduciaries "discharge their duties with an eye single to the interests of the beneficiaries." *See Leigh*, 727 F.2d at 125–26.

**III.** Because the plaintiffs have plausibly stated claims for breach of fiduciary duties under ERISA, this Court should also reverse the district court's dismissal of the plaintiffs' derivative failure-to-monitor and co-fiduciary liability claims.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss de novo. *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1048 (9th Cir. 2012). A motion to dismiss "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Instead, a complaint need only state sufficient factual content that, when accepted as true, "state[s] a claim to relief that is plausible on its face." *Sheppard*, 694 F.3d at 1048. At this stage, this Court must "accept as true all factual allegations in the [c]omplaint and draw all reasonable inferences in favor of the nonmoving party." *Mujica v. AirScan Inc.*, 771 F.3d 580, 589 (9th Cir. 2014).

## ARGUMENT

**I. The district court erred in dismissing the plaintiffs' claims that the Intel fiduciaries breached their duty of prudence by investing billions of dollars of plan assets in hedge funds and private equity.**

When it comes to retirement-plan investments, the duty of prudence encompasses two main duties. *First*, a fiduciary must "exercise prudence in selecting

investments at the outset." *Tibble*, 575 U.S. at 529. *Second*, "separate and apart" from this initial duty, the fiduciary has a "continuing duty to monitor trust investments and remove imprudent ones." *Id.* The plaintiffs here alleged that Intel's fiduciaries violated both of these duties, acting imprudently when (1) deciding, unlike all comparable plans and fund managers, to invest substantial plan assets in hedge funds and private equity, and (2) failing to change the asset-allocation model even as it became clear that the non-traditional investments caused employees hundreds of millions of dollars in retirement-plan losses.

In dismissing the plaintiffs' claims, the district court committed numerous legal errors. It applied a "meaningful benchmark" pleading requirement that has no basis in the statute. It refused to credit the plaintiffs' allegations and draw all factual inferences in their favor, instead choosing to believe the fiduciaries' contrary account of the facts. And, perhaps most importantly, it improperly conflated the fiduciaries' initial duty to prudently choose investments with their continuing duty to prudently monitor those investments. Based on that error, the district court ordered the plaintiffs to complete two impossible tasks: *First*, alleging a "meaningful benchmark" for a brand-new investment strategy with no performance history to compare, and *second*, identifying a benchmark that met the court's own view of "meaningful" even where the plaintiffs' theory of breach was that no prudent investor would have adopted the asset-allocation strategies chosen by the Intel fiduciaries. That approach

finds no support in ERISA's text or purposes, Rule 8's pleading standards, or basic principles of finance. The district court's order should be reversed.

**A.** **The plaintiffs plausibly alleged that the Intel fiduciaries acted imprudently both by initially allocating plan assets to non-traditional investments and by failing remove those investments despite their high costs and poor performance.**

The plaintiffs' specific and detailed allegations are more than enough to state a claim for breach of ERISA's duty of prudence. To determine whether a fiduciary satisfied the prudence standard, this Court must consider "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Wright*, 360 F.3d at 1097; *see also* Restatement (Third) of Trusts § 90 cmt. d, at 299 (explaining that prudent investing "involves obtaining relevant information about such matters as the circumstances and requirements of the trust and its beneficiaries, the contents and resources of the trust estate, and the nature and characteristics of available investment alternatives"). This inquiry is necessarily "context-sensitive" because "the content of the duty of prudence turns on the circumstances . . . prevailing at the time the fiduciary acts." *Dudenhoeffer*, 573 U.S. at 425. And here, the allegations—in the context of what was known at the time about hedge funds and private equity—plausibly demonstrate that the Intel fiduciaries failed to prudently investigate the merits of investment strategy, both at the time of their initial asset-allocation decision and as the funds continued to perform poorly.

This is particularly true because "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). Facts relating to a fiduciary's misconduct "will frequently be in the exclusive possession of the breaching fiduciary." *See id.* Thus, "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009); *see also Sacerdote v. N.Y.U.*, 9 F.4th 95, 107 (2d Cir. 2021); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

So the plaintiffs here need not—and, in fact, cannot without further discovery—make "direct allegations" concerning the process by which the plan was managed and investment decisions were made. *Sacerdote*, 9 F.4th at 107; *see Allen*, 835 F.3d at 678 (explaining that "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story"). In other words, "circumstantial factual allegations" are sufficient, so long as a court can "reasonably infer from what is alleged that the process was flawed" or "that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote*, 9 F.4th at 108.

