No. 22-16268

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

## WINSTON ANDERSON, et al.,
*Plaintiffs-Appellants,*

*v.*

## INTEL CORPORATION INVESTMENT POLICY COMMITTEE, et al.,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
CASE NO. 3:19-CV-04618 (HON. LUCY KOH / HON. VINCE CHHABRIA)

---

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES

---

SCOTT P. COOPER
PROSKAUER ROSE LLP
  *2049 Century Park East, Ste. 3200*
  *Los Angeles, CA 90067*
  *(310) 557-2900*

MYRON D. RUMELD
PROSKAUER ROSE LLP
  *Eleven Times Square*
  *New York, NY 10036*
  *(212) 969-3000*

DANIEL F. KATZ
DAVID S. KURTZER-ELLENBOGEN
JULI ANN LUND
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*

*COUNSEL FOR DEFENDANTS-APPELLEES*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ................................................... 6

STATEMENT OF THE ISSUES ........................................................ 6

STATUTES AND REGULATIONS ................................................... 7

STATEMENT OF THE CASE ........................................................... 7

    A.    Factual Background ................................................................. 7

        1.    The Intel Plans and Intel Funds ................................ 7

        2.    The Intel Funds' Risk-Mitigation Strategy and Asset
            Allocation .................................................................. 8

        3.    Hedge Funds and Private Equity in ERISA-Governed
            Plans .......................................................................... 9

        4.    The Real-World Risk Mitigation of Hedge Funds ... 11

        5.    The Intel Funds' Performance ................................. 12

    B.    Procedural Background .......................................................... 13

        1.    The Parties ................................................................ 13

        2.    The Three Consolidated Cases ................................. 14

        3.    The June 2020 Consolidated Complaint ................. 14

        4.    The First Dismissal Order ....................................... 16

        5.    The Amended Consolidated Complaint .................... 19

        6.    The Second Dismissal Order .................................... 21

i

SUMMARY OF THE ARGUMENT ......................................................24

STANDARD OF REVIEW .................................................................27

ARGUMENT .....................................................................................28

I.    THE COURT SHOULD AFFIRM THE DISMISSAL OF
PLAINTIFFS' IMPRUDENCE CLAIMS. ..................................28

    A.    Plaintiffs Waived Their Challenge to the Meaningful
Benchmark Requirement by Not Raising That Challenge
Below.................................................................................29

    B.    The District Court Did Not Err in Requiring Plaintiffs To Plead
a Meaningful Benchmark. ..................................................30

        1.    The Meaningful Benchmark Requirement Accords with
ERISA's Text and Is Backed by a Broad and Growing
Consensus........................................................................30

        2.    The District Court Appropriately Required a Meaningful
Benchmark at the Pleadings Stage.............................34

        3.    The District Court Did Not Ask the Impossible. .....................40

    C.    Plaintiffs Cannot Circumvent the Meaningful Benchmark
Requirement with Generalized Claims About the Intel Funds'
Asset Allocations...............................................................41

        1.    ERISA Does Not Permit *Per Se* Challenges...........................41

        2.    The Intel Fund's Deviation from the "Prevailing View"
About Asset Allocation Does Not State a Claim......................46

        3.    Plaintiffs' Preference for a Riskier Allocation Strategy
Does Not State a Claim.............................................49

    D.    The District Court Correctly Concluded That Plaintiffs'
Proposed Comparators Are Not Meaningful Benchmarks. ...............50

II.     THE COURT SHOULD AFFIRM THE DISMISSAL OF
        PLAINTIFFS' DISLOYALTY CLAIMS. ......................................................54

III.    THE COURT SHOULD AFFIRM THE DISMISSAL OF
        PLAINTIFFS' DERIVATIVE CLAIMS. .....................................................58

CONCLUSION ......................................................................................................59

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Abogados v. AT&T, Inc.*, 223 F.3d 932 (9th Cir. 2000) ..........................................29

*Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022) ...................................*passim*

*Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014)...............................................29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................27, 35

*Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765 (N.D. Cal. 2019)..............................................................................................................51

*Barchock v. CVS Health Corp.*, 2017 WL 9324762 (D.R.I. Jan. 31, 2017), *aff'd*, 886 F.3d 43 (1st Cir. 2018) ..............................................................31, 50

*Barchock v. CVS Health Corp.*, 886 F.3d 43 (1st Cir. 2018) .................................47

*Becker v. Wells Fargo & Co.*, 2021 WL 1909632 (D. Minn. May 12, 2021).........51

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).................................27, 32, 35, 36

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009)............36, 38, 39, 58

*Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036 (9th Cir. 2001)..................................................................................................45

*Coyne & Delany Co. v. Selman*, 98 F.3d 1457 (4th Cir. 1996) ..............................59

*Cryer v. Franklin Templeton Res., Inc.*, 2017 WL 818788 (N.D. Cal. Jan. 17, 2017) ..................................................................................................................58

*Cunningham v. Cornell Univ.*, 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017).......38

*Davis v. Salesforce.com, Inc.*, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) ......*passim*

*Davis v. Washington Univ. in St. Louis*, 960 F.3d 478 (8th Cir. 2020).......32, 35, 39

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457 (7th Cir. 1990) ...................................................................................................30, 47

*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982)...............................................56

iv

*Dover v. Yanfeng US Automotive Interior Systems I LLC*, 563 F. Supp. 3d 678 (E.D. Mich. 2021) .........................................................................54

*Ebner v. Fresh, Inc.*, 838 F.3d 958 (9th Cir. 2016) ..................................28

*Evans v. Associated Banc-Corp*, 2022 WL 4638092 (E.D. Wis. Sept. 30, 2022) ...................................................................................................34

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) .......................10, 24, 33

*Forman v. TriHealth, Inc.*, 40 F.4th 443 (6th Cir. 2022).........................39

*Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008) ..........27

*Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 2022 WL 4368188 (M.D.N.C. Sept. 21, 2022).................................................................38

*Gonzalez v. Northwell Health, Inc.*, 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022) ...................................................................................................34

*Halperin v. Richards*, 7 F.4th 534 (7th Cir. 2021) ..................................56

*Hughes v. Nw. Univ.*, 142 S. Ct. 737 (2022)....................................6, 24, 27

*Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023) ..............................32, 35, 36, 39

*In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331 (D. Mass. July 22, 2021).......37

*In re Calpine Corp. ERISA Litig.*, 2005 WL 1431506 (N.D. Cal. Mar. 31, 2005) ...................................................................................................59

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir. 2013) ...............35

*In re LinkedIn ERISA Litig.*, 2021 WL 5331448 (N.D. Cal. Nov. 16, 2021)..........37

*In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812 (N.D. Cal. 2005) ...................................................................................................59

*In re MedStar ERISA Litig.*, 2021 WL 391701 (D. Md. Feb. 4, 2021) ..................37

*In re Omnicom ERISA Litig.*, 2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021)..........37

*In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649 (C.D. Cal. July 16, 2021) ...................................................................................................37

*Jones v. DISH Network Corp.*, 2023 WL 2644081 (D. Colo. Mar. 27, 2023) ........34

*Karpik v. Huntington Bancshares Inc.*, 2019 WL 7482134 (S.D. Ohio Sept. 26, 2019) ...................................................................................................51

*Kayes v. Pac. Lumber Co.*, 51 F.3d 1449 (9th Cir. 1995) ......................................58

*Kendall v. Pharm. Prod. Dev., LLC*, 2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) ..................................................................................................34

*Kong v. Trader Joe's Co.*, 2022 WL 1125667 (9th Cir. Apr. 15, 2022) .....34, 38, 39

*Kopp v. Klein*, 894 F.3d 214 (5th Cir. 2018) (per curiam) .....................................55

*Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) ..................................................................................................58

*Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185 (D. Colo. 2021) ...................................34

*Laborers Nat'l Pension Fund v. N. Tr. Quantitative Advisors, Inc.*, 173 F.3d 313 (5th Cir. 1999) ..............................................................................45

*Locascio v. Fluor Corp.*, 2023 WL 320000 (N.D. Tex. Jan. 18, 2023) ............34, 50

*Matney v. Barrick Gold of N. Am., Inc.*, 2022 WL 1186532 (D. Utah Apr. 21, 2022) ..................................................................................................34

*Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022) ............*passim*

*Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018).........................*passim*

*Miller v. Astellas US LLC*, 2021 WL 1387948 (N.D. Ill. Apr. 13, 2021) ..............58

*Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293 (D. Minn. 2021).................34

*Pegram v. Herdrich*, 530 U.S. 211 (2000)..............................................................56

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ...............................................................................30, 42, 43, 45

*Pilkington PLC v. Perelman*, 72 F.3d 1396 (9th Cir. 1995)...................................58

*Ramos v. Banner Health*, 461 F. Supp. 3d 1067 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) ..............................................................56

*Sacerdote v. NYU*, 9 F.4th 95 (2d Cir. 2021).......................................38, 39

*Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190 (5th Cir. 2020) ....................................................................................................49

*Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022)...................*passim*

*Snyder v. UnitedHealth Grp., Inc.*, 2021 WL 5745852 (D. Minn. Dec. 2, 2021) ....................................................................................................53

*Stegemann v. Gannett Co.*, 970 F.3d 465 (4th Cir. 2020) ..........................43, 44, 45

*Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019)..........................................38, 39

*Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057 (N.D. Cal. 2017)...........................51

*Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015) ..............................................................38

*Toomey v. DeMoulas Super Mkts., Inc.*, 2020 WL 3412747 (D. Mass. Apr. 16, 2020) .............................................................................................41

*Tullgren v. Hamilton*, 2023 WL 2307615 (E.D. Va. Mar. 1, 2023) .......................34

*United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010) ...........................................57

*Wehner v. Genentech, Inc.*, 2021 WL 2417098 (N.D. Cal. June 14, 2021) ...........34

*White v. Chevron Corp.*, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016)...............31

*White v. Chevron Corp.*, 2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018)....................................................49

*White v. Chevron Corp.*, 752 F. App'x 453 (9th Cir. 2018)..........................*passim*

*Wilcox v. Georgetown Univ.*, 2019 WL 132281 (D.D.C. Jan. 8, 2019) .................35

*Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004).................*passim*

## STATUTES AND REGULATIONS

29 C.F.R. § 2510.3-101 ...........................................................................10

29 C.F.R. § 2550.404a-1(b)(1)–(2) (2018) ............................................................45

29 U.S.C. § 1104(a)(1)(B) ................................................................*passim*

## OTHER AUTHORITIES

Restatement (Third) of Trusts § 90 cmt. e(1) (Am. L. Inst. 2007) ..........................46

**INTRODUCTION**

Following the market crash of 2008, when some equity-heavy funds lost nearly half their value, the fiduciaries for two Intel retirement plans (the "Plans") implemented a risk-mitigation strategy, seeking reduced volatility and stable risk-adjusted returns that would better cushion participants against the risk of precipitous market drops. To implement this strategy, the fiduciaries created customized, broadly diversified portfolios that included not only stocks and bonds (as in retail funds such as those offered by Vanguard), but also hedge fund and private equity investments (as are common in defined benefit plans, college endowments, and institutional investment products). They recognized—and repeatedly disclosed—that their risk-mitigation strategy would deliver lower returns during a bull market than equity-heavy funds, and would carry the higher fees typically charged for actively-managed investments. Plaintiffs now seek to hold the fiduciaries liable for that strategy.