The plaintiffs' allegations here fully satisfy these pleading standards. First, the plaintiffs allege that, between 2009 and 2011, Intel fiduciaries imprudently adopted an asset-allocation model that disproportionately favored hedge funds, private equity, and other non-traditional investments, even though that approach sharply deviated from the strategies used by professional investment managers of target-date and balanced funds as well as plan fiduciaries for similarly sized defined contribution plans. *See supra* at pps. 13-15. And they allege that the fiduciaries did so despite their own experience with failed hedge fund strategies during the 2008 financial crisis, contemporaneous reports of poor hedge-fund returns, the exorbitant expenses of hedge funds and private equity, and the well-recognized risks of hedge funds and private equity. *See supra* at pps. 10-13. Indeed, at the time of the fiduciaries' allocation decision, a wide array of sources—government publications, investment reports, and financial industry periodicals—had already highlighted the risks and costs of investing in hedge funds and private equity. 3-ER-626, 635, 638–40, 661, 664, 666. Yet the Intel fiduciaries nonetheless chose to subject the participants' retirement assets to these risks and costs, for little benefit.

Second, the plaintiffs allege that the fiduciaries acted imprudently by failing to revise their radical asset-allocation model and refusing to remove the non-traditional investments from the funds' holdings—even as it became evident that they were under-performing cheaper alternatives and the broader market. 3-ER-597–612. They

allege that the fiduciaries' decision to substantially increase investment in hedge funds and private equity caused the expense ratios for both Intel GDF and TDFs to skyrocket far beyond those for comparable funds. 3-ER-586–94.

This ongoing failure to invest plan assets prudently was obvious to other investment experts, one of whom publicly observed that Intel's plans had been "infiltrated by hedge funds" and described Intel's decision to invest heavily in hedge funds as "institutional gambling with employees['] assets." 3-ER-581. Another article commented that Intel had decided to use "expensive, opaque and potentially risky hedge funds in its main 401k investment options[]" and to "forc[e] company contributions into [hedge funds]," thereby "embark[ing], essentially, on an experiment with nearly $14 billion in worker retirement money for more than 63,000 participants." 3-ER-581–82. Given the widespread knowledge of the risks and costs associated with hedge funds and private equity, the plaintiffs have more than alleged that Intel failed to act with the "with the care, skill, prudence, and diligence" of "a prudent man." 29 U.S.C. § 1104(a)(1)(B).

To be sure, it is possible that the fiduciaries may be able to show that—contrary to the prevailing view of investment managers, financial experts, and federal regulators—they were justified in adopting their atypical asset-allocation model. But not at the pleading stage. *See Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019) (finding such argument inappropriate to consider on a motion to dismiss). Rule 8's

"plausibility standard" does not "require an ERISA plaintiff to rule out every possible lawful explanation for the conduct he challenges." *Sacerdote*, 9 F.4th at 108. Indeed, "[t]o do so would invert the principle that the complaint is construed most favorably to the nonmoving party on a motion to dismiss." *Id.* It is for this reason that this Court has not hesitated over the past year to reverse district courts that have flouted this basic principle when it comes to breach-of-fiduciary-duty claims under ERISA—including in cases on which the district court relied. *See, e.g.*, *Kong v. Trader Joe's Co.*, 2022 WL 1125667 (9th Cir. 2022) (reversing dismissal and cautioning that district courts must "draw[] every reasonable inference in favor of Plaintiffs" and take "all the allegations as true"); *Davis v. Salesforce.com, Inc.*, 2022 WL 1055557 (9th Cir. 2022) (same). It should do so here as well.

### B. Nothing in ERISA's text or purposes supports the district court's threshold "meaningful benchmark" pleading requirement.

The district court refused to consider whether the plaintiffs' allegations, if true, plausibly showed that Intel acted imprudently in allocating billions of dollars of plan assets to hedge funds and private equity. Instead, it dismissed the plaintiffs' claims solely because it found that the plaintiffs had not satisfied what it believed to be a threshold requirement for pleading a breach of investment prudence: "meaningful benchmarks." *See* 1-ER60–71. But ERISA does not impose any such requirement. *See*

*Concha*, 62 F.3d at 1502 (finding that a complaint does not need "to allege with particularity the circumstances surrounding the alleged breaches of fiduciary duty").

**1.a.** To start, the district court's threshold pleading requirement has no basis in ERISA's text. *See Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation, as we always say, begins with the text."); *Trs. of Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 774 (9th Cir. 2009) (in interpreting ERISA, this Court "begin[s], as [it] must, with the text of the statute").

The statutory text here says nothing about benchmarks. ERISA's duty of prudence is broadly formulated: Fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). And in fulfilling their duties, fiduciaries are judged not based on what a prudent layperson would have done, but based instead on what a prudent *investor* would have done. *Tibble*, 843 F.3d at 1198 (explaining that this rule requires fiduciaries to "invest and manage trust assets as a prudent investor would"). To act prudently, then, "a fiduciary must 'give[] appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or

36

investment course of action involved.'" *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 473 (4th Cir. 2020) (quoting 29 C.F.R. § 2550.404a-1(b)(1)(i)).