Notably, while conceding that the Intel Funds at issue (the Global Diversified Fund or "GDF," and Target Date Funds or "TDFs") made money, Plaintiffs complain that they did not make *as much* money during an unprecedented bull market as certain equity-heavy off-the-shelf funds. But nothing in ERISA required the fiduciaries to adopt Plaintiffs' preferred strategy in which bull-market retirees would hit a home run, while market-crash retirees would suffer large losses in their

retirement portfolios. Thus, the district court (Koh, J.) correctly rejected Plaintiffs' contention that the Intel fiduciaries "never should have pursued a risk mitigation strategy at all" but rather should have adopted "a *riskier* strategy that could provide more returns."[1] 1-ER-30. As the district court correctly held, "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns." *Id.*

Added to that, in contending that an inference of imprudence is available because of the underperformance or cost of the Intel Funds, Plaintiffs' own allegations established that they were comparing apples and oranges by evaluating the Intel Funds against "funds with different aims, risks, and potential rewards." 1-ER-26. All three circuit courts to have considered the question have held that such comparisons require a "meaningful benchmark," and have affirmed the dismissal of claims based on inapposite comparisons such as those Plaintiffs propose here. *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166-67 (6th Cir. 2022); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018). This Court, too, repeatedly has affirmed the dismissal of claims resting on inapt comparisons of funds with different strategies or

---

[1] Unless noted, emphases are added, quotations are cleaned up, and internal citations are omitted.

management styles.  *White v. Chevron Corp.*, 752 F. App'x 453, 455 (9th Cir. 2018);

*Davis v. Salesforce.com, Inc.*, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022).

The district court directed Plaintiffs to identify a meaningful benchmark if they wanted to pursue claims grounded in alleged underperformance or excessive fees, and dismissed Plaintiffs' claims when they failed to do so.  1-ER-20–21, 26, 28.  Plaintiffs now say that the test they accepted (but failed) in the district court is not required in the first place.  They also say that the test they told the district court they had satisfied was actually impossible, as no prudent ERISA fiduciary would adopt the approach taken by these fiduciaries given certain inherent risks of hedge funds and private equity (such as liquidity or transparency risks).  Plaintiffs assert that more than a *de minimis* investment in hedge funds and private equity is essentially imprudent *per se* under ERISA.  Finally, Plaintiffs return to the argument they pressed below:  that they *did* allege meaningful benchmarks by comparing the funds here to equity-heavy retail funds or to aggregated indices.  They accuse the district court of engaging in "impermissible factfinding" in ruling otherwise.  OB 49; *see also* OB 35.

Plaintiffs' challenges go nowhere.  By failing to raise the issue below, they waived any argument against the existence of a baseline requirement that they articulate a "meaningful benchmark" for their performance and fee comparisons.  Even if this Court considers Plaintiffs' newly-minted challenge to that requirement,

3

the Court should affirm. The requirement is consistent with ERISA's text, which grounds the duty of prudence in "the conduct of an enterprise *of a like character and with like aims*." 29 U.S.C. § 1104(a)(1)(B). Otherwise, ERISA plaintiffs could compare the performance of any target date fund to *any other* target date fund, or of any balanced fund to *any other* balanced fund, and proceed to trial on the premise that all such funds are comparable, regardless of their different goals and strategies.

Moreover, pleading a "meaningful benchmark" was not an impossible task. There is nothing novel about risk mitigation. Plaintiffs argue that the Intel Funds were purportedly unique, but that allegation refers not to the Funds' *strategy*, but rather to their *asset allocation*. Even then, Plaintiffs' own allegations and incorporated sources undermine their assertions, confirming both that risk mitigation is a common objective (and that the fiduciaries' allocation mitigated risk better than Plaintiffs' proposed allocation), and that many ERISA plans subject to the same fiduciary duties as the Intel Plans dedicate substantial allocations to the same "non-traditional" asset categories at issue here. As the district court correctly concluded, Plaintiffs' challenges—both to the Funds' risk-mitigation strategy and to the asset allocation used to implement that strategy—fail to state a claim. 1-ER-30–31, 62–63.

Nor did the district court engage in "impermissible factfinding." Many courts—including this Court—have embraced the commonsense conclusion that

4

merely comparing the performance or fees of two funds does not plausibly allege imprudence. *See, e.g.*, 1-ER-19; *White*, 752 F. App'x at 455. Otherwise, duty of prudence claims would be trivial to plead. Hindsight will always reveal better-performing or cheaper alternatives. As many other courts have done, the district court here correctly dismissed Plaintiffs' claims on the pleadings because Plaintiffs' purported comparators did not have similar aims, risks, and potential benefits as the Intel Funds, *see, e.g.*, 1-ER-27. Beyond that, certain allegations affirmatively precluded any such inference. For example, the GDF "outperformed 80% of the largest funds *that Plaintiffs claim are benchmarks*." *Id.*

The district court also correctly held that Plaintiffs failed to plead any plausible allegations of disloyalty. Plaintiffs allege only that Intel Capital (Intel's venture capital subsidiary) and various independent investment companies in whose funds the Plans invested happened to see value in a small set of overlapping opportunities. 1-ER-35–36. Plaintiffs contend that this unremarkable overlap suffices for an inference of disloyalty because two fiduciaries were involved in investment decisions for both Intel and the retirement plans. But Plaintiffs alleged nothing to connect any investment decisions by (for example) BlackRock (one of the largest investment and advisory firms) to any decisions by the Plans, nor linking any investment decision by the Plans to any benefit sought or obtained by Intel. Plaintiffs' conclusory allegations were clearly insufficient.

Lastly, the district court correctly dismissed two "derivative" claims—that (1) fiduciaries who appointed other fiduciaries failed to monitor their appointees, and (2) all fiduciaries have co-fiduciary liability vis-à-vis one another—because Plaintiffs alleged no primary breach. Moreover, as Plaintiffs alleged no supporting facts, those claims fail regardless.

Because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," courts "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). The district court did so here, and this Court should affirm.

## STATEMENT OF JURISDICTION

Defendants agree with Plaintiffs as to the basis for subject-matter jurisdiction, the appealability of the judgment, and the timeliness of Plaintiffs' appeal.

## STATEMENT OF THE ISSUES

I.     Did the district court correctly hold that Plaintiffs failed to allege facts sufficient to state a plausible claim for breach of ERISA's duty of prudence?

II.     Did the district court correctly hold that Plaintiffs failed to allege facts sufficient to state a plausible claim for breach of ERISA's duty of loyalty?

III.    Did the district court correctly dismiss Plaintiffs' derivative claims, where Plaintiffs alleged neither the necessary primary breach nor plausible supporting allegations for the derivative claims?

## STATUTES AND REGULATIONS

Pertinent regulations are contained in an addendum.  Pertinent statutes are contained in an addendum to the opening brief.

## STATEMENT OF THE CASE

### A.    Factual Background

### 1.    The Intel Plans and Intel Funds

Among the benefits Intel Corporation offers to its employees are retirement plans, including the Intel Retirement Contribution Plan and the Intel 401(k) Savings Plan.  1-ER-7.  Among other investment options, these Plans include two types of customized funds relevant here:  the GDF, a "multi-asset portfolio with a fixed allocation model," and TDFs, blended funds that "use a dynamic allocation model whereby the allocation to asset classes within the fund changes over time."  1-ER-8.

***The express objective of both the GDF and the TDFs is "minimiz[ing] dispersion of outcomes for plan participants with a bias of downside protection implemented by reducing overall risk."***  2-ER-217;[2] *see also* 3-ER-624 (GDF and

---

[2] This and other record items were incorporated into Plaintiffs' original and amended consolidated complaints or were otherwise subject to judicial notice, as the district

TDFs "pursu[ed]" a "risk-mitigation strategy"). To implement that objective, the TDFs' allocation model features a glidepath that grows more conservative as the target retirement date approaches. At all stages, that glidepath has a lower allocation to equity, and contains a broader range of asset classes (including hedge funds and commodities), than typically found in off-the-shelf target date funds offered by companies like Vanguard. *Compare* 2-ER-265, *with* 3-ER-517. The GDF employs a broadly diversified allocation model (including stocks and bonds, as well as hedge funds, commodities, and private equity) with an expressly disclosed target of a 5% real annual return. 2-ER-104, 235. Like the TDFs, the GDF's allocation model is designed to achieve reduced volatility. 2-ER-217.

### 2. The Intel Funds' Risk-Mitigation Strategy and Asset Allocation

Following the 2008 market crash, when some equity-heavy funds lost nearly half their value, the Intel fiduciaries redesigned the Intel Funds' strategy and asset allocation, with an eye to the risk-mitigation objective noted above. 1-ER-8; 2-ER-217; 3-ER-623–24, 640. In adopting this strategy, the Intel fiduciaries looked to modern portfolio theory, which recognizes that while investment risk cannot be eliminated, it can be reduced through diversification. 2-ER-222. Thus, the fiduciaries charted a course to broadly diversify the Funds' investments to include

---

court concluded. 1-ER-14–16; 1-ER-50–52. Plaintiffs do not challenge the district court's judicial notice decisions on appeal.

not only stocks and bonds but also "non-traditional assets" (in Plaintiffs' parlance) including hedge funds and private equity, all with a goal of reducing volatility and achieving stable, risk-adjusted returns. 2-ER-229–31; 2-ER-249–51; 3-ER-640. In doing so, the Intel fiduciaries considered among other things the substantial downside protection hedge fund investments provided to the Plans during the 2008 crash. At that time, unlike the 24% to 41% losses suffered by equity-heavy off-the-shelf funds, the hedge funds in the Plans dropped only 17%. *Compare* 3-ER-462, *with* 3-ER-660.

The fiduciaries expressly disclosed that their strategy was intended to moderate both peaks and valleys, which would yield lower returns than an equity-heavy approach during a bull market, but would mitigate the risk of large losses during an equity market downturn. 2-ER-229; 2-ER-249–50. The fiduciaries also disclosed that, because this risk-mitigation strategy included allocations to assets like hedge funds and private equity, it would carry higher active management fees. *Id.*

### 3. Hedge Funds and Private Equity in ERISA-Governed Plans

Although less common in defined contribution plans such as the Plans, hedge funds and private equity are common in defined benefit plans. But defined contribution and defined benefit retirement plans are subject to the same fiduciary duties, as both case law and government reports incorporated in the complaint

establish.[3]  As Plaintiffs' supporting materials show, ERISA fiduciaries for defined benefit plans significantly expanded their use of hedge funds and private equity following the 2008 financial crisis.  3-ER-442.  By 2010, 92% of large defined benefit plans invested in private equity and 60% invested in hedge funds, with allocations as high as 30% for private equity and 33% for hedge funds.  *See* 3-ER-430, 434; *see also* 2-ER-341–42; 3-ER-415–16.

In a series of reports issued between 2008 and 2011 and discussed in Plaintiffs' complaints, the Government Accountability Office noted that fiduciaries attributed their increasing use of hedge fund and private equity investments to the diversification benefits the investments offered and, as to hedge funds specifically, their "steadier, less volatile returns."  2-ER-342–43.  For these reasons, the GAO concluded that, while investments in hedge funds and private equity "place demands on plan sponsors that are significantly beyond the demands of more traditional asset classes," such assets still may "serve useful purposes in a well-thought-out

---

[3] In 2020, the Department of Labor confirmed that private equity investments are permissible for *all* plans, including defined contribution plans like those at issue here. 3-ER-449–51. *See also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418-19 (2014) ("[T]he same standard of prudence applies to all ERISA fiduciaries."). And as far back as 1987, federal regulations provided guidance to ERISA fiduciaries who invest in "venture capital operating companies." 29 C.F.R. § 2510.3-101.

investment program, offering plan sponsors advantages that may not be as readily available from more traditional investment options." 3-ER-442.[4]

The diversification benefits of hedge funds were echoed in a 2008 report by the Investors' Committee to the President's Working Group on Financial Markets (another source incorporated in the complaint), which explained that, because of "the multiple roles that hedge funds may play in an overall portfolio, there is no standard allocation and diversification rule." 2-ER-283. Instead, hedge funds "offer investors access to a wide variety of investment strategies and risk exposures not typically available through traditional investment classes and investment vehicles," such that they "may offer opportunities for fiduciaries and investors to improve the likelihood of achieving their investment objectives." 2-ER-280, 286.