There is nothing in ERISA to suggest that, to show that a fiduciary breached its duty of prudence, an ERISA plaintiff *must*—at the pleading stage—identify specific alternative funds as "benchmarks" to proceed with their claim. To the contrary, as this Court has held, there are a "myriad of circumstances that could violate the [prudence] standard." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1102 (9th Cir. 2008). That's because ERISA's "prudence requirement is a flexible standard," *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008), and so a trustee's breach of that duty is inherently a "fact intensive issue," *Srein v. Frankford Tr. Co.*, 323 F.3d 214, 223 (3d Cir. 2003); *see also Wilson v. Craver*, 994 F.3d 1085, 1092 (9th Cir. 2021). Accordingly, "evaluating the prudence of an investment decision requires a totality-of-the-circumstances inquiry." *Tatum*, 761 F.3d at 360.

A categorical pleading rule is the opposite of a totality-of-the-circumstances inquiry. Yet that is what the district court applied here: It required the plaintiffs to plead "meaningful benchmarks"—without any consideration of the plaintiffs' theory of breach or the particular circumstances here. The district court did not even try to justify its ruling by reference to ERISA's text.

**b.** Nor can the district court's meaningful benchmark requirement be squared with the common law of trusts. Under the common law, it is well-established that

"[n]o fixed formula exists for determining whether a trustee has met the standard of care." George G. Bogert, *The Law of Trusts & Trustees* § 541 (3d ed. 2009). As in ERISA, trust law's traditional "prudent person" standard was flexible and broadly formulated: "A trustee must . . . exercise the care, skill, prudence, and diligence of an ordinarily prudent person engaged in similar business affairs and with objectives similar to those of the trust in question." *See id.* Moreover, to judge whether a trustee's investment decisions in particular are prudent, courts applied a "prudent investor" standard, which likewise requires a trustee to "invest and manage the funds . . . as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust." Restatement (Third) of Trusts § 90.

The common law of trusts thus confirms what ERISA's text already makes clear: The prudence inquiry necessarily involves evaluating a fiduciary's actions against the particular circumstances and context of the plaintiff's claims. Contrary to what the district court believed, it cannot be reduced to a binary categorical rule.

**c.** Finally, the district court's rule would undermine ERISA's central purpose: "to safeguard employees from the abuse and mismanagement of funds." *Morash*, 490 U.S. at 112. ERISA's strict fiduciary standards reflect Congress's "principal[] concern[] with the financial integrity of the plan." *See Varity*, 516 U.S. at 524–25. A categorical benchmark requirement at the pleading stage would paradoxically allow fiduciaries who employ the most radical and untested investment approaches—those

that are likely to pose the *greatest* risks to plans' financial integrity—to escape liability altogether. If accepted, in other words, the district court's rule would "mak[e] it impossible for a plaintiff to state a duty-of-prudence claim" based on a novel, untested asset-allocation approach or investment strategy—"no matter how meritorious." *See Dudenhoffer*, 573 U.S. at 425. That outcome is irreconcilable with ERISA's fundamental purposes.

**2.** This case perfectly illustrates how the district court's approach cannot be reconciled with ERISA. Consider the plaintiffs' claim that Intel's initial allocation of plan assets was imprudent. The plaintiffs allege that the decision to disproportionately invest defined-contribution plan assets in hedge funds and private equity was unusual, if not unparalleled—and that this unusual decision resulted in lower returns and higher costs to plan beneficiaries. The central point of this claim is that this asset-allocation approach differed from those of *all* other similarly situated funds and plans—precisely because no prudent fiduciary "acting in a like capacity familiar with such matters" would have made the same decisions Intel's fiduciaries did "in the conduct of an enterprise of a like character and with like aims." § 1104(a)(1). There are, in other words, *no* meaningful comparators for the fiduciaries' decision. To satisfy the district court's benchmark requirement, the plaintiffs had to allege something that simply didn't exist.

In *Tibble*, the Supreme Court made clear that courts "err[] by applying a statutory bar to a claim of a breach or violation of a fiduciary duty without considering *the nature* of the fiduciary duty." *See Tibble*, 575 U.S. at 528 (emphasis added). But that is exactly what the district court did here: It imposed a "statutory bar" on all ERISA plaintiffs who do not allege sufficiently "meaningful benchmarks" without considering whether that requirement made sense given "the nature" of Intel's breach. Here, the plaintiffs are not alleging that the fiduciaries should have removed their target-date funds and global-diversified fund in favor of other alternative funds that *also* allocated substantial fund assets to hedge funds and private equity—for example, because the alternatives had lower fees or promised greater returns. Their allegations are that the fiduciaries acted imprudently *because* they disproportionately allocated the plans' assets to these non-traditional investments.

To justify its contrary view, the district court relied on two Eighth Circuit decisions that, without any statutory analysis, first articulated the "meaningful benchmark" pleading rule. *See* 1-ER-20 (citing *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 833 (8th Cir. 2018); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020)).

But not even the Eighth Circuit would require the plaintiffs to plead meaningful benchmarks to state a claim. That's because both Eighth Circuit cases imposing a meaningful benchmark requirement involved only "investment-by-

40

investment challenge[s]"—not claims, like those here, that more broadly challenge the fiduciaries' approach to asset allocation and investment strategy. *See Davis*, 960 F.3d at 484.