### 4. The Real-World Risk Mitigation of Hedge Funds

Consistent with their incorporated sources, Plaintiffs acknowledged that leading up to the 2008 financial crisis, hedge funds provided the downside protection and volatility dampening that the fiduciaries sought. For example, in comparing a hedge fund index and an equity index during "up months" and "down months"

---

[4] Plaintiffs incorporated this and other reports to support their allegations that hedge funds and private equity come with certain category risks relating to liquidity, transparency, etc. 3-ER-629–30, 636–37. But Plaintiffs also alleged in detail the impressive qualifications of the Intel fiduciaries involved in asset selection and monitoring, 3-ER-555–62, and never alleged that those fiduciaries lacked the capability to account for such category-specific considerations.

between 1998 and 2010, Plaintiffs alleged that the hedge fund index experienced only 19% of the average equity loss during down months, while "a traditional 60/40 blend" (i.e., 60% equities and 40% bonds) "suffer[ed] 58% of the downside." 3-ER-622–23. Put another way, the "traditional 60/40 blend" suffered triple the loss in down months. Hedge funds experienced significantly less overall volatility, too: While the equities index showed an 8% swing in average returns between "up" and "down" months (3.74% on average in up months, -4.10% in down months), the hedge fund index experienced only a 2% swing (1.22% in up months, -0.77% in down months). 3-ER-622. Even compared to a "blend" of stocks and bonds (about a 5% swing), the hedge fund index was much less volatile. *Id.*

### 5. The Intel Funds' Performance

The Intel fiduciaries' strategy performed as disclosed, cushioning participants against stock market volatility (as described above) while yielding positive returns. From 2011 through 2018 ("the most recent date in Plaintiffs' data," 1-ER-27), the GDF *exceeded* its express target of a 5% real annual return (2-ER-235) and *surpassed* the "[m]edian peer group return" as a whole during that same period (7.40% versus 6.53% average annual return). 3-ER-611–12. Indeed, as the district court noted, the GDF "outperformed 80% of the largest funds in the Morningstar World Allocation Category" between 2008 and 2018. 1-ER-27. The reduced volatility in the TDFs meant that those funds sometimes outperformed equity-heavy

retail funds:  Every Intel TDF outperformed its purported Vanguard comparator at least one year between 2011 and 2016, and multiple Intel TDFs outperformed those purported comparators in multiple years.  3-ER-602–04.

As was also expected and disclosed, *e.g.*, 2-ER-229, 2-ER-250, the Intel Funds did not deliver the returns during the bull market period between 2011 and 2018 of funds with much greater equity market exposure.

### B.    Procedural Background

#### 1.    The Parties

Plaintiffs Christopher Sulyma and Winston Anderson are former Intel employees who participated in the Plans and invested in the Intel Funds.  1-ER-6. Plaintiffs name as defendants 21 individuals (primarily current and former Intel employees and directors) who acted as fiduciaries to the Plans since 2009, along with three committees on which they served:  (1) the Investment Policy Committee, which develops and executes investment and allocation strategy;  (2) the Administrative Committee, which oversees communications to participants;[5] and (3) the Finance Committee of the Intel Board of Directors, which (for a period of time) appointed members of the other two committees.  1-ER-6.

---

[5] Plaintiffs have abandoned two disclosure-related claims against the Administrative Committee members.  *See* OB 5-6; *infra*, 27 n.11.  Those fiduciaries remain defendants on one "derivative claim" of co-fiduciary liability.  *See infra*, 58-59.

### 2. The Three Consolidated Cases

In October 2015, Sulyma sued the Intel fiduciaries. The parties consented to assignment to Magistrate Judge Nathanael Cousins. 1-ER-10. In January 2016, a related suit by another Plan participant (Florence Lo) was consolidated with *Sulyma*. 1-ER-11–12. In March 2017, Judge Cousins granted summary judgment on all claims, principally finding them time-barred. 1-ER-12. Sulyma appealed, this Court reversed, and the Supreme Court affirmed. 1-ER-12–13.

In August 2019, Anderson (represented by the same counsel as Sulyma) filed suit, presenting substantially the same allegations and claims of imprudent investments. After Anderson declined magistrate judge jurisdiction, Anderson's action was assigned to Judge Lucy Koh and stayed pending the Supreme Court's *Sulyma* decision. 1-ER-13. On *Sulyma*'s remand, *Anderson* and *Sulyma* were consolidated before Judge Koh. *Id.*

### 3. The June 2020 Consolidated Complaint

Plaintiffs' first consolidated complaint, filed in June 2020, alleged that the Intel fiduciaries acted imprudently and disloyally by including hedge funds and private equity in the Intel Funds' broadly-diversified portfolio.

Plaintiffs' first theory was that the fiduciaries breached the duty of prudence by allocating assets to such "non-traditional" investments. SER-113–28. Plaintiffs alleged that such investments "generally" or "common[ly]" pose certain drawbacks

14

(such as lack of liquidity or transparency) that render their use by ERISA plans imprudent. SER-113–28. Although Plaintiffs attacked these "non-traditional" asset classes generally, Plaintiffs denied that their theory was a *per se* challenge. SER-26–27. Instead, Plaintiffs contended that because retail balanced funds and target date funds do not invest in hedge funds and private equity, the adoption of "an asset allocation model" that "excessively allocated assets" to such investments created a plausible inference that the Intel fiduciaries breached their duty of prudence. 1-ER-54.

In support of their theory, Plaintiffs pointed to the lower costs and higher returns of retail funds with an equity-heavy asset allocation model during the 2009-2018 bull market. 1-ER-47–48. Unlike the risk-mitigation strategy pursued by the Intel Funds, SER-106, those retail funds focused on maximizing returns. *See* 3-ER-532 (T. Rowe Price fund "seeks the highest total return over time"); 3-ER-536 (Fidelity fund "seeks high total return"). That different strategy featured a much greater equity allocation—as much as 90%. 3-ER-520, 528–29; *see also* SER-111. Plaintiffs acknowledged that their equity-heavy comparator funds were *riskier* than the Intel Funds, and conceded that "non-traditional" assets such as hedge funds have a "comparable market risk" standing alone to a portfolio allocated primarily to bonds. *See* SER-107 & fig.3 (acknowledging that risk of hedge funds is comparable to a portfolio allocated "26% in equity and 74% in bonds").

15

Plaintiffs also alleged that the fiduciaries favored Intel's interests over those of Plan participants because (1) the Intel Funds invested in private equity funds offered by leading firms (*e.g.*, BlackRock and Goldman Sachs), (2) which firms sometimes invested in start-up companies (*e.g.*, DocuSign) in which (3) Intel Capital (a venture capital subsidiary of Intel) also invested. SER-130–34. This, Plaintiffs alleged, yielded a plausible inference that the fiduciaries used the Intel Funds "to promote [Intel's] investment interests." SER-134.[6] Plaintiffs did not allege that the fiduciaries had any influence over (or even knowledge of) which start-up companies BlackRock, etc., invested in. The sole fact alleged in support of the alleged disloyalty was that two senior Intel employees who had significant duties relating to Intel Capital also served on the Plans' Investment Policy Committee. SER-134.

### 4. The First Dismissal Order

In January 2021, the district court dismissed all putative class claims. 1-ER-72. The district court first examined Plaintiffs' allegations of imprudence. In doing so, it recognized that courts must be "especially cautious" to "not rely on the vantage point of hindsight when assessing the prudence of the plan fiduciaries' conduct." 1-ER-55. Rather, to state a claim, Plaintiffs must plausibly allege that the decision to allocate a portion of the Intel Funds' investments "to hedge fund and

---

[6] Plaintiffs alleged that Intel Capital's investments have spanned "over 1,500 companies," of which about 50 allegedly were also invested in by BlackRock, etc. SER-64, 130–33.

private equity was imprudent at the time that decision was made." 1-ER-56–57.

Reading the complaint "as a whole," the district court assessed the five bases

Plaintiffs alleged in support of their theory:

> (1) that these "Non-Traditional Investments" (in Plaintiffs' parlance) underperformed allegedly comparable investments;
>
> (2) that they charged higher fees than those alleged comparators;
>
> (3) that "the prevailing norm" of allegedly comparable asset managers was to avoid such investments;
>
> (4) that contemporary evidence (government reports, news articles, and other publications) incorporated in the complaint allegedly demonstrated such investments did not mitigate risk; and
>
> (5) that the Intel fiduciaries allegedly invested in these assets to benefit Intel, rather than plan participants.

1-ER-57.

As to Plaintiffs' allegations that the Intel Funds had lower returns and higher

fees than Plaintiffs' comparators, the district court held that "where a plaintiff claims

that a prudent fiduciary in like circumstances would have selected a different fund

based on the cost or performance of the selected fund," to state a plausible claim, the

plaintiff must provide "a sound basis for comparison—a meaningful benchmark."

1-ER-59. Here, that requirement was not met: "Plaintiffs allege comparisons of the

Intel funds' performance to peer and comparable funds, [but] have failed to provide

17

sufficient allegations to support their claim that these other funds are adequate benchmarks against which to compare the Intel funds."  1-ER-59.[7]

The district court also rejected Plaintiffs' other premises.  First, as to "Plaintiffs' allegations regarding the Intel Funds' deviation from industry allocation standards," the court explained that "Plaintiffs do not cite a single case to support the proposition that the deviation they highlight states a claim for breach of the duty of prudence," and "the Court cannot find any such case."  1-ER-63.  Next, the documents incorporated by reference, purportedly showing that "hedge funds and private equity funds carried [] risks," were insufficient to create a plausible inference that the use of such investments was imprudent.  1-ER-64.  And finally, as to Plaintiffs' claim that the fiduciaries' alleged disloyalty caused them to make imprudent investments, "Plaintiffs have provided little more than conclusory allegations devoid of even minimal factual support."  1-ER-66.

Reviewing Plaintiffs' allegations "taken together," the district court held that Plaintiffs failed to state plausible allegations of a breach of the duty of prudence. 1-ER-67.  The district court held that Plaintiffs' duty of loyalty allegations likewise

---

[7] *See also* 1-ER-61 ("Without factual allegations to support Plaintiffs' claim that the complaint compares fees incurred by the Intel funds with a meaningful benchmark, the Court cannot discern whether Plaintiffs are comparing funds that have different aims, different risks, and different potential rewards that cater to different investors.").

were insufficient, noting that "the mere fact that Intel Capital invested in a small percentage of the same companies that also received investments from private equity funds in which the Intel funds invested is not sufficient to state a claim." 1-ER-68.[8]

The district court granted leave to amend "to cure the deficiencies identified in this Order and in Defendants' motion to dismiss." 1-ER-72.