In *Meiners*, for example, the plaintiffs alleged that Wells Fargo fiduciaries acted imprudently by offering several Wells Fargo target-date funds that cost more and performed worse than one family of target-date funds. *See* 898 F.3d at 821. The Eighth Circuit first explained—without any analysis of ERISA's text—that "[t]o show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark." *Id.* at 822. It then held that Meiners had failed to do so, because he pled only "one" comparable alternative fund—and that fund had "a different investment strategy." *See id.* at 823–24.

The theory of imprudence was the same in *Davis*: The plaintiffs there alleged that their university retirement plan was "just too expensive and offer[ed] too many poorly performing investment options." *Davis*, 960 F.3d at 481. The Eighth Circuit held that the plaintiffs had not plausibly alleged that prudent fiduciaries would have "jettisoned" the "poor performers" because they did not allege that better alternatives—with the *same* investment strategies—existed in the market. *See id.* at 484–87. Notably, however, *Davis* also held that the plaintiffs *had* plausibly alleged a different theory of imprudence: "that fees were too high and that WashU should

have negotiated a better deal." *Id.* at 483. And, when discussing this theory—which didn't involve an "investment-by-investment" challenge—the Eighth Circuit didn't invoke the meaningful benchmark concept at all. *See id.* at 483–84.

Even putting aside their complete absence of statutory analysis, *Meiners* and *Davis* make clear that ERISA imposes no *categorical* meaningful benchmark requirement. In each case, the court must evaluate the allegations in light of the nature of the fiduciary's particular duty and the plaintiff's specific theory of breach. *Meiners*, 898 F.3d at 823–24; *Davis*, 960 F.3d at 484–87. Here, contrary to what the district court believed, when the fiduciaries initially adopted their novel allocation approach, there were no funds with meaningfully "similar aims, risks, and rewards" against which to compare these decisions. 1-ER-23–24; *see* 3-ER-581–82 (describing Intel's investing approach as an "experiment"). So, even if "meaningful benchmarks" might be required when evaluating the performance and cost of given funds on an investment-by-investment basis (and they are not), the district court was wrong to require the plaintiffs to identify such a benchmark for their claims targeting the initial allocation of plan assets. *See, e.g.*, *Stegemann*, 970 F.3d at 483 (holding, without analyzing any benchmarks, that defendants plausibly breached the duty of prudence by imprudently concentrating plan assets in single-security funds); *Toomey v. DeMoulas Super Markets, Inc.*, 2020 WL 3412747, at *3 (D. Mass. Apr. 16, 2020) (finding that plaintiffs stated a claim where they alleged "a series of facts occurring over time

42

regarding both the allocation structure of the investment Plan vis-à-vis the interests of the beneficiaries and the implementation of the Plan that, taken together, plausibly allege a claim of imprudence").

Put differently, the plaintiffs' prudence claims here inherently require a comparison of *different* approaches to asset allocation—namely, investing significant assets in hedge funds and private equity versus not doing so. *See Stegemann*, 907 F.3d at 483 (noting that the plaintiffs "allege that their fiduciaries should have recognized the imprudence of a fund based on the fund's *composition*") (emphasis in original). But the district court entirely barred that kind of analysis by demanding, at the pleading stage, that the plaintiffs allege non-existent benchmarks. If this Court were to affirm that reasoning, it would "insulate from liability every fiduciary who, although imprudent, initially selected" novel or unusual investment strategies, as Intel's fiduciaries did with hedge funds and private equity. *See Sweda*, 923 F.3d at 333–34. "Neither the statute nor [this Court's] precedent justifies such a rule." *See id.*

## C. Even if meaningful benchmarks are required, the plaintiffs plausibly alleged them here.

Even if the district court was correct that meaningful benchmarks are required, its analysis was wrong. As directed by the district court, the plaintiffs amended their complaint to allege that the asset-allocation choices and performance of numerous other funds, plans, and market indices—all of which are commonly used as benchmarks by investment managers and retirement-plan fiduciaries—

showed that Intel fiduciaries imprudently invested the plans' assets. Rather than accept the complaint's allegations, however, the district court engaged in a detailed comparison of the proposed benchmarks that construed the facts and drew inferences in favor of Intel, not the plaintiffs. That was reversible error. As most courts have recognized, determining whether a benchmark is sufficiently "meaningful" is a holistic and highly fact-specific inquiry that necessarily turns on the evidence. The district court therefore should have denied Intel's motion to dismiss and allowed the parties to proceed to discovery.

**1.** As an initial matter, the plaintiffs alleged that Intel's funds were more costly than and underperformed the very funds and indices against which the Intel fiduciaries compared their plans. As the complaint alleged, the Intel fiduciaries expressly announced to plan participants that they considered the Morningstar MSCI World Index and two Morningstar "peer-group categories" ("World Allocation" and "Balanced/Hybrid Funds-International/Growth") as benchmarks for its global diversified fund. 3-ER-606–07. And the Intel fiduciaries also "commissioned Morningstar to prepare fact sheets for investment offerings in Intel's retirement contribution plans, in which Morningstar compared the Intel [target-date funds], for example, to Morningstar [target-date fund] categories." 3-ER-583.