### 5. The Amended Consolidated Complaint

In amending, Plaintiffs refused the district court's invitation to add allegations explaining why their preferred comparators provided a meaningful benchmark for the Intel Funds—or to choose new comparators that did so. Instead, Plaintiffs retained the same equity-heavy comparators as before, *see, e.g.*, 3-ER-600–15, while *expressly admitting* that those comparators pursued "different investment strategies" than the Intel Funds, SER-12. Indeed, Plaintiffs' amended complaint made clear that, despite chastising the fiduciaries for their supposedly "risky" allocation to hedge funds and private equity, Plaintiffs' real complaint is that the Intel fiduciaries should have chosen the *higher* risk associated with the equity-heavy allocation used by Plaintiffs' preferred funds. In Plaintiffs' view, the Intel Funds were "limiting downside risk at the cost of proportionally less upside gain"—i.e., "in a down market

---

[8] The district court also dismissed disclosure claims asserted against certain fiduciaries for lack of standing and dismissed the "derivative claims" for lack of any primary claim. 1-ER-69–72.

they do not sufficiently outperform equities to compensate for the opportunity losses in an up market." 3-ER-623.

Although the district court had instructed that "simply labeling funds as 'comparable' or 'a peer' is insufficient," 1-ER-59, Plaintiffs did exactly that. They again alleged that their preferred comparators were "peer[s]" of the Intel Funds, and that comparisons to aggregated indices are "common" despite admittedly divergent aims, risks, and rewards. 3-ER-586. Plaintiffs alleged that the Intel Funds could therefore be compared to passively managed retail funds (*e.g.*, from Vanguard), as well as to entire category averages (*e.g.*, the Morningstar Target Date Fund category). SER-15–17. Plaintiffs also sought to characterize Morningstar categories as the "Plans' own benchmarks" because fact sheets provided to Plan participants included information about those categories. SER-8–9; *see* 3-ER-609–10.

As to their disloyalty claims, Plaintiffs retained without material alteration the same allegations regarding the handful of companies in which both Intel Capital and funds offered by third-party investment companies invested. *See* 3-ER-654–57.[9]

---

[9] Plaintiffs also added convoluted allegations regarding another Intel retirement plan, purportedly to show how the fiduciaries' interests diverged from those of Plan participants. 4-ER-656–57. Plaintiffs' Opening Brief does not reference these allegations, which the district court held "implausible even based on the facts [alleged]," 1-ER-36.

### 6.     The Second Dismissal Order

On January 8, 2022, the district court dismissed all putative class claims with prejudice.  1-ER-43.  The district court concluded that Plaintiffs still failed to allege meaningful benchmarks for the Intel Funds.  1-ER-26, 28.  Instead, Plaintiffs merely alleged that "common" benchmarks for target date funds include "(1) published indices such as the S&P 500; (2) peer groups such as the categories established by Morningstar, Inc., a leading provider of investment data, and (3) specific peer alternatives within a given asset class."  1-ER-22.  But Plaintiffs entirely failed to explain "why the Intel TDFs have similar aims, risks, and rewards as Plaintiffs' chosen comparators," instead asserting only "that these comparators are 'common.'" 1-ER-23.[10]  The district court noted that this failure was particularly acute with regard to Plaintiffs' reliance on "the Morningstar 'peer group category,'" which "is an average of a large group of TDFs," yet "Plaintiffs provide no information as to the aims, risks, or rewards of any individual fund within the 224 funds" within that category.  1-ER-24; *see also* 1-ER-25 (deeming Morningstar "peer group categories" inappropriate benchmarks for the TDFs).

The district court also concluded that Plaintiffs' own allegations contradicted their claims.  For example, Plaintiffs asserted that they were comparing "the Intel

---

[10] *See also* 1-ER-28 ("The argument that all plans with similarly sized contributions are meaningful benchmarks is again too conclusory to survive motion to dismiss.").

21

TDFs to the benchmarks designated by Intel itself." 1-ER-25. Yet "the document on which Plaintiffs rely, which is incorporated by reference into the [complaint], unambiguously shows that the Intel TDFs are *not* benchmarked against the Morningstar 'peer group category' but against a *customized* benchmark." 1-ER-25. *"*Plaintiffs do not allege that the Intel TDFs performed worse than the customized benchmark." 1-ER-25. Likewise, Plaintiffs alleged that "peer TDFs of the same vintage (i.e., share the same target date) are meaningful benchmarks" to one another. 1-ER-22. But that is "especially conclusory given that Plaintiffs' own [complaint] explains that 'there are *considerable differences among TDFs* offered by different providers, even among TDFs with the same target date.'" 1-ER-22–23.

The district court concluded that "Plaintiffs do not provide any factual allegations that explain why the S&P 500, the Intel TDFs' 'peer group category' as defined by Morningstar, Inc., and four identified TDF fund families are apples-to-apples comparators rather than funds with different aims, risks, and potential rewards." 1-ER-26. The district court reached the same conclusion for the GDF based on the same defects, and noted further that "[e]ven if the Morningstar World Allocation Category was a benchmark, *the Intel GDFs outperformed 80% of the largest funds in the Morningstar World Allocation Category in the 10-year period ending in December 2018*, the most recent date in Plaintiffs' data." 1-ER-26–27; *see also* 1-ER-28 ("Plaintiffs cannot state a claim for breach of the duty of

prudence by comparing the Intel GDFs to a benchmark *that the Intel GDFs outperformed over a five-year period*.").

The district court further rejected Plaintiffs' argument that "the determination of the appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss stage." 1-ER-29. It noted that "courts within this district have consistently considered the question of whether a meaningful benchmark has been pled at the motion to dismiss stage," and concluded that this approach properly held Plaintiffs to their burden of pleading a plausible claim. 1-ER-29. Without a meaningful benchmark, "the Court cannot evaluate if an allegation of a violation of the duty of prudence is plausible because a plaintiff's comparison of apples to oranges is not a way to show that one is better or worse than the other." 1-ER-29.

The district court likewise rejected Plaintiffs' challenge to the prudence of the "investment strategy itself." 1-ER-30. First, the district court noted that Plaintiffs had nowhere alleged that a risk-mitigation strategy was imprudent, but rather attacked only "the allocations chosen to implement that strategy." 1-ER-30. Second, the district court rejected, as a matter of law, that the Intel fiduciaries "should have been looking for ways to change their risk mitigation strategy to a riskier strategy." 1-ER-30. That theory could not advance, because "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns." 1-ER-30; *see also* 1-ER-31 ("Plaintiffs also do not cite a

23

single case to support their new theory that a risk mitigation strategy can be deemed imprudent under the law.").

With regard to the disloyalty claims, the district court concluded that Plaintiffs' amendment still "merely show[ed] that Intel Capital and some investment companies happened to invest in similar startups." 1-ER-35–36. Such allegations, which showed only "a *potential* conflict of interest," were "not sufficient to plausibly support Plaintiffs' claim that the Investment Committee acted disloyally in its fiduciary duties." 1-ER-36–37.

Finally, the district court dismissed Plaintiffs' disclosure claims, 1-ER-38–41, after which the absence of any primary claim again mandated dismissal of the derivative claims. 1-ER-42–43.

One non-class claim (by Anderson individually) was dismissed by stipulation of the parties, 1-ER-3, after which this appeal followed.

## SUMMARY OF THE ARGUMENT

In assessing the plausibility of ERISA claims, courts must apply a "careful, context-sensitive scrutiny" to "divide the plausible sheep from the meritless goats." *Dudenhoeffer*, 573 U.S. at 425. That is what the district court did here, recognizing the "range of reasonable judgments" and "difficult tradeoffs" facing the Intel fiduciaries. *Hughes*, 142 S. Ct. at 742.

24

*First*, the Court should affirm the dismissal of Plaintiffs' duty of prudence claims. Plaintiffs belatedly argue that it was improper for the district court to require a "sound basis for comparison—a meaningful benchmark" to support their allegations that the Intel Funds underperformed and cost too much. 1-ER-19. According to Plaintiffs, that task was both "atextual" (because ERISA does not require "a sound basis for comparison") and "impossible" (because purportedly no other comparable funds used the same asset allocation approach). OB 4, 30, 41. Both arguments were invented for this appeal and are therefore waived.

In any event, the district court asked nothing "atextual" or "impossible" of Plaintiffs, only that they ground their allegations of underperformance and excessive costs in a plausible comparison to a fund "of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). In requiring that allegations of investment imprudence based on performance or fees be grounded in a "meaningful benchmark," the district court followed a growing consensus, including express decisions from the Sixth, Seventh, and Eighth Circuits as well as implicit recognition by this Court. *Albert*, 47 F.4th at 581 (7th Circuit); *CommonSpirit*, 37 F.4th at 1166-67 (6th Circuit); *Meiners*, 898 F.3d at 822-23 (8th Circuit); *Salesforce.com*, 2022 WL 1055557, at *2 n.1 (9th Circuit). Plaintiffs could have chosen comparators to the Intel Funds that pursue a risk-mitigation strategy. Instead, Plaintiffs doomed their prudence claims by choosing to compare the Intel Funds to funds that (as they expressly admitted

below, SER-12) pursued "different investment strategies"—specifically, return maximization.

The district court also correctly rejected Plaintiffs' challenge to the Intel Funds' risk-mitigation strategy itself. Plaintiffs cite nothing to suggest that such a strategy was outside the range of reasonable judgments a fiduciary may make, and they do not directly address the issue on appeal. Instead, Plaintiffs criticize the fiduciaries for using an *asset allocation* approach that "radically deviated from all other similarly situated" ERISA-governed funds. OB 27. That assertion is both irrelevant as a matter of law (as the district court held, 1-ER-62–64) and misleading according to the materials Plaintiffs incorporated into their complaint. *See* SER-120–25. Plaintiffs' polemic on the alleged evils of hedge funds and private equity, OB 31-35, adds nothing. Under ERISA, fiduciaries must measure the risk of a portfolio as a whole, not the risk of individual underlying assets or asset classes. As Plaintiffs previously acknowledged to this Court, a *per se* challenge to the use of hedge funds and private equity in ERISA funds is not cognizable. SER-42.

*Second*, the district court correctly held that Plaintiffs failed to plead any plausible claim of disloyalty in alleging only that a small number of start-up companies attracted investments from both Intel Capital and various independent firms in whose funds the Intel Funds invested. Plaintiffs alleged no facts connecting those firms' investment decisions to actions by the fiduciaries, nor connecting any

decisions for the Intel Funds to any direct benefit to Intel. Plaintiffs' speculation of some attenuated benefit stemming from the Intel Funds investing in funds offered by firms with a limited number of investments overlapping with Intel Capital's investments does not plausibly suggest that the fiduciaries' "operative motive" was to further interests other than those of Plan participants. *CommonSpirit*, 37 F.4th at 1170.

*Third*, Plaintiffs admit that their derivative claims can proceed only if they establish a primary breach. OB 58. No claim for primary breach has been stated, but even if one had been, the derivative claims still fail. Plaintiffs allege no facts to hold any Intel fiduciary derivatively liable for the conduct of others.

The Court should affirm.[11]

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's dismissal for failure to state a claim. *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1096 (9th Cir. 2004). For ERISA claims, as for all claims in federal court, a plaintiff must satisfy "the pleading standard discussed in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)." *Hughes*, 142 S. Ct. at 742. The Court "is not

---

[11] Plaintiffs do not challenge the district court's dismissal of their disclosure claims, 1-ER-38–42, and have therefore abandoned them. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) (claims unaddressed in opening brief are waived).

required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Wright*, 360 F.3d at 1096. The Court may affirm "on any ground supported by the record." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016).