These allegations should have been enough, standing alone, to demonstrate meaningful benchmarks sufficient to overcome the fiduciaries' motion to dismiss.

Numerous courts have found that plaintiffs plausibly state a claim for breach of fiduciary duty when they allege that a plan underperforms the "very benchmarks that [the] [d]efendants themselves selected for comparison." *See Becker v. Wells Fargo & Co.*, 2021 WL 1909632, at *5 (D. Minn. May 12, 2021); *see also*, *e.g.*, *Karpik v. Huntington Bancshares Inc.*, 2019 WL 7482134, at *5 n.9 (S.D. Ohio Sept. 26, 2019) (noting that, "unlike in *Meiners*, Plaintiffs did not cherry-pick a fund to demonstrate underperformance; rather, Plaintiffs compared each fund to the benchmark listed in that fund's prospectus, which Defendants chose"); *Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 780–81 (N.D. Cal. 2019) (sustaining fiduciary duty claims that compared the plan's funds to the "benchmark indices" and other similar funds); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1076 (N.D. Cal. 2017) (holding the complaint drew "a plausible inference that the Defendants' decision-making process was flawed" where the plaintiff alleged that "almost all of the investment options . . . underperformed compared to their benchmark"). Yet the district court here refused to credit the plaintiffs' allegations comparing the Intel funds' performance to the plan-disclosure benchmarks.

**2.** Aside from the plans' benchmarks, the plaintiffs alleged dozens of other plausible comparators for the Intel funds, including published indices by major firms like S&P and Dow Jones, peer groups such as the categories established by Morningstar, Inc., and specific prominent peer funds in the given asset class. 3-ER-

583; *see also* 3-ER-583–85, 603–07, 611. The complaint alleged that these are "common benchmarks" used by investment managers and retirement-plan fiduciaries when evaluating the performance of their own funds. 3-ER-583–85. And the complaint provided extensive detail about how the alleged benchmarks compared to Intel's funds with respect to asset-allocation strategies, investment style, total size, etc. *See, e.g.*, 3-ER-583–85, 603–07, 611. The plaintiffs also alleged that the fiduciaries' investment decisions could be benchmarked against those of fiduciaries for sixteen of the most similarly situated defined-contribution plans in the country. 3-ER-595.

Instead of crediting the plaintiffs' allegations about these benchmarks—as it was required to do at the pleading stage—the district court went one-by-one through the benchmarks and evaluated whether, in its own opinion, each benchmark was sufficiently "meaningful." *See* 1-ER-22–31. In doing so, the district court improperly strayed into the merits of the claims.

For example, the district court rejected the plaintiffs' allegations that other target-date funds were appropriate benchmarks for Intel's target-date fund, finding that the "peer" funds that the plaintiffs alleged to be benchmarks were not similar *enough* to Intel's plan. But that finding——based on nothing more than the court's own say-so——was directly contrary to the complaint's allegations. The plaintiffs specifically alleged that these funds shared "common goals and features." 3-ER-581. They are all "long-term investment vehicle[s] designed for employee-participants

46

who do not want themselves to actively manage their retirement savings"; they combine "asset classes, including at least publicly traded equity, fixed income securities and cash"; they utilize "a 'glidepath' that specifies a defined, automatic decline in equity exposure . . . as the targeted retirement date approaches; and they offer "moderate risk," as required by federal regulations. *Id.* Nevertheless, the court hypothesized that peer target-date funds "could all have differing aims, risks, and rewards than the Intel TDFs." 1-ER-24. That is precisely the opposite of what a court is supposed to do at the pleading stage: "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Moreno v. UtiliQuest, LLC*, 29 F.4th 567, 573 (9th Cir. 2022).

The district court committed the same basic error with respect to the plaintiffs' other allegations concerning benchmarks. The plaintiffs alleged, for example, that experienced investors commonly use Morningstar's "peer group" categories as benchmarks. Indeed, the Intel fiduciaries "commissioned Morningstar to prepare fact sheets for investment offerings in Intel's retirement contribution plans, in which Morningstar compared the Intel TDFs, for example, to Morningstar TDF categories." 3-ER-583; *see also* 3-ER-584 (explaining how funds within each category "share common attributes"). For this reason, institutional investors and retirement-plan fiduciaries, including Intel's, commonly use Morningstar peer funds to benchmark their funds. 3-ER-583; *see also, e.g.*, *Dover v. Yanfeng US Auto. Interior Sys. I*

*LLC*, 563 F. Supp. 3d 678, 688 (E.D. Mich. 2021) (noting that parties in ERISA actions "routinely reference [Morningstar] indexes, or expert testimony that cites these indexes, to allege a breach of duty"); *Snyder v. UnitedHealth Grp., Inc.*, 2021 WL 5745852, at *4 (D. Minn. Dec. 2, 2021) (finding that "Morningstar Comparators constitute meaningful benchmarks because they fall within the same universe, and incorporate similar purposes, asset allocations, and risk exposure as the Wells Fargo TDFs").