## ARGUMENT

## I. THE COURT SHOULD AFFIRM THE DISMISSAL OF PLAINTIFFS' IMPRUDENCE CLAIMS.

Plaintiffs' core complaint is that, in hindsight, participants would have done better during a lengthy bull market with a larger (and concededly riskier) allocation to equities. But alleged underperformance or excessive fees cannot support an inference of imprudence unless based on a comparison to a fund of "like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). All three courts of appeals that have directly considered this issue require "apples-to-apples" comparisons—a meaningful benchmark—for a plausible claim of imprudence. *See Albert*, 47 F.4th at 581 (affirming dismissal where plaintiffs failed to show "a sound basis for comparison"); *CommonSpirit*, 37 F.4th at 1166-67 (same); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 282 (8th Cir. 2022) (affirming dismissal because of difference between "value" strategy of challenged fund and "growth" strategy of proposed comparator). This Court should follow its sister Circuits.

## A. Plaintiffs Waived Their Challenge to the Meaningful Benchmark Requirement by Not Raising That Challenge Below.

On appeal, Plaintiffs argue for the first time that the meaningful benchmark requirement is "atextual" and "cannot be reconciled with ERISA." OB 4, 39. This argument "was not raised before the district court and is therefore waived." *Abogados v. AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000); *see also Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) (an issue is generally deemed waived if "not raised sufficiently for the trial court to rule on it").

Plaintiffs provide no explanation for failing to make this argument below. This Court routinely enforces waiver principles where a party "has no excuse for its failure to raise these arguments below" after having "had ample opportunity to craft its response to the district court." *Armstrong*, 768 F.3d at 982. Nothing prevented Plaintiffs from arguing below, in response to either motion to dismiss, that ERISA does not require that alleged underperformance or excessive fees be substantiated through a meaningful benchmark.

Instead, Plaintiffs accepted the obvious premise that a claim of underperformance or excessive fees is a relative one—something cost more or delivered less *than something else*—and therefore requires specifying an appropriate basis for comparison. Plaintiffs argued on the first motion cycle that the "peer" funds they had identified as comparators were sufficient, *see* SER-30–34, and then retained those comparators, and made the same fundamental argument, on the

29

second round, SER-8–15.  The Court should not consider Plaintiffs' new argument that the entire exercise (in which they participated below without objection) is "atextual" and "inconsistent with ERISA."[12]

**B.    The District Court Did Not Err in Requiring Plaintiffs To Plead a Meaningful Benchmark.**

**1.    The Meaningful Benchmark Requirement Accords with ERISA's Text and Is Backed by a Broad and Growing Consensus.**

Putting aside the issue of waiver, the district court correctly directed Plaintiffs to identify a meaningful benchmark.  ERISA commands that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).    ERISA "requires prudence, not prescience."   *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990).  A court evaluating allegations of imprudence must therefore "focus on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."  *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath.*

---

[12] Indeed, below, Plaintiffs sought to distinguish other authority by noting that "the complaint [in that case] did not allege meaningful benchmarks, *unlike the Complaint here*."  SER-12.

*Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013); *see also Wright*, 360 F.3d at 1097 (prudence is judged "at the time [the fiduciary] engaged in the challenged transactions").

Two relevant principles flow from this settled rule. First, "[f]iduciaries are not required to predict the future, and cannot be held liable for deciding to avoid risks that, in hindsight, could have been tolerated." *Barchock v. CVS Health Corp.*, 2017 WL 9324762, at *5 (D.R.I. Jan. 31, 2017), *aff'd*, 886 F.3d 43 (1st Cir. 2018). Second, "underperformance" does not indicate imprudence when it results from a considered strategy, because "a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *White v. Chevron Corp.*, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016); *see also CommonSpirit*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision— largely a process-based inquiry—that breaches a fiduciary duty."); *Meiners*, 898 F.3d at 823 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged TDFs] were an imprudent choice at the outset. … No authority requires a fiduciary to pick the best performing fund.").

31

Consistent with these principles, this Court has reasoned that allegations that a defendant "could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund" do not, standing alone, make it "more plausible than not that any breach of a fiduciary duty had occurred" and so "fail[] to state a claim for breach of fiduciary duty." *White*, 752 F. App'x at 455. Instead, a plaintiff "must provide 'some further factual enhancement' to take a claim of fiduciary duty violation from the realm of 'possibility' to 'plausibility.'" *Hughes v. Nw. Univ.*, 63 F.4th 615, 628 (7th Cir. 2023) (quoting *Twombly*, 550 U.S. at 557).

The meaningful benchmark requirement is a necessary element of that "further factual enhancement" required to state a claim when a plaintiff seeks an inference of imprudence by comparing performance or fees. Put another way, it embodies the commonsense notion that if a plaintiff chooses to plead by comparison, apples must be compared to apples—i.e., two funds of "a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), rather than two funds with "different aims, different risks, and different potential rewards." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020).

Absent a meaningful benchmark, differences in performance and costs between a challenged fund and other funds do not mean one investment product is "necessarily better or worse," "just different." *Id.* at 485-86. "The key to nudging

32

an inference of imprudence from possible to plausible is providing a sound basis for comparison—a meaningful benchmark—not just alleging that costs are too high, or returns are too low." *Matousek*, 51 F.4th at 278.

The requirement of a meaningful benchmark allows district courts assessing allegations that a fund underperformed or cost too much to "divide the plausible sheep from the meritless goats." *See Dudenhoeffer*, 573 U.S. at 425. That is, it assists district courts in the "careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Id.* Thus, it is unsurprising that where plaintiffs seek an inference of imprudence regarding performance and fees, three circuits have expressly held that a plausible claim requires pleading "a sound basis for comparison" through factual allegations sufficient to show that the funds "have similar aims, risks, and potential rewards." 1-ER-19; *see Albert*, 47 F.4th at 581 (affirming dismissal; 7th Circuit); *CommonSpirit*, 37 F.4th at 1166-67 (same; 6th Circuit); *Meiners*, 898 F.3d at 822-23 (same; 8th Circuit).

This Court, too, has consistently applied that logic. In unpublished opinions, this Court has permitted imprudence claims to advance based on the alleged use of more costly shares of the *same* fund (i.e., retail versus institutional shares), but has affirmed dismissal of claims that allege "only that [the fiduciary] could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund." *White*, 752 F. App'x at 454-55

33

(affirming dismissal); *accord Kong v. Trader Joe's Co.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (permitting claim to advance where, "[e]xcept for the extra fees, *the share classes were identical*").  The Court made this same distinction in *Salesforce.com*, reversing dismissal of imprudence claims based on different share classes *of the same fund*, but affirming dismissal of imprudence claims based on comparing *actively and passively managed funds*.  2022 WL 1055557, at *2 & n.1.[13]

The district court's decision here was correct and consistent with the broad and growing consensus of courts that require plaintiffs to plead a meaningful benchmark.

### 2. The District Court Appropriately Required a Meaningful Benchmark at the Pleadings Stage.

Plaintiffs alternatively argue that, even if a meaningful benchmark is necessary to prove imprudence on the merits, it is not required to be alleged at the

---

[13] Many district courts, in this Circuit and elsewhere, have likewise dismissed claims based on comparative performance and fees that fail to plead a meaningful benchmark.  After all, a plaintiff can always find *some* other fund that performed better or was cheaper.  *See, e.g.*, *Jones v. DISH Network Corp.*, 2023 WL 2644081, at *6-7 (D. Colo. Mar. 27, 2023);  *Tullgren v. Hamilton*, 2023 WL 2307615, at *5-7 (E.D. Va. Mar. 1, 2023); *Locascio v. Fluor Corp.*, 2023 WL 320000, at *6 (N.D. Tex. Jan. 18, 2023); *Gonzalez v. Northwell Health, Inc.*, 2022 WL 4639673, at *7-9 (E.D.N.Y. Sept. 30, 2022); *Evans v. Associated Banc-Corp*, 2022 WL 4638092, at *6-7 (E.D. Wis. Sept. 30, 2022); *Matney v. Barrick Gold of N. Am., Inc.*, 2022 WL 1186532, at *9-10 (D. Utah Apr. 21, 2022); *Wehner v. Genentech, Inc.*, 2021 WL 2417098, at *8-9 (N.D. Cal. June 14, 2021); *Kendall v. Pharm. Prod. Dev., LLC*, 2021 WL 1231415, at *9 (E.D.N.C. Mar. 31, 2021); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1303-04, 1306-07 (D. Minn. 2021); *Kurtz v. Vail Corp.*, 511

pleadings stage. OB 48; *see* 1-ER-29–30. But the requirement to *plead* a meaningful benchmark ensures that claims seeking an inference of imprudence based on comparisons of performance or fees are weeded out where an "obvious alternative explanation"—such as the pursuit of a different investment strategy—explains the difference in outcome. *See Hughes*, 63 F.4th at 628 (quoting *Twombly*, 550 U.S. at 567-68). Two funds with dissimilar strategies producing dissimilar results says nothing about the prudence of either. As the district court observed, comparing "apples to oranges is not a way to show that one is better or worse than the other." 1-ER-29 (quoting *Davis*, 960 F.3d at 485).

This Court's precedent supports the district court's holding. "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *White*, 752 F. App'x at 454-55 (quoting *In re Century Aluminum*, 729 F.3d at 1108)

---

F. Supp. 3d 1185, 1199-1200 (D. Colo. 2021); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *11 (D.D.C. Jan. 8, 2019).

(applying principle to affirm dismissal of ERISA claims); *see also Hughes*, 63 F.4th at 628 ("A fiduciary's actions may give rise to different inferences—some that suggest a breach of fiduciary duty and others that do not. … The alternative inference that can arise from fiduciary conduct is analogous to the 'obvious alternative explanation' that the Court in *Twombly* accounted for when assessing telephone carriers' parallel conduct in an antitrust action."); *CommonSpirit*, 37 F.4th at 1166-67 (noting parallels between ERISA imprudence claim and *Twombly*).

A meaningful benchmark provides that "something more." If a plaintiff shows that over a sustained period, a fund cost more or delivered less than another fund with similar aims, risks, and potential benefits, that fact may help "[n]udg[e] the complaint past the plausibility threshold," *Matousek*, 51 F.4th at 281, by allowing the court "to infer from what is alleged that the [fiduciaries'] process was flawed." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). In contrast, "comparison can be the thief of accuracy when it comes to two funds with separate goals and separate risk profiles." *CommonSpirit*, 37 F.4th at 1167. Alleged "disappointing performance by itself does not conclusively point towards deficient decision-making, especially when we account for competing explanations and other common sense aspects of long-term investments." *Id.*

All three courts of appeals that have adopted the meaningful benchmark requirement have applied it *to affirm dismissal for failure to state a claim*. *Albert*,

36

47 F.4th at 582; *CommonSpirit*, 37 F.4th at 1166-67; *Meiners*, 898 F.3d at 822-23. So too have district courts across the country. *See supra*, 34 n.13 (collecting cases). Plaintiffs assert the contrary—that a judicial "consensus" supports deferring the assessment of the plausibility of comparisons in the pleadings until a later stage, citing a handful of district court opinions permitting allegations of underperformance and excessive fees to advance. OB 48-49. None of those cases, however, tracks the context here.