Yet, disregarding these plausible allegations, the district court concluded—again, based only on its own view of what was necessary to meaningfully benchmark investment funds—that "average[s] of a large group of funds" are "inappropriate benchmarks." 1-ER-25; *see* 1-ER-26–27. In doing so, the court "invert[ed] the principle that the complaint is construed most favorably to the nonmoving party on a motion to dismiss." *Sacerdote*, 9 F.4th at 108.

**3.** More fundamentally, the district court's detailed comparison of benchmarks was inappropriate for the pleading stage. Instead of employing a "holistic approach," as required under ERISA, the court "parsed" the complaint "piece by piece to determine whether each allegation, in isolation, [wa]s plausible." *See Sweda*, 923 F.3d at 331. And, even worse, the district court evaluated whether the risks, aims, and strategies of a wide range of investment funds—much of which are not public knowledge or otherwise accessible to an ERISA plaintiff without

48

discovery—were sufficiently "similar" to the Intel funds without evidence or factual development.

No authority supports this approach. Even those district courts that apply the atextual meaningful-benchmark requirement routinely conclude that the inquiry cannot be "properly resolved at the motion to dismiss stage." *In re MedStar ERISA Litig.*, 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021); *see Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017) (noting that "defendants' argument that plaintiffs used inappropriate benchmarks to assess the performance of the challenged options raises factual questions that are not properly addressed on a motion to dismiss"); *see also, e.g.*, *In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *6 (C.D. Cal. July 16, 2021); *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 2022 WL 4368188, at *7 (M.D.N.C. Sept. 21, 2022); *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021); *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *8 (N.D. Cal. Nov. 16, 2021); *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021). This conclusion reflects a basic rule of civil procedure: "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Departing from this consensus, however, the district court placed its own view of how investments should be compared above the plaintiffs' plausible allegations

(and investment experts' views) about how benchmarking should be conducted. In doing so, the district court "engaged in impermissible factfinding at the pleadings stage" and "failed to draw all reasonable inferences in favor of Plaintiff." *See Porteous v. Cap. One Servs. II, LLC*, 809 F. App'x 354, 356–57 (9th Cir. 2020); *see also In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). Thus, even if ERISA does require plaintiffs to allege meaningful benchmarks (and it does not), the district court's misapplication of Rule 8's pleading standard on its own compels reversal.

## II. The plaintiffs plausibly alleged that the Intel fiduciaries breached their fiduciary duty of loyalty by making investments that benefitted their venture-capital arm, Intel Capital, at the expense of plan participants.

The Intel fiduciaries' decision to allocate billions of dollars of assets to costly and poorly performing hedge funds and private equity is difficult, if not impossible, to justify from the vantage point of plan beneficiaries. But the plaintiffs allege that this unusual allocation decision did serve the interests of someone else: Intel.

**1.** ERISA's duty of loyalty requires fiduciaries' investment decisions to be made with an "eye single" to the interests of participants and beneficiaries. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). This statutory command "is unequivocal: fiduciaries must act '*solely in the interest* of the participants and beneficiaries' and '*for the exclusive purpose* of providing benefits to participants and their beneficiaries.'" *Pilkington*, 72 F.3d at 1401 (emphasis in original). That is so even when the fiduciary also serves as a corporate officer or executive: Such a person must "wear only one hat at a time, and

50

wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. "[T]he most fundamental duty of a" fiduciary, the Supreme Court has explained, "is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224.

The plaintiffs plausibly alleged that the Intel fiduciaries breached this fundamental duty. Specifically, they alleged that the fiduciaries increased their retirement-plan allocations to hedge funds and private-equity funds to help Intel's corporate venture-capital division, Intel Capital. 3-ER-647–53. Intel's retirement-plan investments, the plaintiffs alleged, gave the hedge funds and private-equity funds more capital to co-invest in startup companies that Intel Capital had already invested in—benefitting Intel Capital both by increasing the value and by reducing the risk of its investments. 3-ER-647–52. And these additional investments also advanced Intel's core business interests as well, since Intel Capital's portfolio companies are often "in businesses that complimented Intel's business." 3-ER-651.

In addition to these business entanglements, the plaintiffs alleged that some plan fiduciaries held conflicting loyalties. Arvind Sodhani, a member of Intel's retirement-plan investment committee, also served as Intel Capital's president for nearly a decade—and therefore was responsible for ensuring that Intel Capital's startup investments succeeded. Ravi Jacob, another member of the investment

committee, similarly wore "two hats"—as plan fiduciary and as Intel's Corporate Vice President Treasurer generally responsible for the company's external investments (including through Intel Capital). 3-ER-648, 652. And several other investment committee members, including Christopher Geczy and David Pottruck, have significant experience working in the hedge-fund, private-equity, and venture-capital industries. 3-ER-552.