Five of the cases Plaintiffs cite held that the complaint *did* plausibly allege a meaningful comparator[14] or implicitly held the same[15]—i.e., they evaluated the issue on the pleadings, precisely as Plaintiffs say there is a "consensus" not to do. Another case involved alleged overpayment for shares of an *identical* fund, where the

---

[14] *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021); *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *8 (N.D. Cal. Nov. 16, 2021).

[15] *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021) (noting plausible similarity between "Index" and "Active" suites, given allegations that both are "actively managed," share "the same [] management firm" and "management team," and have "almost identical glide paths"); *In re Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *6 (C.D. Cal. July 16, 2021) (noting plausible similarity between "Index" and "Active" suites, given allegations that both "are inherently actively managed" and "share[] the same management firm and a nearly identical glide path"); *In re MedStar ERISA Litig.*, 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021) (noting plausible similarity between "Index" and "Active" suites given allegations that both "share[] the same investment management company, investment managers, and equity glide path").

comparison (as discussed next) obviously is meaningful.[16]  Plaintiffs' last cited case is simply an outlier—its holding is wrong and inconsistent with this Circuit's law.[17]  Plaintiffs have identified no "consensus" running their way.  *Compare supra*, 34 n.13 (citing cases going the other way).

Plaintiffs also cite decisions by courts of appeal that they claim caution against dismissal of ERISA imprudence claims at the pleadings stage.  OB 32, 34-35, 48 (citing *Sacerdote v. NYU*, 9 F.4th 95, 108 (2d Cir. 2021); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 331, 333 (3d Cir. 2019); *Braden*, 588 F.3d at 598; *Kong*, 2022 WL 1125667, at *1; *Salesforce.com*, 2022 WL 1055557, at *1).  All five of those cases include allegations that fiduciaries paid more for a different share class of the *same* fund or funds that hold the same underlying assets.[18]  For such "share-class" claims,

---

[16] *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *7-8 (S.D.N.Y. Sept. 29, 2017) (allegations relating to use of "retail funds over lower-cost, but otherwise identical, institutional funds" sufficed to state a claim).

[17] *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 2022 WL 4368188, at *7 (M.D.N.C. Sept. 21, 2022), declined to assess at the pleading stage the plausibility of an allegation that lower recordkeeping fees were available, despite the lack of any context-specific comparison of the services provided.  This holding is at odds with the law in this Circuit.  *Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013) ("[A] fiduciary might have chosen funds with higher fees for any number of reasons, including potential for higher return, lower financial risk, more services offered, or greater management flexibility"), *vacated on other grounds*, 575 U.S. 523 (2015); *see also White*, 752 F. App'x at 454-55 (affirming dismissal of imprudence claim resting on difference in fees charged but without allegations regarding services provided).

[18] *Sacerdote*, 9 F.4th at 109 ("[T]he alleged imprudent choice … was simply between higher-or lower-cost shares of the same fund."); *Sweda*, 923 F.3d at 332 n.7 ("Penn

"the comparator action that a prudent fiduciary should have taken—replacing retail shares with institutional shares—is baked into the claim." *Hughes*, 63 F.4th at 636 (noting that "five other circuits"—the Second (*Sacerdote*), Third (*Sweda*), Sixth (*Forman*[19]), Eighth (*Davis*), and Ninth (*Kong*)—have recognized that comparing a fund *to itself*, as share-class claims do, can state a plausible claim). It is hardly surprising that those cases found dismissal inappropriate. In contrast, this Court, in *Salesforce.com*, *affirmed* dismissal of claims that were based on inapt comparisons of *different* funds with *different* management styles. 2022 WL 1055557, at *2 & n.1; *supra*, 33-34.

The district court did not, as Plaintiffs suggest, require them "to rule out every possible lawful explanation for the conduct [they] challenge[d]." OB 34 (quoting *Sacerdote*, 9 F.4th at 108). The court merely required Plaintiffs to rule out the "obvious alternative explanation," *Hughes*, 63 F.4th at 628, for the differing

---

frequently selected higher cost investments when identical lower-cost investments were available."); *Braden*, 588 F.3d at 595 ("[E]ach of the ten funds included in the Plan offers only retail class shares, which charge significantly higher fees than institutional shares for the same return on investment."); *Kong*, 2022 WL 1125667, at *1 (alleged use of "'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments); *Salesforce.com*, 2022 WL 1055557, at *1 (alleged imprudent use of "lower-cost share classes or collective investment trusts with substantially identical underlying assets.").

[19] *Forman v. TriHealth, Inc.*, 40 F.4th 443 (6th Cir. 2022).

performance and costs of the Intel Funds and Plaintiffs' proposed comparators—i.e., their different "aims, risks, and potential rewards." 1-ER-19.

### 3. The District Court Did Not Ask the Impossible.

Plaintiffs also argue that the requirement to articulate a meaningful benchmark was an "impossible task[]." OB 30. They assert that requiring plaintiffs to plead a meaningful benchmark "immunizes the most brazenly atypical and risky investment strategies, because those are the least susceptible to 'benchmarking.'" OB 4. Plaintiffs' argument rests on the fallacy that to be meaningful, a benchmark must be identical in all particulars. No court, including the district court here, has so held. The meaningful benchmark requirement merely embraces the commonsense notion that, in comparing performance or fees, an actively managed risk-mitigation strategy is not the same as a passively managed return-maximization strategy, and plainly is not the same as the aggregated strategies of an entire index of hundreds of funds.

The district court did not require Plaintiffs to identify a comparator with the same "asset-allocation approach" as the Intel Funds, nor did it "bar[]" Plaintiffs from proposing comparators with "different approaches to asset allocation." OB 42-43. Plaintiffs could have alleged comparators with "similar aims, risks, and potential rewards" to the Intel Funds, 1-ER-19, by—for example—identifying comparator funds that pursued a risk-mitigation strategy through a different (and in their view,

prudent) mix of assets.[20]  Plaintiffs instead made a tactical decision:  Rather than proposing risk-mitigating comparators that might undermine or defeat their contentions of underperformance, they doubled down on the same equity-heavy retail comparators that, as Plaintiffs affirmatively admitted, pursued "different investment strategies" than the Intel Funds.  SER-12.[21]  The task was not "impossible;" Plaintiffs simply chose not to tackle it.

### C. Plaintiffs Cannot Circumvent the Meaningful Benchmark Requirement with Generalized Claims About the Intel Funds' Asset Allocations.

#### 1. ERISA Does Not Permit *Per Se* Challenges.

Plaintiffs attempt to circumvent the meaningful benchmark requirement by arguing that their claim is a more generalized one about the Intel fiduciaries' allocation of plan assets to hedge funds and private equity, both initially and after

---

[20] Plaintiffs now assert that when, in 2011, the fiduciaries "initially adopted their novel allocation approach, there were no funds with meaningfully 'similar aims, risks, and rewards' against which to compare these decisions."  OB 42.  Plaintiffs raised no such argument in the district court.  *See generally* SER-4–23.  Risk mitigation is hardly a "novel" strategy, and Plaintiffs point to no allegation that *no* funds pursued that type of strategy in 2011.

[21] This admission renders Plaintiffs' reliance on *Toomey v. DeMoulas Super Markets, Inc.*, 2020 WL 3412747 (D. Mass. Apr. 16, 2020), inapt.  *See* OB 42.  The allegations in *Toomey* included that the fund's *actual* allocation diverged significantly from the *target* allocation.  *Id.* at *1-2 (fund that targeted "70% to fixed income options and 30% to equities" allegedly "in some years" devoted "as much as 86% to fixed income options").  Here, Plaintiffs' theory distills to the assertion that the fiduciaries "should have been looking for ways to change their risk mitigation strategy to a *riskier strategy* that could provide more returns."  1-ER-30.

seeing the returns.  OB 31-35.  The district court correctly rejected this argument, which amounts to an impermissible *per se* challenge to the prudence of hedge fund and private equity investments.  1-ER-30–31.

On appeal, Plaintiffs repeatedly attack the fiduciaries' "asset-allocation strategy" as "market-defying," "radical," and "unprecedented."  *See, e.g.*, OB 3, 13, 18.  In doing so, Plaintiffs conflate the risk-mitigation *strategy* of the Intel Funds with the broadly diversified *allocation* (including hedge funds and private equity) "chosen to implement that strategy."  1-ER-30.  Although Plaintiffs characterize their challenge as directed to the fiduciaries' "asset-allocation approach," *see, e.g.*, OB 2, it is impossible to read the complaint's broadside attack on these allegedly "high-priced, low-performing[,] illiquid and opaque" investment categories as anything other than a *per se* challenge to their prudence.  3-ER-548; *see* 3-ER-636–48.  Indeed, if Plaintiffs' critiques were credited, how could any prudent fiduciary allocate even a dollar to these supposedly terrible assets?

Plaintiffs' broad-brush criticisms of entire asset classes, without facts to show that a single *actual investment* in the GDF or TDFs suffered from any of those alleged defects, amount to nothing more than an impermissible claim of "imprudence by association."  *See St. Vincent*, 712 F.3d at 721-24.  In *St. Vincent*, the plaintiffs alleged that Morgan Stanley over-allocated to "high-risk" mortgage-backed securities despite public "warning signs" about such securities.  *Id.*

42

at 711-12. The complaint did not identify as imprudent any specific mortgage-backed securities in which the plan invested. *Id.* at 721. In affirming dismissal, the Second Circuit noted that the complaint "offers no insight into how risky those unspecified investments became relative to their price, nor does it allege any facts suggesting that a prudent investor at the time would have viewed this unspecified risk as high enough to render the investments imprudent." *Id.* at 722.

As in *St. Vincent*, Plaintiffs here fail to connect their generalized attacks on hedge funds and private equity to any *actual* investment in the Intel Funds at any time, or to the *actual* risks of such *actual* investment relative to its actual fees. Instead, they contend only that investments in hedge funds and private equity are *generally* risky (*e.g.*, OB 1); that hedge funds and private equity *generally* underperform "the broader market" (*e.g.*, OB 17); and that hedge funds and private equity investments *generally* have higher fees than "traditional" funds (*e.g.*, OB 17). Such "imprecise pleading" is "particularly inappropriate," *St. Vincent*, 712 F.3d at 723, *where Plaintiffs' counsel has known since 2016 the identities of "the hedge and private equity funds in which the retirement plans invest.*" SER-182.

Plaintiffs' reliance on *Stegemann v. Gannett Co.*, 970 F.3d 465 (4th Cir. 2020), to challenge the prudence of the fiduciaries' "initial allocation of plan assets" is puzzling. *See* OB 36, 42-43. *Stegemann* did not involve, as here, generalized allegations about the imprudence of an initial asset allocation concentrating funds in

certain investment *classes*. Rather, it addressed allegations of "imprudently concentrating plan assets in *single-security funds*." OB 42. In other words, those plaintiffs alleged that plan assets were over-allocated *in a single stock*. *Stegemann*, 970 F.3d at 468. *Stegemann* is focused primarily on an alleged violation of ERISA's *diversification* requirement, *id.* at 483—a claim Plaintiffs do not bring. Instead, Plaintiffs complain that the Intel Funds were *too* diversified, including "not only stocks and bonds but also other asset classes like hedge funds, private equity and commodities." 1-ER-8.