These allegations of conflicting business and individual interests—combined with the allegations that the fiduciaries imprudently allocated disproportionate plan assets to costly and poorly performing non-traditional investments—plausibly show that the fiduciaries' allocation decision "benefited Intel and Intel Capital and prioritized their interest over those of the participants." 3-ER-652. Indeed, as the district court acknowledged, courts have repeatedly found similar allegations to be enough to state a claim under ERISA. *See* 1-ER-64–65 (citing cases).[5]

---

[5] *See, e.g.*, *Braden*, 588 F.3d at 596 (allegations that expensive and poorly-performing investment funds were included to "benefit the trustee at the expense of the participants" sufficient); *Miller v. Astellas US LLC*, 2021 WL 1387948, at *6 (N.D. Ill. Apr. 13, 2021) (allegations that defendant received indirect benefits "through the receipt of hundreds of millions of dollars in Plan assets as 'seed money' for [defendant's] investment management business" sufficient); *Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *10 (D. Minn. Nov. 20, 2012) (allegations that defendant selected certain investment funds "to seed new and untested affiliated mutual funds, which made those funds more marketable to outside investors" and "to benefit themselves at the expense of participants" sufficient); *Cryer v. Franklin Templeton Res.*,

**2.** In dismissing the plaintiffs' loyalty claims, the district court committed two critical errors, each of which independently require reversal.

*First*, as with the prudence claims, the district court refused to credit the plaintiffs' allegations and impermissibly drew factual inferences in favor of the fiduciaries. For example, it found that the plaintiffs' complaint "merely show[ed] that Intel Capital and some investment companies happened to invest in similar startups." 1-ER-36. But that simply disregarded the plaintiffs' detailed allegations that Intel invested in these investment companies (hedge funds and private equity) to reduce its own risk and increase the value of Intel Capital's investments. 3-ER-647–53. The court also faulted the plaintiffs for "never alleg[ing] that the Investment Committee had any influence over any investment firm's decision to invest in one of the startups in which Intel invested." 1-ER-35. But the question is not whether the investment committee influenced Intel Capital's investment decisions; rather, it is whether the senior Intel officers responsible for Intel Capital's success influenced the plans' investments through the investment committee on which they sat.

On this, the district court again just refused to draw the inference in favor of the plaintiffs, who alleged that Intel invested billions of dollars in multiple rounds

---

2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017) (allegations that plan fiduciaries invested in higher-cost, lower-performing investments, and that investment decisions were made in order to allow defendant to collect excessive administrative and investment fees sufficient).

over many years in these firms, which were undoubtedly aware that their investment in Intel Capital portfolio companies would help Intel. And the court further stated that "[t]he mere fact that Intel Capital invested in a tiny percentage of the same companies that also received investments from private equity funds that the Intel Funds invested in is not sufficient to plausibly allege a real conflict of interest." *Id.* This statement not only refused to credit the plaintiffs' allegations; it recited facts— "a tiny percentage"—that are nowhere to be found in the complaint. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (noting that "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)").[6] In sum, "[b]y assessing [Intel's] state of mind, and finding [the plaintiffs'] claim of improper motivation 'unlikely,' the district court improperly resolved a contested issue of fact" at the pleading stage. *See Pilkington*, 72 F.3d at 1402. That was inappropriate.

*Second*, the district court held the plaintiffs to the incorrect legal standard. In its view, to state a claim for breach of the duty of loyalty, the plaintiffs had to show that "*the aim* of the Investment Committee's investment in private equity and hedge funds was to aid Intel Capital and its venture capital investments." 1-ER-35 (emphasis

---

[6] The district court did not explain its basis for finding that only a "tiny percentage" of Intel Capital's portfolio companies also received investments from hedge funds and private equity in which Intel plans had invested. In their first motion to dismiss, the Intel fiduciaries asserted that these investments "amount[ed] to a tiny fraction" of the companies in which Intel Capital had invested. ECF 99, at 20.

added). The plaintiffs' burden at the pleading stage, in other words, was to show that Intel "engaged in self-dealing"—that it "received a direct benefit from the investment of the Intel Funds into private equity and hedge funds." 1-ER-37.

That's just wrong. As detailed above, ERISA's duty of loyalty—among the "highest known to the law"—strictly requires that fiduciaries' decisions be made *solely* and *exclusively* to benefit plan participants and beneficiaries. *Howard*, 100 F.3d at 1488; *see* 29 U.S.C. § 1104(a)(1)(A). ERISA fiduciaries therefore cannot make investment decisions even *in part* to benefit themselves, their company, or third parties. *See Leigh*, 727 F.2d at 125. Rather, those "decisions must be made with an eye single to the interests of the participants and beneficiaries." *Donovan*, 680 F.2d at 271; *see Tussey v. ABB, Inc.*, 850 F.3d 951, 958 (8th Cir. 2017) ("A fiduciary can . . . breach its duties by acting on improper motives, even if one acting for the right reasons might have ended up in the same place."). For that reason, "[m]any forms of conduct permissible in a workaday world for those acting at arm's length [] are forbidden to those bound by fiduciary ties." *Meinhard*, 164 N.E. at 546; *cf.*, *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1468 (9th Cir. 1995) ("Corporations should not be permitted to rely on their ERISA plan assets to finance takeovers or other risk ventures.").