Plaintiffs assert that because the alleged downsides of "non-traditional" assets like hedge funds and private equity make them "riskier than traditional investments like stocks and bonds," OB 1-2, prudent fiduciaries allocate "virtually no assets to private-equity and hedge funds." OB 10. But Plaintiffs' argument contradicts their complaint, which (as the district court correctly noted) alleges that the Intel Funds' asset allocation was *less* risky than a "traditional" allocation to "stocks and bonds." *See supra*, 11-13. It is also legally irrelevant. As Plaintiffs expressly acknowledged to this Court on their prior appeal, under the Department of Labor's long-standing interpretation, "'a particular investment' cannot 'be deemed *per se* prudent or *per se* imprudent based on its level of risk.'" SER-42 ("Such a *per se* approach is directly at odds with both case law and ERISA itself."). That is correct, and eviscerates

44

Plaintiffs' effort on *this* appeal to present what amounts to precisely the *per se* challenge they previously acknowledged is unavailable.

Moreover, Plaintiffs' focus on the alleged detriments of hedge funds and private equity—liquidity, transparency, and so forth—runs contrary to the Department of Labor's ERISA regulations, which require that fiduciaries evaluate the prudence of investments as part of an overall portfolio, not in isolation. 29 C.F.R. § 2550.404a-1(b)(1)–(2) (2018); *see also St. Vincent*, 712 F.3d at 717 ("[T]he prudence of each investment is not assessed in isolation but, rather, as the investment relates to the portfolio as a whole."); *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001) ("The prudence rule … requires that a fiduciary give appropriate consideration to the role a proposed investment plays in a portfolio as a whole."). That requirement flows from the ERISA regulations' adoption of "modern portfolio theory," which recognizes that investment risk cannot be eliminated, but must instead be managed through diversification. *Laborers Nat'l Pension Fund v. N. Tr. Quantitative Advisors, Inc.*, 173 F.3d 313, 317-18 (5th Cir. 1999).

"*[A]ll* investments involve some degree of risk." *Stegemann*, 970 F.3d at 475 (emphasis in original). Riskier investments (like stocks) offer the possibility of both higher gains and deeper losses than less risky ones (like bonds); that volatility is an investment's risk. *See* 3-ER-621–23. Category-specific considerations around

45

non-traditional assets like hedge funds and private equity, such as liquidity or transparency risks, can be managed, just like the risks of any other asset class. *See* 3-ER-430; *see also* Restatement (Third) of Trusts § 90 cmt. e(1) (Am. L. Inst. 2007) (noting "competent use of investments or techniques that are often characterized as risky or 'speculative'"—"for example, real estate and venture capital"—is permitted).

The Department of Labor has stated outright that private equity investments may prudently be included in defined contribution plans (like the Plans at issue here) "as part of a multi-asset class vehicle structured as a custom target date, target risk, or balanced fund." 3-ER-448-49. After reviewing these authorities incorporated by reference, the district court correctly concluded that Plaintiffs' allegations of generalized, category-based risks of hedge funds and private equity failed to state a claim of imprudence. 1-ER-64.

## 2. The Intel Fund's Deviation from the "Prevailing View" About Asset Allocation Does Not State a Claim.

Plaintiffs argue that they stated a plausible claim by alleging that the Intel fiduciaries' asset allocation approach diverged from the "prevailing view" of other ERISA fiduciaries and investment managers. OB 34; *see also* OB 4 ("The plaintiffs' claims are premised on the fact that *no* other similarly situated plan or target-date fund used these reckless asset-allocation models, which is precisely *why* the Intel's [*sic*] fiduciaries were imprudent." (emphases in original)). In this Court, as in the

district court, 1-ER-63, Plaintiffs cite no legal authority that requires fiduciaries to track "prevailing views" on asset allocation. Other circuits have squarely rejected such a theory. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48-49, 55 (1st Cir. 2018) (rejecting allegation that fiduciaries "departed radically" from standard allocations of similar funds as "just cavils about deviation from industry standards" insufficient to state a claim); *DeBruyne*, 920 F.2d at 465 (explaining that "assertions of what a 'typical' balanced fund portfolio manager might have done in [the past] say little about the wisdom of [defendant's] investments, only that [defendant] may not have followed the crowd").

Plaintiffs' premise is doubly flawed when set against the very sources they cite in their complaint. As of 2010—shortly before the Intel fiduciaries implemented the allocation challenged here—fully *92%* of large defined benefit plans invested in private equity and *60%* invested in hedge funds. 3-ER-430. The Intel fiduciaries' choice to use an asset allocation approach concededly common in defined benefit plans subject to the same standard of prudence does not state a claim of imprudence.

As the GAO report incorporated in the complaint (*e.g.*, 3-ER-641–42) notes, the non-traditional assets Plaintiffs attack "may serve useful purposes in a well thought out investment program, offering plan sponsors advantages that may not be as readily available from more traditional investment options." 3-ER-442; *see also* 3-ER-425. The unique benefits available from such assets are precisely why

47

multi-billion dollar defined benefit plans were already commonly invested in hedge funds and private equity at the time the Intel fiduciaries expanded their allocation approach to include such assets in the Intel Funds. 3-ER-414–17. These are facts Plaintiffs themselves put before the district court, and they doom any inference that the fiduciaries acted imprudently in implementing a risk mitigation strategy that included allocations to such assets.

Plaintiffs' complaint even acknowledges that the allocation approach of the Intel Funds *lowered* overall risk. 3-ER-608–09. According to Plaintiffs themselves, between 2007 and 2018, the hedge funds held by the GDF and TDFs had a "comparable market risk" to a portfolio holding "26% in equity and 74% in bonds." 3-ER-624. Meanwhile, a "typical" 66% equity/34% bond portfolio had more than double the risk over that period, but produced only a 1% annual increase in return (across a prolonged bull market). 3-ER-624. During the 2008 financial crisis, Plaintiffs admit, the hedge fund investments in the Intel Funds provided protection against the sharp drop in the equity markets that resulted in a 24% to 41% loss for off-the-shelf target date funds. *Compare* 3-ER-462 (noting Morningstar report citing 24% to 41% loss for target date 2010 funds), *with* 3-ER-660 (alleging 17% drop in hedge funds for same period). That is, according to Plaintiffs themselves, the Intel Funds better mitigated overall risk than the approach Plaintiffs now argue, with the benefit of hindsight, should have been followed.

"The prudent man rule as codified in ERISA is a flexible standard." *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 196 n.31 (5th Cir. 2020). It does not dictate the "right" choice, as to strategy or asset allocation, but rather authorizes fiduciaries to balance considerations like risk and return in designing both. Plaintiffs can state no claim based on the allegation that the Intel fiduciaries did not follow the "prevailing" asset allocation approach.

### 3. Plaintiffs' Preference for a Riskier Allocation Strategy Does Not State a Claim.

Contradicting their rhetoric about the fiduciaries' supposedly "risky" choices, Plaintiffs' central thesis is (as the district court noted) that the Intel fiduciaries "never should have pursued a risk mitigation strategy at all and that Defendants should have been looking for ways to change their risk mitigation strategy to a *riskier* strategy that could provide *more returns* for employees." 1-ER-30.[22] This theory fails because "ERISA fiduciaries are not required to adopt a riskier strategy simply because that strategy may increase returns." 1-ER-30. Instead, "[a] fiduciary may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option." *White*

---

[22] This thesis is substantiated by Plaintiffs' allegation that the Intel Funds were "limiting downside risk at the cost of proportionally less upside gain"—i.e., "in a down market [the hedge funds] do not sufficiently outperform equities to compensate for the opportunity losses in an up market." 3-ER-623.

*v. Chevron Corp.*, 2017 WL 2352137, at *10 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018).

Here, the fiduciaries' express objective in adopting a risk-mitigation strategy was "to minimize dispersion of outcomes for plan participants." 2-ER-217; *see also* 3-ER-624, 640. Plaintiffs complain that the Intel fiduciaries "gave up the long-term benefit of investing in equity." 3-ER-624. But "[s]ometimes stocks underperform," too. *Locascio*, 2023 WL 320000, at *1 & n.1 (referring to 2022). ERISA neither requires fiduciaries "to predict the future" nor penalizes them "for deciding to avoid risks that, in hindsight, could have been tolerated." *Barchock*, 2017 WL 9324762, at *5. As the district court correctly concluded, Plaintiffs' preference for a return-maximizing, rather than risk-minimizing, strategy, does not state a claim. 1-ER-30; *see also Wright*, 360 F.3d at 1100 (ERISA does not require fiduciaries "to maximize pecuniary benefits.").

### D. The District Court Correctly Concluded That Plaintiffs' Proposed Comparators Are Not Meaningful Benchmarks.

Plaintiffs lastly contend that their proposed comparators *were* meaningful benchmarks after all. OB 43-48. But they fail to demonstrate that the district court erred in rejecting their conclusory assertions. Indeed, they fail even to address the district court's rationale for its holding, which relied on facts Plaintiffs pled or that were incorporated by reference.

For example, Plaintiffs claim that "the district court here refused to credit the plaintiffs' allegations comparing the Intel Funds' performance to the plan-disclosure benchmarks." OB 45. The district court did no such thing. Rather, it rejected Plaintiffs' claim that a Morningstar category average was the Intel Funds' "own benchmark" merely because fund fact sheets reference that average. "[T]he document on which Plaintiffs rely," the district court noted, "unambiguously shows that the Intel TDFs are *not* benchmarked against the Morningstar 'peer group category' but against a customized benchmark." 1-ER-25.[23] Tellingly, Plaintiffs did not argue below, and do not argue here, either that this custom benchmark was an inappropriate comparator or that the TDFs underperformed when measured against that customized benchmark.

Plaintiffs also argue that the district court rejected their allegation that all funds of a given variety may be compared to one another on "nothing more than the

---

[23] This distinguishes the present case from those comparing a challenged fund to its own designated benchmark. *See* OB 44-45 (citing *Becker v. Wells Fargo & Co.*, 2021 WL 1909632, at *5 (D. Minn. May 12, 2021); *Karpik v. Huntington Bancshares Inc.*, 2019 WL 7482134, at *5 n.9 (S.D. Ohio Sept. 26, 2019); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1076 (N.D. Cal. 2017)). Morningstar itself, in a document Plaintiffs incorporated by reference, disclaims that target date funds are interchangeably comparable, cautioning that "a wide range of approaches" exist. 3-ER-521. Plaintiffs (OB 45) also cite *Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 780-81 (N.D. Cal. 2019). *Baird* does not involve a comparison with a plan's own benchmark; the claims proceeded in part because the funds underperformed compared to other funds "with the same investment strategies." *Id.* at 780.

court's own say-so." OB 46. In fact, the district court relied on *Plaintiffs'* "say-so": "Plaintiffs' allegation that peer TDFs of the same vintage (i.e., share the same target date) are meaningful benchmarks is especially conclusory *given that Plaintiffs' own [complaint] explains* that 'there are considerable differences among TDFs offered by different providers, even among TDFs with the same target date.'" 1-ER-23–24 (quoting 3-ER-590). A plaintiff cannot escape dismissal on the basis of conclusory allegations that contradict documents incorporated by reference. *Wright*, 360 F.3d at 1096.

Nor are Plaintiffs correct that the district court rejected their reliance on Morningstar's "peer group categories"—the average performance of entire categories of funds—as meaningful benchmarks based "only on its own view." OB 47-48. Again, the district court's decision was traceable to Plaintiffs' own allegations (or lack thereof): Although Plaintiffs expressly conceded that differences in the construction of portfolios for individual target date funds "can significantly affect the way a TDF performs," 3-ER-590, "Plaintiffs provide[d] no information as to the aims, risks, or rewards of any individual fund within the 224 funds that constitute [Morningstar's] peer group funds with a [given] target date." 1-ER-24. Plaintiffs also fail to contest the district court's identical conclusion with respect to the GDF (let alone its observation that on Plaintiffs' own allegations, the GDF

outperformed more than 80% of the funds in the Morningstar category Plaintiffs allege as an aggregated comparator). *See* 1-ER-26–28; *supra*, 22.