Yet the district court turned this standard on its end: To state a claim, it held, the plaintiffs had to show that the fiduciaries' primary (or even exclusive) "aim" was to benefit itself and Intel Capital. 1-ER-35–37. Outside of brazen acts of self-dealing,

this standard would make it almost impossible for ERISA plaintiffs to state a loyalty-based claim. As discussed, "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," *Braden*, 588 F.3d at 598, because the facts relating to a fiduciary's intent and misconduct "will frequently be in the exclusive possession of the breaching fiduciary," *Concha*, 62 F.3d at 1503. Indeed, here, the district court did not explain how the plaintiffs could ever allege, without discovery, the actual "aim" of the Intel fiduciaries' investment decisions.

Nor was the district court correct that dismissal was warranted because the plaintiffs alleged that Intel was indirectly or potentially benefitted by its investment in hedge funds and private equity. 1-ER-37. Indeed, "[w]here the potential for conflicts is substantial, it may be virtually impossible for fiduciaries to discharge their duties with an eye single to the interests of the beneficiaries, and the fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests." *Leigh*, 727 F.3d at 125. At the very least, "[w]here it might be possible to question the fiduciaries' loyalty, they are obliged . . . to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *See id.* at 126–27; *see also Pilkington*, 72 F.3d at 1402.

The plaintiffs alleged that, because Intel's investments in hedge funds and private equity had the potential to benefit the company at the expense of participants and because those in a position to most influence the plan's investment decisions were the same people who ran Intel Capital, the fiduciaries should have undertaken a particularly intensive investigation into the merits of allocating disproportionate plan assets to these non-traditional investments. Based on the allegations, it is plausible to infer that they did *not* undertake such an investigation. In fact, the costs and risks of such an investment approach were so widely known that very few comparable plans or funds invested *anything* in hedge funds and private equity, and *none* allocated anything close to the same amount of assets as Intel did. Yet Intel's fiduciaries just doubled down on their asset-allocation approach even as it became clear that their investments were underperforming alternative options while charging higher prices. At the same time, the plaintiffs allege, these investments had the potential to—and did in fact—benefit Intel by allowing Intel Capital to invest in technology startups more effectively and with reduced risk.

In sum, the Intel "fiduciaries' actions . . . when taken together and viewed in context, shed light on their motivations," and tend "to suggest [they] did what they did not because they thought it was best for the plans, but because they wanted to get a better deal for" Intel. *See Tussey*, 850 F.3d at 957–58 (agreeing that "there [were] too many coincidences to make the beneficial outcome for [the defendant]

serendipitous, particularly considering the powerful draw of self-interest when transactions are occurring out of sight and are unlikely to ever be discovered"). In refusing to take the plaintiffs' allegations together and to view them contextually, the district court committed reversible error.

## III. The district court's dismissal of the plaintiffs' failure-to-monitor and co-fiduciary liability claims should be reversed.

In addition to their claims for breach of the duties of prudence and loyalty, the plaintiffs brought several additional claims. As relevant here, they alleged that Intel's Finance Committee and Chief Financial Officer—the Intel entities responsible for appointing the Investment Committee—failed to properly monitor and supervise the Investment Committee's investment activities. 4-ER-699–705. And they also alleged a claim for co-fiduciary liability against all defendants under 29 U.S.C. § 1105(a), which makes any fiduciary "liable for a breach of fiduciary responsibility of another fiduciary."

The district court dismissed the claims solely based on its determination that the plaintiffs "failed to state an underlying ERISA violation." 1-ER-42–43. Because, for the reasons above, the plaintiffs have sufficiently alleged that Intel breached ERISA's fiduciary duties of prudence and loyalty, the district court's dismissal of the plaintiffs' derivative claims should also be reversed.

## CONCLUSION

The district court's order granting Intel's motion to dismiss should be reversed.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street
Suite 1250
San Francisco, CA 94111
(415) 573-0336

R. JOSEPH BARTON
BARTON & DOWNES, LLP
1633 Connecticut Avenue NW
Suite 200
Washington, DC 20009
(202) 734-5458

GREGORY Y. PORTER
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
(202) 463-2101

JOSEPH CREITZ
CREITZ & SEREBIN LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
(415) 269-3675

February 7, 2023                    *Counsel for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16268

I am the attorney or self-represented party.

**This brief contains** | 13,506 | **words,** including | 116 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Matthew W.H. Wessler | **Date** | 2/8/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*