The district court's view is not controversial—courts commonly reject using category averages as benchmarks. Otherwise, a plaintiff could evade the "meaningful benchmark" requirement simply by relying on a category average that elides significant differences in aims, risks, and potential benefits. *See, e.g.*, *Matousek*, 51 F.4th at 281-82 (rejecting reliance on "aggregate data" because "[t]here is no way to compare the large universe of funds—about which we know little—to the risk profiles, return objectives, and management approaches of the funds in MidAmerican's lineup.").

Plaintiffs cite two district court decisions purportedly in support of their reliance on aggregated Morningstar categories. OB 47. But one of those cases *rejects* the claim "that the entire Morningstar peer universe constitutes a meaningful benchmark" because "permitting these types of comparators would allow plaintiffs to dodge the requirement for a meaningful benchmark by merely finding a less expensive alternative fund or two with some similarity." *Snyder v. UnitedHealth Grp., Inc.*, 2021 WL 5745852, at *4 n.2 (D. Minn. Dec. 2, 2021). Indeed, after *Snyder* was decided, the Eighth Circuit made clear that comparisons using such "aggregate data" do not support a plausible claim: When "the composition of the peer groups remains a mystery" because "there is no explanation of what types of

53

funds are in each group, much less the criteria used to sort them," a court has "no way of knowing whether the peer-group funds provide a sound basis for comparison." *Matousek*, 51 F.4th at 281. The other case Plaintiffs cite on this point (OB 47), *Dover v. Yanfeng US Automotive Interior Systems I LLC*, 563 F. Supp. 3d 678, 687 (E.D. Mich. 2021), predates the Sixth Circuit's decision in *CommonSpirit* adopting the "meaningful benchmark" requirement.

In rejecting Plaintiffs' conclusory allegations, the district court did not, as Plaintiffs' contend, "improperly stray into the merits," OB 46, nor did it separately "parse[]" each of Plaintiffs' allegations, OB 48. It evaluated Plaintiffs' allegations "as a whole." 1-ER-55, 57; *see* 1-ER-16–17, 66. It held Plaintiffs could not show that risk mitigation is outside the range of reasonable strategies. 1-ER-26–27. It held that "deviation" from a "prevailing" allocation approach creates no inference of imprudence. 1-ER-62–63. And it held that Plaintiffs' admitted apples-to-oranges comparisons of funds pursuing different investment strategies could not be cured by conclusory assertions regarding shared "peer groups." 1-ER-18–24. Considering those allegations "as a whole," the district court concluded that Plaintiffs failed to state a claim: zero plus zero is still zero.

## II. THE COURT SHOULD AFFIRM THE DISMISSAL OF PLAINTIFFS' DISLOYALTY CLAIMS.

Plaintiffs accuse the district court of applying too stringent a test to their disloyalty claims and "refus[ing] to credit" their allegations. OB 53. That is

incorrect. The district court grounded its dismissal on Plaintiffs' failure "to plausibly allege a *real* conflict of interest, rather than the *mere potential* for a conflict of interest." 1-ER-35; *see also Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018) (per curiam) ("[T]he potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty."). Plaintiffs alleged only that Intel Capital invests in a large number of start-up companies, that the Intel Funds invested in certain private equity funds offered by third-party firms such as Goldman Sachs or BlackRock, and that those firms' funds occasionally invested in the same start-up companies as Intel Capital. Plaintiffs do not allege that the Intel fiduciaries knew anything about, or had any ability to influence, which start-up companies Goldman Sachs, etc., chose to fund.[24]

Contrary to Plaintiffs' argument (OB 54), the district court correctly recognized that ERISA requires fiduciaries to "act solely in the interest" of participants. 1-ER-32. It held that Plaintiffs stated no claim under that test because Plaintiffs "provide[d]" no "factual allegations to support the claim that the aim of the Investment Committee's investment in the various private equity funds was to

---

[24] Plaintiffs argue that because these investments "had the potential to benefit" Intel, the fiduciaries "should have undertaken a particularly intensive investigation into [those investments'] merits." OB 56. But that is a challenge to the prudence of the fiduciaries' process, which (as the district court correctly held) cannot be repackaged as a claim of disloyalty. 1-ER-68–69.

55

aid Intel Capital in its venture capital investments." 1-ER-35–36*; see also* 1-ER-66. Plaintiffs mischaracterize this holding as requiring them "to show that the fiduciaries' primary (or even exclusive) 'aim' was to benefit itself [*sic*] and Intel Capital." OB 55. Nothing in the district court's order imposed such a requirement. Rather, as the district court explained, Plaintiffs failed to allege that the Intel fiduciaries "had any influence over any investment firm's decision to invest in one of the startups in which Intel invested." 1-ER-35.[25]

Such an allegation is a necessary (though not sufficient) predicate to a plausible disloyalty claim because ERISA distinguishes between the *reason* for a fiduciary's decision and the *effect* of that decision: Fiduciaries can make investment decisions "they 'reasonably conclude best ... promote the interests of plan participants and beneficiaries' even where such decision[s] 'incidentally benefit[] the corporation.'" *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1125 (D. Colo. 2020) (first alteration in original) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)), *aff'd*, 1 F.4th 769 (10th Cir. 2021). To plead a violation of the duty

---

[25] Plaintiffs misstate the applicable test, arguing that the relevant inquiry "is whether the senior Intel officers responsible for Intel Capital's success influenced the Plans' investments." OB 53. It is well-settled that, unlike the common law of trusts, ERISA permits fiduciaries to "wear different hats." *Halperin v. Richards*, 7 F.4th 534, 547 (7th Cir. 2021) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000)) (explaining departure from common law). The unsurprising fact that senior Intel personnel responsible for Intel Capital's investments were also asked to serve on the Investment Policy Committee yields no inference of disloyalty.

of loyalty, plaintiffs must plead facts suggesting the "fiduciary's operative *motive* was to further its own interests." *CommonSpirit*, 37 F.4th at 1170.

Absent plausible allegations both (1) that the Intel fiduciaries *could* steer Goldman Sachs or BlackRock, for example, to invest in companies they otherwise would not have, to benefit Intel Capital at the expense of Plan participants, and (2) that the fiduciaries *did* do so, there is no basis for a disloyalty claim. Instead, Plaintiffs merely alleged that sophisticated investment companies—Intel Capital, on the one hand, and firms like Goldman Sachs and BlackRock, on the other—saw value in some of the same opportunities. That is hardly surprising. Because Plaintiffs alleged no more than a *potential* conflict of interest, they alleged no plausible claim of disloyalty. 1-ER-32–38.[26]

The district court correctly held that Plaintiffs' conclusory, speculative assertions of disloyalty were not supported by well-pled allegations of any actual conflict of interest.[27] The cases Plaintiffs cite do not support reversal on this point.

---

[26] Plaintiffs also argue that when the district court noted the "tiny percentage" of overlap, it "recited facts" "that are nowhere to be found in the complaint." OB 53 (quoting 1-ER-35). Plaintiffs ignore their own allegations that Intel Capital has invested "in over 1,500 companies," and that funds operated by BlackRock, etc., invested in about 50 of those companies. 3-ER-563–64. The district court thus correctly characterized Plaintiffs' allegations.

[27] In their background section, Plaintiffs reference an alleged meeting between one Intel fiduciary and a "confidential witness." OB 22. They offer no argument as to how that meeting supports a claim. *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) (arguments "in passing," without citation or authority, "are generally

Half involved fiduciaries offering their own (or their affiliates') more expensive funds, whose fees would redound to their or their affiliates' direct benefit.[28] Here, Plaintiffs allege no such direct benefit to Intel or the Plan fiduciaries. The other half involve facially inapt facts, such as alleged "quid pro quo" payments.[29] The district court correctly deemed such cases "inapposite." 1-ER-36–37.

## III. THE COURT SHOULD AFFIRM THE DISMISSAL OF PLAINTIFFS' DERIVATIVE CLAIMS.

The district court dismissed Plaintiffs' derivative claims alleging failure to monitor and co-fiduciary liability because Plaintiffs pleaded no primary violation. 1-ER-42–43. Plaintiffs ask the Court to reinstate these claims if it reverses on any primary claim. OB 58. But the derivative claims rest only on conclusory allegations, and fail regardless.

---

deemed waived"). As alleged, Intel's Treasurer—a senior officer in a large company—met personally with an employee to hear out concerns but supposedly did not provide sufficiently detailed information in response. 3-ER-555, 565, 655–66. These allegations support no plausible claim of disloyalty.

[28] OB 52 n.5 (citing *Cryer v. Franklin Templeton Res., Inc.*, 2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017); *Miller v. Astellas US LLC*, 2021 WL 1387948, at *6 (N.D. Ill. Apr. 13, 2021); *Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *10 (D. Minn. Nov. 20, 2012)).

[29] OB 52 n.5 (citing *Braden*, 588 F.3d at 596); *see also* OB 55 (citing *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1467 (9th Cir. 1995) (fiduciaries allegedly used plan assets as collateral *for purpose of terminating the plan*); OB 54 (citing *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401 (9th Cir. 1995) ("strong evidence" that defendant selected vendor so that "more funds reverted to [itself]")).

As to the appointing fiduciaries' alleged failure to monitor their appointees, Plaintiffs offer no substantive allegations at all. They simply assert in a conclusory manner that the appointing fiduciaries "fail[ed] to monitor" and "fail[ed] to remove" their appointees. 4-ER-703. The duty to monitor appointees does not "expose[] the appointing fiduciary to open-ended liability." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996). A plausible claim requires non-conclusory facts that a defendant failed to "review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance" with plan terms and ERISA requirements. *In re Calpine Corp. ERISA Litig.*, 2005 WL 1431506, at *4-6 (N.D. Cal. Mar. 31, 2005). Plaintiffs offer nothing of the sort.

Plaintiffs similarly offer only a conclusory statement of the elements of co-fiduciary liability, 4-ER-705–08, rather than any facts supporting liability of any fiduciary for the conduct of others. *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 841 (N.D. Cal. 2005) (dismissing for lack of "specific facts").

These pleading failures provide an independent basis for dismissal.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Juli Ann Lund*

DANIEL F. KATZ
DAVID S. KURTZER-ELLENBOGEN
JULI ANN LUND
  *Williams & Connolly LLP*
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*

SCOTT P. COOPER
PROSKAUER ROSE LLP
  *2049 Century Park East,*
  *Suite 3200*
  *Los Angeles, CA 90067*
  *(310) 557-2900*

MYRON D. RUMELD
PROSKAUER ROSE LLP
  *Eleven Times Square*
  *New York, NY 10036*
  *(212) 969-3000*

*Counsel for Defendants-Appellees*

DATED: JUNE 7, 2023

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Defendants state that they are not aware of any related cases pending before this Court.

/s/ *Juli Ann Lund*
JULI ANN LUND

DATED:    June 7, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 22-16268

I am the attorney or self-represented party.

**This brief contains 13,998 words,** excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XX] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ___/s/___ *Juli Ann Lund* _____

**Date:** June 7, 2023

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 7, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Juli Ann Lund*
JULI ANN LUND

DATED:     June 7, 2023