No. 22-16268

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

## WINSTON ANDERSON, et al.,
*Plaintiffs-Appellants,*

*v.*

## INTEL CORPORATION INVESTMENT POLICY COMMITTEE, et al.,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
CASE NO. 3:19-CV-04618 (HON. LUCY KOH/HON. VINCE CHHABRIA)

## DEFENDANTS-APPELLEES'
## SUPPLEMENTAL EXCERPTS OF RECORD
Volume 1 of 1

SCOTT P. COOPER
PROSKAUER ROSE LLP
  2049 Century Park East, Ste. 3200
  Los Angeles, CA 90067
  (310) 557-2900

MYRON D. RUMELD
PROSKAUER ROSE LLP
  Eleven Times Square
  New York, NY 10036
  (212) 969-3000

DANIEL F. KATZ
DAVID S. KURTZER-ELLENBOGEN
JULI ANN LUND
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue SW
  Washington, DC 20024
  (202) 434-5000

*COUNSEL FOR DEFENDANT-APPELLEES*

# TABLE OF CONTENTS

| Docket Entry | Description | Page |
|---|---|---|
| | **VOLUME I of I** | |
| 122 | Excerpted copy of Plaintiffs' June 9, 2021 Opposition to Defendants' Motion to Dismiss the Amended Consolidated Complaint | 3 |
| 101 | Excerpted copy of Plaintiffs' August 19, 2020 Opposition to Defendants' Motion to Dismiss the Consolidated Complaint | 25 |
| 100-1 | Declaration of Vidya A. Mirmira in Support of Defendants' July 22, 2020 Motion to Dismiss the Consolidated Complaint | 36 |
| 100-2 | Exhibit 11 to Defendants' July 22, 2020 Motion to Dismiss the Consolidated Complaint – Excerpt of the Opening Brief of Plaintiff-Appellant Christopher Sulyma in *Sulyma v. Intel Corporation Investment Policy Committee, et al.*, No. 17-15864, Dkt. No. 16 (9th Cir.), filed on December 29, 2017 | 40 |
| 96 | Plaintiffs' June 24, 2020 Consolidated Complaint | 44 |
| 81* | Declaration of Gregory Y. Porter in Support of Motion to Be Designated Lead Counsel in *Sulyma v. Intel Corporation Investment Policy Committee, et al.*, No. 15-cv-04977, Dkt. No. 81 (N.D. Cal.), filed on March 2, 2016 | 180 |

*This refers to docket entry 81 in *Sulyma v. Intel Corporation Investment Policy Committee, et al.*, No. 15-cv-04977 (N.D. Cal), which was subsequently consolidated with the later-filed lead case, *Anderson v. Intel Corporation Investment Policy Committee, et al.*, 19-cv-04618 (N.D. Cal.).

1  Joseph Creitz (Cal. Bar No. 169552)
   CREITZ & SEREBIN LLP
2  100 Pine Street, Suite 1250
   San Francisco, CA 94111
3  joe@creitzserebin.com
   Telephone: (415) 466-3090
4  Facsimile: (415) 513-4475

5  *Attorneys for Plaintiffs*

6

7                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
8                          **SAN JOSE DIVISION**

9

10  WINSTON R. ANDERSON, CHRISTOPHER          Case No: 5:19-cv-04618-LHK
    M. SULYMA, and all others similarly situated,   (Consolidated with No. 15-cv-04977-NC
                                                     & No. 16-cv-00522)
11
          Plaintiffs,
12                                              **PLAINTIFFS' OPPOSITION TO**
                                                **MOTION TO DISMISS COUNTS I – VI**
          v.                                    **OF AMENDED CONSOLIDATED**
13                                              **COMPLAINT**

14  INTEL CORPORATION INVESTMENT
    POLICY COMMITTEE, INTEL
15  RETIREMENT PLANS ADMINISTRATIVE
    COMMITTEE, FINANCE COMMITTEE OF
16  THE INTEL CORPORATION BOARD OF
    DIRECTORS, CHRISTOPHER C. GECZY,
17  RAVI JACOB, DAVID S. POTTRUCK,
    ARVIND SODHANI, RICHARD TAYLOR,
18  TERRA CASTALDI, RONALD D. DICKEL,
    TIFFANY DOON SILVA, TAMI GRAHAM,
19  CARY KLAFTER, STUART ODELL,
    CHARLENE BARSHEFSKY, SUSAN L.
20  DECKER, JOHN J. DONAHOE, REED E.
    HUNDT, JAMES D. PLUMMER, FRANK D.
21  YEARY, STACY SMITH, ROBERT H. SWAN,
    TODD UNDERWOOD, AND GEORGE S.
22  DAVIS

23        Defendants,

24
    and
25
    INTEL 401(K) SAVINGS PLAN and INTEL
26  RETIREMENT CONTRIBUTION PLAN,

27        Nominal Defendants.

28

---

*Anderson v. Intel*          Opposition to Motion to Dismiss          Case No. 5:19-cv-04618-LHK

# I.   INTRODUCTION

Plaintiffs allege that Defendants breached their fiduciary duties under the Employee Retirement Income Security Act by employing a strategy in two defined contribution plans—the Intel 401(k) Savings Plan and the Intel Retirement Contribution Plan ("the Plans")—that radically departed from the asset allocation strategies for target date funds and balanced funds used by professional investment managers of target date and balanced funds and plan fiduciaries for similar-sized (billion-dollar) defined contribution plans. The Plans' fiduciaries engaged in this strategy despite (1) their own experience with failed hedge fund strategies during the 2007–2008 market crisis, (2) contemporaneous reports of poor hedge fund returns, (3) the exorbitant expenses of hedge funds and private equity, and (4) the widely-reported risks of hedge funds and private equity. As a result of these investment strategies, the Plans lost hundreds of millions of dollars due to underperformance and excessive fees as compared to peer plans and funds.

The Court dismissed the prior Consolidated Complaint, ECF No. 95, with leave to amend, identifying three deficiencies: (1) insufficient allegations explaining why Plaintiffs' benchmarks for asset allocation, investment returns, and fees were appropriate; (2) insufficient allegations about contemporaneous information and data that a prudent fiduciary knew or should have known belied the case for hedge funds; and (3) for the duty of loyalty claim, insufficient allegations about conflicts of interest about Intel's use of the Plans' assets to bolster its own investment portfolio. ECF No. 109 ("Order"). The Amended Consolidated Complaint cures these deficiencies and clarifies that Defendants did not just breach their duties at the time of the initial investment decision in 2011, but throughout the Class Period by breaching their duty to monitor and remove the investments.

***First***, Plaintiffs added detailed allegations about benchmarks and explained their purpose and how retirement plan fiduciaries use benchmarks. Plaintiffs added detailed allegations about a variety of appropriate benchmarks and explained why a wide variety of selected benchmarks, some of which were used by Defendants themselves, are appropriate. ***Second***, Plaintiffs added detailed allegations about what was known or knowable by retirement plan fiduciaries in 2011 when Defendants bet the house on hedge funds. Plaintiffs identified numerous contemporaneous articles

and studies by leading analysts warning of the dangers and risks of hedge funds. Plaintiffs added detailed investment return data showing that hedge funds repeatedly failed to deliver returns commensurate with risk—that is, the returns for hedge funds in the years leading up to 2011 showed that at every interval of risk-adjusted return, hedge funds failed miserably when compared to traditional retirement plan investments. Additionally, allegations about the Plans' continued poor performance suffice to allege that the Plans' fiduciaries breached their ongoing duty to monitor the investments. **Third**, Plaintiffs added detailed factual allegations that Defendants invested and continued to invest the Plans in hedge funds to benefit Intel and its subsidiary. Plaintiffs added detailed allegations, based on the first-hand observations of a confidential witness, that Defendants, which include executives in high management positions, put their own interests ahead of those of participants with lower pay.

Defendants' motion to dismiss makes numerous improper factual assertions and inferences and relies on extrinsic evidence.[1] At every turn, it depends on Defendants' version of the facts, data interpretation, and evidence. Read carefully, Defendants' motion and its many disputes with the Complaint show only that there are multiple disputed material facts that could not be resolved at summary judgment, let alone on a motion to dismiss. Thus, the Court should deny their motion.

## II.   LEGAL STANDARD

A motion to dismiss "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). A complaint need only state sufficient factual content that, when accepted as true, "state[s] a claim to relief that is plausible on its face." *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1048 (9th Cir. 2012). Defendants ignore the key principles for a motion to dismiss. **First**, the plausibility standard is not a "probability requirement" and a "complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[S]o long as the plaintiff alleges facts to support a

---

[1] The litany of Defendants' improper inferences is identified in Appendix to this Opposition.

theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.* **Second**, "[s]pecific facts are not necessary" to state a plausible claim because the complaint need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555). **Third**, all non-conclusory facts alleged in the complaint must be taken as true and all reasonable inferences drawn in favor of the plaintiff. *Mujica v. AirScan Inc.*, 771 F.3d 580, 589 (9th Cir. 2014); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 969 (N.D. Cal. 2016) (Koh, J.). "Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). **Fourth,** "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). **Finally**, the complaint must be read as a whole, not "parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citing *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009) and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)).

Following these principles is vital in ERISA actions where private individuals have an "important role" to "enforc[e] ERISA's fiduciary duties" and "prevent through private civil litigation misuse and mismanagement of plan assets." *Braden*, 588 F.3d at 597–98. A "holistic evaluation of an ERISA complaint's factual allegations" is counseled by participants' "limited access to crucial information" regarding facts that "tend systemically to be in the sole possession of defendants." *Id.* at 598; *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

Further, "circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage" because plaintiffs may not "be in a position to describe with particularity the events constituting the alleged misconduct." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). Thus, ERISA plaintiffs are not "required to describe directly the ways in which [defendants] breached their fiduciary duties," to explain "the process by which the Plan was

1    managed," or to "rule out potential lawful explanations for [defendants'] conduct." *Braden*, 588 F.3d

2    at 596; *Sweda v. U. of Pa.,* 923 F.3d 320, 332 (3d Cir. 2019) (reversing dismissal where plaintiff did not

3    "directly allege[] how [defendants] mismanaged the Plan").

4    Applying these principles, the Amended Consolidated Complaint contains ample factual

5    allegations of not only underperformance before and during the Class Period and high fees but also

6    knowable concerns with the challenged investments within defined contributions plans and radical

7    departure from decisions made by fiduciaries of comparable plans and managers of comparable

8    funds. These allegations present a detailed indictment of the challenged investments across all

9    observations that can be made without access to information that remains solely in Defendants'

10   possession; they permit a reasonable inference that the process by which the Plans were managed

11   was tainted by failure of prudence or loyalty. Defendants have relied on their own self-serving

12   interpretation of 21 exhibits, totaling over 400 pages, to improperly ask the Court to draw inferences

13   in their favor to rebut Plaintiffs' factual allegations. Defendants have improperly parsed the

14   Complaint, rather than considering it as a whole, and improperly expect that Plaintiffs should rebut

15   their various "alternative explanations" for Defendants' conduct. But none of those explanations

16   renders Plaintiffs' allegations implausible. Thus, properly viewed, the Amended Consolidated

17   Complaint contains sufficient factual allegations to support each claim.

18   **III.    ARGUMENT**

19         **A.    COUNTS I AND II PROPERLY ALLEGE BREACHES OF THE DUTIES
                  OF PRUDENCE AND LOYALTY AT THE TIME OF THE INITIAL
20                DECISION AND THROUGHOUT THE CLASS PERIOD**

21   This Court previously explained that on an ERISA § 404(a)(1)(B) claim, the fiduciary

22   "standard 'focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results,

23   and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the

24   merits of a particular investment.'" Order at 11 (quoting *Pension Benefit Guar. Corp. ex rel. St. Vincent v.*

25   *Morgan Stanley Inv. Mgmt.* ("*St. Vincent*"), 712 F.3d 705, 716 (2nd Cir. 2013)). An ERISA claim alleging

26   an imprudent investment process can survive a motion to dismiss even when the facts do not

27   directly address the process by which the Plan was managed because a court can infer a flawed

28

process from "circumstantial factual allegations." *Id.* at 12 (quoting *St. Vincent*, 712 F.3d at 718). "[A] plaintiff relying on inferences from circumstantial allegations" is required to allege facts that "a prudent fiduciary in like circumstances would have acted differently." *St. Vincent*, 712 F.3d at 720. At the pleading stage, "a plaintiff must provide a sound basis for comparison—a meaningful benchmark," such as a market index, "[t]o show that 'a prudent fiduciary in like circumstances' would have selected a different fund." Order at 18 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)). The Court found the prior Complaint failed to "provide sufficient allegations to support [the] claim that . . . other funds are adequate benchmarks against which to compare the Intel Funds." *Id.* at 16. Dismissing the Complaint *without prejudice,* the Court allowed Plaintiffs to plead additional allegations that their benchmarks are meaningful. *Id.* at 16, 23–24, 29.[2] The Amended Consolidated Complaint includes sufficient factual allegations meeting the Court's mandate. *Id.* at 16*,* 18. As a result, Counts I and II should be allowed to proceed.

### 1. The Complaint Alleges Plausible Benchmarks for the Intel Funds

The Amended Consolidated Complaint alleges plausible benchmarks for the Intel Funds. **First**, this Complaint, including the Plaintiffs' experts referenced therein, expressly uses the Plans' own benchmark indices for the GDF. *E.g.*, ECF No. 113 ("ACC") ¶¶ 180-181. The benchmark indices for in the TDF disclosures, however, provide little basis for comparison. The fund fact sheets, for example, identify a "Blended Benchmark," which is composed of multiple underlying indices, and the investment disclosure documents benchmark the TDFs against MSCI World, which is an index of global equities, whereas the TDFs include equities, bonds, commodities, hedge funds, and private equity. Nevertheless, as the Plan also benchmarked the TDFs against the Morningstar category, the Complaint uses the Plan's benchmarks when comparing to the category. ACC ¶ 15 & n. 8. The Complaint also uses common benchmarks for defined contribution plan investments: (1) published indices; (2) peer groups such as the categories established by Morningstar, Inc., and (3) specific peer alternatives within a given asset class." ACC ¶ 136 (citing ECF No. 113-1 ("Halpern

[2] The Court explained that adequate benchmarks were needed to support both allegations that the Intel Funds underperformed and had excessive fees. Order at 16, 18, 23, 24.

Decl.") ¶¶ 6–7). The leading published indices for target date funds ("TDFs") are maintained by Dow Jones, Morningstar and S&P. *Id.* ¶ 164.[3] Courts in this District have held post-*Meiners* that a plan's own benchmarks are plausible benchmarks against which to compare the challenged funds. *E.g., Baird v. BlackRock Institutional Tr. Co., N.A.,* 403 F. Supp. 3d 765, 780-81 (N.D. Cal. 2019) (sustaining fiduciary duty claims that compared the plan's funds to the "benchmark indices" and other similar funds); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1076 (N.D. Cal. 2017) (holding the complaint drew "a plausible inference that the Defendants' decision-making process was flawed" where the plaintiff alleged that "almost all of the investment options … underperformed compared to their benchmark"); *see Becker v. Wells Fargo & Co.*, No. 20-2016, 2021 WL 1909632, *5 (D. Minn. May 12, 2021) (holding that the plan's benchmarks were "sufficiently meaningful to provide proper comparisons to the challenged funds with respect to both performance and fees" and "[plaintiff] makes considerably 'more than a bare allegation that cheaper investments exist in the market place'").[4] By using the Plans' benchmarks, Plaintiffs have alleged "meaningful benchmarks."

**<u>Second</u>**, this Complaint explains why peer group categories, specifically Morningstar, are plausible benchmarks. Notably, the Morningstar fact sheets commissioned by Intel for the Intel Funds—a benchmarking source chosen by Defendants—compares the Intel funds to peer groups. ACC ¶¶ 15 & n.8, 151; *see also* ECF No. 118-2 at 175 (benchmarking the 2035 vintage TDF to "the Target Date 2035 Morningstar Category average"). Retirement plan fiduciaries commonly use Morningstar peer groups for benchmarking. ACC ¶¶ 136-137. Morningstar classifies funds into

---

[3] Defendants' exhibits show that the T. Rowe Price TDFs compared themselves to the S&P Target Date Index and that the S&P Target Date Index is the most common index that target date funds choose to benchmark themselves to. ECF No. 118-2 at 408 and 439. Plaintiffs also compare the Intel TDFs to published indices, ACC ¶ 164 & Table 6, which are common benchmarking tools used by plan fiduciaries. *Id.* ¶ 136.

[4] *See also Braden*, 588 F.3d at 596 (reversing dismissal where complaint alleged that defendants failed to change options in the plan although most funds "underperformed the market indices they were designed to track."); *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-cv-10397, 2020 WL 8575183, *1 (D. Mass. July 23, 2020) (sustaining allegations where "[m]any of the plan funds materially underperformed against their own benchmarks and similar (and less expensive) market comparators"); *Falberg v. Goldman Sachs Grp., Inc.*, No. 19 Civ. 9910, 2020 WL 3893285, *3, *9 (S.D.N.Y. July 9, 2020) (same); *Karpik v. Huntington Bancshares, Inc.*, No. 2:17-cv-1153, 2019 WL 7482134, *5 n.9 (S.D. Ohio Sept. 26, 2019) (sustaining claim where complaint "compared each fund to the benchmark listed in that fund's prospectus").

---

categories, considering stated investment style and objectives, actual investments and asset allocation, and other factors. *Id.* ¶ 139. All the funds within a given Morningstar category share common attributes and the funds within a given category are a set of peer funds within the given asset class. *Id.* ¶ 139 (citing Halpern Dec. ¶ 8 and Pomerantz Decl. ¶ 6). Morningstar subcategorizes target date funds by "vintage year," i.e., the five-year period during which investors are expected to retire. *Id.* ¶ 140. Thus, TDFs of the same "vintage" are comparable in light of their common goals and features. *Id.* ¶ 141.

**Third**, retirement plan fiduciaries commonly benchmark funds against specific, prominent funds in the asset class. *Id.* ¶¶ 136, 141. Plaintiffs' expert identified a robust set of up to 21 target date fund peers—professionally managed target date products with the same-vintage TDFs—and compared the Intel TDFs' performance to the absolute performance of the peer group funds and the risk-adjusted performance of the peer group. *Id.* ¶ 172–177. The funds selected for comparison were among the largest and most widely-used TDFs in the market, and thus would have been considered by a prudent fiduciary. *Id.* ¶ 142.

**Fourth**, given their mix of equities and non-equity investments from around the world, the Morningstar World Allocation TR benchmark is an appropriate comparator to the GDF, and Defendants informed participants in 2014 that the Intel GDF could be benchmarked as part of the "World Allocation" category or "Balanced/Hybrid Funds—International/Growth". *Id.* ¶ 179–181. Plaintiffs' experts also supported a benchmark of 60% World/40% Bond as being meaningful for the GDF. *Id.* ¶ 182. The GDF underperformed all three of these indexes across nearly all relevant time periods, including the 10-year period ending in December 2018. *Id.* ¶ 182.

**Fifth**, the conduct of peer-plan fiduciaries is also an important benchmark. The statute commands comparisons to similarly situated fiduciaries as it requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man *acting in a like capacity and familiar with such matters* would use *in the conduct of an enterprise of a like character and with like aims*." 29 U.S.C. 1104(a)(1)(B) (emphasis added). Here, the Investment Committee Defendants ("the IPC Defendants") selected target date and global balanced funds for

defined contribution plans. Thus, their decisions should be compared to fiduciaries for similarly-sized defined contribution plans. As the Intel Plans were among the largest in the country, Plaintiffs compared the choices made by the Defendants to those made by $10 billion defined contribution plans and the 16 defined contribution plans closest in size to the Intel Plans. AAC ¶ 160.

Defendants attack the Complaint's benchmarks by criticizing its reference and reliance on expert declarations. ECF No. 117 ("Mot.") at 7-9. But "written instruments attached to pleadings may be considered part of the pleading." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "Exhibits [that] are attached to a complaint… are deemed part of the complaint for all purposes, including for purposes of determining the sufficiency of the plaintiff's claims." *Jackson v. Romero*, No. 3:19–5756, 2020 WL 133906, *2 (W.D. Wash. Jan. 13, 2020). By contrast, a court is not "required to accept as true allegations that contradict exhibits attached to the Complaint." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Defendants cite *City of Royal Oak Retirement System v. Juniper Networks, Inc.*, No. 5:11–4003, 2013 WL 2156358 (N.D. Cal. May 17, 2013), to argue that an expert declaration attached to the complaint should not be considered on a motion to dismiss, but they ignore that "affidavits and declarations" are allowed where "they form the basis of the complaint.'" *Id.* at *7 (citing *Ritchie*, 342 F.3d at 908).[5] Here, the expert declarations by Samuel Halpern and Steven Pomerantz, form the basis of Plaintiffs' allegations. Even if the declarations themselves are ignored, the factual allegations in the Complaint based on those declarations must be considered. *Nguyen v. Simpson Strong-Tie Co., Inc.,* No. 19-CV-07901-TSH, 2020 WL 5232563, *5 (N.D. Cal. Sept. 2, 2020) (finding allegations of complaint derived from expert would be considered on motion to dismiss); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1222 (S.D. Cal. 2001) (same).

Defendants argue that "[t]he fundamental problem with Plaintiffs' theory is that Plaintiffs

---

[5] In *Ritchie*, the Ninth Circuit did NOT consider whether a declaration attached to or provided *to support* a complaint should be considered. Rather, the Ninth Circuit determined that a motion filed by a former criminal defendant should be treated as a civil complaint. *Ritchie*, 342 F.3d at 907. As the government's opposition was then treated as a Rule 12(b)(6) motion, the question was whether the court could properly consider an unsigned declaration – not referenced in the complaint – submitted in support of the defendant's motion to dismiss. *Id.* at 908. In that context, the Ninth Circuit held that the declaration submitted by the defendant on a motion to dismiss could not be considered. *Id.* at 909.

chose their comparators precisely because those comparators pursue a ***different*** investment strategy, reflected in different underlying assets, than the Intel Funds." Mot. at 11 (emphasis in original); *see also id.* at 2, 3, 5, 8. As noted above, "a plaintiff relying on inferences from circumstantial allegations" is only required to allege facts that show "a prudent fiduciary in like circumstances *would have acted differently.*" *St. Vincent*, 712 F.3d at 720 (emphasis added). Here, Plaintiffs allege that "[i]n pursuing a purported risk-mitigation strategy, the Intel Funds gave up the long-term benefit of investing in equity, which delivers superior returns. Even on a risk-adjusted basis, participants fared worse than a simple allocation of stocks and bonds." ACC ¶ 217. As the Complaint alleges that not only the Intel Funds' underlying assets but also the investment strategy itself were imprudent, comparators with different investment strategies are appropriate (as explained by the Department of Labor guidance):[6]

> … *there are considerable differences among TDFs offered by different providers, even among TDFs with the same target date. For example, TDFs **may have different investment strategies**, glide paths, and investment-related fees. Because these differences can significantly affect the way a TDF performs, **it is important that fiduciaries understand these differences when selecting a TDF as an investment option for their plan***.

ACC ¶ 150 & n.10 (quoting "A Look at 401(k) Plan Fees," U.S. Department of Labor, 2019, p.1, "Tips") (emphasis added). Here, comparators with differences in investment strategies will be crucial to the Court's analysis and should not be avoided based on distinguishable case law focused on challenges to different allocation decisions made under a common strategy. Further, Defendants had a duty to carefully select and annually update "on the latest information available to the plan" the plan benchmarks. *See* 29 C.F.R. § 2550.404a-5(d). Defendants' failure to do so illustrates that Defendants were unable to find any suitable alternative benchmarks. And as explained above,

---

[6] Defendants' case, *Davis v. Washington University in St. Louis*, 960 F.3d 478 (8th Cir. 2020), is distinguishable because the complaint there did not allege meaningful benchmarks, unlike the Complaint here, which uses the Plans' own benchmarks (among others). Further, the Eighth Circuit panel demanded comparators with the same strategy as the fund at issue, which does not apply here where the strategy itself is challenged as imprudent and different comparators are needed under ERISA § 404(a)(1)(B) and *St. Vincent. See Davis*, 960 F.3d at 482 (rejecting real estate fund comparator to another real estate fund because its strategy "is different"). *Davis* is an out-of-circuit decision that has been rejected as imposing an inappropriate standard under Rule 12(b)(6). *See Miller v. AutoZone, Inc.*, No. 2:19-cv-02779, 2020 WL 6479564, at *4 (W.D. Tenn. Sept. 18, 2020) (declining to follow *Davis* and denying motion to dismiss ERISA claims).

1  Plaintiffs are allowed to rely on the Plans' own benchmarks and certainly are not barred from

2  bringing a fiduciary breach claim in instances where a defendant's failing is so unique that there are

3  no perfect examples of another fiduciary or investment manager doing the same.

4      Finally, where, as here, defendants raise factual questions challenging the appropriateness of

5  the plaintiffs' comparators to assess the performance of the challenged funds, "[c]ourts have held

6  that the determination of the appropriate benchmark for a fund is not a question properly resolved

7  at the motion to dismiss stage." *In re MedStar ERISA Litig.*, No. RDB-20-1984, 2021 WL 391701, *6

8  (D. Md. Feb. 4, 2021). Whether a passively-managed investment can be used as a benchmark for an

9  actively-managed investment is "not a question properly resolved at the motion to dismiss stage." *Id.*

10  (citing *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, *7 (S.D.N.Y. Sept. 29,

11  2017) and rejecting defendants' argument that a passively-managed investment cannot be used as a

12  benchmark for an actively-managed investment).

13      Here, what decisions were and were not made to advance an investment strategy, or for

14  other purposes, are not issues before this Court on the present procedural posture; nor are they

15  related to any proposed comparators' strategies and allocations. *See Baird*, 403 F. Supp. 3d at 781

16  ("While the BlackRock Defendants very well may have had legitimate reasons to select the

17  challenged funds, that is not a determination the Court may make as a matter of contested fact" on a

18  motion to dismiss). Defendants rely on extrinsic exhibits to inappropriately create their own version

19  of events and draw inferences in their favor. For example, citing the 2017 Intel 401(k) Savings Plan

20  Investment Policy Statement, ECF No. 118-2 at 122-36, Defendants assert that "[u]nlike Plaintiffs'

21  equity-heavy retail funds, the Intel Funds are designed to "minimize dispersion of outcomes for plan

22  participants with a bias of downside protection implemented by reducing overall risk" and "[t]o

23  further that strategy, the fiduciaries customized the Intel Funds to include hedge funds and private

24  equity, asset classes commonly found in defined benefit plans and other types of institutional

25  investments." Mot. at 2. Defendants claim that "[t]he Intel Funds' strategy is based on modern

26  portfolio theory, which recognizes that investment risk cannot be eliminated, but must be managed

27  through diversification, using assets that present different types of risks. *See* Ex. 3 at 10." Mot. at 7

28

n.6; *see also* Mot. at 12 ("Thus, unlike the more conservative strategy focused on 'downside protection' pursued by the Intel Funds, Ex. 3 at 5, Plaintiffs' proposed comparators focus on maximizing returns." (citing Ex. 20 at 1; Ex. 21 at 2)). As such claimed strategy and actions cannot be proved by the cited documents, and the allegedly different strategies and investment decisions of Plaintiffs' comparators cannot be proved at present, the exhibits contain disputed facts. *See Baird*, 403 F. Supp. 3d at 777 (citing *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 999-1000 (9th Cir. 2018). And this case is not a securities case about the materiality of disclosures where the fact of the disclosure is relevant to the prima facie claim.

Defendants overstate any differences in the objectives of the Intel TDFs compared to peers. Mot. at 12. First, the Intel TDF, like other TDFs, was designed to offer investors a single broadly-diversified fund that would become more conservative as the indicated retirement date approaches and that would be a suitable singular investment for workers looking to retire near the indicated date. ACC ¶ 15. Defendants quibble that some TDFs are too different from Intel's TDFs because the peers "focused on maximizing returns," but Intel's TDFs had the ***same*** stated objective. ECF No. 118-2 at 126 (the Intel TDFs' "asset allocation is managed to maximize returns."). Indeed, Intel's Investment Policy Statement describes the Intel TDFs as follows:

> Target Date Funds provide a single fund approach to investing based on your age and approximate date of retirement at age 65… While a younger investor may be able to afford to take more risk in order to maximize returns, an investor approaching retirement should reduce his/her risk and choose investments that provide more stability in the portfolio. A Target Date Fund is designed to achieve this balance, because it is adjusted over time to reduce exposure to higher-risk assets, such as stocks and increase exposure to lower risk investments such as bonds and stable value.

ECF No. 118-2 at 13 and 72. This mirrors the DOL's general description of TDFs:

> Target date retirement funds, or TDFs, can be attractive investment options for employees who do not want to actively manage their retirement savings. TDFs automatically rebalance to become more conservative as an employee gets closer to retirement. The "target date" refers to a target retirement date… TDFs offer a long-term investment strategy based on holding a mix of stocks, bonds and other investments (this mix is called an asset allocation) that automatically changes over

time as the participant ages. A TDFs initial asset allocation, when the target date is a number of years away, usually consists mostly of stocks or equity investments, which often have greater potential for higher returns but also can be more volatile and carry greater investment risk. As the target retirement date approaches, … the fund's asset allocation shifts to include a higher proportion of more conservative investments.

*Id.* at 361. Thus, the purpose and objectives of Intel's TDFs align with the purposes and objectives of TDFs generally and the peer groups and individual peers identified in this Complaint.

## 2. The Complaint Plausibly Alleges Imprudent Investment Decisions Both in 2011 and *During the Course of the Class Period*

The Intel TDFs and GDFs performed poorly as compared to every plausible benchmark. Across vintages, the Intel TDFs underperformed all three of the published indices for TDFs. ACC ¶ 164. Indeed, in every year from 2012 to 2017, the Intel TDFs performed poorly compared to the S&P TDF index for every vintage. *Id.* ¶ 177. Across vintages, Intel's TDFs were always in the bottom 30 percent, and for some, were the worst performing TDFs of the same vintage as compared to the Morningstar peer group. *Id.* ¶ 172–177. The Intel TDFs also underperformed the Morningstar category averages. *Id.* ¶¶ 162–163; and ECF No. 118-2 at 165 (showing Intel's 2035 vintage TDF underperforming the Morningstar Category Average over one-, three-, five- and ten-year periods as of September 30, 2015). Plaintiffs' expert identified up to 21 target date fund peers—professionally managed target date products with the same-vintage as Intel's TDFs—and compared Intel's TDFs' performance to the absolute performance of the peer group funds and the risk-adjusted performance of the peer group. Across vintages, Intel's TDFs were always in the bottom 30 percent, and for some, were the worst performing TDFs of the same vintage. *Id.* ¶¶ 172–177. The Intel TDFs were also inferior to the most commonly used specific peer alternatives within the same asset class and same Morningstar categories. *Id.* ¶ 152. As of 2010–11, Fidelity, T. Rowe Price, and Vanguard's TDFs dominated the marketplace, capturing over 75% of the TDF market. *Id.* ¶¶ 142, 151. American Funds was also ranked as a "top" tier TDF fund family as of June 2011. *Id.* ¶ 151. These four managers continued to dominate the TDF marketplace over the Class Period. ECF No. 118-2 at 385. Intel's TDFs charged fees higher than each of these peer funds and, as of Dec. 2011,

1    underperformed them across all vintages. ACC 165.[7] This underperformance continued through the

2    end of 2018, the last year for which Defendants have provided performance data. *Id.* ¶¶ 166–171.[8]

3         Compared to their Morningstar peer group averages, Intel's TDFs charged significantly

4    higher fees (*id.* ¶¶ 152–159), which increased over time even as the median fees charged by TDFs

5    decreased. *Id.*; ECF No. 118-2 at 394 (charting decline in the fees charged on the average TDF

6    investor). As compared to TDFs selected by fiduciaries for peer plans (plans of $10 billion or more

7    in assets), the Intel TDFs were the *most* expensive—by far. ACC ¶ 161 & Table 15. And the Intel

8    TDFs charged far higher fees than the average fees for $1 billion defined contribution plans and

9    larger generally. *Id.* ¶¶ 146-147. Likewise, the fees of the GDFs were nearly triple the average fee for

10   peer funds. *Id.* ¶ 149. Among peer plans, each with over $10 billion in assets,[9] the fee disparity is

11   even worse, as the fiduciaries for nearly all such plans chose TDFs with fees below 0.2%. *Id.* ¶ 160.

12   Of the 16 plans closest to Intel's in size (8 larger and 8 smaller), only three invested in TDFs

13   charging more than 0.15%, with the most expensive being 0.58%. *Id.* ¶ 161. The average Intel TDF

14   fee was, therefore, 50 percent higher than the *most* expensive TDFs selected by fiduciaries of

15   comparability-sized plans. Defendants claim, without any authority, that the fees of the TDFs

16   cannot be excessive because they were not *the single most expensive TDFs*. Mot. at 18. Yet, no court has

17   ever held that only the single most expensive investment can be imprudent.

18        The Intel GDF also failed to perform against every plausible benchmark. The GDF

19   underperformed all three benchmark indices in the ACC, the Morningstar World Allocation TR,

20   "Balanced/Hybrid Funds—International/Growth," and a 60% World/40% Bond portfolio. ACC

21   ¶¶ 179-183 & Table 13. The Complaint also benchmarked the GDF against the Morningstar World

22

---

23   [7] The only exception is the five-year trailing performance for the vintage designed for people already
24   in retirement which trailed Fidelity and Vanguard but did exceed that of T. Rowe Price by 0.4%.
     Still, the average performance of Intel's TDFs was 1.07% lower than T. Rowe Price across vintages.
25   ACC ¶ 165.
     [8] Defendants disingenuously suggest that Plaintiffs should have provided more recent performance
26   data despite their refusing to produce such data to Plaintiffs.
     [9] By the end of 2017, Intel's Plans has grown to $11.8 billion in assets. Paragraph 161 of the ACC,
27   erroneously lists this as $1.18 billion, but the Complaint properly compares Intel to the 8 larger and
     8 smaller plans, ranging in size from $11.1 billion to $14.3 billion in assets.
28

---

Allocation Category median—the average of peer funds—and against the largest individual funds within that category by assets under management. *Id.* ¶ 184. The GDF generally underperformed. *Id.* ¶ 185. Against "balanced fund" peers, the GDF also underperformed. *Id.* ¶¶ 186–193. While peer balanced funds charged an average of 0.33% per year as fees (ACC ¶ 146), the GDF charged 1.25%—270% more than the peer average. *Id.* ¶ 149. Defendants extensively reference one interval, the ten years ending 2018, during which the GDF exceeded the median returns of one Morningstar category average. Mot. at 13. Because the GDF underperformed nearly all benchmarking measures over nearly all time periods, such cherry-picked snapshots cannot establish prudence.

Focusing only on 2018 performance of the GDF (as compared to the broad peer group) also ignores that the Complaint alleges that the GDF should have been removed or restructured before 2018.[10] But the Ninth Circuit has held that losses caused by a breaching fiduciary cannot be "offset by gains in excess of the benchmark" unless the multiple breaches are so related that they do not constitute separate and distinct breaches and a fiduciary cannot reduce losses against gains that "do not involve a breach of trust." *Cal. Ironworkers Field Pen. Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047-1048 (9th Cir. 2001) (citing *Donovan v. Bierworth*, 754 F.2d 1049, 1054 (2d Cir. 1985)). A fiduciary's "continuing duty to monitor trust investments and remove imprudent ones" is a duty that "exists separate and apart from the trustee's duty in selecting investments at the outset." *Tibble v. Edison Int'l.*, 575 U.S. 523, 529 (2015). Each time that a fiduciary monitors or has a duty to monitor the investment, that is a separate action (or breach). *Id.* at 530; *Tibble v. Edison Int'l*, No. CV 07-5359 SVW (AGRx), 2017 WL 3523737, *12-13 (C.D. Cal. 2017). As the Complaint alleges (and Plaintiffs prove) a breach in 2014 (or before 2018), then the presumption is that Plan would have been invested in the most profitable plausible alternative funds that outperformed the GDF from 2014 (or earlier) to the present. Even if the GDF later outperformed funds (or even if it *later* became a prudent investment) after Defendants failed to remove the fund in 2014, the issue would be a remedy question, not a breach one.

---

[10] Defendants' suggestion that no investment can be imprudent unless it has underperformed for 10-years is unsupported by the law. Mot. at 14. If such a rule were adopted, it would conflict with ERISA's 6-year statute of limitations as no imprudent decision could be actionable.

In short, the Complaint alleges that Defendants deviated from the decisions made by fiduciaries of similarly sized plans and they should have known at the time (and later) that would result in a dramatic increase in fees above what peers pay for the same investment styles and that in fact promptly resulted in lower performance—including on a risk-adjusted basis—compared to comparable plans. Defendants argue that some defined benefit plans invested in hedge funds or private equity, but they do not identify any defined contribution plans, any target date funds, or any global diversified funds that did so during the Class Period. Mot. at 17.

Defendants cite *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017), where plaintiffs challenged the retention of a single fund that did not underperform its benchmark "until 2012" and was removed in early April 2014 prior to the filing of the complaint. *Id.* at *3, 20. Here, the IPC Defendants should have known the imprudence of the TDFs and GDF at the beginning of the Class Period and should have monitored the performance during the Class Period, but failed to remove them—suggesting a failure of process. In another of Defendants' cases, plaintiff "did not plead facts showing the Wells Fargo TDFs were underperforming funds [but] only pled that one Vanguard fund, which he alleges is comparable, performed better than the Wells Fargo TDFs." *Meiners*, 898 F.3d at 823. The *Salesforce.com* plaintiffs merely compared the plan's actively managed funds to passively managed funds of their own choosing, and the complaint contained no factual allegations to support a finding that the passively managed funds provided a meaningful benchmark. *See Davis v. Salesforce.com, Inc.*, No. 20-cv-01753-MMC, 2020 WL 5893405, *3–4 (N.D. Cal. Oct. 5, 2020). By contrast to those cases, this Complaint uses multiple comparators and uses the Plans' own benchmarks. Combined with the rest of the allegations, allegations concerning the inexplicable concentration of the Intel Funds in imprudent assets, poor performance, and high fees cure any deficiencies in the prior complaint.

### 3. The Additional Publicly Available Performance Information, with the Rest of the Allegations, Supports a Plausible Inference of Imprudence

#### a. *The Additional Pre-2011 Publications*

The Court concluded that while the prior Complaint "plausibly alleged that there was some evidence available in 2011 that hedge funds and private equity funds carried risks," that "small body

of evidence [wa]s insufficient on its own to support a claim for breach of the duty of prudence." Order at 21-22. The current Complaint alleges additional facts and cites additional pre- and post-2011 sources to support that Defendants were or should have been aware *by 2011 and after* of the risks and hedge funds' failure to provide the purported downside performance protection as follows:

**Pre-2011 GAO Reports:** The U.S. General Accounting Office reports in August 2008 and July 2010 explained that hedge funds and private equity posed significantly more challenges and risks to retirement plans than publicly traded mutual funds. ACC ¶¶ 233 & 234. The Reports warned that hedge funds and private equity lacked liquidity and the transparency of publicly traded funds and hedge funds used leverage or borrowed money to amplify returns. *Id.* ¶¶ 233, 234, 263, 264, 278. Even if hedge fund managers disclosed their positions and trading tactics, plan fiduciaries still "may not be able to independently ascertain the value of its hedge fund investment or fully assess the degree of investment risk posed by its hedge fund investment." *Id.* ¶ 278. These Reports also warned that these investments carried significant operational and valuation risks, and because their underlying holdings and strategies were not well known, these investments were difficult for retirement plan fiduciaries to evaluate. *Id.* ¶¶ 233, 234, 260, 281.

**Investor's Committee Reports:** The Investor's Committee of the United States President's Working Group on Financial Markets warned investors in April 2008 and January 2009 reports of similar risks about investment in hedge funds. *Id.* ¶¶ 259, 275, 282.

**Financial Times Reporting:** *The Financial Times* reported between September and December 2008 that hedge funds were hit by a record redemption of $40 billion by hedge fund investors in October 2008 and a record loss of an average of 19% in the first 11 months of 2008. *Id.* ¶¶ 246-48. *The Financial Times* reported in November 2010 that hedge funds' lack of transparency was the "leading concern" of investors. *Id.* ¶ 275.

**The Hedge Fund Mirage:** Simon Lack's 2012 book explained that hedge funds' loss in 2008 exceeded all their profits in the prior 10 years and investment "into Treasury bills" would have generated better returns than hedge funds. *Id.* ¶ 355.[11]

---

[11] The book was published in 2012 but cites publications and data that existed prior to 2011.

The Amended Complaint retains its previous citations to pre- and post-2011 sources, including (a) 2006 and 2010 publications by Vanguard about significant biases in reported hedge fund returns and hedge funds' failure to mitigate market risk to the extent hedge fund managers claimed (*id.* ¶ 340) and the high performance correlation between hedge funds and a 60/40 portfolio (*id.* ¶ 349); and (b) 2011-2012 reporting by *The Economist* that hedge funds failed to provide downside protection in volatile markets and the return of hedge funds since 1998 was half the return of Treasury bills. *Id.* ¶¶ 353-54. Thus, the Amended Complaint contains ample sources and facts that were well known in the investment community both before and after 2011. *See Tibble*, 575 U.S. at 528-29 (holding that the duty of prudence extends to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones).

Defendants cite *Divane v. Northwestern University.*, 953 F.3d 980 (7th Cir. 2020),[12] to argue that the GAO and the Investors' Committee Reports "***preclude***" any conclusion of "objectively unreasonable" conduct by Defendants, Mot. at 16 (emphasis in original), and the Complaint must "support a plausible inference that no objectively reasonable fiduciary would have made the same decisions that the defendant fiduciaries made." *Id.* at 3. Not only does this conflict with Ninth Circuit standard, but the *Divane* court only required plaintiff to "plausibly allege action that was objectively unreasonable." *Divane*, 953 F.3d at 988.[13] And the motion to dismiss was decided after the parties engaged in more than a year of discovery. *Compare id.* at 986, 990 *with Pinnell v. Teva Pharm. USA, Inc.*, No. 19-5738, 2020 WL 1531870, *4 (E.D. Pa. Mar. 31, 2020) (distinguishing *Divane* because the court did not "have the benefit of discovery as yet").

Defendants selectively cite the Pre-2011 and 2011 GAO Reports and argue that some *defined*

---

[12] Defendants' other case involved the plaintiffs' challenge to "plan's mix and range of investment options," not "the prudence of the inclusion of any particular investment option." *Renfro v. Unisys Corp.*, 671 F.3d 314, 325-28 (3d Cir. 2011). Here, Plaintiffs challenge IPC Defendants' investment of the Intel Funds in hedge funds and private equity. *See Terraza v. Safeway Inc.*, 241 F. Supp. 3d at1057, 1079 (distinguishing *Renfro* and denying motion to dismiss).

[13] At the request of the Supreme Court, the United States DOL and DOJ have filed petition requesting that the Supreme Court grant certiorari of this decision. https://www.supremecourt.gov /DocketPDF/19/19-1401/180105/20210525160954238_19-1401%20Hughes%20- %20US%20invitation%20brief%20final.pdf.

*benefit plans*[14] had invested in hedge funds or private equity, with an allocation between 20% and 30% in 2006 and that "ERISA fiduciaries" expanded use of such investments between 2006 and 2010 and might continue to do so afterwards. *Id.* at 17-18 (citing all three GAO Reports).[15] Yet, whereas a defined benefit plan participant's benefits "are fixed and will not change, regardless of how well or poorly the plan is managed," the benefits of participants in defined contribution plans such as the Intel Plans "will typically depend on how well the trust is managed, so every penny of gain or loss is *at the beneficiaries' risk.*" *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1619-20 (2020) (emphasis added). Defendants' argument utterly disregards this distinction in allocation of risk and the losses borne by participants in the Intel Plans instead of Intel as a result of the IPC Defendants' mismanagement of the Plans. *See* Mot. at 17 & n.13. It also ignores that the average allocation to hedge funds and private equity of the defined benefit plans mentioned in the GAO Reports consistently comprised a small share of plan assets—4-5% to hedge funds and 5-9% to private equity—between 2007 and 2010. ACC ¶ 335; ECF No. 118-2 at 250, 260 & 322 (Pre-2011 GAO Reports); *id.* at 337 (2011 Report); *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 (9th Cir. 2011) (courts must "draw all reasonable inferences in favor of the nonmoving party" on a motion to dismiss).

Defendants argue that some of the defined benefit plans chose these investments for diversification purposes and claimed to have taken steps to mitigate their risks.[16] Mot. at 17, 18. Defendants also cite the 2008 Investor's Committee Report to argue that hedge funds might help fiduciaries achieve certain unspecified objectives and provide downside protection and "'no standard allocation or diversification rule'" applied to these investments. *Id.* at 16-17 (citing report). These arguments improperly attempt to raise factual disputes such as whether the IPC Defendants invested

---

[14] Governmental plans are not subject to ERISA. 29 U.S.C. §§ 1002(32) & 1003(b)(1).

[15] Notably, in comparing the Plans' investments conduct to those of defined benefit plans, Defendants urge yet another improper inference in their favor asking the Court to rely on the conduct of defined benefit plan fiduciaries as a benchmark for Defendants' conduct with respect to defined contribution plans. This is especially rich given that they ask the Court to reject the comparisons to mega-defined contribution plan fiduciaries alleged by Plaintiffs. Although Plaintiffs' comparisons are clearly more apt, this dispute between the parties shows how Defendants' motion turns on disputed facts.

[16] The 2011 GAO Report concluded that investment in hedge funds and private equity pose "daunting" challenges, even to large plan sponsors. ECF No. 118-2 at 349-50.

---

*Anderson v. Intel*      Opposition to Motion to Dismiss      Case No. 5:19-cv-04618-LHK

1    the Intel Plans in hedge funds and private equity for diversification or downside protection purposes

2    and whether the Defendants took proper steps to mitigate risks. *See City of Oakland v. BP PLC*, 969

3    F.3d 895, 910 (9th Cir. 2020) (a motion to dismiss "is not a procedure for resolving a contest

4    between the parties about the facts or the substantive merits of the plaintiff's case"). Defendants

5    also improperly invite the Court to draw inferences in their favor on issues such as how the Reports

6    should be interpreted and whether the IPC Defendants prudently allocated the Intel Funds to those

7    investments and monitored the Intel Funds.[17] *See Baird*, 403 F. Supp. 3d at 781 (refusing to resolve

8    whether defendants had "legitimate reasons to select the challenged funds").

9    　　　Defendants do not challenge the sufficiency of Plaintiffs' allegations that even before 2011,

10   it was well reported that hedge funds failed to provide the downside protection they claimed to

11   provide. *Compare* ACC ¶¶ 346-49 *with* Mot. at 16-18. Combined with the rest of the Amended

12   Complaint as a whole, the additional allegations and sources are sufficient to permit a reasonable

13   inference that the IPC Defendants were on notice by 2011 and breached their duty of prudence by

14   deciding to dramatically increase the Intel Funds' investment in, for example, hedge funds and

15   private equity in 2011, and continuing these investments after.

16   　　　　　　　　b.　　*The Amended Complaint Plausibly Alleges That It Was Not
     　　　　　　　　　　　Reasonable to Expect Hedge Funds to Deliver Superior Risk-*
17   　　　　　　　　　　　*Adjusted Returns by 2011 or **After**.*

18   　　　Defendants do not dispute that the Complaint alleges that prudent fiduciaries would have

19   considered the returns of hedge funds in comparison to traditional asset classes before ploughing

20   25% of target date fund assets into hedge funds-of-funds products. ACC ¶¶ 206-209. The

21   Complaint also alleges that as of 2011, after a full market cycle, the data shows hedge funds did not

22   deliver downside protection commensurate with foregone returns; rather, the data shows that,

23   although hedge funds provided some downside protection in down markets, the losses avoided in

24   the down market were dwarfed by the returns from equities and bonds in up markets. *Id.* ¶¶ 210-

25   214. In short, hedge funds were a poor diversifier of downside risk as compared to bond funds,

26

27   [17] Defendants also cite a 2020 opinion letter by the Department of Labor to improperly invite the
     Court to draw the inference at this stage that the Intel Plans' private equity investments were
28   "'prudently selected and monitored.'" Mot. at 18 n.16 (quoting same letter).

---

which were available at much lower cost. *Id.* For these reasons, a traditional 60/40, equity/bonds portfolio fared far better than hedge funds in the years preceding 2011, with much lower costs and much greater transparency and liquidity. *Id.* ¶¶ 213-214.

Instead, Defendants argue merely because hedge funds provide some downside protection, they win. Mot. at 19-20. But Defendants impermissibly request that the Court draw inferences in their favor to render these allegations implausible. Not only does Plaintiffs' analysis covers a full market cycle, whereas Defendants cherry-pick several isolated months, but these arguments present factual disputes about the proper time interval to evaluate investments.

Likewise, Defendants simply assert that their "objective was to deliver solid risk-adjusted returns while reducing the risk of widely divergent outcomes." Mot. at 20. But Defendants' objectives are not provable facts on the pleadings. Just because they said it doesn't make it true. Moreover, even accepting as true on the pleadings that risk-adjusted returns is the proper measure, Plaintiffs allege that an investor circa 2011, based on the data presented in the Complaint, would not reasonably expect hedge funds to deliver superior risk-adjusted returns to equity and that bonds would have been a better diversifier than hedge funds. ACC ¶¶ 214-217. Indeed, the Complaint is full of allegations that the Intel TDFs and GDF underperformed benchmarks on a risk-adjusted basis. *Id.* ¶ 12, 172, 177. In the 2008 financial crisis, Intel's hedge funds lost 17% as compared to a 5.2% gain in the bond index. *Id.* ¶ 327. In sum, the data belies Defendants' argument that hedge funds deliver "solid" (whatever "solid" means) risk-adjusted returns, putting aside that their arguments raise a host of disputed factual issues.

### 4. The Additional Allegations Sufficiently State a Claim of Breach of the Duty to Act in the Sole Interest of Participants

The Court recognized that "plausible allegations of self-dealing or conflicts of interest, combined with plausible allegations of higher-than-average fees and poor performance suffered by investments, are sufficient to state a claim for breach of the duty of prudence under ERISA." Order at 21-22. But the Court held that the prior Complaint did not allege sufficient facts "that the aim of the Investment Committee's investment in the various private equity funds was to aid Intel Capital in its venture capital investments." *Id.* at 23. In addition to the prior allegations that Intel Capital (an

1  Intel subsidiary) has partnered with investment companies such as hedge fund and private equity

2  investors to co-invest in and secure sequential funding for third-party startups, ACC ¶¶ 306-07, the

3  Amended Complaint adds the following allegations:

4      *Investment in Co-Investing Companies to Benefit Intel Capital:* Securing such funding

5  from these hedge fund and private equity investors has benefited Intel Capital by (a) ensuring that

6  the startups in which Intel Capital has invested "have sufficient funding to grow"; (b) reducing Intel

7  Capital's risk in investing in these startups and allowing Intel Capital to diversify its investments and

8  risk; (c) increasing the value of Intel Capital's investment in the startups with the hedge fund or

9  private equity investor making "a subsequent investment at price greater than Intel Capital's initial

10  investment"; and (d) providing access to new technology startups and opportunities. *Id.* ¶¶ 308-10.

11  The IPC Defendants, including Arvind Sodhani, Executive Vice President of Intel and President of

12  Intel Capital, and Ravi Jacob, Corporate Vice President Treasurer of Intel, invested the Intel Funds

13  in these hedge funds and private equity funds to attain these benefits for Intel Capital. *Id.* ¶¶ 308,

14  310. While Intel does not disclose its investments or returns of Intel Capital in its public disclosures,

15  it is reasonable to infer that Intel makes these investments to earn a profit.

16      *Use of Hedge Funds to Invest in Companies to Benefit Intel and Intel Capital's*

17  *Investments in the Same Companies:* Intel and Intel Capital invested in the private equity of

18  companies that complimented Intel's business, did so in the first funding round, and used hedge

19  funds to come in and invest in the same companies as a second round. *Id.* ¶ 312. Using hedge funds

20  to invest in these companies benefited Intel by (a) providing additional capital to these companies

21  without Intel doing the same; (b) allowing Intel to recognize an increase in the value of its

22  investments; and (c) providing Intel or Intel Capital a basis to increase its investment in the same

23  companies. *Id.* ¶ 313. The Complaint alleges that the IPC Defendants in turn invested the Intel

24  Funds in these hedge funds in order to have Intel and Intel Capital reap these benefits. *Id.* ¶ 314.

25      *Failure to Consider and Address the Interests of Participants in Lower Pay Grades:* The

26  Minimum Pension Plan ("the DB Plan") and the Retirement Contribution operate under a "floor

27  offset" arrangement. *Id.* ¶ 317. That arrangement means that if a participant's monthly annuity value

28

R. Joseph Barton (Cal. Bar No. 212340)
jbarton@blockleviton.com
BLOCK & LEVITON LLP
1735 20th St. NW
Washington DC 20009
Telephone: (202) 734-7046
Facsimile: (617) 507-6020

*Attorney for Plaintiffs*
*[additional counsel listed on signature]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| WINSTON R. ANDERSON, CHRISTOPHER M. SULYMA, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> INTEL CORPORATION INVESTMENT POLICY COMMITTEE, INTEL RETIREMENT PLANS ADMINISTRATIVE COMMITTEE, FINANCE COMMITTEE OF THE INTEL CORPORATION BOARD OF DIRECTORS, CHRISTOPHER C. GECZY, RAVI JACOB, DAVID S. POTTRUCK, ARVIND SODHANI, RICHARD TAYLOR, TERRA CASTALDI, RONALD D. DICKEL, TIFFANY DOON SILVA, TAMI GRAHAM, CARY KLAFTER, STUART ODELL, CHARLENE BARSHEFSKY, SUSAN L. DECKER, JOHN D. DONAHOE, REED E. HUNDT, JAMES D. PLUMMER, FRANK D. YEARY, STACY SMITH, ROBERT H. SWAN, TODD UNDERWOOD, AND GEORGE S. DAVIS <br><br> Defendants, <br><br> and <br><br> INTEL 401(K) SAVINGS PLAN and INTEL RETIREMENT CONTRIBUTION PLAN, <br><br> Nominal Defendants. | Case No: 5:19-cv-04618-LHK <br><br> (Consolidated with No. 16-cv-04977-NC & No. 16-cv-00522) <br><br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT** |

# I.    INTRODUCTION

Plaintiffs' Consolidated Complaint (Dkt. 95) alleges Defendants breached their fiduciary duties under the Employee Retirement Income Security Act by making a massive bet on hedge funds and private equity with employee retirement savings in two defined contribution plans, the Intel 401(k) Savings Plan and the Intel Retirement Contribution Plan (the "Plans"). Their strategy radically departed from the asset allocation strategies for target date funds and balanced funds used by professional investment fiduciaries and plan fiduciaries for similar-sized (billion-dollar) defined contribution plans. The Plans' fiduciaries made this bet despite (1) their own experience with failed hedge fund strategies during the 2007–2008 market crisis, (2) contemporaneous reports of poor hedge fund returns, (3) the exorbitant expenses of hedge funds and private equity, and (4) the widely-reported risks of hedge funds and private equity. As a result of these investment strategies, the Plans lost hundreds of millions of dollars in underperformance and fees. Only after several years, did Defendants turn to a third-class asset management firm to attempt to manage their way out of their failed strategies.

Defendants' Motion to Dismiss ("MTD," Dkt. 99) asks the Court to violate virtually every principle of notice pleading. Instead of drawing inferences in Plaintiffs' favor, Defendants draw them in their favor. They attack allegations piecemeal instead of addressing the Complaint as a whole. And they improperly seek to introduce seventeen extrinsic documents for the truth of the matters asserted therein. When viewed under the proper standards, their arguments fail.

On Counts I and II alleging breach of the duty of prudence, Defendants argue: (1) they cannot be held accountable for experimenting with billions of dollars in employee retirement savings because ERISA does not categorically prohibit investments in hedge funds and private equity; (2) Defendants' investment decisions cannot be compared to asset allocation decisions of prudent professional investment fiduciaries and plan fiduciaries of equivalent-sized plans because their strategies are so radically different; (3) Plaintiffs' claims rest on improper, *post hoc*, facts. These arguments are wrong. First, the Complaint does not allege that ERISA per se prohibits any specific type of investment class. It alleges investment decisions require prudence

and circumstantial evidence shows imprudence. Second, the notion that radical departures from prudent asset management precludes comparisons to investment decisions by prudent fiduciaries is untenable. Not only would such a rule encourage absurd investment decisions by immunizing fiduciaries from suit, it is contrary to ERISA. Third, the Complaint details copious facts the Defendants knew or should have known about hedge funds and private equity, including historic investment returns, before they decided to depart radically from the asset allocation strategies employed by virtually all professional asset managers and fiduciaries for billion-dollar 401(k) plans. Finally, investment returns during the class period are directly relevant to damages, and to breaches of duty for failing to remove the poor-performing investments.

As to the breach of the duty of loyalty in Counts I and II, Defendants contradict Plaintiffs' specific factual allegations that the fiduciaries caused the Plans to invest in funds in which Intel's capital investment arm shared investments to benefit Intel. Defendants' argument that these facts do not state a claim requires the Court to draw inferences in Defendants' favor.

The disclosure claims, Counts III and V, allege the Administrative Committee breached its fiduciary duties by failing to disclose the risks associated with the allocation strategies at issue and their underlying funds and that the summary plan descriptions for the Plans ("SPDs") failed to include accurate and comprehensive information about such risks. Both Plaintiffs have Article III standing to pursue these claims, and neither is precluded from asserting them.

Finally, the Complaint properly states a claim against the appointing fiduciaries for failure to monitor their appointees (Count IV) and a claim for co-fiduciary liability (Count VI). Accordingly, Defendants' motion to dismiss should be denied.

## II. DEFENDANTS' MOTION VIOLATES THE BASIC PRINCIPLES OF EVALUATING WHETHER A COMPLAINT STATES A CLAIM

A motion to dismiss "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). A complaint only requires a "short and plain statement of the claim showing that the pleader is entitled to relief," a complaint need only state sufficient factual

SER 27

content that, when accepted as true that "state[s] a claim to relief that is plausible on its face." *Sheppard v. David Evans and Assoc.*, 694 F.3d 1045, 1048 (9th Cir. 2012) (reversing dismissal of two and half page complaint); Fed. R. Civ. P. 8(a)(2). Defendants ignore the key principles on a motion to dismiss. ***First***, the plausibility standard is not a "probability requirement" and a "complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). ***Second***, "[s]pecific facts are not necessary" to state a plausible claim because the complaint need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). ***Third***, all non-conclusory facts alleged in the complaint must be taken as true and all reasonable inferences drawn in favor of the plaintiff. *Mujica v. AirScan Inc.*, 771 F.3d 580, 589 (9th Cir. 2014); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 969 (N.D. Cal. 2016) (Koh, J.). ***Fourth***, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *N.J. Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (explaining that a reasonable inference supporting liability "need not be 'as compelling as any opposing inference' one might draw from the same factual allegations"). ***Finally***, the complaint must be read as a whole, not "parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citing *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)).

Following these principles is especially vital in ERISA actions because private individuals have an "important role" to "enforc[e] ERISA's fiduciary duties" and "prevent through private civil litigation misuse and mismanagement of plan assets." *Braden*, 588 F.3d at 597–98. A "holistic evaluation of an ERISA complaint's factual allegations" is counseled by plaintiff-participants' "limited access to crucial information" regarding facts that "tend

have "earned more" while "paying lower fees, with no need for complicated due diligence, and without the need to sacrifice liquidity." *Id*. An annualized risk-return analysis of the decade before the Investment Committee's 2011 decision shows that for the same risk as the average hedge fund, returns were a full percentage point per year higher for a traditional blend of stocks and bonds. Comp. ¶¶ 175–79, 207, 262–90 (chronicling high fees, underperformance, and other drawbacks of hedge funds pre-dating the dramatic increase of the Plans' investments in them).

Poor performance allegations further support the inference that continued inclusion of the challenged investments was not prudent. The combination of higher-than-average fees and poor performance sufficiently state a claim for breach of fiduciary duty, particularly when combined with allegations that, like here, the challenged investment benefitted the fiduciaries or plan sponsor. *Braden*, 588 F.3d at 585, 589; *Cryer v. Franklin Resources*, No. 16-cv-4265, 2017 WL 818788, *4 (N.D. Cal. Jan 17, 2017) (alleged self-interest combined with higher fees and lower performance than available comparable alternatives is sufficient defeat a motion to dismiss); *Krueger v. Ameriprise Financial, Inc*., No. 11-cv-02781 (SRN/JSM), 2012 WL 5873825, *10 (D. Minn. Nov. 20, 2012) (citing *Gipson v. Wells Fargo & Co*., No. 08-4546 (PAM/FLN), 2009 WL 702004, *1–2 (D. Minn. Mar. 13, 2009) for the proposition that plaintiffs plausibly demonstrated a breach of ERISA's fiduciary duties by alleging "that the defendant's fund was performing poorly compared to other funds, such as a fund offered by the Vanguard firm").

Defendants attack the basis for comparison, but that is not an appropriate argument at this stage. *See* MTD at 13–14. "Defendants may well be able to prove that these alternatives were not comparable or that they did not perform better in the long-run, but the Court may not resolve such factual questions at the motion to dismiss stage." *Cryer*, 2017 WL 818788 at *4; *see also Bekker v. Neuberger Berman Inv. Comm.*, No. 16 CV 6123-LTS-BCM, 2019 WL 2073953, *4 (S.D.N.Y. May 9, 2019) (finding it would be appropriate to "determine the appropriateness of some of the comparator funds chosen by Plaintiff, [or] identify other funds that charged similar or greater fees…, and otherwise provide competing statistical measurements").

*Anderson v. Intel*          Opp. to Mot. to Dismiss          Case No. 19-cv-4618-LHK

### 3. Plaintiffs' comparators are fair comparisons as alternatives selected by prudent fiduciaries in enterprises of like character and aims.

Defendants insist that the prudent alternatives must contain *identical* allocations to the same Non-Traditional asset categories. MTD at 16–19. That is both illogical, and impossible. Such a standard would immunize fiduciaries precisely *because* their decision was not merely imprudent, but uniquely reckless. As one court explained, although it may be "inappropriate" to compare different investments "***solely*** by cost" because they have different features, cost allegations along with allegations about investment returns and improper motive state a claim, which Plaintiffs allege here (as well as much more). *Terraza v. Safeway Inc.*, 241 F. Supp. 2d 1057, 1076–77 (N.D. Cal. 2017) (emphasis added) (sustaining claims about imprudent investment in target date funds). Further, contrary to Defendants' argument (MTD at 7), the mere fact that fees fall within a range courts have found to be reasonable does not win the day. *Id.* at 1077. Such an approach would create a "presumption of prudence" which the Supreme Court has rejected. *Id.* Moreover, Defendants cannot "have their cake and eat it too" by pointing to fees alone as a sign of prudence but requiring plaintiffs to allege more than high fees alone. *Id.*

Here, the Complaint alleges much more than high costs. *Supra*, Part III.A.1, 2. It alleges no fiduciary of *any* comparable plan or manager of *any* comparable asset allocation or target date or balanced product larded their investment with such significant investment in Non-Traditional asset categories. Comp. ¶¶ 145–46, 239, 271. Despite supporting an inference that prudent fiduciaries would have acted differently, Defendants suggest instead that it forecloses Plaintiffs' claim because there is no alternative or benchmark that also offered the same asset allocation. As Plaintiffs attack the asset allocation decision as being imprudent, a comparator with the identical asset allocation would, therefore, not be a prudent alternative.

The stated objective of Intel's target date funds was not unique: "Target-date funds are designed for investors expecting to retire around the year indicated in each fund's name. The Funds are managed to gradually become more conservative over time as they approach their target date" Dkt. 100-2 at ECF p. 156 (Intel 2035 Fund Fact Sheet). This is the objective of all target date funds: "TDFs automatically rebalance to become more conservative as an employee

*Anderson v. Intel*                          Opp. to Mot. to Dismiss                          Case No. 19-cv-4618-LHK

SER 30

gets closer to retirement. The 'target date' refers to a target retirement date, and often is part of the name of the fund." Dkt. 100-2 at ECF p. 200 (DOL Tips for ERISA Plan Fiduciaries). The comparator funds and benchmarks have similar objectives but meet them without massive investments in Non-Traditional assets (and at lower cost). Comp. ¶¶ 145–46, 180–193, 239.

Defendants argue their allocation was reasonable as a matter of law because it sacrificed higher returns for safety (at higher cost). MTD at 17. That argument depends on accepting their stated intentions as true and that their strategies were presumptively prudent. It also makes no sense. Under this theory, a fiduciary could argue that her stated intent was to take enormous risk by betting at the casino in expectation of enormous returns. That would be a breach even if things turned out well. Further, the Complaint alleges the investments caused higher fees and lower performance (even on a risk-adjusted basis) and Defendants could have achieved the same objectives at lower cost. Comp. ¶¶ 12, 153, 158 & 175. For example, Defendants rationalize investing in hedge funds as a risk-mitigation strategy based on their loss of *only* 17% during the 2008 financial crisis, but dismiss allegations that bonds provided more safety during the crisis, at lower cost, and continue to be universally used for risk mitigation by other target date funds. MTD at 20; Comp. ¶¶ 177–178. Indeed, Figure 7 shows that Defendants sacrificed returns in ways that cannot be explained by sacrificing risk. Comp. ¶ 207. The Plan paid for including the Non-Traditional investments and got nothing in return, while Defendants reaped the benefit. *Id.* ¶ 258. While a risk-mitigation strategy can be prudent, the Complaint sufficiently alleges facts that larding Plans with expensive non-traditional assets was not a prudent risk-mitigation strategy.

### 4. Performance comparisons plausibly allege fiduciary breach.

Contrary to Defendants' assertion, the Complaint does not allege that after the fact underperformance establishes a *per se* ERISA violation. MTD at 7, 13. Nor do such allegations improperly rely on hindsight when complaining about a failure to remove imprudent target date funds after investment. *Lorenz*, 241 F. Supp. 3d at 1019. Continued investment in underperforming funds—and selection of historically underperforming funds—are relevant to and sufficient to render a claim plausible when combined with other factors, such as high fees or

self-dealing. *See*, *Sweda*, 923 F.3d at 332 (reversing dismissal where plan fiduciaries "retained expensive underperformers over better performing, cheaper alternatives"); *Cryer*, 2017 WL 818788 at *4 (denying motion to dismiss). Like those cases, the Complaint here alleges "specific comparisons between returns on Plan investment options and readily available alternatives" and "the practices of similarly situated fiduciaries to show what plan administrators 'acting in a like capacity and familiar with such matters would do in the conduct of an enterprise of a like character and with like aims.'" *Sweda*, 923 F.3d at 332.

Alleging that a fiduciary included high cost, low performing funds in a plan raises a plausible inference that "the process by which [the fiduciaries] selected and managed the funds in the Plan would have been tainted by failure of effort, competence, or loyalty." *Braden*, 588 F.3d at 596. Defendants rely on *Meiners v. Wells Fargo & Co.,* 898 F.3d 820 (8th Cir. 2018), but the plaintiffs' complaint alleged only that the challenged funds were more expensive than one alternative—a passively managed alternative famed for its low fees. *Id.* at 823–24. The Eight Circuit held that the existence of one alternative that would have been cheaper is insufficient. *Id.* Here, the Complaint compares fees to a variety of passive and actively managed alternatives as well as category averages. Comp. ¶ 138–40. It also alleges facts about the unique risks of hedge funds and private equity. Comp. ¶ 191. This more than satisfies *Meiners* because the Complaint alleges that the investments are both too expensive in the market generally and are otherwise an imprudent choice. *Compare id. with Meiners*, 898 F.3d at 821, 823–24.

One of Defendants' cases, *Bekker v. Neuberger Berman Grp*., No. 16 CV 6123, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018), illustrates this point. The *Bekker* court dismissed the original complaint, which compared a challenged fund's fees and performance to a Vanguard alternative, but found that the plaintiff's amended complaint (alleging that the fund was also expensive compared to the market generally including actively managed alternatives), sufficiently stated a claim for fiduciary breach. *Compare id. with Bekker*, 2019 WL 2073953 at *4.

Finally, Defendants cite an unpublished district court decision, *White v. Chevron Corp*., No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) for the proposition that it is

*Anderson v. Intel*          Opp. to Mot. to Dismiss          Case No. 19-cv-4618-LHK

SER 32

"inappropriate to compare distinct investment *solely* by vehicles by cost." MTD. At 20. But the issue in *White* was whether comparing generally more expensive mutual funds to generally less expensive collective trusts and separate accounts was fair in light of mutual funds' better "regulatory and transparency features." *White*, 2016 WL 4502808 at *12.[5] Here, the challenged investments are investments with less robust regulatory and transparency features, yet charged fees far higher than the alternatives selected by Defendants' peers in similar 401(k) plans, including a variety of mutual funds, separate accounts and collective trusts. And Plaintiffs allege far more than fee comparisons. The decision in *Lorenz v. Safeway* illustrates that *White* is not dispositive. Although the *Lorenz* court acknowledged that investment fee differences, standing alone, are not sufficient, high fees combined with allegations that past performance did not "indicate that higher performance would offset this difference in fees," and that comparable funds "substantially outperformed" during the class period (along with allegations that the fiduciaries may have selected and kept the target date funds in order to benefit the plan's trustee and recordkeeper, instead of the plan and its participants), was sufficient to state a plausible claim. 241 F. Supp. 3d at 1019. Additionally, the *Lorenz* court rejected defense arguments that comparisons to other target date funds were inapt and that the challenged fees were within a reasonable range as being inappropriate on a motion to dismiss. *Id.* at 1019–20. The *Lorenz* court also distinguished *White* and out-of-circuit authorities that dismissed claims where the plaintiffs challenged a menu of investment options as opposed to challenging specific investments, as Plaintiffs do here with the Intel TDFs and GDF. *Id.* at 1021–22. Generally, the "prudence inquiry is fact intensive [a]nd because it involves the application of a reasonableness standard, rarely will such a determination be appropriate on a motion for summary judgment, let alone a motion to dismiss." *Lorenz*, 241 F. Supp. 3d at 1020 (quotations and alterations omitted).

---

[5] Defendants wield *White* like a mythic talisman warding them from any claims. But *White* was affirmed by an unpublished four-paragraph decision that devotes exactly one paragraph to the issues presented here, concluding that it was not error to dismiss claims where the plaintiffs merely alleged the defendants could have made a different investment decision and funds other than those selected performed better. *White v. Chevron Corp.*, 752 F. App'x 453 (2018). Plaintiffs cite multiple California federal cases distinguishing *White* and sustaining claims.

*Anderson v. Intel*        Opp. to Mot. to Dismiss        Case No. 19-cv-4618-LHK

18

SER 33

Other district court decisions in this Circuit have also distinguished *White* in denying motions to dismiss because the *White* plaintiffs complained about high fees without alleging what the fees were or explaining how they were excessive. *Alas v. AT&T Inc.*, No. LACV 17-08106), 2019 WL 1744847, *2–3 (C.D. Cal. Feb. 25, 2019); *Ybarra v. Bd. Of Trustees of Supp. Income Trust Fund*, No. 17-cv-2091, 2018 WL 9536641, *4 (C.D. Cal. Nov. 5, 2018) (same). These decisions show that *White* was merely decided on the limited allegations in that complaint and stands only for the proposition that a bare-bones complaint about excessive fees, with nothing more, does not state a claim.

Even Defendants' own cases recognize that "[i]n devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." *Tibble*, 843 F.3d at 1198 (quoting Unif. Prudent Investor Act § 7). Although Defendants misleadingly suggest *Tibble* stands for the proposition that fees as high as 2% per year are reasonable, in reality the trial court in *Tibble* ultimately found fees excessive on all 17 challenged investments at issue in the case, including one charging fees of only 0.57% per year and none charging over 2% per year. *Tibble v. Edison Int'l*, CV 07-5359 SVW (AGR), 2017 WL 3523737, *12 (C.D. Cal. Aug. 16, 2017); *Tibble*, No. 07-cv-5359, Dkt. 542 at ECF 25 (Expert report identifying fee levels of excessively expensive funds). As *Tibble* demonstrates, it is not the range of fees that matters but, rather, the cost of the individual challenged investments compared to prudent alternatives the fiduciaries could have chosen for the same or similar purpose. Here, the Complaint alleges that jumbo plans, like these Plans, use target date and asset allocation funds with fees far below those charged by the Intel alternatives or the Non-Traditional assets, while Defendants larded the Plan with funds charging fees above those found excessive in *Tibble*. *See*, *e.g.*, Comp. ¶¶ 135–146.

When read as whole, the Complaint details myriad facts that plausibly allege fiduciary breaches even under Defendants' own cited authority.

### C. COUNTS I AND II PROPERLY STATE A CLAIM FOR BREACH OF THE DUTY OF LOYALTY BY THE IPC DEFENDANTS

Defendants argue that Counts I and II are based on "utterly implausible disloyalty allegations." MTD at 20. But Defendants ignore relevant allegations and improperly draw factual inferences in their favor. ERISA § 404(a)(1)(A) requires fiduciaries to discharge their duties "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Counts I and II allege that the IPC Defendants breached their duty of loyalty by failing to properly monitor the performance and fees of the Intel Funds and investigate lower-cost funds with comparable or superior performance, and excessively allocating the Intel Funds in risky, unprecedented strategies featuring, for example, high-priced, low-performing actively-managed hedge funds and private equity funds. Comp. ¶¶ 1–14; 259–96; 321–337. Courts have held that similar allegations plausibly assert disloyalty claims. *E.g.*, *Johnson*, 250 F. Supp. 3d at (finding allegations that plan had "expenses three times higher than average," with recordkeeping expenses "five to ten times higher," asserted "a plausible claim that defendants breached the duties of prudence and loyalty"); *Johnson v. Providence Health & Services*, No. C17-1779-JCC, 2018 WL 1427421, at *9 (W.D. Wash. Mar. 22, 2018) (holding "there is reasonable inference that Defendants breached their duty of loyalty" where they failed to "select lower-cost share classes" and "systematically maintained actively-managed" funds). These allegations, that Defendants simply ignore, require denial of the Motion.

But the Complaint also alleges that Intel Capital "partners with" investment companies to access, for example, startup technologies. Comp. ¶¶ 53, 256, 257. By investing the Non-Traditional Investment Accounts in these businesses and allocating the Intel Funds to these investments, the IPC Defendants improperly favored these investments to the benefit of Intel Capital and Intel at the expense of the participants.[6] *Id.* ¶ 258; *id.* ¶¶ 23, 25. Defendants do not

---

[6] Defendants attempt to limit the disloyalty claims to "the Retirement Contribution Plan's investments" and the fiduciaries for that Plan. MTD at 20 & 22. Nowhere in the Complaint is such limitation stated. *See* Comp. ¶¶ 255–58.

*Anderson v. Intel*      Opp. to Mot. to Dismiss      Case No. 19-cv-4618-LHK

SER 35

Dane H. Butswinkas (*pro hac vice*)
Daniel F. Katz (*pro hac vice*)
Vidya Atre Mirmira (*pro hac vice*)
David Kurtzer-Ellenbogen (*pro hac vice*)
Juli Ann Lund (*pro hac vice*)
WILLIAMS AND CONNOLLY LLP
725 12th Street, NW
Washington, D.C. 20005
Telephone: (202) 434-5000
Email: dbutswinkas@wc.com
      dkatz@wc.com
      vmirmira@wc.com
      dkurtzer@wc.com
      jlund@wc.com

Scott P. Cooper (Cal. Bar No. 96905)
Jennifer L. Jones (Cal. Bar No. 284624)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Email: scooper@proskauer.com
      jljones@proskauer.com

Myron D. Rumeld (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Email: mrumeld@proskauer.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| WINSTON R. ANDERSON, CHRISTOPHER M. SULYMA and all others similarly situated,<br><br>    Plaintiffs,<br><br>      v.<br><br>INTEL CORPORATION INVESTMENT POLICY COMMITTEE, et al.,<br><br>    Defendants. | Case No.  5:19-cv-04618-LHK (Consolidated with Case Nos. 5:16-cv-00522-LHK, 5:15-cv-04977-LHK)<br><br>**DECLARATION OF VIDYA MIRMIRA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Consolidated Complaint Filed: June 24, 2020<br><br>Date:   November 19, 2020<br>Time:  1:30 p.m.<br>Place:  San Jose Courthouse<br>       Courtroom 8 – Fourth Floor<br>Judge:  Hon. Lucy H. Koh |

I, Vidya A. Mirmira, hereby declare and state as follows.

1.      I am a partner of Williams & Connolly LLP, and I represent the Defendants in the above-captioned matter.  I am submitting this Declaration in connection with Defendants' Motion to Dismiss Counts I through VI of Plaintiffs' Consolidated Complaint.  I have personal knowledge of the facts set forth herein and if called upon to do so, could testify competently thereto.

2.      Attached as Exhibit 1 to this Declaration is a genuine copy of the 2013 Summary Plan Description: Intel 401(k) Savings Plan, Intel Retirement Contribution Plan, and Intel Minimum Pension Plan (January 2013).

3.      Attached as Exhibit 2 to this Declaration is a genuine copy of the 2015 Summary Plan Description: Intel 401(k) Savings Plan, Intel Retirement Contribution Plan, and Intel Minimum Pension Plan (January 2015).

4.      Attached as Exhibit 3 to this Declaration is a genuine copy of the Intel 401(k) Savings Plan Investment Policy Statement, as amended and restated on January 12, 2017.

5.      Attached as Exhibit 4 to this Declaration is a genuine copy of the Global Diversified Fund Fact Sheet (December 31, 2011).

6.      Attached as Exhibit 5 to this Declaration is a genuine copy of the Global Diversified Fund Fact Sheet (September 30, 2015).

7.      Attached as Exhibit 6 to this Declaration is a genuine copy of the Global Diversified Fund Fact Sheet (December 31, 2017).

8.      Attached as Exhibit 7 to this Declaration is a genuine copy of the Target Date 2045 Fund Fact Sheet (December 31, 2011).

9.      Attached as Exhibit 8 to this Declaration is a genuine copy of the Target Date 2035 Fund Fact Sheet (September 30, 2015).

10.      Attached as Exhibit 9 to this Declaration is a genuine copy of the Target Date 2015 Fund Fact Sheet (September 30, 2015).

11.      Attached as Exhibit 10 to this Declaration is a genuine copy of the Target Date 2035 Fund Fact Sheet (December 31, 2017).

12.      Attached as Exhibit 11 to this Declaration is a genuine copy of an excerpt of the

Opening Brief of Plaintiff-Appellant Christopher Sulyma in *Sulyma v. Intel Corporation Investment Policy Committee, et. al.*, No. 17-15864, Dkt. No. 16 (9th Cir.), filed on December 29, 2017. The excerpt is comprised of the cover page and pages 29–30 of the Opening Brief.

13. Attached as Exhibit 12 to this Declaration is a genuine copy of the Statement of Barbara Bovbjerg before the U.S. Department of Labor's Advisory Council on Employee Welfare and Pension Benefit Plans (August 31, 2011), titled "Plans Face Challenges When Investing in Hedge Funds and Private Equity," located at https://www.gao.gov/assets/90/82457.pdf (last visited and printed on July 21, 2020).

14. Attached as Exhibit 13 to this Declaration is a genuine copy of a letter from Louis J. Campagna, Chief of the Division of Fiduciary Interpretations within the Employee Benefits Security Administration's Office of Regulations and Interpretations, a division of the U.S. Department of Labor, to Jon Breyfogle, Esq. of Groom Law Group, Chartered, dated June 3, 2020, located at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/information-letters/06-03-2020.pdf (last visited and printed on July 21, 2020).

15. Attached as Exhibit 14 to this Declaration is a genuine copy of "Target Date Retirement Funds—Tips for ERISA Plan Fiduciaries," a guidance document prepared by the U.S. Department of Labor's Employee Benefits Security Administration, dated February 2013, located at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf (last visited and printed on July 21, 2020).

16. Attached as Exhibit 15 to this Declaration is a genuine copy of "Intel Custom Target-Date Evolution," PIMCO, DC Dialogue (Volume 9, Issue 3) (March/April 2014), located at http://media.pimco.com/Documents/PIMCO_DC_Dialogue_Odell_Schaus_Mar_Apr_2014.pdf (last visited and printed on July 21, 2020).

17. Attached as Exhibit 16 to this Declaration is a genuine copy of the Morningstar publication "2018 Target-Date Fund Landscape" (May 7, 2018).

18.    Attached as Exhibit 17 to this Declaration is a genuine copy of the T. Rowe Price

Retirement 2015 Fund Fact Sheet (March 31, 2020), located at

https://www.troweprice.com/financial-intermediary/us/en/investments/mutual-funds/us-

products/retirement-2015-fund.html (last visited and printed on July 21, 2020).

I declare under penalty of perjury that the foregoing is true and accurate to the best of my

knowledge, information, and belief.

Executed this 22nd day of July, 2020, in Washington, D.C.

/s/ Vidya A. Mirmira

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the

filing of this document has been obtained from the signatory above.

/s/ Scott P. Cooper

# EXHIBIT 11

No. 17-15864

# In the United States Court of Appeals for the Ninth Circuit

———————————————

CHRISTOPHER M. SULYMA, on behalf of himself and all others similarly situated,
*Plaintiff-Appellant,*

v.

INTEL CORPORATION INVESTMENT POLICY COMMITTEE, et al.
*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the Northern District of California

———————————————

**BRIEF OF PLAINTIFF-APPELLANT**

———————————————

Tillman J. Breckenridge
Gregory Y. Porter
Ryan T. Jenny
BAILEY & GLASSER LLP
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101

R. Joseph Barton
BLOCK & LEVITON LLP
1735 20th Street, NW
Washington, DC 20009
(202) 734-7046

Matthew W.H. Wessler
Jonathan E. Taylor
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*

Joseph A. Creitz
CREITZ & SEREBIN LLP
250 Montgomery Street, Suite 1410
San Francisco, CA 94104
(415) 269-3675

*Counsel for Plaintiff-Appellant*

December 29, 2017

Exhibit 11                Page 1 of 3
SER 41

investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983); *see also DiFelice v. U.S. Airways, Inc.*, 496 F.3d 410, 420 (4th Cir. 2007) (explaining that a court "must ask whether the fiduciary engaged in a reasoned decisionmaking process, consistent with that of a 'prudent man acting in like capacity'").

Under this standard, "[w]hether an ERISA fiduciary has acted prudently requires consideration of both the substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision." *Fish*, 749 F.3d at 680. It is an objective question that "will necessarily be context specific," *Fifth Third Bancorp*, 134 S. Ct. at 2471, requiring knowledge of "all relevant circumstances," not knowledge of the investments alone, *see Roth*, 16 F.3d at 921 ("There is no formula . . . for determining whether an ERISA fiduciary's conduct was reasonable, so the court should take into account all relevant circumstances."). To know that a fiduciary committed a breach of its duty of prudence by including an investment (or several investments) in a plan, in other words, a plaintiff must know more than just "the transaction in connection" with the breach. *Fernandez v. K-M Indus. Holding Co., Inc.*, 585 F. Supp. 2d 1177, 1186 (N.D. Cal. 2008).

Were it otherwise, ERISA's duty of prudence could be breached merely by the inclusion of a particular investment. But such a "*per se* approach is directly at odds" with both case law and ERISA itself. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014). As the Department of Labor has explained, "a

particular investment" cannot "be deemed *per se* prudent or *per se* imprudent based on its level of risk." *See id.* (quoting Investment of Plan Assets under the "Prudence" Rule, 44 Fed. Reg. 37,221, 37,225 (June 26, 1979)). To the contrary, the prudence analysis "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996); *see also Fink*, 772 F.2d at 957 ("A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard."). As a result, "the terms of a transaction alone" will "only rarely provide actual knowledge under section 1113(2)." *Fish*, 749 F.3 at 681 n.4 (rejecting the idea that the disclosure of "the bare terms" of a transaction or investment would be sufficient to demonstrate a breach and trigger section 1113(2)).

*Tibble* illustrates the point. There, a class of employees who participated in an ERISA-governed 401(k) plan brought breach-of-fiduciary-duty claims against the plan fiduciaries. They claimed that the fiduciaries' inclusion of several different types of investments in the plan "had been imprudent" because the fiduciaries had failed to investigate alternatives. 729 F.3d at 1118. The *Tibble* defendants argued that the three-year limitations period barred the suit because SPD and investment prospectuses had disclosed "the inclusion" of the investments to the plaintiffs more than three years before they filed suit. *Id.* at 1120.

Joseph Creitz (Cal. Bar No. 169552)
CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
joe@creitzserebin.com
Telephone: (415) 466-3090
Facsimile: (415) 513-4475

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| WINSTON R. ANDERSON, CHRISTOPHER M. SULYMA, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> INTEL CORPORATION INVESTMENT POLICY COMMITTEE, INTEL RETIREMENT PLANS ADMINISTRATIVE COMMITTEE, FINANCE COMMITTEE OF THE INTEL CORPORATION BOARD OF DIRECTORS, CHRISTOPHER C. GECZY, RAVI JACOB, DAVID S. POTTRUCK, ARVIND SODHANI, RICHARD TAYLOR, TERRA CASTALDI, RONALD D. DICKEL, TIFFANY DOON SILVA, TAMI GRAHAM, CARY KLAFTER, STUART ODELL, CHARLENE BARSHEFSKY, SUSAN L. DECKER, JOHN J. DONAHOE, REED E. HUNDT, JAMES D. PLUMMER, FRANK D. YEARY, STACY SMITH, ROBERT H. SWAN, TODD UNDERWOOD, AND GEORGE S. DAVIS <br><br> Defendants, <br><br> and <br><br> INTEL 401(K) SAVINGS PLAN and INTEL RETIREMENT CONTRIBUTION PLAN, <br><br> Nominal Defendants. | Case No: 5:19-cv-04618-LHK <br><br> (Consolidated with Case No. 16-cv-04977-NC, and Case No. 16-cv-00522) <br><br> **CONSOLIDATED COMPLAINT** <br><br> **CLASS ACTION** |

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ............................................................................ 1

II. JURISDICTION AND VENUE .................................................................... 6

III. PARTIES ...................................................................................................... 7

    A.   PLAINTIFFS ....................................................................................... 7

    B.   DEFENDANTS .................................................................................... 7

IV. CLASS ALLEGATIONS ............................................................................ 17

    A.   Numerosity and Impracticability of Joinder ................................. 17

    B.   Commonality ..................................................................................... 18

    C.   Typicality ........................................................................................... 19

    D.   Adequacy ........................................................................................... 20

    E.   Rule 23(b)(1) ...................................................................................... 20

    F.   Rule 23(b)(2) ...................................................................................... 21

    G.   Rule 23(b)(3) ...................................................................................... 21

V. FACTUAL ALLEGATIONS ........................................................................ 22

    A.   Overview of the Plans and the Intel Investment Options ............ 22

        1.   The 401(k) Savings Plan ....................................................... 22

        2.   The Retirement Contribution Plans ................................... 25

        3.   The Target Date Funds and the Global Diversified Funds ............ 28

        4.   Fiduciary Responsibilities of the Investment Committee Defendants .......... 37

    B.   The Investment Committee Defendants Subjected the Plans and Participants to Unnecessary and Imprudent Expenses ........................................ 38

    C.   The Investment Committee Defendants Failed to Monitor and Replace the Asset Allocation Models and Allocation Percentages for the Intel Funds .......... 56

1.  Excessive Allocations to the Non-Traditional Investment Accounts............. 56

2.  Deviation from Professional Standards for Target Date Funds and
    Balanced Funds ..................................................................... 61

3.  The Intel Funds Imprudently Invested in Hedge Funds ................................ 66

4.  Significant Investment in Hedge Funds and Private Equity Are
    Generally Not Suitable For Balanced Funds........................................ 71

5.  Risks and Costs of Hedge Funds and Private Equity .................................... 72

6.  Opaque Disclosures.................................................................. 81

7.  Self-Interest of the Investment Committee Defendants ................................ 83

8.  Underperformance of the Non-Traditional Investments Accounts.............. 87

9.  The Ongoing Failure of Fiduciaries of the Plans to Conduct an
    Appropriate Investigation ......................................................... 89

D.  The Administrative Committee Defendants Made Inadequate Disclosures
    About the Intel Funds and Provided Misinformation About Participants'
    Accounts and the Intel Funds ...................................................... 100

VI. CLAIMS FOR RELIEF.......................................................................... 109

COUNT I (VIOLATIONS OF ERISA § 404(A) BY THE INVESTMENT
    COMMITTEE IN SELECTING AND MONITORING THE INVESTMENT
    OPTIONS FOR THE PLANS) ............................................................. 108

COUNT II (VIOLATIONS OF ERISA § 404(A) BY THE INVESTMENT
    COMMITTEE AND INVESTMENT COMMITTEE DEFENDANTS IN
    ALLOCATING THE INTEL FUNDS' ASSETS) ............................................. 111

COUNT III (VIOLATIONS OF ERISA §§ 404(A)(1)(A) AND 404(A)(1)(B) BY THE
    ADMINISTRATIVE COMMITTEE DEFENDANTS FOR FAILURE TO

MAKE ADEQUATE AND ACCURATE DISCLOSURES) ........................................... 114

COUNT IV (VIOLATIONS OF ERISA § 404(A) BY THE FINANCE COMMITTEE

AND CHIEF FINANCIAL OFFICER DEFENDANTS FOR FAILURE TO

MONITOR OTHER FIDUCIARIES) .................................................................. 119

COUNT V (VIOLATION OF ERISA § 102(A), 29 U.S.C. § 1022(A) AGAINST THE

ADMINISTRATIVE COMMITTEE DEFENDANTS) .................................................... 122

COUNT VI (CO-FIDUCIARY LIABILITY UNDER ERISA § 405 AGAINST ALL

DEFENDANTS) .................................................... ERROR! BOOKMARK NOT DEFINED.

COUNT VII (FAILURE TO PROVIDE DOCUMENTS UPON REQUEST

PURSUANT TO ERISA § 104(B)(4), 29 U.S.C. § 1024(B)(4), & 29 C.F.R. §

2550.404A-5 AGAINST THE ADMINISTRATIVE COMMITTEE

DEFENDANTS) .................................................... ERROR! BOOKMARK NOT DEFINED.

VII. ENTITLEMENT TO RELIEF ................................................................................. 129

VIII. PRAYER FOR RELIEF ....................................................................................... 129

# I.  NATURE OF THE ACTION

1.     Plaintiffs Winston Anderson and Christopher Sulyma brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), for breaches of fiduciary duties. This action alleges that the fiduciaries of the Intel 401(k) Savings Plan ("the 401(k) Savings Plan") and the Intel Retirement Contribution Plan ("the Retirement Contribution Plan") (collectively "the Plans") breached their fiduciary duties by investing billions of dollars in retirement savings in unproven and unprecedented investment allocation strategies featuring high-priced, low-performing illiquid and opaque hedge funds and private equity funds. Plaintiffs have been participants in the Plans and bring this action on behalf of a class of similarly situated participants as a class action to recover relief on behalf of the Plans against the Intel Retirement Plans Investment Policy Committee ("the Investment Committee") and its members, the Intel Retirement Plans Administrative Committee ("the Administrative Committee") and its members, the Finance Committee of the Intel Corporation Board of Directors ("the Finance Committee") and its members, and the Chief Financial Officers of Intel Corporation ("the Chief Financial Officers").

2.     The Investment Committee designed and implemented retirement investment strategies, a suite of target date portfolios ("Intel TDFs") with a dynamic allocation model (meaning allocations to asset classes changed over time) and a multi-asset portfolio with a fixed allocation model ("Intel GDFs")[1] that deviated greatly from prevailing professional investment standards for such retirement strategies in several critical ways—chief among them investing billions in hedge funds, private equity, and commodities. Then, as investment returns repeatedly lagged peers and benchmarks, the Investment Committee did nothing while billions of dollars in retirement savings were lost. The Investment Committee deviated from the standard of care of similarly-situated plan fiduciaries who select target date funds for their plans that include little or no exposure to these strategies. The Investment Committee (a) failed to properly monitor the performance and fees of the

---

[1] The Global Diversified Fund in the 401(k) Savings Plan is called the 401K Global Diversified Fund. Collectively, the Global Diversified Fund in the Retirement Contribution Plan and that in the 401(k) Savings Plan are referred to herein as the Intel GDFs.

Intel TDFs and Intel GDFs (collectively "the Intel Funds") in the Plans and to properly investigate the availability of lower-cost investment alternatives with similar or superior performance, and (b) failed to properly monitor and evaluate the unconventional, high-risk allocation models adopted for these custom investment options, which excessively allocated assets of the Plans to speculative investments. Additionally, the Administrative Committee failed to provide adequate disclosures associated with the custom investment options' heavy allocation to hedge funds and private equity, and either misinformed or failed to inform participants about the allocation mix of their account balances and the allocation strategy of the custom target-date options. Finally, the Finance Committee and the Chief Financial Officers failed to monitor the Investment and Administrative Committees. As a result of these imprudent decisions and inadequate processes, Defendants caused the Plans and many participants in the Plans to suffer substantial losses in retirement savings.

3.      The 401(k) Savings Plan and the Retirement Contribution Plan are both defined contribution plans under ERISA. As a result, the retirement income provided to participants by the Plans depends on employer and employee contributions and the performance of investment options net of fees and expenses. The Investment Committee chooses the investment options available in the Plans and thereby chooses the fees and expenses paid by the Plans and their respective participants.

4.      The Investment Committee decided that the Plans should offer customized asset allocation portfolios rather than invest in similar portfolios designed and managed by investment professionals. An asset allocation fund or portfolio invests in several asset classes such as equities from large cap to micro cap, bonds from treasuries to high yield, international securities (both equities and bonds), real estate, etc. Allocation models may be fixed or change over time. Both the Intel TDFs and Intel GDFs are custom asset allocation models. Instead of investing the Plans in asset allocation funds offered by professional asset managers such as Fidelity Investments and Vanguard Group, Inc., the Investment Committee chose to create its own asset allocation models.

5.      Until January 1, 2018, the Intel TDFs and GDFs were not actual funds as there was no distinct legal entity such as a mutual fund or collective trust which issued shares or units in the distinct entity that held the investments. Rather, the Intel TDFs and GDFs were allocation models that directed participant savings into various pooled investment funds such as Large Cap,

Commodities, Private Equity and Hedge Funds. Each of these pooled investment funds was structured as a collective trust. Effective December 31, 2017, the Intel TDFs and GDFs were converted from model portfolios to collective investment trusts ("CITs"). Effective January 1, 2018, Global Trust Company ("GTC") was appointed as the trustee for the Intel TDF and GDF CITs, and GTC hired Watson Wyatt Investment Services, Inc., to advise it on asset allocation and sub-advisor selection for the CITs. After driving the retirement savings of thousands of Intel employees into the ditch, the Investment Committee turned the keys of the wreck over to someone else. Further, until GTC was hired to manage the Intel funds, unlike most professionally managed asset allocation funds, the Intel TDFs and Intel GDFs were not funds as such. Rather, they were asset allocation models that invest in various underlying funds representing the asset classes selected by the Investment Committee. These underlying funds were (and are) held in the Plans' Master Trust Investment Accounts, which are pooled investment accounts representing various asset classes and investment strategies.

6.      The Intel GDFs follow a fixed asset allocation model. The model does not shift the percentage of fund assets from one asset class to another.

7.      The Intel TDFs follow a dynamic allocation model: The asset allocation changes over time. A target date fund, such as the Intel TDFs, is intended to reallocate assets over time as a participant approaches retirement age. Target date funds are generally offered as a suite of "vintages" in five-year or ten-year intervals where the vintage refers to the date of the fund such as a 2045 fund. The vintage or target date is intended for participants who will reach normal retirement age (i.e., 65) in or around the given year. For example, a participant who reached age 65 in 2046 would generally invest in the 2045 fund.

8.      In this case, the Investment Committee created a suite of target date funds starting with 2005 and ending with 2055. The suite also includes a TDF Income Fund for participants who have reached retirement age. When an Intel TDF hits the target date, it has the same allocation model as the TDF Income Fund. Thus, all pre-2020 Intel TDFs have virtually the same allocation as the income fund.

9.    The Intel TDFs were (and are) the default investment alternative in the 401(k) Savings Plan. That means 401(k) Savings Plan participants were forced into the TDFs if they did not make an election. The Intel GDF for many years was the only investment option available in the Retirement Contribution Plan for the overwhelming majority of that plan's participants. Plaintiff Anderson was defaulted into the Intel Target Date 2030, 2035, and 2040 Funds in the 401(k) Savings Plan and the Intel GDF in the Retirement Contribution Plan. Plaintiff Sulyma was defaulted into the Intel Target Date 2045 Fund in the 401(k) Savings Plan and the Intel GDF in the Retirement Contribution Plan.

10.   Unlike professionally managed target date funds offered by Fidelity, Vanguard, and others, the Intel TDFs included significant allocations to hedge funds as well as disproportionate allocations to commodities, private equity, and international securities. Similarly, the Intel GDFs included outsize allocation to hedge funds, private equity, and other alternative asset classes as compared to professionally managed fixed asset allocation funds.

11.   The Investment Committee was the fiduciary for the Plans responsible for selecting, managing, and monitoring the investment options in the Plans. The Committee created the Intel TDFs and the GDFs (collectively "the Intel Funds"), and selected and maintained the Intel Funds as the Plans' investment options. The Committee also developed, chose, and managed the asset allocation model for the Intel Funds, including the asset classes and investment strategies to which the Intel Funds' assets are allocated as well as the allocation percentages. Further, the Committee designated the Intel TDFs as the default investment options of the 401(k) Savings Plan and the Intel GDF as the default investment option of the Retirement Contribution Plan.

12.   The Intel TDFs have consistently charged fees significantly higher than both actively-managed and passively-managed target-date series offered by professional asset managers, but the Intel TDFs had substantially worse performance, both in absolute terms and on a risk-adjusted basis. The actively-managed GDFs have consistently underperformed both actively-managed and passively-managed investment alternatives that were significantly less expensive, both in absolute terms and on a risk-adjusted basis. The Investment Committee failed to properly monitor the performance and fees of the Intel Funds and failed to properly investigate and give appropriate

consideration to the availability of lower-cost, better-performing investment alternatives. Instead of using the Plans' bargaining power to negotiate low-cost, better-performing investment options and benefit participants and beneficiaries, the Investment Committee selected and retained the high-cost and underperforming Intel Funds.

13.     The Investment Committee adopted and implemented allocation models for the Intel Funds that drastically departed from prevailing standards of professional asset managers by allocating significant portions of the Intel Funds' assets to speculative investments. For example, beginning in 2011, the Investment Committee dramatically altered the asset allocation model for the Intel TDFs by increasing Intel TDFs' investments in hedge funds from about $50 million to $680 million, an increase of 1,300%. Similarly, the Investment Committee increased the Diversified Fund's exposure to hedge funds and private equity investments starting 2009. During the period from 2009 through 2014, the Intel GDF's investment in hedge funds increased from about $582 million to $1.665 billion, an increase of approximately 286%; the fund's investment in private equity increased from about $83 million to $810 million, an increase of 968%. As of September 2015, between approximately 27 and 37% of each of the Intel TDFs' assets and approximately 56% of the Intel GDFs' assets were allocated to "alternative" investments such as hedge funds, private equity, commodities, and emerging market funds held in the Master Trust Investment Accounts. Comparable target date funds and balanced funds did not allocate their assets anywhere close to the Intel Funds' allocations. The Investment Committee's failure to engage in an adequate process of monitoring the allocation models for the Intel Funds exposed the Plans and their participants to the underperformance of the speculative investments that the Intel Funds were allocated to, and the corresponding underperformance of the Intel Funds, and to the high management and performance fees charged by hedge fund and private equity managers.

14.     The result of the Investment Committee's failed attempt to embark on an unprecedented and risky experiment with the Plans' assets is that the Intel Funds have dramatically underperformed professionally managed target date and asset allocation, and participants have paid enormous fees for poor performance. The Plans and their participants have earned significantly less

than if the Investment Committee had designed prudent asset allocation funds and/or offered prudent funds by well-established and reputable money managers.

15.    Plaintiffs allege six claims on behalf of a class of participants in the Plans who invested in the Intel Funds (a) for breaches of duty under ERISA § 404(a) by the Investment Committee in selecting and monitoring the investment options in the Plans, including monitoring and evaluating on a regular basis the Intel Funds and their performance and fees; (b) for breaches of duty under ERISA § 404(a) by the Investment Committee in managing the assets of the Plans, including monitoring and evaluating on a regular basis the asset allocation models and allocation percentages for the Intel Funds; (c) for breaches of duty under ERISA § 404(a) by the Administrative Committee for failing to provide material and accurate disclosures to participants; (d) for breaches of duty under ERISA § 404(a) by the Finance Committee and Chief Financial Officers for failing to monitor the Investment Committee and removing any member of the Investment Committee whose performance was inadequate in managing the Plans' assets; (e) for the Administrative Committee's violation of ERISA § 102 by issuing Summary Plan Descriptions that failed to disclose and explain the risks associated with the Intel Funds' asset allocations or the accompanying risks associated with investments in the Intel Funds; and (f) for co-fiduciary liability under ERISA § 405 against all Defendants. Plaintiffs seek relief including a declaration that Defendants breached their fiduciary and co-fiduciary duties, as well as restoration to the Plans losses to participants' accounts that resulted from Defendants' breaches.

## II.  JURISDICTION AND VENUE

16.    This Court has exclusive and subject matter jurisdiction over this action under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331 because it is an action under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).

17.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because, upon information and belief, most, if not all, of the individual Defendants can be found in this District.

18.    Assignment to the San Jose Division is appropriate because Intel is headquartered in Santa Clara County, where much of the complained-of conduct likely occurred.

### III.  PARTIES

**A.  PLAINTIFFS**

19.  Plaintiff Winston R. Anderson is and has been a participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), in the Intel 401(k) Savings Plan ("the 401(k) Savings Plan") and the Intel Retirement Contribution Plan ("the Retirement Contribution Plan") (collectively "the Plans"). Anderson is a former employee of Intel Corporation and a current resident of Arizona. He worked for Intel from 2000 until 2015. As a result of his employment with Intel, he became a participant in the Plans. Anderson is fully vested in his accounts in the Plans. During the relevant period, his accounts in the Plans are and have been invested in the Intel GDF and Intel TDFs. Specifically, during the relevant period, his account in the Retirement Contribution Plan is and has been invested in the Intel Global Diversified Fund, and his account in the 401(k) Savings Plan is and has been invested in the Intel Target Date 2030 Fund, the Intel Target Date 2035 Fund, and the Intel Target Date 2040 Fund.

20.  Plaintiff Christopher M. Sulyma is a former employee of Intel Corporation and is a resident of New Mexico. Sulyma worked for Intel from June 2010 until September 2012. During his employment with Intel, Sulyma was a participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), in the 401(k) Savings Plan and the Retirement Contribution Plan. As a result of his two years of employment, Sulyma was partially vested in his account balance in the Retirement Plan. His account in the Retirement Plan was invested in the Intel Global Diversified Fund. Sulyma was fully vested in his account in the 401(k) Savings Plan. His account in the 401(k) Savings Plan was invested entirely in the Intel Target Date 2045 Fund.

**B.  DEFENDANTS**

**Investment Committee Defendants**

21.  The **Intel Corporation Investment Policy Committee** ("the Investment Committee") is a named fiduciary of the Plans with respect to the management and control of the Plans' assets pursuant to Section 13(a) of the Retirement Contribution Plan as restated effective

1  January 1, 2014 ("the Retirement Contribution Plan Document"), the 401(k) Savings Plan as

2  amended and restated effective January 1, 2014 ("the 401(k) Savings Plan Document"), and Section

3  1.2(a) of the Retirement Plans Master Trust Agreement Between Intel Corporation, the Investment

4  Committee, and the Plans' trustee State Street Bank and Trust Company ("the Master Trust

5  Agreement). As such, the Investment Committee is a fiduciary of the Plans within the meaning of

6  ERISA § 402(a), 29 U.S.C. § 1102(a). Pursuant to Section 13(f) of the Retirement Contribution and

7  401(k) Savings Plan Documents (collectively "the Plan Documents"), the Investment Committee is

8  responsible for designating and evaluating the investment options offered to participants under the

9  Plans. Pursuant to the same provision of the Plan Documents, the Investment Committee has the

10 discretionary authority to appoint and remove the trustee and investment managers for the Plans and

11 conduct periodic reviews of the performance, costs, and expenses of the Plans' investment options,

12 trustee, investment managers, and outside service providers. As such, the Investment Committee is a

13 fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

14      22.     **Christopher C. Geczy** has been a Member of the Investment Committee from 2014

15 to the present. He has worked as an Adjunct Professor of Finance at The Wharton School at the

16 University of Pennsylvania since 1997 and serves as the Academic Director of Jacobs Levy Equity

17 Management Center for Quantitative Financial Research and Wharton Wealth Management

18 Initiative. He is the Founder, CEO and Chief Investment Officer of Forefront Analytics, where he

19 oversees investment decision-making. Mr. Geczy acts as an editor of the *Journal of Alternative*

20 *Investments* and serves on the Advisory Board of the Journal of Wealth Management. Mr. Geczy

21 worked for the Board of Governors of the Federal Reserve System's Division of Research and

22 Statistics in Washington, D.C. He has served on the Economic Advisory Board of NASDAQ. Mr.

23 Geczy is a founding board member of the Mid-Atlantic Hedge Fund Association and former

24 Chairman. According to his LinkedIn Profile, Mr. Geczy lives in the Greater Philadelphia Area.

25      23.     **Ravi Jacob** has been a Member of the Investment Committee from at least January of

26 2010 to the present. Mr. Jacob has been a Corporate Vice President and the Treasurer of Intel since

27 2005. As Treasurer, Mr. Jacob manages Intel's cash and investments, capital markets activity,

28

currency and other financial risks, credit and collections, retirement assets, and insurance. According to his LinkedIn Profile, Mr. Jacob lives in the San Francisco Bay Area.

24.     **David S. Pottruck** has served as the Chairman of the Investment Committee from at least 2009 until 2018. He was a Member of Intel's Board of Directors from 1998 until 2018. Mr. Pottruck is the Chairman and Chief Executive of Red-Eagle Ventures Inc. located in San Francisco. He served in various high-level executive positions at Charles Schwab Corporation from 1984 to 2004. According to his LinkedIn Profile, David S. Pottruck lives in the San Francisco Bay Area.

25.     **Arvind Sodhani** was a Member of the Investment Committee from at least October 2009 to 2016. Mr. Sodhani had been an Executive Vice President of Intel from 2007 to 2016. He was also the President of Intel Capital from 2005 to 2016. Mr. Sodhani oversaw Intel's internal new business incubation, external investments, and mergers and acquisitions. He was Head of M&A and Strategy of Intel Corporation from 1988 to 2015. He served as a Treasurer and Senior Vice President of Intel Corporation from 1988 to 2005. Mr. Sodhani joined Intel-Europe in 1981 as Assistant Treasurer and was promoted to Assistant Treasurer of Intel in 1984. He was subsequently promoted to Treasurer in 1988. During his tenure at Intel, Mr. Sodhani was a Board Member of the NASDAQ Stock Market, Inc. and a Non-Industry Director of Nasdaq OMX Group from 1997to 2007. According to his LinkedIn Profile, Mr. Sodhani lives in San Francisco, California.

26.     **Richard Taylor** was a Member of the Investment Committee from at least October 2009 to 2016. He is the HR Project Manager at Intel and has led Human Resources since 1999. He oversees all of the human resource policies and programs for the company worldwide. Mr. Taylor joined Intel in 1986 as an Audit Manager in Europe. According to his LinkedIn Profile, Mr. Taylor lives in the Portland, Oregon area.

27.     Defendants Christopher Geczy, Ravi Jacob, David S. Pottruck, Arvind Sodhani, Richard Taylor are collectively referred to as the "**Investment Committee Defendants**." Since at least October 29, 2009, the Investment Committee and the Investment Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their membership on the Committee and because they each exercised discretionary authority or discretionary control respecting management of the Plans and/or exercised authority or control

---

respecting management or distribution of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**Administrative Committee Defendants**

28.     The **Intel Retirement Plans Administrative Committee** ("the Administrative Committee") is a named fiduciary of the Plans with respect to the operation and administration of the Plans pursuant to Section 13(a) of the Plan Documents and Section 1.2(b) of the Master Trust Agreement. As such, the Administrative Committee is a fiduciary of the Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). Pursuant to Section 13(e) of the Plan Documents, the Administrative Committee is responsible for preparing and furnishing to participants and beneficiaries a general explanation of the Plans and all other information required to be furnished to them under federal law or the Plans. The Administrative Committee is the named administrator of the Plans. As such, the Administrative Committee is a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

29.     **Terra Castaldi** was a Member of the Administrative Committee from 2015 until October 2018. She was a Senior Director in the Benefits Tax and Legal Department of Intel from 2005 until October 2018. Prior to joining Intel, she was a Partner at Morgan, Lewis & Bockius LLP. According to her LinkedIn Profile, Terra Castaldi lives in the San Francisco Bay Area.

30.     **Ronald D. Dickel** was a Member of the Administrative Committee from 2010 to 2015. He was the Vice President of Finance and the Director of Global Tax and Trade at Intel from 2010 until June 2018. Mr. Dickel joined Intel in 2010 as a Vice President and a Director. Prior to his employment at Intel, Mr. Dickel was a Tax Associate at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP. According to his LinkedIn Profile, Mr. Dickel lives in Los Gatos, California.

31.     **Tiffany Doon Silva** has been a Member of the Administrative Committee from 2015 to the present. She is an attorney in the legal department at Intel. Prior to joining Intel, Ms. Silva was an Attorney at Gibson, Dunn & Crutcher LLP from 1995 to 1999. According to her LinkedIn Profile, Tiffany Doon Silva lives in the San Francisco Bay Area.

32.     **Tami Graham** was a Member of the Administrative Committee from 2015 until 2018. Ms. Graham was the Director of Global Benefits Design at Intel's Worldwide Compensation

and Benefits Group and the Global Benefits Design Manager. She was formerly a member of Intel's HR Legal Group as a legal advisor for the design and administration of Intel's compensation and benefit programs. According to her LinkedIn Profile, Ms. Graham lives in the Sacramento, California area.

33. **Cary Klafter** was a Member of the Administrative Committee from at least 2009 to 2015. Mr. Klafter was the Corporate Vice President of Legal and Corporate Affairs of Intel from 1996 to 2015. He was elected to serve as the Corporate Secretary in 2003. Prior to joining Intel in 1996, Mr. Klafter was an Associate and Partner with Morrison & Foerster LLP, a law firm, from 1972 to 1996. According to his LinkedIn Profile, Mr. Klafter lives in the San Francisco Bay Area.

34. **Stuart Odell** was a Member of the Administrative Committee from 2015 until 2018. Mr. Odell served as a Director of Retirement Investments and was the Assistant Treasurer in the Treasury Department of Intel from 2000 to 2018. Mr. Odell and his investment team at Intel were responsible for oversight and management of Intel's $14 billion in qualified and nonqualified retirement plan assets. He was a Board Member and Trustee of the San Jose Federated City Employees Retirement System from 2011 to 2015. According to his LinkedIn Profile, Mr. Odell lives in the San Francisco Bay Area.

35. Defendants Terra Castaldi, Ronald Dickel, Ravi Jacob, Tami Graham, Cary Klafter, Stuart Odell, David Pottruck, Tiffany Doon Silva, and Richard Taylor are collectively referred to as the "**Administrative Committee Defendants**." Since at least October 29, 2009, the Administrative Committee and the Administrative Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their membership on the Committee and because they each exercised discretionary authority or discretionary control respecting management of the Plans and/or exercised authority or control respecting management or distribution of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**Finance Committee Defendants**

36. The **Finance Committee of the Intel Corporation Board of Directors** ("the Finance Committee") is one of the standing committees of Intel's board of directors ("the Board")

and is comprised of directors who represent the Board in ensuring that Intel's senior management adequately carries out its responsibility with respect to Intel's capital and investment transactions. With respect to the Plans, pursuant to Section 13(b) of the Plan Documents, at all relevant times until at least March 2016, the Finance Committee was responsible for the appointment, retention, and removal of the members of the Investment Committee and the Administrative Committee. The Finance Committee was authorized to remove, with or without cause, any members of the Investment Committee and the Administrative Committee and required to appoint their successors. Pursuant to Section 13(m) of the Plan Documents and under ERISA, at all relevant times until at least March 2016, the Finance Committee had an ongoing duty to review the continued prudence of its appointments of the Investment Committee and Administrative Committee members. The Investment Committee and the Administrative Committee were required to report to the Finance Committee on an ongoing basis any information as is necessary and appropriate to permit the Finance Committee to carry out that duty. As such, at all relevant times until at least March 2016, the Finance Committee was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

37. **Charlene Barshefsky** was a member of the Finance Committee between 2007 and 2017 and served as the Chair of the Finance Committee between 2009 and 2017. She has been a Member of Intel's Board of Directors since 2004. Ms. Barshefsky is currently a Partner of the law firm Wilmer Cutler Pickering Hale and Dorr LLP, where she is the Chair of the International Trade, Investment and Market Access Practice Group. She serves on the Boards of Directors of American Express Company, The Estée Lauder Companies Inc., and Starwood Hotels & Resorts Worldwide, Inc. Ms. Barshefsky lives in Washington, D.C.

38. **Susan L. Decker** served on Intel's Board of Directors between 2004 and 2016, and on the Finance Committee between 2009 and 2011. Ms. Decker was Intel's Chief Financial Officer from 2000 to 2007, and then President of Yahoo! Inc. from June 2007 to April 2009. According to her Linked-In Profile, Ms. Decker is currently the Chief Executive Officer of Raftr and is a member of the Board of Directors for Vox Media, Inc., Vail Resorts, SurveyMonkey, Costco Wholesale, and Berkshire Hathaway. Ms. Decker lives in San Francisco, California.

39.     **John J. Donahoe** was a Member of the Finance Committee from March 2009 to May 2017. He served on Intel's Board of Directors from 2009 to 2017. He has been the Chairman of the Board of Directors of PayPal Holdings, Inc., located in San Jose, California since July 2015. He is a Member of the Advisory Board and Director of eVolution Global Partners, LLC, a global venture capital firm that specializes in early stage investments within the information technology and media sectors. Mr. Donahoe was President and CEO of eBay from March 2008 to July 2015. Since 1982, he worked as Worldwide Managing Director of Bain & Company, a global management consulting firm, becoming the firm's President and Chief Executive Officer ("CEO") in 1999 to 2005. He has currently been serving as President and CEO of ServiceNow since April 2017. Mr. Donahoe lives in Portola Valley, California.

40.     **Reed E. Hundt** was a Member of the Finance Committee from 2010 to at least 2016. Mr. Hundt has served on Intel's Board of Directors since 2001 and is presently on the Audit Committee and Compensation Committee. He has been an advisor to the private equity firm Blackstone Group since 2010. He is also a Principal at REH Advisors, a business advisory firm and CEO of Coalition for Green Capital, both since 2009. He was Chairman of the Federal Communications Commission from 1993 to 1997. Mr. Hundt practiced law at Latham & Watkins LLP from 1975 to 1993. According to his LinkedIn Profile, Mr. Hundt lives in Washington, D.C.

41.     **James D. Plummer** was a Member of the Finance Committee from 2006 to May 2017. He has served on Intel's Board of Directors since 2005. He is a Professor and the Dean of the School of Engineering at Stanford University in Stanford, California. He has also been an Independent Director at Cadence Design Systems. Mr. Plummer lives in Portola Valley, California.

42.     **Frank D. Yeary** has been a member of Intel's Board of Directors since 2009, and was a member of the Finance Committee from 2009 until at least 2015. Mr. Yeary is an international investment banker. Prior to 2004, he served as the global head of the Technology, Media and Telecom investment banking practice at Salomon Smith Barney. He served at Citigroup as the Global Head of Mergers and Acquisitions from 2004 to July 2008. Mr. Yeary was co-founder and the Executive Chairman of an advisory firm, CamberView Partners, which is located in San Francisco and describes itself as a "boutique advisory firm that provides public companies with the

advice and expertise they need to succeed with their institutional investors." He has served as a member of Executive Council at Cohesive Capital Partners, a co-investment firm that makes "direct investments alongside high quality private equity sponsors that are leading the transactions." Why CamberView, Camberview Partners, http://www.camberview.com/whycamberview/ (last visited October 15, 2015). According to his Linked-in Profile, Frank D. Yeary lives in the San Francisco Bay Area.

43.    Defendants Charlene Barshefsky, Susan L. Decker, John J. Donahoe, Reed E. Hundt, James D. Plummer, and Frank D. Yeary are collectively, referred to the "**Finance Committee Defendants**." Since at least October 29, 2009, the Finance Committee and the Finance Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their membership on the Committee and because they each exercised discretionary authority or discretionary control respecting management of the Plans and/or exercised authority or control respecting management or distribution of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

### Chief Financial Officer Defendants

44.    According to the 2016 and 2017 Form 5500s for the Plans and pursuant to the resolution of the Intel's Board of Directors, the Plans were purportedly amended effective March 2016 to replace the Finance Committee with the Chief Financial Officer of Intel with respect to the Finance Committee's responsibilities regarding the appointment, retention, and removal of the members of the Investment and Administrator Committees. Pursuant to Section 13(b) of the Plan Documents and the resolution, effective March 2016, the Chief Financial Officer is responsible for the appointment, retention, and removal of the members of the Investment and Administrative Committees. Effective March 2016, the Chief Financial Officer is authorized to remove, with or without cause, any members of the Investment or Administrative Committee and required to appoint their successors. Pursuant to Section 13(m) of the Plan Documents and under ERISA, effective March 2016, the Chief Financial Officer has an ongoing duty to review the continued prudence of its appointments of the Investment and Administrative Committee members. The Investment and Administrative Committees are required to report to the Finance Committee on an ongoing basis any

information as is necessary and appropriate to permit the Chief Financial Officer to carry out that duty. As such, effective March 2016, the Chief Financial Officer is a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

45.    **Stacy Smith** was the Chief Financial Officer of Intel from October 2007 to September 2016. Mr. Smith originally joined Intel in 1988 and has held positions in Finance, Sales and Marketing, and Information Technology. He became vice president of Sales and Marketing in 2002 and was appointed assistant chief financial officer in March 2006. Mr. Smith retired from Intel in January 2018 and is currently the Non-Executive Chairman of the Board Directors of Autodesk, Inc. He lives in the San Francisco Bay Area.

46.    **Robert H. Swan** was the Chief Financial Officer and Executive Vice President of Intel from October 2016 until January 31, 2019. He was named interim chief executive officer of Intel on June 21, 2018. Mr. Swan oversees Intel's global finance organization, Information Technology and the Corporate Strategy Office. According to his LinkedIn Profile, Robert H. Swan lives in the San Francisco Bay Area.

47.    **Todd Underwood** was the Interim Chief Financial Officer of Intel from January 31, 2019 to April 2, 2019. Prior to his January 31, 2019 appointment to CFO, Mr. Underwood was vice president of finance and director of corporate planning and reporting since August 2016.

48.    **George S. Davis** has been the Chief Financial Officer of Intel since April 3, 2019. Prior to his April 3, 2019 appointment to CFO, Mr. Davis was the chief financial officer and executive vice president of Qualcomm, Inc.

49.    Defendants Stacy Smith, Robert H. Swan, Todd Underwood, and George S. Davis are collectively referred to as the "**Chief Financial Officer Defendants**." Since at least March 2016, the Chief Financial Officer Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their role as the Chief Financial Officer of Intel and because they each exercised discretionary authority or discretionary control respecting management of the Plans and/or exercised authority or control respecting management or distribution of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## Nominal Defendants

50.     **The Intel 401(k) Savings Plan** ("the 401(k) Savings Plan") is and at all relevant times has been an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Intel originally established the 401(k) Savings Plan as part of the Intel Corporation Profit-Sharing Retirement Plan ("the Profit Sharing Plan") effective July 1, 1979. Intel bifurcated the Profit Sharing Plan into the Retirement Contribution Plan and the 401(k) Savings Plan effective January 1, 1996. Prior to January 1, 2011, the 401(k) Savings Plan was known as the Intel Corporation 401(k) Savings Plan. The 401(k) Savings Plan is maintained and sponsored by Intel.

51.     **The Intel Retirement Contribution Plan** ("the Retirement Contribution Plan") is and at all relevant times has been an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Intel established the Profit Sharing Plan effective July 1, 1979, and bifurcated it into the 401(k) Savings Plan and the Retirement Contribution Plan effective January 1, 1996. Prior to January 1, 2011, the Retirement Contribution Plan was known as the Intel Corporation Profit Sharing Retirement Plan. The Retirement Contribution Plan is maintained and sponsored by Intel.

## Relevant Non-Parties

52.     **Intel Corporation.** Founded in 1968, Intel Corporation ("Intel") is a technology company that designs and builds processors, motherboards, electronic disk, storage, mobile chips and other technologies and devices related to communications and computing, and is headquartered in Santa Clara, California. As of December 31, 2017, Intel had over 102,000 employees worldwide, with approximately 50% of these employees located in the United States. Intel employs significant numbers of people in California, Colorado, Arizona, New Mexico, Washington, Oregon, Massachusetts, and Utah. Intel is and at all relevant times has been the plan sponsor of the 401(k)

Savings Plan and the Retirement Contribution Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

53. **Intel Capital Corporation.** Founded in 1991, Intel Capital Corporation ("Intel Capital") is the corporate venture capital division and a subsidiary of Intel. Headquartered in Santa Clara, California, Intel Capital operates as an investment firm that is focused on equity investments related to technology startups, global investments, and mergers and acquisitions. Intel Capital invests in developers and providers of hardware, software, and services worldwide in sectors including cloud and storage, mobility, digital media, security, robotic technologies, and semiconductor manufacturing. According to Intel Capital's website, since 1991, Intel Capital has invested over $12 billion in over 1,500 companies in over 55 countries. Between 1998 and 2016, Intel Capital increased its international investing from less than 5% of its investment dollars to about 42%. In 2016, Intel Capital invested $455 million in 87 companies, including 34 new ones. In 2017, Intel Capital invested $690 million in 87 companies, including 42 new ones. In its history, Intel Capital has contributed billions in cash to Intel.

## IV. CLASS ALLEGATIONS

54. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All participants in the Intel Retirement Contribution Plan and the Intel 401(k) Savings Plan, whose accounts were invested in any one of the Intel Target Date Funds, the Intel Global Diversified Fund, or the Intel 401K Global Diversified Fund at any time on or after October 29, 2009.

55. Excluded from the Class are the following persons: (a) Defendants, (b) any fiduciaries of the Plans; (c) any officers or directors of Intel; and (d) any member of the immediate family of and any heirs, successors or assigns of any such excluded party.

## A. Numerosity and Impracticability of Joinder

56. Joinder of all members of the Class would be impracticable based on the number and geographic diversity of the members of the Class. Based on the most recent Form 5500 filed with the Department of Labor for 2018, the 401(k) Savings Plan had over 72,000 participants and/or

beneficiaries as of December 31, 2018. Most of these participants had their Plan investments in or were defaulted to an Intel Target Date Fund. Based on the most recent Form 5500 filed with the Department of Labor for 2018, the Retirement Plan had over 38,000 participants and/or beneficiaries as of December 31, 2018. The Global Diversified Fund was the only available investment for the vast majority of Retirement Plan participants before January 1, 2015 and continue to be the default investment option of the Retirement Contribution Plan after that date.

57. According to Intel's website, it has locations in at least the following states: Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Georgia, Idaho, Illinois, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Texas, Virginia, Washington, and Wisconsin. As such, the members of the Classes are also geographically dispersed. The Class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations.

**B.** **Commonality**

58. Plaintiffs' claims raise common questions that will have common answers for each member of the Class with respect to liability and relief. Some of the common questions of law and fact for the Class include:

A. Whether the Investment Committee was a named fiduciary for the Plans;

B. Whether the Investment Committee's fiduciary duties included managing the Plans' assets, selecting, monitoring, and removing or replacing the investment options for the Plans, and monitoring the performance of the investment options and their fees and expenses;

C. Whether the Investment Committee's fiduciary duties included managing the Plans' assets, selecting, monitoring, and replacing the asset allocation strategy adopted for the Intel Funds, selecting, monitoring, and removing or replacing the underlying investments to which the Intel Funds allocated the Plans' assets.

D. Whether the Investment Committee breached its fiduciary duties to the Plans and their participants in selecting and maintaining the Intel Funds as investments of the Plans including by failing to give appropriate consideration to facts and circumstances relevant to the fees and expenses and performance of the Intel Funds;

E. Whether the Investment Committee breached its fiduciary duties to the Plans and their participants in constructing and managing the Intel Funds including by failing to give appropriate consideration to facts and circumstances relevant to the asset allocation strategy it adopted and implemented for the Intel Funds;

F. Whether the asset allocation models chosen by the Investment Committee for the Intel Funds deviate and deviated from prevailing standards for target date funds and balanced funds;

G. Whether the Investment Committee prudently and loyally selected and managed the underlying funds to which the Intel Funds allocated the Plans' assets;

H. Whether the Plans and their participants suffered losses as a result of the Investment Committee's fiduciary breaches;

I. Whether the Administrative Committee was a named fiduciary for the Plans;

J. Whether the Administrative Committee breached its fiduciary duties to the Plans and their participants by failing to provide adequate disclosures about the Intel Funds and/or misinforming participants about the Intel Funds;

K. Whether the Administrative Committee issued Summary Plan Descriptions that failed to disclose and explain the risks associated with the Intel Funds' asset allocations or the accompanying risks associated with investments in the Intel Funds;

L. The appropriate relief for the Administrative Committee's breaches.

**C.   Typicality**

59.     Plaintiffs' claims are typical of the claims of the Class because his claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiffs' claims challenge whether the fiduciaries of the Plans acted consistently with their fiduciary duties and whether their breaches caused losses or otherwise harmed the Plans and their participants. These are claims common to and typical of other Class members. Moreover, these claims seek recovery on behalf of the Plans.

60.     Plaintiffs' claims are typical of the claims of the Class because like all participants in the Plans, whose accounts were invested through any of the Intel Target Date Fund, the Investment Committee chose the asset allocation model, the asset classes, and the funds representing the selected asset classes for every Intel TDF, including the Intel Target Date 2030 Fund, the Intel Target Date 2035 Fund, the Intel Target Date 2040 Fund, and the Intel Target Date 2045 Fund in which Plaintiffs invested in the 401(k) Savings Plan.

61.     Plaintiffs' claims are typical of the claims of the Class because like all participants in the Plans, whose accounts were invested through any of the Global Diversified Funds, the Investment Committee chose the asset allocation model, the asset classes, and the funds representing the selected asset classes for the Global Diversified Fund in which Plaintiffs invested in the Retirement Contribution Plan.

**D.   Adequacy**

62.     Plaintiffs will fairly and adequately protect the interests of the Class. He is committed to the vigorous representation of the Class.

63.     Defendants do not have any unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

64.     Plaintiffs have engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

**E.   Rule 23(b)(1)**

65.     The requirements of Rule 23(b)(1)(A) are satisfied in this case. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated

participants and to uniformly act in the best interests of the Plans and their participants. As this action challenges whether Defendants acted consistently with their fiduciary duties to the Plans, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the fiduciaries of the Plans.

66.     The requirements of Rule 23(b)(1)(B) are satisfied in this case. As Administration of the Plans treated all similarly situated participants treated consistently, whether Defendants fulfilled their fiduciary obligations with respect to the Plans and the Plans' participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**F.     Rule 23(b)(2)**

67.     The requirements of Rule 23(b)(2) are met in this action. Defendants have applied the same or substantially similar investment policies and investment options in the Plans that cover all members of the Class. The breaches alleged against Defendants on behalf of the Class relate to policies that applied to all members of the Class. As such, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole.

68.     The primary relief sought on behalf of the Class is a determination that Defendants breached their fiduciary duties, a determination of the amount by which those breaches adversely affected the Plans rather than individual members of the Class, and a consequent order requiring Defendants to make good those losses to the Plans. Such relief is accomplished by issuance of a declaration or an injunction and therefore the primary requested relief constitutes final injunctive or declaratory on behalf the Class with respect to the Plans.

**G.     Rule 23(b)(3)**

69.     The requirements of Rule 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plans. Because Class members are those participants whose accounts were invested in the affected investments, common questions related to liability will necessarily predominate over individual questions. Similarly, as

relief will be on behalf of and will flow to the Plans, common questions related to remedies and relief will likewise predominate over individual issues.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by many of the individual members of the Classes are relatively small in proportion to the substantial cost to bring this litigation, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. The fiduciaries of the Plans have an obligation to treat all similarly situated participants similarly and are subject to uniform standards of conduct under ERISA. Thus, the members of the Class have an interest in having this action proceed in a single action. As such, no Class member has an interest in individually controlling the prosecution of this matter.

71.     Plaintiffs and their counsel are not aware of any other lawsuit filed by any member of the Class concerning this controversy, other than (a) *Sulyma v. Intel Corp. Inv. Policy Comm*., No. 5:15-cv-04977 (N.D. Cal.), which the Court consolidated with this action, and (b) *Lo v. Intel Corp.*, No. 5:16-cv-00522 (N.D. Cal.), which was consolidated with this action along with the *Sulyma* action.

72.     This District is the most desirable forum for concentration of this litigation because: (1) Intel is headquartered in this District; (2) a number of the actions challenged by this Complaint took place in this District, chiefly, on information and belief, Investment Committee meetings; (3) the Plans are administered in or near this District; (4) many of the employees of the company are located in or near this District; and (5) many of the employees of Intel named as Defendants can be found in this District.

73.     Given the nature of the allegations, there are no difficulties likely to be encountered in the management of this matter as a class action.

## V.  FACTUAL ALLEGATIONS

### A.     Overview of the Plans and the Intel Investment Options

#### 1.     The 401(k) Savings Plan

74.     Since it was established, the 401(k) Savings Plan has been amended and restated multiple times. The Plan was amended and restated effective January 1, 2011. Since 2014, the

written instrument of the 401(k) Savings Plan has been the 401(k) Savings Plan Document amended and restated effective January 1, 2014.

75.     The 401(k) Savings Plan is a contributory defined contribution plan covering eligible United States employees of Intel Corporation and its subsidiaries and affiliates. All employees who become eligible to participate in the 401(k) Savings Plan are automatically enrolled in it pursuant to Section 3(a) of the Plan and the Plan's definition of "Eligible Employee," unless they make an affirmative election not to participate.

76.     Benefits provided under the 401(k) Savings Plan are funded by participants' tax-deferred contributions and any discretionary contributions made by Intel, taking into account investment returns and losses as well as expenses.

77.     Starting in 2007, Intel began to automatically enroll employees who were eligible to participate in the 401(k) Savings Plan but who had not yet enrolled, unless they opted out by affirmatively electing otherwise during a forty-five day opt-out period. According to Section 3 of the 401(k) Savings Plan Document, such participants were deemed to have elected to contribute 3% of their regular earnings to their 401(k) Plan account, absent an affirmative election otherwise. This contribution then automatically increased by one percentage point each successive year, up to a maximum deferral of 10% of the participant's pre-tax earnings. Pursuant to Section 3(a)(i) of the 401(k) Plan document, employees who became eligible to participate in the 401(k) Plan on or after January 1, 2013 were also automatically enrolled in the Plan. If such participants did not opt-out within a forty-five day opt-out period, they were deemed to have elected to contribute 6% of their regular earnings to their 401(k) Plan account, absent an affirmative election otherwise. This contribution then automatically increased by two percentage points each successive year, up to a maximum deferral of 16% of the participant's pre-tax earnings.

78.     Section 8 of the 401(k) Savings Plan Document sets forth the Vesting and Forfeiture of the Plan. Pursuant to Section 8(a), participants are 100% vested and nonforfeitable in their contributions to their accounts in the Plan. Pursuant to Section 8(a), participants are 100% vested and nonforfeitable in their Retirement Contribution Account, representing the employer's contribution, in the Plan upon the occurrence of any of the following: (a) attainment of age 60; (b)

death; (c) total and permanent disability; (d) job elimination; (e) termination of employment as a result of a divestiture. Section 8(c) of the 401(k) Savings Plan Document provides the following vesting schedule for a participant who does not meet any of the above conditions:

| Completed Years of Service | Nonforfeitable Percentage |
|---|---|
| Less than 2 | 0 (Percent) |
| 2 but less than 3 | 20 (Percent) |
| 3 but less than 4 | 40 (Percent) |
| 4 but less than 5 | 60 (Percent) |
| 5 but less than 6 | 80 (Percent) |
| 6 or more | 100 (Percent) |

79.     According to its 2015 Form 5500, as of December 31, 2015, the 401(k) Savings Plan had approximately 67,000 participants with account balances and approximately $8.5 billion in total assets. According to its 2016 Form 5500, as of December 31, 2016, the Plan had over 69,000 participants with account balances and approximately $9.74 billion in total assets. According to its 2017 Form 5500, as of December 31, 2017, the Plan had over 71,000 participants with account balances and approximately $ 11.82 billion in total assets. According to its 2018 Form 5500, as of December 31, 2018, the Plan had over 72,000 participants with account balances and approximately $11.67 billion in total assets.

80.     Pursuant to Section 12(a) of the 401(k) Savings Plan Document, participants in the 401(k) Savings Plan may direct the investment of their individual account balances into the investment options offered by the Plan and established by the Investment Committee.

81.     Among the investment options of the 401(k) Savings Plan are and have been the Intel TDFs and the 401K Global Diversified Fund. The Intel TDFs are the 401(k) Savings Plan's default investment options.

82.     The Investment Committee designated and continues to designate the Intel TDFs as the default investment options of the 401(k) Savings Plan. Pursuant to Section 12(a) of the 401(k) Savings Plan Document, for any participant who either enrolls in the Plan or is automatically enrolled in the Plan and fails to make an investment election, his or her deferred compensation is by

default invested in a TDF that corresponds to his or her age and assumed retirement age of 65. If a participant at any other time fails to direct how all portions of his or her accounts in the 401(k) Savings Plan are to be invested, including when an investment option is removed from the Plan's investment lineup, those portions will also by default be invested in a Target Date Fund. For such participants the Intel Target Date Funds is their sole investment.

83.     In 2011, Intel mapped existing participant accounts in the 401(k) Savings Plan into the customized Intel TDFs in the 401(k) Savings Plan unless the participants opted out. According to a PIMCO DC Dialogue interview with Stuart Odell, in March/April 2014, approximately two-thirds of existing participants were mapped into the Intel TDFs under this policy.

84.     As of 2015, approximately $3.63 billion of the 401(k) Savings Plan's assets were in the Intel TDFs.[2]

## 2.     The Retirement Contribution Plans

85.     Since it was established, the Retirement Contribution Plan has been amended and restated multiple times. The Retirement Contribution Plan was amended and restated effective January 1, 2011. Since 2014, the Retirement Contribution Plan has been maintained pursuant to the Intel Retirement Contribution Plan Document amended and restated effective January 1, 2014.

86.     Before January 1, 2011, employees were automatically enrolled in the Retirement Contribution Plan as soon as they became eligible to participate pursuant to Section 3(a) of the Plan and the Plan's definition of "Eligible Employee." Effective January 1, 2011, the Retirement Contribution Plan was amended to preclude employees hired on or after January 1, 2011 from participating in the Plan. While this Plan is not available to employees hired on or after January 1, 2011, the Plan continues to cover eligible United States employees of Intel Corporation and its subsidiaries and affiliates who were hired prior to January 1, 2011.

87.     The Retirement Contribution Plan is a non-contributory defined contribution plan. Benefits provided under the Retirement Contribution Plan are funded by discretionary contributions

---

[2] Robert Steyer, *Intel hires manager for target-date, global funds*, Pensions & Investments (June 15, 2015), http://www.pionline.com/article/20150615/PRINT/306159980/intel-hires-manager-for-target-date-global-funds

---

by Intel, taking into account investment returns and losses as well as expenses. Pursuant to Section 4(a) of the Intel Retirement Contribution Plan Document, the amounts of any discretionary contributions by Intel to the Retirement Contribution Plan are determined annually by Intel's Board of Directors in its sole and absolute discretion. Participants do not and did not make employee contributions to the Retirement Contribution Plan.

88.     Section 8 of the Retirement Contribution Plan Document sets forth the Vesting and Forfeiture terms of the Plan. Pursuant to Sections 8(a) and (b), participants' interests become 100% vested and nonforfeitable upon the occurrence of any of the following: (a) attainment of age 60 (if they became participants after January 1, 1987) or age 55 (if they became Participants on or before January 1, 1987); (b) death; (c) total and permanent disability; (d) job elimination; (e) termination of employment as a result of a divestiture or formation of the Care Innovations Joint Venture. Section 8(c) of the Retirement Contribution Plan Document provides the following vesting schedule for a participant who was an Employee on or after December 31, 2007:

| Completed Years of Service | Nonforfeitable Percentage |
| --- | --- |
| Less than 2 | 0 (Percent) |
| 2 but less than 3 | 20 (Percent) |
| 3 but less than 4 | 40 (Percent) |
| 4 but less than 5 | 60 (Percent) |
| 5 but less than 6 | 80 (Percent) |
| 6 or more | 100 (Percent) |

For all other participants, the following vesting schedule applies:

| Completed Years of Service | Nonforfeitable Percentage |
| --- | --- |
| Less than 3 | 0 (Percent) |
| 3 but less than 4 | 20 (Percent) |
| 4 but less than 5 | 40 (Percent) |
| 5 but less than 6 | 60 (Percent) |
| 6 but less than 7 | 80 (Percent) |
| 7 or more | 100 (Percent) |

89.     According to its 2015 Form 5500, as of December 31, 2015, the Retirement Contribution Plan had approximately 46,000 participants with account balances and approximately $6.3 billion in total assets. According to its 2016 Form 5500, as of December 31, 2016, the Plan had approximately 42,000 participants with account balances and approximately $6.07 billion in total assets. According to its 2017 Form 5500, as of December 31, 2017, the Plan had approximately 40,000 participants with account balances and approximately $6.59 billion in total assets. According to its 2018 Form 5500, as of December 31, 2018, the Plan had approximately 38,000 participants with account balances and approximately $6.23 billion in total assets.

90.     Before January 1, 2015, the investment options provided under the Retirement Contribution Plan included the Intel GDF as well as some of Intel's TDFs and Intel's stable value fund.

91.     Prior to January 1, 2015, only participants in the Retirement Contribution Plan who were aged 50 and over could invest their accounts in any combination of the Intel GDF, the Intel TDFs, and the stable value fund provided under the Plan. According to Section 12(a) of the Retirement Contribution Plan Document, between January 1, 2007 and March 31, 2009, participants over the age of 50 could elect to invest their Plan accounts in an Intel TDF. As of April 1, 2009, participants over the age of 50 were permitted to elect to invest their Plan accounts in an Intel TDF or the Intel Stable Value Fund.

92.     Before January 1, 2015, participants in the Plan who were under the age of 50 were not allowed to direct the investment of Intel's contributions on their behalf. Instead, the Investment Committee had the discretionary authority to direct the investment of those contributions. Pursuant to the Investment Committee's direction, before January 1, 2015, contributions made on behalf of participants under the age of 50 were required to be invested in the Intel GDF.

93.     Prior to January 1, 2015, because the participants who could invest in the Intel TDFs were limited to those aged 50 and over, the Intel TDFs provided under the Plan were limited to those that corresponded to those participants' ages and assumed retirement age of 65. For example, in 2013, the Target Date Funds offered under the Plan were limited to the Target Date 2005-2025 Funds and the Target Date Income Fund.

94.     Effective January 1, 2015, the Retirement Contribution Plan was amended to eliminate non-participant-directed investment in the Intel GDF and allow participants to elect to have their accounts invested in any of the investment options made available under the Plan regardless of their ages.

95.     Around the same time, the investment options for the Retirement Contribution Plan was expanded to include all of Intel's TDFs (*i.e.*, the Target Date 2005–2055 Funds and the Target Date Income Fund) so that not only participants aged 50 and over but also participants under 50 can direct the investment of their accounts in an Intel TDF corresponding to their age.

96.     The Investment Committee designated and continues to designate the GDF as the default investment option of the Retirement Contribution Plan. To the extent that these contributions are made, they are invested by default in the Intel GDF unless participants elect otherwise. In other words, the Intel GDF becomes the sole investment option of these participants who do not direct their accounts to be invested in other investments options in the Plan.

**3.     The Target Date Funds and the Global Diversified Funds**

**a.     The Intel Funds**

97.     The Intel TDFs offered under the 401(k) Savings Plan include the following: (a) Target Date 2005 Fund; (b) Target Date 2010 Fund; (c) Target Date 2015 Fund; (d) Target Date 2020 Fund; (e) Target Date 2025 Fund; (f) Target Date 2030 Fund; (g) Target Date 2035 Fund; (h) Target Date 2040 Fund; (i) Target Date 2045 Fund; (j) Target Date 2050 Fund; (k) Target Date 2055 Fund; and (l) Target Date Income Fund (collectively "401(k) TDFs").

98.     The Intel TDFs offered under the Retirement Contribution Plan include the following: (a) Retirement Contribution Target Date 2005 Fund; (b) Retirement Contribution Target Date 2010 Fund; (c) Retirement Contribution Target Date 2015 Fund; (d) Retirement Contribution Target Date 2020 Fund; (e) Retirement Contribution Target Date 2025 Fund; (f) Retirement Contribution Target Date 2030 Fund; (g) Retirement Contribution Target Date 2035 Fund; (h) Retirement Contribution Target Date 2040 Fund; (i) Retirement Contribution Target Date 2045 Fund; (j) Retirement Contribution Target Date 2050 Fund; (k) Retirement Contribution Target Date 2055 Fund; and (l) Retirement Contribution Target Date Income Fund (collectively "RC TDFs").

99.     The Intel TDFs, like other target date funds available in the market, are designed for investors expecting to retire around the year indicated in each Intel TDF's name. As represented in the fund fact sheets, the Intel TDFs are supposed to be managed in such a way that the funds gradually become more conservative over time as they approach their target dates.

100.     The Intel GDF offered under the 401(k) Savings Plan is called the "401K Global Diversified Fund." The Intel GDF offered under the Retirement Contribution Plan is called the "Global Diversified Fund."

101.     The two Intel GDFs are investment options sharing the same asset allocation model that invest in a mix of asset classes.

102.     The Intel TDFs and GDFs offered as investment options under the Plans were, until December 31, 2017, "asset allocation models." As collective investment trusts ("CITs"), since January 1, 2018, the Intel TDFs and GDFs are now structured as funds that issue units to investors.

103.     An asset allocation fund is a portfolio consisting of various asset classes such as domestic and international equities as well as bonds and cash equivalents. Asset allocation funds are often structured in such a way that the portfolio does not directly invest in securities representative of the asset classes but rather invests in underlying funds belonging to the asset classes. Asset allocation funds come in several varieties, which include balanced funds and target date funds.

104.     Until December 31, 2017, as asset allocation models or portfolios, the Intel TDFs and the Intel GDFs did not issue shares or units and were not actual funds in which participants in the 401(k) Savings Plan and the Retirement Contribution Plan held shares or units. Rather, each of the Intel Funds was effectively an investment strategy that, pursuant to the asset allocation adopted for that Intel Fund, directed the assets of the Plans invested in that Intel Fund to be allocated to certain underlying funds and provided each participant investing in the Intel Fund with a proportionate interest in those underlying funds. In other words, plan participants whose accounts were invested in any of the Intel Funds held a direct interest in each of the underlying master trust investment accounts described below that in turn held hedge funds, private equity, commodities, etc.

### b. The Master Trust Investment Accounts

105.    The underlying funds of the Intel Funds that are relevant to this action are held in the Intel Corporation Retirement Plans Master Trust ("the Master Trust"). The Master Trust holds the assets of the 401(k) Savings Plans and the Retirement Contribution Plan as well as the assets of the Intel Minimum Pension Plan, Intel's defined benefit pension plan. The Master Trust includes multiple investment accounts ("the Master Trust Investment Accounts"). The underlying funds in which the Intel Funds invest — or more precisely, to which the assets of the 401(k) Savings Plan and the Retirement Contribution that are invested in the Intel Funds are allocated — are the Master Trust Investment Accounts.

106.    As of December 31, 2014, the Master Trust had nine Master Trust Investment Accounts, which included among other accounts the Hedge Fund Account, the Alternative Investments Account, the Commodities Fund Account, and the Emerging Markets Fund Account collectively "the Non-Traditional Asset Class Accounts"). Early in the relevant period, the Alternative Investments Account included hedge funds and commodities in addition to private equity. In 2010, the hedge funds in that Account were moved into two accounts, i.e., an Absolute Return Fund Account and a Long Short Fund Account. Then, in 2011, the Investment Committee merged the two hedge fund accounts into the Hedge Fund Account while at the same time increasing the number of hedge fund managers and increasing the Plans' investments in hedge funds from approximately $750 million to approximately $1.86 billion. The Commodities Fund Account was added in 2010.

107.    As of December 2014, the rest of the Master Trust investment Accounts included Global Bond Fund Account (which invested largely in debt securities), International Stock Fund Account (which invested in two international stock funds and equity securities), Small Cap Fund Account (which invested in three small cap funds and small cap equity securities), Stable Value Fund Account (which invested in several guaranteed investment contracts and pooled separate accounts), and U.S. Large Cap Fund Account (which invested in four large cap equity funds) (collectively "the Traditional Asset Class Accounts").

108.     In or about May 2015, a portion of the Hedge Fund Account was spun off to form the Growth Oriented Hedge Fund Account and the remaining portion of the Hedge Fund Account was renamed the Defensive Oriented Hedge Fund Account. The Commodities Fund Account was renamed the Diversified Real Assets Fund Account. As of December 31, 2015, the Master Trust had thirteen Master Trust Investment Accounts, which included among other accounts the Defensive Oriented Hedge Fund Account (formerly the Hedge Fund Account), the Growth Oriented Hedge Fund Account, the Alternative Investments Account, the Diversified Real Assets Fund Account (formerly the Commodities Fund Account), and the Emerging Markets Fund Account (collectively "the Non-Traditional Assets Class Accounts").

109.     The Hedge Fund Account invested in hedge fund investment partnerships. As of December 31, 2014, the Master Trust Investment Account had approximately $2.71 billion in total assets.

110.     The Defensive Oriented Hedge Fund Account and the Growth Oriented Hedge Fund Account invested in hedge fund investment partnerships. As of December 31, 2015, December 31, 2016, and December 31, 2017, the Defensive Oriented Hedge Fund Account had approximately $915.9 million, $668.1 million, and $691.2 million in total assets, respectively. As of December 31, 2015, December 31, 2016, and December 31, 2017, the Growth Oriented Hedge Fund Account had approximately $1.71 billion, $1.30 billion, and $1.27 billion in total assets, respectively. The two Master Trust Investment Accounts had approximately $2.62 billion in combined assets as of December 31, 2015, approximately $1.97 billion in combined assets as of December 31, 2016, and approximately $1.96 billion in combined assets as of December 31, 2017.

111.     The Alternative Investments Fund Account invested in private equity investment partnerships including venture capital and private real estate and natural resources funds. The Master Trust Investment Account had approximately $814.2 million, $1.07 billion, $1.27 billion, and $1.43 billion in total assets as of December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017, respectively.

112.     The Diversified Real Assets Fund Account invested in commodities funds. The Master Trust Investment Account had approximately $293.31 million, $203.73, and $461.20 million,

and $539.06 million in total assets as of December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017, respectively.

113.    The Emerging Markets Fund Account invested in emerging markets and emerging markets private equity funds. The Master Trust Investment Account had approximately $1.15 billion, $560.05 million, $503.73 million, and $634.09 million in total assets as of December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017, respectively.

114.    As of December 2015, the rest of the thirteen Master Trust Investment Accounts invested in international stock funds and equity securities, large cap equity funds, small cap equity funds and equity securities, U.S. government securities and bonds, corporate debt securities, and Treasury Inflation-Protected Securities. These accounts included the U.S. Large Cap Stock Fund Account, the U.S. Small Cap Stock Fund Account, the International Stock Fund Account, the Global Equity Fund Account, the Global Bond Fund Account, the Opportunistic Bond Fund Account, the Stable Value Fund Account, and the Treasury Inflation Protected Securities Fund Account (collectively "the Traditional Asset Class Accounts").

115.    The Master Trust Investment Accounts, including the Non-Traditional Investments Accounts, are not investment options offered in the investment lineup of the 401(k) Savings Plan or the Retirement Contribution Plans that participants can choose to direct or not to direct to invest their accounts in. Rather, each of the Intel Funds allocates portions of the participants' accounts invested in that Fund and thus the Plan's assets to the Master Trust Investment Accounts pursuant to the mix of asset classes as determined by that Fund's asset allocation strategy. In other words, if a portion of the participant's account is invested in an Intel Fund, it will be allocated to the Master Trust Investment Accounts based on the asset allocation adopted for that Fund.

116.    As of December 31, 2014, the 401(k) Savings Plan and the Retirement Contribution Plan had approximately $7.8 billion and $6.7 billion in total assets, respectively. The assets of the Master Trust Investment Accounts had over $11 billion in combined value. Of that amount, approximately $4.4 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $6.4 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

117.     As of December 31, 2015, the 401(k) Savings Plan and the Retirement Contribution had approximately $8.5 billion and $6.3 billion in total assets, respectively. The assets of the Master Trust Investment Accounts had over $10.5 billion in combined value. Of that amount, approximately $4.5 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $5.6 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

118.     As of December 31, 2016, the 401(k) Savings Plans and the Retirement Contribution Plan had approximately $9.74 billion and $6.07 billion in total assets, respectively. The assets of the Master Trust Investment Accounts had over $11 billion in combined value. Of that amount, approximately $5.1 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $5 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

119.     As of December 31, 2017, the 401(k) Savings Plans and the Retirement Contribution Plan had approximately $11.82 billion and $6.59 billion in total assets, respectively. The assets of the Master Trust Investment Accounts had over $12 billion in combined value. Of that amount, approximately $5.8 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $5.1 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

120.     The Plans have had and continue to have substantial stakes in the Intel Funds. The majority of the assets of the 401(k) Savings Plan have been and continue to be invested in the Intel Target Date Funds, the Plan's default investment options. The majority of the assets of the Retirement Contribution Plan have been and continue to be invested in the Global Diversified Fund, the Plan's default investment option and the only investment option that accounts of participants under the age of 50 could be invested in before 2015.

121.     Until December 31, 2017, the Intel TDFs and the Intel GDFs were not actual funds in which participants in the 401(k) Savings Plan and the Retirement Contribution Plan hold shares or units. Instead, Intel TDFs were managed pursuant to an asset allocation model. The Investment Committee determined the allocations and selected the underlying Master Trust Investment

Accounts to which the Intel TDFs allocated the Plans' and participants' assets, but there was no actual target date fund as a distinct entity issuing shares or units to investors. Rather, each participant was placed in a portfolio managed by the Investment Committee, which provided each such participant with a proportionate interest in the underlying Investment Funds, based on the allocation mandates of the Intel TDF set by the Investment Committee. Thus, the Intel TDFs were effectively an investment management service and were not mutual funds or collective investment vehicles that issue shares or units. Rather, a plan participant held a specifically weighted selection of investments, which weighting changes over time. The Investment Committee designed, maintained, and managed the weighting and chose and managed the selected investments, i.e., the Master Trust Investment Accounts.

122.    Likewise, the Investment Committee designed, maintained, and managed the Intel GDPs and dictated the asset allocation model, chose and managed the Master Trust Investment Accounts representing the various asset classes, and chose the investments and investment managers in the Master Trust Investment Accounts including, e.g., the various limited partnerships that make up the Private Equity and Hedge Funds.

c.    **Substantial Increases in Allocations to Non-Traditional Asset Class Accounts Beginning 2009**

123.    The Intel Funds were not "funds" as such but rather a set of portfolios that directs the assets of the 401(k) Savings Plan and the Retirement Contribution Plan into the various Master Trust Investment Accounts. The Plans owned a percentage of each Master Trust Investment Account as shown in Table 1 below. The table lists, on December 31, 2011, respectively, the name of each Master Trust Investment Account, the total assets in the given Investment Account, the 401(k) Savings Plan's percentage ownership of the given Investment Account, the dollar value of the 401(k) Savings Plan's ownership of the given Investment Account, the Retirement Contribution Plan's percentage ownership of the given Investment Account, and the dollar value of the Retirement Plan's ownership of the given Investment Account.[3]

---

[3] Table 1 represents the Plans' holdings in the Master Trust Investment Accounts, not the Intel TDFs' and the Intel GDPs' dollar and percentage allocations to the Investment Accounts, except as to the

**Table 1**

| Master Trust Investment Account | Assets in Master Trust Investment Account | 401(k) Savings Plan % | 401(k) Savings Plan $ | Retirement Contribution Plan % | Retirement Contribution Plan $ |
|---|---|---|---|---|---|
| US Large Cap | $1,411,807,722 | 45.10% | $636,725,283 | 54.90% | $775,082,439 |
| Int'l Stock | $1,216,444,003 | 48.10% | $585,109,565 | 51.90% | $631,334,438 |
| Global Bond | $2,200,337,976 | 17.30% | $380,658,470 | 54.00% | $1,188,182,507 |
| US Small Cap | $368,890,696 | 54.20% | $199,938,757 | 45.80% | $168,951,939 |
| Em Mkts | $963,325,120 | 43.20% | $416,156,452 | 56.80% | $547,168,668 |
| Stable Value | $596,326,952 | 79.70% | $475,272,581 | 20.30% | $121,054,371 |
| Private Equity | $348,400,370 | 0.40% | $1,393,601 | 99.60% | $347,006,769 |
| Commodities | $385,501,100 | 36.90% | $142,249,906 | 63.10% | $243,251,194 |
| Hedge Fund | $1,860,015,367 | 36.60% | $680,765,624 | 58.20% | $1,082,528,944 |

124.   The Plans' financial statements filed with the Forms 5500 with the United States Department of Labor reflect similar allocations in 2012 to 2014.

125.   Starting in 2009, the Investment Committee began dramatically increasing the Retirement Contribution Plan's investment in private equity, hedge funds, and commodities via the Global Diversified Fund. At the end of 2008, the Intel GDF held approximately 6.17% of its assets, or $214 million, in private equity, hedge funds, and commodities. By the end of 2009, the Intel GDF held approximately 15.33%, or $667 million, of its assets in such investments. In 2010, the Intel GDF's investment in private equity tripled from about $83 million to $245 million. In 2010, the Intel GDF's added an investment in commodities, about $245 million, and its investment in hedge funds increased from approximately $583 million in 2009 to approximately $697 million in 2010. By the end of the year, the Intel GDF held about 22.23% of its assets in commodities, private equity, and hedge funds, or about $1.2 billion. In 2011, the Investment Committee invested even more Intel GDF money into private equity, hedge funds, and commodities, increasing such investments to almost 33% of the fund's portfolio, or approximately $1.67 billion. By the end of 2013, the Intel

Private Equity, Commodities, and Hedge Funds, because the specific dollar and percentage allocations of the Intel TDFs and the Intel GDPs are not available to participants. In other words, Table 1 does not represent the asset allocations of the Intel Funds as such. Using Table 1 for that purpose would understate the percentage allocations to Private Equity, Commodities, and Hedge Funds on December 31, 2011 because the remaining funds were held in part in participant accounts outside of the Diversified Fund and Intel TDF portfolios.

GDF held approximately 36.71% of its assets in private equity, hedge funds, and commodities, or approximately $2.4 billion.

126.    Between 2009 and 2013, the Investment Committee caused the Intel GDF in the Retirement Contribution Plan to increase its allocation to private equity, hedge funds, and commodities by 595% and increase the dollar value of the Intel GDF investment in such investments from an estimated $214 million to almost $2.33 billion, an increase of 1,088%. These changes in investment allocations in the Intel GDF are detailed in Figure 1 below.

**Figure 1**



127.    Prior to 2011, Defendants called Intel's customized target date portfolios LifeStage Funds. In or around 2011, the Investment Committee restructured and renamed the portfolios, calling them Target Date Funds and adding several additional target date vintages. As part of this new model, beginning in 2011, the Intel TDFs invested a very large percentage of 401(k) Savings Plan TDF assets in hedge funds and commodities, approximately 23% in 2011. The Intel TDFs also adopted a heavy weighting in international equities in comparison to peer target date funds.

128.    As Bill Parish, an independently registered investment advisor, observed in Intel Q4 2013 Earnings – Time to Fix Pension Plan (January 16, 2014), Intel's 401(k) and Retirement Plans

"have been infiltrated by hedge funds," commenting that Intel's decision to invest heavily in hedge funds amounted to "institutional gambling with employees['] assets."[4]

129.    As The Oregonian newspaper reported on August 30, 2014 in *What's Inside Intel's retirement plans? Hedge funds. Lots of 'em*: "Intel's 401k-type plans are unusual in a couple of ways that aren't comforting to some investors and financial advisers. It's embarked, essentially, on an experiment with nearly $14 billion in worker retirement money for more than 63,000 participants." As this article observed, Intel decided to use "expensive, opaque and potentially risky hedge funds in its main 401k investment options[]" and to "forc[e] company contributions into [hedge funds]."[5]

### 4.    Fiduciary Responsibilities of the Investment Committee Defendants

130.    The Investment Committee Defendants had the authority, discretion, and responsibility to select, monitor, and remove or replace investment options in the 401(k) Savings Plan and the Retirement Contribution Plan. Their specific responsibilities and powers included, but were not limited to, (a) making decisions with respect to selecting and removing or replacing investment options for the Plans and selecting and replacing the asset allocation strategy adopted for any of those investment options; (b) monitoring the performance and fees and expenses of the Plans' investment options on a regular basis and removing or replacing any investment options that were imprudent or disloyal; (c) monitoring the asset allocation strategy adopted for any of those investment options and replacing any asset allocation strategy that was imprudent or disloyal; and (d) appointing, monitoring, and removing any investment managers with respect to management of the Plans' investment options or investment of the Plans' assets. It is presently unknown to Plaintiffs whether, how, and to what degree the Investment Committee Defendants retain authority and discretion over the Intel TDFs and GDFs after the appointment of GTC to serve as trustee for the Intel Funds.

---

[4] Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish - Parish & Company Registered Investment Advisor Blog (Jan. 16, 2014), http://blog.billparish.com/2014/01/16/intel-q4-2013-earnings-time-to-fix-pension-plan/.
[5] Hunsberger, Brent, *What's inside Intel's retirement plans. Hedge funds. Lots of 'em.*, The Oregonian (Aug. 30, 2014),

---

131.     Specifically, pursuant to the Intel 401(k) Savings Plan Investment Policy Statement and the Intel Retirement Contribution Plan Investment Policy Statement, as amended and restated by the Investment Policy Committee on January 12, 2017, effective from January 12, 2017 (collectively "the Investment Policies"), the Investment Committee has the authority to appoint investment managers or trustees to manage the assets of the Plan and is responsible for reviewing the Plans' investment funds and managers, allocating assets within funds and between managers, and appointing and replacing any such funds or managers. The Investment Committee is also responsible for periodically reviewing performance, costs, and expenses of investment managers and determining the reasonableness of expenses incurred by the Plan taking into account fund expense ratios and fund returns net of expenses (both relative to peer group). Further, the Investment Committee is responsible for selecting the investments for Plan assets and determining the performance benchmarks, asset allocation, monitoring and rebalancing criteria, and similar metrics applicable to such investment choices.

132.     Pursuant to the Investment Policies, the Investment Subcommittee, a subgroup of the Investment Committee as delegated by it, is responsible for investment decisions for Plan assets including decisions relating to definition and development of investment strategies and philosophies of the Investment Committee and/or for the Plans, ratification of manager selection, and manager performance monitoring. The Investment Committee has oversight of the Investment Subcommittee, which is required to report to the Investment Committee on investment activities and decisions on a periodic basis, which is expected to be quarterly.

**B.     The Investment Committee Defendants Subjected the Plans and Participants to Unnecessary and Imprudent Expenses**

133.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is based on employee and employer contributions and the gains and losses through investment in the options made available under the plan less expenses. *See* 29 U.S.C. §1002(34). Excessive fees and poor investment performance will significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of benefits available at retirement. U.S.

Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

134. Multi-billion dollar defined contribution plans such as the 401(k) Savings Plan and the Retirement Contribution Plan have massive bargaining power to negotiate low-cost investment alternatives. As of December 31, 2014, and December 31, 2015, the 401(k) Savings Plan had approximately $7.9 billion and $8.5 billion in assets, respectively. As of December 31, 2014, and December 31, 2015, the Retirement Contribution Plan had approximately $6.7 billion and $6.3 billion in assets, respectively. The 401(k) Savings Plan stands in the top 0.1% of over 530,000 401(k) plans in plan assets. Investment Company Institute, *A Close Look at 401(k) Plans, 2014* ("ICI Study - 2014") at 12, *available at* https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf.

135. In 2013, in defined contribution 401(k) plans with over $1 billion in assets, the average expense ratio for target-date funds was 0.48% and the average expense ratio for non-target date balanced funds was 0.33%. Investment Company Institute, *A Close Look at 401(k) Plans, 2013*, at 51, *available at* https://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf. In 2014, the average expense ratio for target-date balanced funds in plans with over $1 billion in assets was 0.46% and the average expense ratio for non-target date balanced funds was 0.33%. ICI Study - 2014, at 53.

136. The fees charged for investing in the Intel TDFs and the Intel GDFs have been and are significantly higher than the above-mentioned averages and to alternative target-date funds and non-target balanced funds with comparable investment styles and similar or superior performance. Before the Investment Committee changed the Intel TDF allocations in approximately 2011, the fees for the Intel TDFs ranged from 65 basis points to 71 basis points.[6] Although the fees for the Intel TDFs were already substantially higher than index-based TDFs such as those offered by Vanguard, the increased allocation to hedge funds beginning in 2011 significantly increased the expenses of the Intel TDFs, almost doubling the range of fees to between 130 to 136 basis points. No explanation has been provided justifying or evidencing that the Investment Committee observed sufficiently

---

[6] Intel 401(k) Savings Plan: Important Plan and Investment-Related Information, Including the Plan's Investment Options, Performance History, Fees and Expenses, at 6-8.

rigorous, thorough, and documented bases for incurring the significantly higher fees resulting from such exposure to high-fee hedge funds and private equity. To the contrary, investing in high-fee hedge funds and private equity caused the Intel TDFs to consistently and substantially underperform Vanguard's index-based TDFs since 2011.

137.     As *What's behind the changes to Intel's worker retirement plans* commented, the Intel TDFs were rising in expenses in contrast to the general trend in the industry, which was lowering expenses.[7]

138.     In 2014, the 12 Intel TDFs in the 401(k) Savings Plan had expense ratios between 1.07 and 1.09%, which exceeded the category average of 0.46% by more than 130%. The Intel GDFs had an expense ratio of 1.25%, which exceeded the category average of 0.33% for non-target date balanced funds by more than 270%. In 2015, the Intel Funds in the 401(k) Savings Plan charged similarly high fees. The Intel Target Date Funds in the Plan had expense ratios between 0.92% and 1.04%, and the 401K GDF had an expense ratio of 1.25%. The Intel Funds in the investment lineup of the Retirement Contribution Plan had the same or similar expense ratios as the Intel Funds in the 401(k) Savings Plan.

139.     Comparable investment alternatives to the Intel Funds, however, show that the above comparisons *understate* the gross excessiveness of the fees for the Intel Funds. For example, as of September 2015, the fees for the Intel Funds in the 401(k) Savings were considerably higher — up to 940 % more expensive — than actively-managed and passively-managed investment alternatives with comparable investment styles and with similar or superior performance, as shown by Table 2 below:

---

[7] Brent Hunsberger, *What's behind the changes to Intel's worker retirement plans*, The Oregonian (May 2, 2015), http://www.oregonlive.com/finance/index.ssf/2015/05/whats_behind_the_ _changes_to_in.html.

**Table 2**

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date Income Fund | 101 bps[8] | Vanguard Target Retirement Fund - Institutional (VITRX) | 10 bps | 901% |
| | | Vanguard Target Retirement Fund - Investor (VTINX) / | 16 bps | 531% |
| | | T. Rowe Price Retirement Balanced Fund - Investor (TRRIX) | 56 bps | 80% |
| Target Date 2005 Fund | 101 bps | Fidelity Freedom Index 2005 - Investor (FJIFX) / | 16 bps | 531% |
| | | T. Rowe Price Retirement 2005 - Investor (TRRFX) | 58 bps | 74% |
| Target Date 2010 Fund | 104 bps | Vanguard Target Retirement 2010 Fund - Institutional (VIRTX) | 10 bps | 940% |
| | | Vanguard Target Retirement 2010 Fund - Investor (VTENX) / | 16 bps | 550% |
| | | American Funds 2010 Target Date Retirement Fund - R6 (RFTTX) | 36 bps | 189% |
| Target Date 2015 Fund | 103 bps | Vanguard Target Retirement 2015 Fund - Institutional (VITVX) | 10 bps | 903% |
| | | Vanguard Target Retirement 2015 Fund - Investor (VTXVX) / | 16 bps | 543% |
| | | American Funds 2015 Target Date Retirement Fund - R6 (RFJTX) | 36 bps | 186% |

---

[8] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to 0.01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', *available at* http://www.investopedia.com/terms/b/basispoint.asp (last visited Oct. 12, 2017).

---

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date 2020 Fund | 102 bps | Vanguard Target Retirement 2020 Fund - Institutional (VITWX) | 10 bps | 902% |
| | | Vanguard Target Retirement 2020 Fund - Investor (VTWNX) / | 16 bps | 538% |
| | | American Funds 2020 Target Date Retirement Fund - R6 (RRCTX) | 38 bps | 168% |
| Target Date 2025 Fund | 100 bps | Vanguard Target Retirement 2025 Fund - Institutional (VRIVX) | 10 bps | 900% |
| | | Vanguard Target Retirement 2025 Fund - Investor (VTTVX) / | 17 bps | 488% |
| | | American Funds 2025 Target Date Retirement Fund - R6 (RFDTX) | 40 bps | 150% |
| Target Date 2030 Fund | 96 bps | Vanguard Target Retirement 2030 Fund - Institutional (VTTWX) | 10 bps | 860% |
| | | Vanguard Target Retirement 2030 Fund - Investor (VTHRX) / | 17 bps | 465% |
| | | American Funds 2030 Target Date Retirement Fund - R6 (RFETX) | 42 bps | 129% |
| Target Date 2035 Fund | 92 bps | Vanguard Target Retirement 2035 Fund - Institutional (VITFX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2035 Fund - Investor (VTTHX) / | 18 bps | 411% |
| | | American Funds 2035 Target Date Retirement Fund - R6 (RFFTX) | 43 bps | 114% |

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date 2040 Fund | 92 bps | Vanguard Target Retirement 2040 Fund - Institutional (VIRSX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2040 Fund - Investor (VFORX) / | 18 bps | 411% |
| | | American Funds 2040 Target Date Retirement Fund - R6 (RFGTX) | 43 bps | 114% |
| Target Date 2045 Fund | 92 bps | Vanguard Target Retirement 2045 Fund - Institutional (VITLX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2045 Fund - Investor (VTIVX) / | 18 bps | 411% |
| | | American Funds 2045 Target Date Retirement Fund - R6 (RFHTX) | 43 bps | 114% |
| Target Date 2050 Fund | 92 bps | Vanguard Target Retirement 2050 Fund - Institutional (VTRLX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2050 Fund - Investor (VFIFX) / | 18 bps | 411% |
| | | American Funds 2050 Target Date Retirement Fund - R6 (RFITX) | 44 bps | 109% |

Case: 5:19-cv-04618-LHK Document 97 Filed 06/24/20, Page 48 of 136

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date 2055 Fund | 96 bps | Vanguard Target Retirement 2055 Fund - Institutional (VIVLX) | 10 bps | 860% |
| | | Vanguard Target Retirement 2055 Fund - Investor (VFFVX) / | 18 bps | 433% |
| | | American Funds 2055 Target Date Retirement Fund - R6 (RFKTX) | 47 bps | 104% |
| 401K Global Diversified Fund | 125 bps | Vanguard LifeStrategy Growth Fund - Investor (VASGX) / | 20 bps[9] | 525% |
| | | T. Rowe Price Balanced Fund - Investor (RPBAX) | 55 bps | 127% |

140.    The fees charged for the Intel Funds have been far higher than the fees charged for either actively-managed or passively-managed target date funds and balance funds available in the market. In 2017, the expense ratios of the Intel TDFs in the 401(k) Savings Plan fell between 0.82% and 0.95%, which were considerably higher than comparable investment alternatives. For example, Intel Target Date 2015 and 2020 Funds were up to 956% more expensive than comparable investment alternatives offered by Vanguard and up to 171 % more expensive than actively-managed alternatives offered by American Funds. The Intel TDFs in the Retirement Contribution Plan charged similarly high fees, with expense ratios between 0.83 and 0.96%. The expense ratio of the Intel GDF in the 401(k) Savings Plan, which had increased to 1.52% in 2017 from 1.25% in 2015, was also considerably higher than comparable alternatives. So was the Intel GDF in the Retirement Contribution Plan, which had an expense ratio of 1.53%, increased from 0.90% in 2011. In 2018, the expense ratios of the Intel TDFs in the Plans continue to be high, ranging up to 1.01%. As of September 2018, the expense ratio of the Intel GDFs in the 401(k) Savings Plan and the Retirement Contribution Plan have increased to 2.08% and 2.09%, respectively.

---

[9] Vanguard has since reduced the net expense ratio of this fund to 14 bps.

141. The Intel TDFs have significantly higher fees compared to the market in general. Morningstar reports that asset-weighted expense ratios for TDFs have declined 35% since 2009. Morningstar 2018 Target-Date Fund Landscape ("TDF Landscape"), at 15. The Intel TDF fees have gone in the opposite direction, increasing, on average, 24% since 2011, as Table 3 illustrates:

**Table 3**

| Intel TDF Vintage | Fee as of 12/31/2011[10] | Fee as of 12/31/2018[11] | % Increase |
|---|---|---|---|
| Income | 62 bps | 92 bps | 46 |
| 2005 | 65 bps | 94 bps | 45 |
| 2010 | 69 bps | 94 bps | 36 |
| 2015 | 68 bps | 98 bps | 44 |
| 2020 | 69 bps | 99 bps | 43 |
| 2025 | 70 bps | 90 bps | 29 |
| 2030 | 71 bps | 80 bps | 13 |
| 2035 | 71 bps | 76 bps | 7 |
| 2040 | 71 bps | 72 bps | 1 |
| 2045 | 71 bps | 74 bps | 4 |
| 2050 | 71 bps | 73 bps | 3 |
| Avg. | 69 bps | 86 bps | 25 |

142. The Morningstar report covers 58 target date fund ("TDF") series offered by professional asset managers. TDF Landscape at 16–17, Ex. 13. The average asset-weighted expense ratio for target date funds at the end of 2017 was 66 basis points. *Id.* at 15. The average Intel TDF fee was 86 basis points, which is higher than 44 of the professionally-managed target date fund series covered by Morningstar. *Id.* at 16–17, Ex. 13. The fourteen providers that had fees exceeding 86 basis points had a collective market share of only 4.38%. *Id.* No provider with more than 5%

---

[10] Intel 401(k) Savings Plan: Important Plan and Investment-Related Information, Including the Plan's Investment Options, Performance History, Fees and Expenses.

[11] https://workplaceservices.fidelity.com/mybenefits/navstation/navigation.

market share charged more than 73 basis points. *Id.* Only one provider charging more than 86 basis points had market share exceeding 1% (1.67%). *Id.*

143. The differences are even greater when considering the cheapest share class for each target date fund provider—that is the share class large investors like the Plans are most likely to invest in. Every single target date fund provider charges, on average, less than the Intel TDFs. *Id.* at 20, Ex. 16. The Intel TDFs are the most expensive target date funds in the country for large plan investors.

144. The differences are even starker when evaluated from the investors' perspective. On an asset-weighted basis, the average investor paid 47 basis points, *id.* at 17, less than half the average fee for Intel TDFs.

145. Compared to other defined contribution plans which, like Intel's, have over $10 billion in total assets, the fee difference is even more significant. Most such plans use target date funds in a "collective trust" rather than mutual fund structure, allowing them to achieve additional institutional fee savings. These target date funds typically charge fees below 0.20%, including the Blackrock Lifepath Funds (0.08%); Prudential Bright Horizon Funds (0.12%); Vanguard Target Retirement Trust Select Funds (0.05%); and DFA Life Path Funds (0.06%). The jumbo plans which do use mutual fund TDFs invest in either the actively managed Fidelity Freedom Funds (0.47% for the 2030 Fund) or passively managed Vanguard Index TDFs identified above.

146. Indeed, of the 10 closest plans to Intel's in terms of assets (5 larger and 5 smaller), six invest in the Blackrock Lifepath collective trusts (0.08%). One invests in Prudential's collective trust TDF product (charging 0.12%), one in Vanguard's Target Date mutual funds (charging 0.14% or less), one in State Street Global Advisor's collective trust (charging, upon information and belief, less than 0.14%), and one, 3M, utilizes its own custom target date fund whose fees are not known to Plaintiffs.

147. Although participants in the Intel Plans paid high fees, they did not receive superior investment returns. For example, as of the end of 2018, Intel Target Date 2015, 2020, 2030, 2025, 2035, 2040, and 2045 Funds in the 401(k) Savings Plan generally underperformed comparable alternatives such as those offered by Vanguard in each calendar year between 2011 and 2018, and

consistently yielded significantly lower average returns for that same time period, as illustrated by Table 4:

**Table 4**

|  | 2011 Return | 2012 Return | 2013 Return | 2014 Return | 2015 Return | 2016 Return | 2017 Return | 2018 Return | Ave. Return |
|---|---|---|---|---|---|---|---|---|---|
| Intel Target Date 2015 Fund | -0.31% | 9.18% | 12.36% | 3.75% | -2.08% | 6.21% | 11.19% | -2.86% | 4.68% |
| Vanguard Target Retirement 2015 Fund (VTXVX) | 1.71% | 11.37% | 13.00% | 6.56% | -0.46% | 6.16% | 11.50% | -2.97% | 5.86% |
| Intel Target Date 2020 Fund | -0.06% | 10.05% | 12.70% | 3.97% | -1.73% | 7.06% | 12.71% | -3.56% | 5.14% |
| Vanguard Target Retirement 2020 Fund (VTWNX) | 0.60% | 12.35% | 15.85% | 7.11% | -0.68% | 6.95% | 14.08% | -4.24% | 6.50% |
| Intel Target Date 2025 Fund | -1.51% | 10.86% | 12.63% | 4.04% | -1.88% | 7.94% | 14.63% | -5.13% | 5.20% |
| Vanguard Target Retirement 2025 Fund (VTTVX) | -0.37% | 13.29% | 18.14% | 7.17% | -0.85% | 7.48% | 15.94% | -5.15% | 6.96% |
| Intel Target Date 2030 Fund | —[12] | 11.32% | 12.55% | 3.91% | -2.37% | 8.92% | 16.43% | -6.49% | 5.53% |

---

[12] The Intel Target Date 2030 and 2040 Funds do not have full-year performance data for 2011 because they were not available as investments options in the 401(k) Savings Plan until July 1, 2011.

---

*Anderson v. Intel*       Consolidated Complaint      Case No. 5:19-cv-04618-LHK

47

|  | 2011 Return | 2012 Return | 2013 Return | 2014 Return | 2015 Return | 2016 Return | 2017 Return | 2018 Return | Ave. Return |
|---|---|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2030 Fund (VTTHX) | -1.27% | 14.24% | 20.49% | 7.17% | -1.03% | 7.85% | 17.42% | -5.86% | 7.38% |
| Intel Target Date 2035 Fund | -1.91% | 11.31% | 12.64% | 3.95% | -2.52% | 9.50% | 17.60% | -7.24% | 5.42% |
| Vanguard Target Retirement 2035 Fund (VTHRX) | -2.24% | 15.16% | 22.82% | 7.24% | -1.26% | 8.26% | 19.12% | -6.58% | 7.82% |
| Intel Target Date 2040 Fund | – | 11.32% | 12.65% | 3.94% | -2.69% | 9.53% | 18.72% | -7.66% | 5.73% |
| Vanguard Target Retirement 2040 Fund (VFORX) | -2.55% | 15.56% | 24.37% | 7.15% | -1.59% | 8.73% | 20.71% | -7.32% | 8.13% |
| Intel Target Date 2045 Fund | -2.20% | 11.32% | 12.65% | 3.97% | -2.72% | 9.78% | 19.11% | -7.56% | 5.54% |
| Vanguard Target Retirement 2045 Fund (VTIVX) | -2.51% | 15.58% | 24.37% | 7.16% | -1.57% | 8.87% | 21.42% | -7.90% | 8.18% |

148.    As of the end of 2015, other Intel TDFs in the 401(k) Savings Plan and the Intel TDFs in the Retirement Contribution Plan similarly underperformed Vanguard's alternatives. The GDFs in the Plans also underperformed Vanguard's comparable alternative in the period between 2011 and 2015, with an average annual return of 5.37% at the end of 2015, compared to an average annual return of at least 7.84% of the Vanguard LifeStrategy Growth Fund.

149.    The Intel TDFs have continued to underperform comparable investment alternatives. For example, as of December 31, 2016, Intel Target Date 2015, 2025, 2035, and 2045 Funds in the

401(k) Savings Plan all underperformed comparable alternatives by Vanguard, American Funds and T. Rowe Price over available five- and ten-year horizons as illustrated by Table 5:

**Table 5**

| Ave. Annual Returns as of 12/31/2016 | Intel Target Date 2015 Fund | Vanguard Target Retirement 2015 Fund (VTXVX) | American Funds 2015 Target Retirement Fund (RFJTX) | T. Rowe Price Retirement Fund 2015 (TRRGX) |
|---|---|---|---|---|
| 5 Year | 5.77% | 7.22% | 8.04% | 8.06% |
| 10 Year | 3.51% | 4.85% | —[13] | 5.04% |

| Ave. Annual Return as of 12/31/2016 | Intel Target Date 2025 Fund | Vanguard Target Retirement 2025 Fund (VTTVX) | American Funds 2025 Target Retirement Fund - R6 (RFDTX) | T. Rowe Price Retirement Fund 2025 (TRRHX) |
|---|---|---|---|---|
| 5 Year | 6.59% | 8.86% | 10.40% | 9.75% |
| 10 Year | 3.09% | 5.00% | — | 5.32% |

| Ave. Annual Return as of 12/31/2016 | Intel Target Date 2035 Fund | Vanguard Target Retirement 2035 Fund (VTTHX) | American Funds 2035 Target Retirement Fund - R6 (RFFTX) | T. Rowe Price Retirement Fund 2035 (TRRJX) |
|---|---|---|---|---|
| 5 Year | 6.82% | 10.15% | 11.31% | 10.87% |
| 10 Year | 2.70% | 5.09% | — | 5.52% |

| Ave. Annual Return as of 12/31/2016 | Intel Target Date 2045 Fund | Vanguard Target Retirement 2045 Fund (VTIVX) | American Funds 2045 Target Retirement Fund - R6 (RFHTX) | T. Rowe Price Retirement Fund 2045 (TRRKX) |
|---|---|---|---|---|
| 5 Year | 6.84% | 10.54% | 11.51% | 11.14% |

---

[13] The 10-year average returns for the American Funds Target Date Funds as of December 31, 2016 are not available because they did not become available until July 13, 2009.

| 10 Year | 2.60% | 5.27% | – | 5.65% |

150. As of December 31, 2017, Intel Target Date 2015, 2025, 2035, and 2045 Funds in the 401(k) Savings Plan all underperformed comparable alternatives by Vanguard and T. Rowe Price over available five- and ten-year horizons:

**Table 6**

| Ave. Annual Returns as of 12/31/2017 | Intel Target Date 2015 Fund | Vanguard Target Retirement 2015 Fund – Investor (VTXVX) | T. Rowe Price Retirement 2015 Fund – Investor (TRRGX) |
|---|---|---|---|
| 5 Year | 6.16%% | 7.25% | 7.97% |
| 10 Year | 3.99%% | 5.23% | 5.67% |

| Ave. Annual Return as of 12/31/2017 | Intel Target Date 2025 Fund | Vanguard Target Retirement 2025 Fund – Investor (VTTVX) | T. Rowe Price Retirement 2025 Fund – Investor (TRRHX) |
|---|---|---|---|
| 5 Year | 7.30% | 9.36% | 10.06% |
| 10 Year | 3.91% | 5.79% | 6.34% |

| Ave. Annual Return as of 12/31/2017 | Intel Target Date 2035 Fund | Vanguard Target Retirement 2035 Fund – Investor (VTTHX) | T. Rowe Price Retirement 2035 Fund – Investor (TRRJX) |
|---|---|---|---|
| 5 Year | 8.00% | 10.90% | 11.53% |
| 10 Year | 3.79% | 6.18% | 6.83% |

| Ave. Annual Return as of 12/31/2017 | Intel Target Date 2045 Fund | Vanguard Target Retirement 2045 Fund – Investor (VTIVX) | T. Rowe Price Retirement 2045 Fund – Investor (TRRKX) |
|---|---|---|---|
| 5 Year | 8.30% | 11.64% | 12.03% |
| 10 Year | 3.80% | 6.56% | 7.10% |

151.     The Intel TDFs have also underperformed the most widely-used benchmark for TDFs, the S&P Target Date Index. TDF Landscape at 32, Ex. 27 (identifying benchmarks).

152.     The Intel TDFs also underperform almost all peer funds on an average and weighted-average basis. Weighted average returns are a useful performance metric because they measure the returns earned by the average investor, as opposed to the returns generated by the average investment manager.

153.     Table 7 below compares the ten-year returns of the Intel TDFs as of year-end 2018 to same-vintage TDFs managed by professional asset managers available in the market during the entire period using average return, weighted average return, and average risk-adjusted return. For example, the Intel 2015 TDF earned 6.62% compared to the average mutual fund which earned 7.60%. Within the group of 13 mutual funds with 10 years of such data, ending December 2018, the Intel performance was in the 83rd percentile. Other vintages fared similar or worse; in some cases, the Intel TDF was the worst performing TDF for that Vintage. The peer returns are based on the cheapest share class.

**Table 7**

| 10 Year | Vintage 2000-2010 | Vintage 2015 | Vintage 2025 | Vintage 2035 | Vintage 2045 | Vintage Retirement |
|---|---|---|---|---|---|---|
| Std Avg. | 7.074 | 7.605 | 8.829 | 9.693 | 10.041 | 6.128 |
| Wtd Avg. | 8.063 | 8.288 | 9.344 | 10.237 | 10.461 | 6.371 |
| # Peers | 12 | 13 | 19 | 19 | 18 | 19 |
| Intel | **6.01** | **6.62** | **7.52** | **7.71** | **7.79** | **5.59** |
| Ret v Std | -15% | -13% | -14.8% | -20.5% | -22.4% | -8.8% |
| Ret v Wtd | -25.5% | -20.1% | -19.5% | -24.5% | -25.5% | -12.2% |
| Rank | 82 | 83 | 95 | 100 | 100 | 78 |

154.     Table 7 above shows that the Intel TDFs underperform the average professional TDF manager by a substantial margin. It also shows that the Intel Plans and their participants did even worse compared to the average TDF investor.

155.     The same is true for 2011–2018, as Table 8 demonstrates below.

**Table 8**

| 2011–2018 | Vintage 2015 | Vintage 2025 | Vintage 2035 | Vintage 2045 |
|---|---|---|---|---|
| Std Avg. | 5.22 | 6.09 | 6.82 | 7.14 |

---

*Anderson v. Intel*                    Consolidated Complaint                    Case No. 5:19-cv-04618-LHK

51

| Wtd Avg. | 5.83 | 6.60 | 7.27 | 7.49 |
|---|---|---|---|---|
| # Peers | 15 | 21 | 21 | 20 |
| Intel | **4.86** | **5.63** | **6.04** | **6.23** |
| Ret v Std | -6.9% | -7.5% | -11.4% | -12.7% |
| Ret v Wtd | -16.6% | -14.7% | -16.9% | -16.8% |
| Rank | 73 | 81 | 91 | 95 |

156. Applying these data to a hypothetical plan participant shows the cumulative impact over a life of retirement savings. Assume that a plan participant retiring at age 65 in 2045 invested $15,000 a year in a 2045 TDF until retirement. Assume also that the annualized Intel 2045 TDF, average peer TDF, and weighted average peer TDF from 2011 through 2018 apply going forward to 2045. The following chart shows the total savings at retirement for the three returns. The average and weighted peer returns yield, respectively, $380,645 and $550,727, more than the projected Intel 2045 TDF return, as Figure 2 below reflects.

**Figure 2**



157. Assuming that this same hypothetical plan participant begins drawing $150,000 a year starting in 2046 and that her investment is in a TDF Retirement. Assuming the Intel TDF Retirement returns shown in Tables 7 and 8 above from 2046 forward, the participant would run out of money at age 86. Assuming the peer average and peer weighted average returns, at age 86, the

1  participant would still have $2.2 million and $3.5 million, respectively. These data underscore the

2  catastrophic effect of poor investment design by the Investment Committee on retirement savings.

3      158.    The Intel TDFs also fail to measure up on a risk-adjusted basis. Risk-adjusted return

4  is a measure of the return of the investment relative to the risk of the investment. Thus, where two

5  investments have the same return, the investment that took less risk would have a better risk-adjusted

6  return. A risk-adjusted return comparison presumably should be more favorable to the Intel TDFs

7  than a standard return comparison because the Intel TDFs purportedly take less risk by investing in

8  hedge funds. But the Intel TDFs perform poorly on a risk-adjusted basis as well. As Exhibit A

9  illustrates, in every year from 2012–2017, the Intel TDFs performed poorly compared to Vanguard

10  target date funds and the S&P TDF index for every vintage. The data makes two important points.

11  First, the returns generated by the Intel TDFs are not commensurate with the risk, i.e., the returns

12  should be higher given the level of risk. The Vanguard target date fund of the same vintage and the

13  S&P TDF index for the same vintage both deliver more return per unit of risk in every year 2012-

14  2017. Second, the slopes of the Intel TDFs are shallower than the comparables. Specifically, as risk

15  increases, the incremental return of the Intel TDFs is half the incremental return of the comparables.

16  In other words, the more risk the Intel TDFs take, the less value for investors.

17      159.    Similarly, the Intel GDFs have underperformed peer balanced funds. From May 2007,

18  when the Intel GDFs began investing in hedge funds and private equity, through May 2014, the fund

19  underperformed a Vanguard balanced fund, the LifeStrategy Moderate Growth Fund (Ticker:

20  VSMGX), by approximately 50 basis points (.50%) annually.[14] As of June 2015, the Retirement

21  Contribution Plan invested the vast majority of its assets in the Intel GDF – $5.82 billion out of

22

23

24

25

26

_____

27  [14]Hunsberger, Brent, *What's inside Intel's retirement plans. Hedge funds. Lots of 'em.*, The
    Oregonian (Aug. 30, 2014), http://www.oregonlive.com/finance/index.ssf/2014/08/whats_inside

28  _intels_retirement.html.

$6.66 billion.[15] Thus, fifty basis points of underperformance annually between May 2007 and May 2014 translates into a loss of over $100 million.

160. The Intel GDFs in the Plans have continued to underperform comparable alternatives. For example, as of December 31, 2016, the two Intel Funds underperformed comparable alternatives by Vanguard and American Funds over available five- and ten-year horizons as illustrated by Table 9:

**Table 9**

| Ave. Annual Return as of 12/31/2016 | 401K Global Diversified Fund | Global Diversified Fund | Vanguard LifeStrategy Growth Fund (VASGX) | T. Rowe Price Balanced Fund (RPBAX) |
| --- | --- | --- | --- | --- |
| 5 Year | 6.38% | 6.86% | 9.73% | 8.95% |
| 10 Year | 2.65% | 2.97% | 4.65% | 5.54% |

161. Similarly, as of December 31, 2017, the two Intel GDPs underperformed comparable alternatives by Vanguard and American Funds over available five- and ten-year horizons as follows:

**Table 10**

| Ave. Annual Return as of 12/31/2016 | 401K Global Diversified Fund | Global Diversified Fund | Vanguard LifeStrategy Growth Fund (VASGX) | T. Rowe Price Balanced Fund (RPBAX) |
| --- | --- | --- | --- | --- |
| 5 Year | 6.98% | 7.54% | 10.64% | 9.71% |
| 10 Year | 3.07% | 3.43% | 5.75% | 6.56% |

162. Comparing the Intel GDFs to the broader market for GDFs over the past ten years also shows lagging returns as Table 11 demonstrates.

---

[15] "Intel Corp. moved to external management for two big investment options that house all of the alternative investments in its $14.85 billion defined contribution plans." Steyer, *supra* note 2. As of the end of March 31, 2014, the Intel GDF had approximately 37.59% of its portfolio in commodities, hedge funds, and private equity. Of that, 67.39% was allocated to hedge funds, 17.56% to private equity and venture capital, 11.74% to commodities, and 3.31% to real estate. *401K Global Diversified Fund*, Oregonian Live at 1 (Mar. 31, 2014), http://media.oregonlive.com/finance/other/ 401K%20Global%20Diversified%20Fund.pdf.

---

**Table 11**

| 10-Yr | US Fund World Large Stock | US Fund Allocation--85%+ Equity | US Fund Allocation--70% to 85% Equity | US Fund Allocation--50% to 70% Equity |
|---|---|---|---|---|
| Std Avg | 9.68 | 10.45 | 9.25 | 8.61 |
| Wtd Avg | 9.81 | 10.09 | 9.57 | 9.66 |
| # Peers | 118 | 37 | 61 | 138 |
| **Intel GDF** | **7.4** | **7.4** | **7.4** | **7.4** |
| Rank | 86 | 98 | 95 | 84 |

163.    Low-cost passively- and actively-managed investments with comparable investment styles and similar or superior performance, including comparable target-date and non-target balanced funds, have been and are available in the market as investment options. Instead of using the Plans' bargaining power to negotiate low-cost investment options and benefit participants and beneficiaries, the Investment Committee Defendants selected and retained as the Plans' investment options high-cost Intel target-date and non-target date balanced funds that underperformed available comparable alternatives. Despite the Intel Funds' excessive fees and underperformance, the Investment Committee Defendants designated the Intel TDFs as the default investment options of the 401(k) Savings Plan, and the Intel GDF as the default investment option of the Retirement Contribution Plan.

164.    The conduct of the Investment Committee Defendants demonstrates that they failed to perform a proper investigation of the availability of lower-cost target date funds and balanced funds and/or to select and monitor the Plans' default investment options solely based on the merits of the investment options and in the interest of participants. The Investment Committee Defendants adopted extraordinary asset allocation models at extremely high cost in comparison to the models and costs of professional asset managers. Had the Investment Committee conducted a proper investigation and managed the assets of the Plans, including by selecting and evaluating on an ongoing basis the Intel Funds, in a cost-conscious and prudent manner, the Investment Committee Defendants would have removed the costly and underperforming Intel Funds in favor of investment alternatives with similar or superior performance but with lower expense.

165.    By selecting and maintaining the Intel Target Date Funds and the 401K Global Diversified Fund in the 401(k) Savings Plan and designating the Intel Target Date Funds as the

default investment options of the 401(k) Savings Plan, the Investment Committee Defendants caused the Plan and many of its participants to pay millions of dollars in excess fees per year.

166.     By selecting and maintaining the Intel Target Date Funds and the Global Diversified Fund in the Retirement Contribution Plan and designating the Global Diversified Fund as the default investment option of the Retirement Contribution Plan, the Investment Committee Defendants caused the Plan and many of its participants to pay millions of dollars in excess fees per year.

**C.     The Investment Committee Defendants Failed to Monitor and Replace the Asset Allocation Models and Allocation Percentages for the Intel Funds**

    **1.     Excessive Allocations to the Non-Traditional Investment Accounts**

167.     The Investment Committee Defendants managed the Intel Funds and dictated the asset allocation model for them with respect to the asset classes and allocation percentages. These Defendants determined the asset classes and the allocation percentages for the Intel Funds and directed the allocation of the Intel Funds' assets to the Master Trust Investment Accounts. They selected the Non-Traditional Investments Accounts' underlying investments and the investment managers for them. The Investment Committee Defendants were responsible for monitoring and evaluating on a regular basis the asset allocation models and allocation percentages adopted and implemented for the Intel Funds as well as the Master Trust Investment Accounts' underlying investments and their investment managers.

168.     As of December 31, 2015, and December 31, 2016, the 401(k) Plan had approximately $1.1 billion and $1.2 billion in assets allocated to the Non-Traditional Investments Accounts, respectively. As of December 31, 2015, and December 31, 2016, the Retirement Contribution Plan had approximately $3.0 billion and $2.7 billion in assets allocated to the Non-Traditional Investments Accounts, respectively.

169.     Pursuant to the asset allocations adopted and implemented for them, the Intel Funds have allocated and continue to allocate excessive portions of the Intel Funds' assets to the Non-Traditional Investments Accounts, which invest in speculative asset classes such as hedge funds, private equity funds, emerging market funds, and commodities. For example, as of September 2015, each of the Intel TDFs in the 401(k) Savings Plan was managed in such a way that between 27.46

---

and 37.20 percent of each fund's assets were allocated to the Non-Traditional Investments Accounts that invested in hedge funds, commodities, and emerging market funds, as shown by the following Table 12:

**Table 12**

| Intel Target Date Fund | Defensive Oriented Hedge Fund Account | Growth Oriented Hedge Fund Account | Diversified Real Assets & Emerging Market Fund Account | Total Allocation to Non-Traditional Investments Accounts |
|---|---|---|---|---|
| Income Fund | 13.48% | 12.90% | 3.25% | 29.63% |
| 2005 | 12.34% | 11.93% | 3.19% | 27.46% |
| 2010 | 13.99% | 14.53% | 5.63% | 34.15% |
| 2015 | 13.41% | 16.07% | 7.72% | 37.20% |
| 2020 | 11.80% | 15.07% | 7.36% | 34.23% |
| 2025 | 9.72% | 17.33% | 8.70% | 35.75% |
| 2030 | 7.96% | 14.19% | 11.09% | 33.24% |
| 2035 | 7.47% | 13.31% | 12.15% | 32.93% |
| 2040 | 2.95% | 16.92% | 12.17% | 32.04% |
| 2045 | 3.11% | 17.82% | 13.14% | 34.07% |
| 2050 | 3.01% | 16.35% | 13.44% | 32.80% |
| 2055 | 3.11% | 17.64% | 13.57% | 34.32% |

170.    The Intel TDFs in the Retirement Contribution were managed in such a way that the allocations of those funds' assets to the Non-Traditional Investments Accounts were similarly excessive as the Target Date Funds in the 401(k) Savings Plan.

171.    As of September 2015, 56.22% of the assets of Intel GDF in the 401(k) Savings Plan were allocated to the Non-Traditional Investments Accounts that invested in as hedge funds, commodities, and emerging markets funds as well as private equity funds (including venture capital funds and private real estate and natural resources funds), as follows: 10.79% to the Defensive

Oriented Hedge Fund Account, 19.32% to the Growth Oriented Hedge Fund Account, 2.34% to the Diversified Real Assets Fund Account, 5.26% to the Emerging Markets Fund Account, and 18.51% to the Alternative Investments Fund Account. Similar or identical percentages of the assets of the Intel GDF in the Retirement Contribution Plan were allocated to these Non-Traditional Investments Accounts.

172.    The Intel TDFs have continued to be managed in such a way that excessive amounts of the funds' assets are allocated to the Non-Traditional Investments Accounts. As of March 2017, each of the Intel TDFs in the Plans had between 25.17 and 30.31 percent of the fund's assets allocated to the Non-Traditional Investments Accounts as presented in Table 13:

**Table 13**

| Intel Target Date Fund | Defensive Oriented Hedge Fund Account | Growth Oriented Hedge Fund Account | Diversified Real Assets & Emerging Market Fund Account | Total Allocation to Non-Traditional Investments Accounts |
|---|---|---|---|---|
| Income Fund | 15.74% | 3.98% | 5.45% | 25.17% |
| 2005 | 16.22% | 4.58% | 6.01% | 27.81% |
| 2010 | 15.16% | 5.45% | 6.90% | 27.51% |
| 2015 | 13.20% | 9.18% | 7.10% | 29.48% |
| 2020 | 10.48% | 9.88% | 9.07% | 29.43% |
| 2025 | 7.83% | 11.14% | 11.34% | 30.31% |
| 2030 | 4.75% | 11.29% | 14.05% | 30.09% |
| 2035 | 3.15% | 11.15% | 15.15% | 29.45% |
| 2040 | 2.76% | 10.78% | 15.21% | 28.75% |
| 2045 | 2.80% | 10.98% | 15.03% | 28.81% |
| 2050 | 2.59% | 9.92% | 15.29% | 27.80% |
| 2055 | 2.53% | 10.30% | 15.09% | 27.92% |

173.     The Intel GDFs have continued to be managed in such a way that excessive amounts of the funds' assets are allocated to the Non-Traditional Investments Accounts. As of March 2017, the two Intel Funds allocated 57.18% of their respective assets to the Non-Traditional Investments Accounts, as follows: 6.39%% to the Defensive Oriented Hedge Fund Account, 15.08% to the Growth Oriented Hedge Fund Account, 4.03% to the Diversified Real Assets Fund Account, 4.15% to the Emerging Markets Fund Account, and 27.53% to the Alternative Investments Fund Account.

174.     The poor performance of the Intel TDFs and GDFs can be attributed in large measure to the substantial allocations to hedge funds. The weighted average fee for the hedge fund portfolio in which the Intel TDFs and GDFs invest was 1.52% with an additional weighted average performance fee of 21.2%. For example, if the hedge fund portfolio earns a gross return of 6%, the hedge fund managers earn a management fee of 1.52%. Of the remaining 6.00% – 1.52% = 4.48%, the managers earn a performance fee of 0.95% (adjusted for any hurdle requirements), leaving a net return to investors of 3.53%. In effect, investors pay a fee of 2.46%. In other words, the hedge fund managers collect 41% of the returns in this hypothetical.

175.     The allocation of Intel TDF and GDF assets to the hedge fund portfolio harmed participant. In pursuing a purported risk-mitigation strategy, the Intel Funds gave up the long-term benefit of investing in equity, which delivers superior returns. Even on a risk-adjusted basis, participants fared worse than a simple allocation of stocks and bonds.

176.     The analysis that follows in Figure 3 compares the hedge fund portfolio to investments in the equity benchmark "MSCI World Stock" and the fixed income benchmark "BarCap Aggregate Bond Index." These are the two comparators used on the hedge fund portfolio fact sheet. The graph below illustrates the risk return trade-off in terms of allocations to these two benchmarks. The left most values represent lower equity weights, which produce lower returns along with lower risk. The right most values represent the alternative higher equity weight portfolios.

**Figure 3**



177.    The isolated green point represents the behavior of the hedge fund portfolio, which is below the portfolios that consist solely of the benchmarks. Participants would have fared better by investing their hedge fund allocation to a portfolio that was simply 26% in equity and 74% in bonds, in that they would have experienced comparable market risk, with greater return.

178.    The alternate point identified in red to the right of the graph illustrates the typical 401(k) plan allocation which is 66% equity and 34% fixed income.[16] Participants typically choose traditional portfolios that have higher equity weights with commensurately greater return. Investors in the hedge fund portfolio earned 4.2%, while those in traditional capital market investments earned nearly a full percentage point higher.

179.    A $10,000 investment in the hedge fund portfolio grew to $15,823, a traditional investment identified above grew to $17,080. As Figure 4 below illustrates, the hedge fund portfolio suffered similar losses to a balanced portfolio during the 2007-2008 financial crisis, but failed to appreciate when the rest of the markets did.

---

[16] EBRI Survey,"401(k) Plan Asset Allocation, Account Balances, and Loan Activity in 2014", April 2016, No. 423.

**Figure 4**



2. **Deviation from Professional Standards for Target Date Funds and Balanced Funds**

180. By overweighting allocations of the Plans' assets to the speculative asset classes represented by the Non-Traditional Investments Accounts, the allocation model for the Intel TDFs deviates and has deviated drastically from prevailing professional asset manager standards for target date funds available in the market.

181. In 2009, the average asset allocations for 2030 target date funds offered by major fund companies are reflected in Table 14:

**Table 14**

| Firm/Product | US Equity | Non-US Equity | Bond | Cash | Other |
|---|---|---|---|---|---|
| Fidelity | 48.57% | 18.29% | 14.28% | 4.26% | 14.60% |
| American Century | 60.48% | 21.52% | 6.74% | 11.19% | 0.07% |
| American Funds | 50.13% | 28.59% | 11.09% | 9.08% | 1.10% |
| John Hancock | 60.63% | 27.70% | 5.49% | 5.10% | 1.08% |
| Principal | 53.46% | 19.63% | 23.58% | -0.43% | 3.76% |
| Russell | 58.55% | 27.60% | 7.01% | 5.35% | 1.48% |
| T Rowe Price | 64.01% | 19.96% | 10.73% | 4.29% | 1.01% |
| Vanguard | 68.09% | 16.65% | 14.28% | 0.54% | 0.43% |
| **Average** | **58.0%** | **22.5%** | **11.7%** | **4.9%** | **2.9%** |

182. By comparison, the Intel 2030 Target Date Fund had approximately 21% of assets allocated to hedge funds and 5% to commodities by 2014.[17] Peer group target date funds (i.e., funds with a "target date" of 2030) do not allocate any assets to hedge funds and very few peer TDFs have even small commodity stakes. Further, peer target date funds allocate 70% of equity assets to U.S. stocks and 30% to foreign whereas the Intel 2030 TDF allocates over 50% of equity investments to foreign stocks.

183. Figure 5 below compares the asset allocation of the Intel Target Date 2030 Fund as of April 30, 2015 to the average asset allocations of the eight professional investment management firms represented in Table 14 above:

**Figure 5**





---

[17] *Target Date 2030 Fund*, Oregonian Live at 2 (March 31, 2014), http://media.oregonlive.com/ finance/other/Target%20Date%202030%20Fund-1.pdf.

184. The categories represented in the pie chart for the 2030 Intel TDF in Figure 5 above correlate to the Master Trust Investment Accounts as follows: the "Hedge Funds" category represents the Hedge Fund Account; the "Others" category represents the Stable Value Fund Account, the Private Equity Fund Account, and the Commodities Fund Account; the "U.S. Equity" category represents the U.S. Large Cap Fund Account and U.S. Small Cap Fund Account; the "Non-U.S. Equity" category represents the International Stock Fund Account and the Emerging Markets Fund Account; and the "Bonds" category represents the Global Bond Fund Account. The allocations to these respective categories are based on the allocations represented in a Target Date Funds fact sheet published by Intel with the effective date of April 30, 2015. Exhibit B to the Complaint provides additional comparisons between other Intel TDFs and the average allocations of the eight professional investment management firms represented in Table 14 for the target dates funds of the same year.

185. Generally, a target date fund is a hybrid investment that pursues a long-term investment strategy by holding a mix of asset classes such as stocks, bonds, and cash equivalents that is readjusted to become more conservative over the time horizon of the fund, as the fund approaches the date indicated in its name. Under prevailing standards, a target date fund follows a "glide path" or asset allocation path, according to which the assets of the fund is reallocated across asset classes to become more conservative as the target date approaches. The glide path is designed to account for factors affecting the participant's risk profile over time, which include a shorter time horizon before retirement age, fewer chances to make contributions to savings, and greater sensitivity to capital swings.

186. Peer target date funds do not allocate to speculative asset classes in any percentage close to the allocations of the Intel TDFs. The Intel TDFs have continued to allocate their assets to speculative asset classes in substantial percentages. As of September 2015, the Intel Target Date 2035 Fund allocated 20.78% of its assets to the Defensive Oriented Hedge Fund and Growth Oriented Hedge Fund Accounts alone and over 32% in total to the Non-Traditional Investments Accounts. As of June 2017, the Intel Target Date 2035 Fund allocated 14.17% of its assets to the Defensive Oriented Hedge Fund and Growth Oriented Hedge Fund Accounts and over 29% in total

to the Non-Traditional Investments Accounts. In contrast, peer target date funds with a target date of 2035 do not allocate assets anywhere close to 29% to these speculative asset classes. For instance, as of June 2017, the American Funds 2035 Target Date Retirement Fund allocated 79.2% to U.S. and non-U.S. equities, 13.2% to bonds, and 7.6% to cash and equivalents, and no assets to hedge funds or commodities. Also, as of August 2017, the Vanguard Target Retirement 2035 Fund allocated about 79% to U.S. and non-U.S. equities and about 21% to bonds, and no assets to hedge funds or commodities. As of September 2017, the Fidelity Freedom 2035 Fund allocated about 11% of its assets to commodities and emerging market funds and the rest of its assets to U.S. and non-U.S. equities and bonds, and allocated no assets to hedge funds.

187.    Few professional target date fund providers allocate assets to alternative investments such as hedge funds. Of 51 target date fund providers analyzed by Morningstar, only 8 allocated any assets to alternative investments. TDF Landscape at 37. Of those eight, only one exceeded an allocation percentage of 7.3%, the Putnam RetirementReady product. *Id.*

188.    No defined contribution plan with assets exceeding $10 billion invested in the Putnam RetirementReady product.

189.    Upon information and belief, none of the 46 other defined contribution plans with assets exceeding $10 billion invested in the Putnam RetirementReady product or any other target date product allocating over 7.3% of its assets to alternative investments. The two that Plaintiffs' Counsel's investigation discovered as including *any* hedge fund allocation at all included Verizon (less than 2% hedge funds) and HCA (5% allocated to an "Alternative Pool" which may include hedge funds, among other investments).

190.    The Intel Global Diversified Funds' substantial allocation (consistently of more than 50% of the funds' assets) to the Non-Traditional Investments Accounts differs markedly from the typical allocation of peer balanced funds. For example, neither the Vanguard LifeStrategy Growth Fund nor the T. Rowe Price Balanced Fund allocates assets more than 2%, if any, to commodities, and allocates no assets to hedge funds or private equity funds.

191.    Significant allocations of the Plans' assets to hedge funds and private equity funds are inappropriate for the Intel Funds. Hedge funds pose investment risks not found with traditional

investments managed by registered investment companies. For example, registered investment companies are subject to certain strict leverage limits to which hedge funds are not. Whereas hedge funds can use leverage or borrowed money, and often do, to amplify returns, leverage can also magnify losses. Hedge funds lack liquidity as they often require an initial "lock-up" period where investors must commit their money for one-to-two years or more, and capital redemption after the lock-up periods often is limited to one per quarter and requires at least thirty days' notice, as in the case of the hedge funds in the Non-Traditional Investments Accounts. Hedge funds also lack the transparency of publicly traded funds such as mutual funds. In particular, hedge funds lack transparency by design because individual hedge fund managers claim a proprietary interest in their investment strategies. Investing in hedge funds carries valuation risk because the underlying holdings and strategies of many hedge funds are often not well known, even to institutional investors like the Plans, making the current value of a retirement plan's investment uncertain. Thus, it is difficult for retirement plan fiduciaries to evaluate hedge funds, including their performance. Private equity funds pose the same investment and valuation risks and lack transparency and liquidity as hedge funds do. *See* Barbara Borbjerg, *Plans Face Challenges When Investing in Hedge Funds and Private Equity* (August 31, 2011) ("the GAO Report"), at 6-8, *available a*t http://www.gao.gov/ assets/90/82457.pdf. Significant allocations to hedge funds do not increase diversification of asset classes. Hedge funds themselves are not an asset class so much as esoteric investment strategies often holding widely traded securities.

192.    Significant allocations to emerging markets funds and private real estate and natural resources funds also do not provide risk diversification because investments in equities and, in the case of emerging markets, investments in non-U.S. equities, already provide exposure to the sectors represented by these funds. Instead, they expose investors to bets on speculative areas of the markets. Emerging markets are a particularly high-risk area as investments in emerging markets are susceptible to foreign exchange risk, lower liquidity, and political risk, all on top of the overall increase in volatility that comes with investing in developing countries. Investments in commodities are often subject to higher-than-average volatility and the risk of investing through futures contracts, which offer a high degree of leverage.

193.   In 2018, a down year in the equity markets where one might expect hedge funds to provide downside protection, hedge funds largely failed to do so. According to a report from Bloomberg, in 2018 the hedge fund industry had its "biggest annual loss since 2011, declining 4.1% on a fund-weighted basis." Hedge Fund Performance in 2018: The Good, Bad, and the Ugly (Jan. 9, 2019), *available at* https://www.bloomberg.com/news/articles/2019-01-09/hedge-fund-performance-in-2018-the-good-the-bad-and-the-ugly. Similarly, MarketWatch reported that hedge funds outperformed the S&P 500 by a "whisker" in 2018. Hedge funds lose money in 2018 but outperform S&P 500 by a whisker. In other words, in allocating huge percentages of Intel TDF assets to hedge funds, the Plan fiduciaries effectively exchanged years of robust equity returns for one year of a scintilla of outperformance. The result is that the Plan and its participants lost hundreds of millions.

### 3.   The Intel Funds Imprudently Invested in Hedge Funds

194.   Target date funds are based on two important investment theories: Modern Portfolio Theory ("MPT") and the importance of asset allocation to generating retirement savings.

195.   MPT posits that the power of combining securities and asset classes that have low correlations to each other can reduce risk, as measured by the volatility of a portfolio.

196.   Brinson, Beebower, and Hood studied the impacts of asset allocation on 91 pension funds over a 10-year period and found that 94% of differences in performance can be explained purely by the asset allocation and only 6% is explained by market timing and security selection.[18] This underscores that trying to achieve excess returns by timing the markets is a generally superfluous strategy when considering a large pool of assets over a long investment horizon covering many market cycles. Market timing and security selection tied to near-term cycles tend to wash out over time.

197.   Many hedge funds enable the manager to invest in near-term opportunities without adhering to a stated fund objective. By contrast, mutual funds regulated by the 1940 Act are obligated to state and adhere to their investment objectives. Mutual funds also have stringent fee disclosure requirements.

---

[18] Gary P. Brinson et al., *Determinants of Portfolio Performance*, 42 Financial Analysts Journal 133, 133-138 (1995).

198.  Most target date funds employ a sliding scale of equity, fixed income and cash allocations to provide substantial correlation benefits to market swings. Most off-the-shelf target date funds avoid any meaningful use of leverage (as leverage is strictly constrained in 1940 Act funds) and generally employ only minor use of derivatives, usually for proxy or liquidity needs (and typically in the fixed income allocation where bond liquidity is increasingly challenged). Thus, the portfolio manager of a 1940 Act-regulated Target Date Fund has strong guidance as to the exposures he or she will receive when incorporating standard, prospectus-driven mutual funds in a fund-of-fund lineup. Additionally, for index-based target date funds, computer programs dictate strict adherence to the given index and do not afford manager discretion to deviate from guidelines and strategies.

199.  Hedge funds involved in event driven and directional bets are generally using either focused security selection or market timing strategies, while distressed (and/or stressed) and value-driven funds are generally security selection funds. Brinson, Beebower and Hood explain that these strategies do not make sense for a retirement investment.

200.  Hedge funds have been traditionally limited to "accredited investors" who have over $200,000 in annual income and/or over $1,000,000 in net worth. The reason for limiting investment to those accredited investors is to restrict these investments to those who can afford to lose their invested principal.

201.  The hedge funds to which the Intel TDFs have allocated their assets of the Plan purport to have included as many as 21 different hedge funds between at least 2014 and 2018. For example, in 2014, of those hedge funds at least 6 were primarily deemed Multi-Strategy, 5 were deemed Directional, 5 involved Distressed (or Stressed), and 8 were Event Driven. Several listed multiple strategies. The makeup of the hedge funds for 2018 was largely the same. Some of these hedge funds represent the most potentially volatile of hedge fund strategies. Event driven strategies generally place bets on the chance that a particular market event – such as a merger or a key interest rate change – takes place. If the event does not occur, or if the ramifications are not as impactful, then the leveraging and risk concentration employed will be for naught, and potentially large losses can take place as a result. Distressed strategies tend to seek opportunities with either equity or debt

1    in companies or other entities that are on the verge of a potentially calamitous event – such as a

2    bankruptcy – thus driving the price of their securities down. The hedge fund managers bet the event

3    will not happen and buy in. If the event does happen, the losses are usually deep and permanent.

4    Conversely, if they "short" the event (i.e. a bet on the price of the securities going down) and it does

5    not happen, losses can exceed even the invested principal.

6           202.    A common feature of these strategies is that the managers often employ significant

7    leverage through various means such as borrowing, shorting or the use of derivatives. For hedge

8    funds that commit significant amounts of capital to sustain the collateral requirement through the

9    cycle of the anticipated event, the funds are extremely illiquid. As a result, many hedge funds

10   employ strict constraints around access to invested capital by their investors by requiring months of

11   notice and reserving the right to deny such requests for redemptions at their discretion.

12          203.    The impact or potential impact of the illiquidity of hedge funds on the scale invested

13   in by the Plans is that if the hedge funds refuse to honor redemption requests, the Investment

14   Committee will be forced to sell off other, more marketable investments (*i.e.*, publicly traded

15   securities), thereby increasing the Plans' concentration in hedge funds. There is a significant risk that

16   the lock-up of hedge fund investments will cause selling in traditional securities and further harm the

17   invested principal of the plan participants.

18          204.    Hedge fund managers often move illiquid or impaired assets out of the main fund into

19   a separate holding vehicle known as a "side pocket." Creating a side pocket is solely within the

20   discretion of the hedge fund manager. As the Wall Street Journal reported as early as 2006,

21   regulators and investors were becoming concerned about the abusive use of side pockets to mask

22   underperformance and inflate manager performance fees.[19] Because side pockets are often used for

23   illiquid investments, hedge fund managers impose onerous withdrawal constraints. In the wake of

24   the 2008 financial crisis, the SEC instituted several enforcement proceedings against hedge fund

25   managers for improper use of side pockets.[20]

26   —————————————

27   [19] Gregory Zuckerman & Scott Patterson, *"Side Pocket" Accounts of Hedge Funds Studied*, The
     Wall Street Journal (Aug. 4, 2006) http://www.wsj.com/articles/SB115465505123626547.

28   [20] *SEC Charges Hedge Fund Managers With Fraudulently Overvaluing Side-Pocketed Assets,*

205.     As the vast majority of former employees will roll their 401(k) investments into an IRA (upon retirement or changing employers) or into a new employer's plan, portability and liquidity are important considerations in constructing and selecting a TDF. Because hedge funds are not liquid and not portable, the substantial allocation to hedge fund investments by the Investment Committee means that participants attempting to liquidate Intel TDF holdings were (and are) at significant risk of being forced to lock-in substantial realized losses during a down or volatile market upon the need to liquidate their investments in the Plans.

206.     Further, as of 2010, the year before the Investment Committee decided to move the Intel TDFs and GDFs heavily into hedge funds, it was apparent that hedge fund performance did not warrant investment as an alternative to traditional retirement plan allocations. Consider the historical behavior of a standard hedge fund index relative to traditional investments as of 2010. The results were very similar to what transpired in 2011 and after, as illustrated in Figure 6 below. The annualized return of the HFRI FOF Index was more than 1% below a comparable risk portfolio of stocks and bonds. Investors in a simple portfolio of stocks and bonds earned more than FOF investors, while paying lower fees, with no need for complicated due diligence, and without the need to sacrifice liquidity. The traditional portfolio, allocated 66% to equity, still earned slightly more than the hedge fund index, through a volatile market.

*Defalcation, and Material Misrepresentation,* U.S. Securities and Exchange Commission (October 19, 2010), http://www.sec.gov/litigation/litreleases/2010/lr21699.htm.

**Figure 6**



207.    Figure 7 below illustrates that many of the traditional benchmarks outperformed the hedge fund index even though equity markets were very volatile and declined substantially during parts of this period. The declines of 2002 and 2008 did not compromise the long-term effects of the benefits of a traditional portfolio approach. Even over this period, traditional balanced portfolios provided superior returns.

**Figure 7**



208.     The data presented above in Figures 6 and 7 was known to the investment community in 2011 when the Investment Committee decided to bet on hedge funds. This data was not known to Plaintiffs or other members of the Class. The risks of investing in hedge funds was known to the Investment Committee in 2011 and should have been known to the Investment Committee; however, such information was not known by Plaintiffs or by the participants in the Plans.

**4.     Significant Investment in Hedge Funds and Private Equity Are Generally Not Suitable For Balanced Funds**

209.     Like target date funds, balanced funds in retirement plans need certain levels of liquidity, and volatility.

210.     For these reasons, significant investments in hedge funds and private equity generally are not suitable for balanced funds. Few, if any, balanced fund portfolio managers invest in hedge funds and private equity. A prudent investigation by the Investment Committee would have revealed the lack of suitability of significant investments in a balanced fund.

### 5.     Risks and Costs of Hedge Funds and Private Equity

211.     Hedge funds and private equity funds are generally structured as investment partnerships. The investors are limited partners and the managers are general partners. Managers are often paid under a "2 and 20" formula, meaning that the manager is paid a fee of 2% of the assets under management and 20% of the profits generated by the fund's investments.

a.     *Hedge Funds.*

212.     A "hedge fund" pools investor assets to pursue a variety of active management strategies.

213.     Hedge funds invest in many different types of assets. Hedge funds "do not constitute an asset class but rather provide access to particular trading strategies that may be employed by specific fund managers."[21] Hedge funds usually are classified according to their investment strategy.

(1)     Valuation Risk.

214.     Because the investment holdings and investment strategies of many hedge funds are often not well known, even to institutional investors like the Plans, it is difficult for the fund assets to be marked to market. The Government Accountability Office noted in 2011 that "[b]ecause many hedge funds may own [securities traded infrequently or in low volume] and derivatives whose valuation can be complex and subjective, a retirement plan official may not be able to obtain timely information on the value of assets owned by a hedge fund. Further, hedge fund managers may decline to disclose information on asset holdings and the net value of individual assets largely because the release of such information could compromise their trading strategy."[22]

215.     A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

---

[21] Theda R. Haber, *et al.*, Report to the Secretary of Labor: *Hedge Funds and Private Equity Investments*, at 6 (November 2011), http://www.dol.gov/ebsa/pdf/2011ACReport3.pdf.
[22] Barbara Borbjerg, *Plans Face Challenges When Investing in Hedge Funds and Private Equity*, at 6 (August 31, 2011), http://www.gao.gov/assets/90/82457.pdf.

(2)     Investment Risk.

216.     Hedge funds pose risks not found with traditional investments managed by registered investment companies. For example, registered investment companies are subject to strict leverage limits; whereas, hedge funds "can make relatively unrestricted use of leverage."[23] Leverage — essentially borrowed money — "can magnify profits, but can also magnify losses to the fund if the market goes against the fund's expectations."[24]

217.     A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

(3)     Lack of Liquidity.

218.     Hedge funds tend to be illiquid investments, where investor redemptions are severely limited by the hedge fund manager. For example, hedge funds often require an initial "lock-up" period where investors must commit their money for one or two years, or more.

219.     In some cases, hedge fund managers may only allow one capital redemption per quarter. Once invested in a hedge fund, it is difficult for an investor to sell its interest in the fund and move to another option. Unlike investments in other vehicles, like mutual funds, a hedge fund investment cannot simply be bought or sold any day of the week.

220.     The hedge funds to which the Plans allocate their assets typically require at least thirty days' notice to receive or redeem capital.[25]

221.     A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

---

[23] *Id*. at 7.
[24] *Id*.
[25] Interview Moderated by Stacy L. Schaus, PIMCO Executive Vice President and Defined Contribution Practice Leader with Stuart Odell, Assistant Treasurer of Retirement Investments, Intel Corp., (March/April 2014), http://media.pimco.com/Documents/PIMCO_DC_Dialogue_Odell_Schaus_Mar_Apr_2014.pdf.

(4)     High Fees.

222.     The hedge funds to which the Plans allocate their assets (each of the Hedge Fund, the Defensive Oriented Hedge Fund, and the Growth Oriented Hedge Fund Investment Accounts managed by Intel is a fund-of-hedge funds) charge incentive fees, and inclusion of hedge fund investments in the Plans' portfolios has increased fees.[26]

223.     Even without an incentive fee, a two percent annual flat fee on assets under management is high and not justified in the defined contribution plan context. Such a fee is up to ten times higher than the average standard wholesale level fees for pension plan investments – for example, 2% versus 0.20%.[27] Indeed, one hedge fund industry expert has calculated that hedge fund managers collected 98% of the profits generated by hedge funds during the years 1998-2010.[28]

224.     The high fees of hedge funds can have a significant negative impact on net investment returns. For example, under the typical two and twenty fee structure, a 12% return would be reduced to only 8% after deduction of fees.[29]

225.     The Investment Committee purportedly chose to invest in hedge funds in an attempt to achieve at least three goals: to increase diversification of plan assets; to decrease the volatility of the plan's investment performance; and to enhance the plan's performance overall.[30]

226.     For example, many hedge funds do not provide substantial risk reduction or risk diversification for pension plan assets because they are correlated to the equity market. According to data compiled by the hedge fund house AQR, the HFRI Fund Weighted Composite Index – a leading hedge fund industry index – was 0.93 correlated with equity markets, or nearly 100% correlated. Often, hedge funds provide insufficient plan visibility into the strategies of their investments to enable an investor to properly understand the risk profile of the investment.

---

[26] *Id.*

[27] Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish- Parish & Company Registered Investment Advisor Blog (January 16, 2014), http://blog.billparish.com/2014/01/16/intel-q4-2013-earnings-time-to-fix-pension-plan/.

[28] Simon Lack, *How The Hedge Fund Industry Has Kept 98% of The Profits In Fees*, SL Advisors: The Hedge Fund Mirage Blog (January 23, 2012), http://www.sl-advisors.com/how-the-hedge-fund-industry-has-kept-98-of-the-profits-in-fees/.

[29] Borbjerg, *supra* note 22, at 8, n. 11.

[30] *401K Global Diversified Fund Fact Sheet*, Mar. 31, 2014 at 3.

---

227.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

(5)    Lack of Transparency.

228.    Hedge funds lack the transparency of publicly traded funds such as mutual funds. In particular, hedge funds lack transparency by design, because individual hedge fund managers claim a proprietary interest in their investment strategies.

229.    The desire of the hedge fund manager to keep an investment methodology private conflicts with a plan fiduciary's duty to monitor the fund's methodology. As Randall Dodd, Director of the Financial Policy Forum, testified before the U.S. Department of Labor, Employee Benefits Security Administration: Advisory Council on Employee Welfare and Pension Benefit Plans on September 20, 2006 about hedge funds: "[t]he investment strategies of hedge funds are often not well known, or are so lacking in transparency – even to their own investors […]– that the investors cannot adequately assess the hedge fund investment's contribution to their overall portfolio risk."

230.    It is difficult for retirement plan fiduciaries to evaluate the performance of hedge funds because of the variety of hedge fund strategies; the substantial rate of turnover of funds opening and closing; the selection bias created when new funds choose not to report returns until after they have a run of good years; and the survivorship bias created when closed funds simply disappear from hedge fund indices.[31]

231.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

(6)    Operational Risks.

232.    Retirement plans investing in hedge funds are also exposed to greater operational risks than presented by traditional investments. As the GAO Report explained, operational risk is the "risk of investment loss because of inadequate or failed internal processes, people, and systems, or

---

[31] Haber, *supra* note 21, at 13.

1  problems with external service providers." "Operational problems can arise from a number of

2  sources, including inexperienced operations personnel; inadequate internal controls; lack of

3  compliance standards and enforcement; errors in analyzing, trading or recording positions; or

4  outright fraud."[32]

5        233.    Hedge funds are not registered with the SEC, and are subject to few regulatory

6  controls. Unlike mutual funds and other registered investment companies in the United States, hedge

7  funds may avoid the registration requirement imposed by the Investment Company Act.[33] As Mr.

8  Dodd explained, the absence of such regulatory controls, coupled with the fact that many hedge

9  funds make it difficult for their assets to be marked to market, make hedge fund investments

10  "especially prone to financial fraud."

11        234.    Hedge fund strategies are often very complex. A prudent fiduciary must be capable of

12  understanding the strategy in order to evaluate whether it is appropriate for investment of retirement

13  plan assets. "[P]articular care should be exercised in due diligence of hedge funds, because of the

14  complex investment strategies they employ; the fact that hedge fund organizations are frequently

15  young and small; their use of leverage and the associated risks; the possibilities of concentrated

16  exposure to market and counterparty risks, and the generally more lightly regulated nature of these

17  organizations."[34] "The process of selecting and monitoring hedge fund investments requires

18  additional resources and continuous support from experienced professionals, which may be

19  substantially more expensive than those required to select and monitor traditional investments.

20  Fiduciaries should understand the effort and costs that will be required, and should commit these

21  resources prior to investing in hedge funds."[35]

22

23

24

---

25  [32] Borbjerg, *supra* note 22, at 8.

   [33] Haber, *supra* note 21.

26  [34] Gary Bruebaker, *et al.*, *Principles and Best Practice for Hedge Fund Investors*, U.S. Commodity

27  Futures Trading Commission at 14 (Jan. 15, 2009), http://www.cftc.gov/idc/groups/public/@swaps/
documents/file/principlespractices.pdf.

28  [35] *Id.* at 7.

---

235.     Even if the plan fiduciary is able to gain visibility of a hedge fund's investment strategy, the detailed holdings of a hedge fund portfolio are not disclosed to individual investors like Plaintiffs and the participants invested in the Intel TDFs and GDFs.

236.     A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

        b.     *Private Equity.*

237.     The term "private equity" refers to a form of alternative investment which uses pooled funds to invest in privately held companies. Investors are generally described as "limited partners."

238.     Private equity advisors have been criticized for their valuation practices, such as using a valuation methodology that is different from the one that has been disclosed to investors or changing the valuation methodology from period to period without additional disclosure. Such valuation practices make it exceedingly difficult, if not impossible, to monitor manager performance and evaluate fees accurately where fees are tied to assets under management and therefore increase as valuations increase.

239.     Private equity investments pose several challenges for retirement plans like the Intel Plans. The four largest target date fund providers in the market, BlackRock, Fidelity, T. Rowe Price, and Vanguard, do not include private equity in their target date funds.[36]

240.     A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

        (1)     High Fees, Hidden Fees, and Inflated Fees.

241.     Contracts with private equity managers generally address two forms of manager compensation: a flat fee for all assets under management (generally about 2%), and a "carried

---

[36] Margaret Collins& Devin Banerjee, *Would You Like Some Private Equity in Your 401(k)?,* Bloomberg Businessweek, (Apr. 4, 2013). http://www.bloomberg.com/bw/articles/2013-04-04/would-you-like-some-private-equity-in-your-401-k.

1  interest" fee, which is a percentage of any profits after a "hurdle" has been met. A typical fee

2  structure in the private equity industry is "two and twenty," where the fee for assets under

3  management is 2% and the incentive fee is 20% of profits above the hurdle.

4      242.    The private equity funds in the Alternative Investments Account charge incentive

5  fees. An examination of private equity firms by the SEC has found that many private equity

6  managers charge hidden and inflated fees to investors in their funds. According to Andrew Bowden,

7  Director of the SEC's Office of Compliance Inspections and Examinations ("OCIE"), the SEC

8  identified "violations of law or material weaknesses in controls over 50% of the time" at private

9  equity firms. This, according to Mr. Bowden, is "a remarkable statistic."[37] The SEC's examination

10  found that the most egregious violations were in the areas of fees, where the SEC found inadequate

11  disclosures to investors. Examples of hidden or undisclosed fees include:

12      (a)    Accelerated Monitoring Fees. Many private equity managers charge monitoring fees

13               to the portfolio companies in the fund. These fees are charged at the portfolio

14               company level, not the fund level, and, thus, are generally invisible to investors.

15               Moreover, private equity managers often force monitoring agreements of ten years or

16               more on the portfolio companies they control. When the portfolio company is sold

17               before the monitoring agreement expires, the private equity manager accelerates the

18               fees for the remaining years of the contract, even though the manager is no longer

19               monitoring the portfolio company. Disclosure of this practice is virtually nonexistent.

20      (b)    Operating Partners. Private equity managers often foist "operating partners" or

21               consultants in which they have an interest or affiliation on portfolio companies

22               without the knowledge of investors. The fees collected by the private equity managers

23               via these arrangements are not disclosed to investors. As Mr. Bowden commented:

24               "Many of these Operating Partners, however, are paid directly by portfolio companies

25               or the funds without sufficient disclosure to investors. This effectively creates an

26

27  [37]Andrew J. Bowden, Director of the Office of Compliance Inspections and Examinations, Spreading Sunshine in Private Equity, Address Before Private Fund Compliance Forum (May 16,

28  2014). http://www.sec.gov/news/speech/2014--spch05062014ab.html.

additional "back door" fee that many investors do not expect, especially since Operating Partners often look and act just like other adviser employees. They usually work exclusively for the manager; they have offices at the manager's offices; they invest in the manager's funds on the same terms as other employees; they have the title "partner"; and they appear both on the manager's website and marketing materials as full members of the team. Unlike the other employees of the adviser, however, often they are not paid by the adviser but instead are expensed to either the fund or to the portfolio companies that they advise." [38] Mr. Bowden continues: There are at least two problems with this. First, since these professionals are presented as full members of the adviser's team, investors often do not realize that they are paying for them a la carte, in addition to the management fee and carried interest. The adviser is able to generate a significant marketing benefit by presenting high-profile and capable operators as part of its team, but it is the investors who are unknowingly footing the bill for these resources. Second, most limited partnership agreements require that a fee generated by employees or affiliates of the adviser offset the management fee, in whole or in part. Operating Partners, however, are not usually treated as employees or affiliates of the manager, and the fees they receive therefore rarely offset management fees, even though in many cases the Operating Partners walk, talk, act, and look just like employees or affiliates."[39]

  (c) Usurping Fee Discounts. Private equity firms leverage investor capital to obtain discounts on professional and vendor services for themselves, but cause their funds and portfolio companies to use the same professionals and vendors without any discounts.

  (d) Charging undisclosed "administrative" or other fees not contemplated by the limited partnership agreement.

---

[38] *Id.*
[39] *Id.*

(e)     Exceeding the limits set in the limited partnership agreement around transaction fees or charging transaction fees in cases not contemplated by the limited partnership agreement, such as recapitalizations.

(f)     Hiring related-party service providers, who deliver services of questionable value.[40]

243.    The SEC has also found problems in how private equity managers report investment returns. Private equity managers generally report investment performance in the form of a "net internal rate of return" ("IRR"), which is supposed to reflect actual investor profits (or losses). But many managers invest their own money in their funds and that money does not pay fees at the fund level, i.e., the 2% asset fee and the 20% carried interest. Given that fees are a significant factor in net performance, including the manager's fee-free assets in the computation of IRR distorts investor experience because investors actually receive a lower return. Among the private equity firms that include manager assets in calculating IRR is Apollo Global Management LLC.

244.    The high fees of private equity funds can have a significant negative impact on net investment returns. For example, under the typical two and twenty fee structure, a 12% return would be reduced to only 8% after deduction of fees.[41]

245.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

(2)     Valuation and Reporting.

246.    The SEC has found deep problems in the way private equity conducts valuations of Portfolio Companies. Common valuation problems identified by the SEC include: [42]

(a)     Advisers using a valuation methodology that is different from the one that has been disclosed to investors.

(b)     Cherry-picking comparables or adding back inappropriate items to EBITDA — especially costs that are recurring and persist even after a strategic sale — if there are

---

[40]*Id.*

[41] Borbjerg, *supra* note 22, at 8, n.11.

[42]*Id.*

not rational reasons for the changes, and/or if there are not sufficient disclosures to alert investors.

(c)     Changing the valuation methodology from period to period without additional disclosure — even if such actions fit into a broadly defined valuation policy — unless there's a logical purpose for the change. For instance, the SEC has observed advisers changing from using trailing comparables to using forward comparables, which resulted in higher interim values for certain struggling investments. While making such changes is not wrong in and of itself, the change in valuation methodology should be consistent with the adviser's valuation policy and should be sufficiently disclosed to investors.

247.    These valuation practices make it difficult to monitor manager performance and evaluate fees accurately where fees are tied to assets under management and therefore increase as valuations increase.

248.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiffs or upon information and belief by the most participants in these Plans.

6.     **Opaque Disclosures**

249.    The Intel 401(k) Savings Plan disclosure of investment-related information to participants of as June 26, 2012, for example, hid the true nature of the underlying investments of the target date funds. Participants were alternatively told to benchmark the TDFs against either the Barclays Aggregate Bond Index, a pure bond benchmark, or the MSCI World (N) Index, a pure equity index. Participants were told that their target date funds were becoming "more conservative over time" and that they were subject to equity and fixed income volatility and risks associated with "high yield, small cap and foreign securities" risks, but the disclosures were silent as to any of the risks associated with the TDFs' alternative investments, as described above.

250.    The full risks were not disclosed also in the Fund Fact Sheets, which told participants that the alternative investments, including hedge funds, would reduce investment risk while maintaining return potential appropriate for an investor's target retirement date.

---

251.    Moreover, these Fund Fact Sheets misrepresented past performance to create the impressions that performance would be higher. The Fact Sheets reported "simulated" past performance — not the actual past performance of the target date strategies — for all periods before March 31, 2011, which created the appearance of successful long-term results but, in reality, was based on hindsight bias, not actual performance. For example, the March 31, 2014 Fact Sheet for the 2030 TDF showed actual three-year performance trailing its category average by 154 bps per year. However, longer time periods utilized simulated returns infected with hindsight bias, creating the impression that the Fund outperformed its benchmark by a wide margin: 263 bps per year over the prior decade – an impossible feat for a fund to report on March 31, 2014 while reporting an inception date of July 11, 2011.

252.    The March 31, 2014 401K GDF Fact Sheet discloses that 37.59% of the Fund is allocated to "Alternative Investments" and 67.39% and 17.56% of the "Alternative Investments" are hedge and private equity investments, respectively. The fact sheet reveals little about the hedge and private equity fund investments other than describing them in very general terms.

253.    Similarly, the March 31, 2014 for the Intel 2030 TDF reveals very little about the investments in hedge funds and private equity. It says how much of the portfolio is allocated to these investments, but nothing about the specific hedge funds held by the Plans such as the fund name, strategy, fees, or investment returns.

254.    As for the Hedge Fund Fact sheet for May 2014 (specific to the Hedge Fund Account) in which the Intel Funds invested, it too is opaque and provides no information that would allow a reasonable investor or plan participant to evaluate or assess the prudence of hedge funds chosen for the Plans. The Hedge Fund Fact sheet provides a list of hedge funds that make up the Hedge Fund Account (Funds A – U). But it does not provide the names of the funds, the funds' managers, or the funds' fee and expenses. Instead, it provides a one-sentence description for each fund that is couched in technical and vague investment terms. Fund B, for example, is described as "A directional fund that uses primarily forwards and futures to invest in commodity, credit, currency, equity and interest rate markets around the globe based on the model-driven output generated from research of macroeconomic factors and their influence on these markets." Fund L is

described as "A multi-strategy fund that may invest in all asset classes but is primarily known for its expertise as an event driven and relative value manager." And Fund Q is described as "A multi-strategy event driven fund that allocates capital across merger arbitrage, distressed/high yield debt and value equity investments." No reasonable person could decipher this limited and opaque information and reach any conclusions about the prudence of any given hedge fund investment made by the Investment Committee Defendants.

**7.      Self-Interest of the Investment Committee Defendants**

255.      In selecting and monitoring the asset allocation model and percentages for the Intel Funds and the underlying investments in the Master Trust Investments Accounts, the Investment Committee Defendants included in the Non-Traditional Investments Accounts, especially the Alternative Investments Fund Account, many investments that were provided by investment companies that had invested or would invest in entities that Intel Capital also had invested or would invest in. Many of these investment companies are private equity or venture capital investment firms. Some of the underlying investments in the Non-Traditional Investment Accounts, the companies that offered these underlying investments, and the entities that those companies and Intel Capital invested or would invest in, sometimes in the same funding round and sometimes in different rounds, included the following listed in Table 15:

**Table 15**

| Investment Company | Underlying Funds of Non-Traditional Investments Accounts Provided by Investment Company or Its Affiliated Company | Companies that Investment Company and Intel Capital Invested In |
|---|---|---|
| Andreessen Horowitz | Andreessen Horowitz Fund III, L.P.<br><br>Andreessen Horowitz Fund IV, L.P.<br><br>AH Parallel Fund III, L.P.<br><br>AH Parallel Fund IV, L.P. | Airware<br><br>Coho Data<br><br>GoodData<br><br>Maxta<br><br>Prism Skylabs<br><br>BlueStacks<br><br>Ark<br><br>Kno<br><br>CoreOS<br><br>Bromium<br><br>Clinkle |
| Bain Capital Ventures | Bain Capital Asia II, L.P. | Lightbend<br><br>INRIX<br><br>HookLogic<br><br>DocuSign<br><br>DataSynapse |
| Founders Circle Capital | Founders Circle Capital I, L.P.<br><br>Founders Circle Opportunities Fund I, L.P. | DocuSign<br><br>Kabam |
| Kayne Partners | Kayne Anderson Energy Fund VII, L.P.<br><br>Kayne Anderson Energy Fund V, L.P.<br><br>Kayne Anderson Real Estate Partners IV | ColdLight Solutions |
| Top Tier Capital Partners | Top Tier Venture Capital V, L.P.<br><br>Paul Capital Top Tier IV, L.P.<br><br>Paul Capital Top Tier Special Opportunities Fund, L.P. | AlienVault<br><br>VirtusStream |
| Advent International Corporation | Advent International Global Private Equity VII B, L.P. | Demantra |

| Investment Company | Underlying Funds of Non-Traditional Investments Accounts Provided by Investment Company or Its Affiliated Company | Companies that Investment Company and Intel Capital Invested In |
|---|---|---|
| Goldman Sachs Group, Inc. | GS Capital Partner VI Parallel, L.P. | Kaltura<br>MongoDB<br>Mirantis<br>Cloudian<br>Guavus<br>ScienceLogic<br>Clearwire<br>Veoh<br>Celoxica<br>Tejas Networks India<br>Spectrawatt<br>Virtual Iron Software<br>Platform Solutions<br>Intellon Corporation<br>Cereva Networks<br>Silknet |
| Atomico | Atomico Ventures III, L.P. | FreedomPop<br>Gengo |
| Axxon Capital | Axxon Brazil Private Equity II C, L.P. | PhotoEx |
| The Carlyle Group | Carlyle Partners V, L.P. | Cidera<br>Solsoft<br>Skila |
| General Atlantic | General Atlantic Investment 2013 Limited Partnership | Exent |
| Oaktree Capital Partners | Oaktree European Princl Fd III Limited Partnership | Plastic Logic |
| Softbank China Venture Capital | SBCVC Fund III, L.P.<br>SBCVC Fund IV, L.P.<br>SBCVC Fund V, L.P. | VeriSilicon Holdings |
| SVB Capital | SVB Strategic Investors Fund IV, L.P.<br>SVB Strategic Investors Fund V, L.P. | July Systems |

| Investment Company | Underlying Funds of Non-Traditional Investments Accounts Provided by Investment Company or Its Affiliated Company | Companies that Investment Company and Intel Capital Invested In |
|---|---|---|
| | Strategic Investors Fund VI-A, L.P.<br>Strategic Investors Fund VII-A, L.P. | |
| TPG Growth, TPG Biotech, and/or TPG Capital | TPG Growth III (A), L.P. | Swrve<br>CardioDx<br>CareDx |
| BlackRock | BlackRock Dow Jones-UBS Commodity Index Fund | Snapdeal |
| Tybourne Capital Management | Tybourne Equity Offshore Fund | Snapdeal |
| Farallon Capital Management | Farallon Capital Institutional Partners, L.P. | Sohu.com<br>Asit Media Technology |

256.     Intel Capital partners with investment companies to access startup technologies and investment opportunities that Intel Capital and Intel otherwise would not be able to access readily. Intel Capital also seeks out these startups to build a market for and expand consumer use of Intel's processors and other products. While many startups already have an existing relationship with institutional investment companies such as venture capital firms, they do not have such a relationship with the corporate venture division of a large corporation such as Intel. The investment companies that Intel Capital partners with serve as an intermediary between Intel Capital and the startups that Intel Capital wants to assess.

257.     Intel Capital also partners with investment companies to help generate funding for the businesses that Intel Capital invests or will invest in. After the initial round of raising "seed capital," businesses such as technology startups need sequential funding to grow. Intel Capital develops and maintains relationships with investment companies to help secure co-investors in the businesses that Intel Capital invests or will invest in, and to help those businesses achieve sequential funding. As of January 2014, Intel Capital had a global investment syndicate, a ready group of over 30 co-investing

companies, to assist in filling out funding rounds for businesses that Intel Capital invested or would invest in.

258.     By including in the Non-Traditional Investment Accounts numerous investments provided by investment companies that Intel Capital partnered with, the Investment Committee Defendants, including Executive Vice President of Intel and President of Intel Capital Arvind Sodhani and Corporate Vice President Treasurer of Intel Ravi Jacob, helped Intel Capital develop and maintain a profitable network of investment companies that could provide Intel Capital and Intel with access to new technology startups and opportunities for market expansion or, by becoming co-investors, could assist Intel Capital in marketing itself to prospective customers or generating funding for them. By including these investments, the Investment Committee Defendants selected and monitored the allocation model and allocation percentages for the Intel Funds and the underlying investments in the Non-Traditional Investments Accounts in a manner that prioritized the interest of Intel Capital and Intel over those of the participants in the Plans and benefited Intel Capital and Intel. Put simply, the Investment Committee used the Plans' assets to promote the investment interests of Intel Capital.

**8.     Underperformance of the Non-Traditional Investments Accounts**

259.     The significant allocations to the Non-Traditional Investments Accounts and the associated excessive fees were the primary cause of the Intel Funds' underperformance. In the past six years, the Non-Traditional Investments Accounts performed significantly less well than the Traditional Asset Class Accounts. Between 2011 and 2017, the assets held in the Non-Traditional Investments Accounts approximately fell between 37 and 43% of the assets held in all the Master Trust Investment Accounts. However, where both the Traditional Asset Class Accounts and the Non-Traditional Investments Accounts had a net investment gain, the latter consistently accounted for significantly less than 37% of the combined net gain of all the Master Trust Investment Accounts. For example, in 2013, while the assets held in the Non-Traditional Investments Accounts represented more than 40% of the total assets in the Master Trust Investment Accounts, the net investment gain of the Non-Master Trust Investment Accounts was responsible for only about 30% of the $1.16 billion net investment gain of all the Master Trust Investment Accounts. Similarly, in

2014, although the Non-Traditional Investments Accounts held approximately 43% of the assets in all the Master Trust Investment Accounts, they accounted for only about 22% of the $496 million net investment gain of all the Master Trust Investment Accounts. Similarly, the Non-Traditional Investments Accounts approximately accounted for less than 30% and 34% of the net investment gain of all the Master Trust Investment Accounts in 2016 and 2017, respectively.

260.    Where the Non-Traditional Master Trust Investment Accounts had a net investment loss, the poor performance of the Non-Investment Asset Class Accounts either substantially reduced the gains of the Traditional Asset Class Account and thus the net gain of all the Master Trust Investment Accounts or substantially increased their net loss. In 2011, while the Traditional Asset Class Accounts had a net gain of over $128 million, the Non-Traditional Investments Accounts suffered a net loss of $100 million. The Hedge Fund Account had a loss of over $41 million, the Emerging Markets Fund Account had a loss of over $47 million, and the Commodities Fund Account (which was later renamed the Diversified Real Assets Fund Account) had a loss of over $28 million. The net loss of the Non-Traditional Investment Accounts reduced the net gain of all the Master Trust Investment Accounts to $28 million. In 2015, the Non-Traditional Investments Accounts accounted for at least $93 million of the $106 million net loss of all the Master Trust Investment Accounts. That year, the Growth Oriented Hedge Fund Account, the Emerging Markets Fund Account, and the Diversified Real Assets Fund Account had an investment loss of at least $50 million, $114 million, and $83 million, respectively. In fact, for 2012 and 2014, the Diversified Real Assets Fund Account, which invested in commodities, had also reported an annual net loss. For 2013 and 2014, the Emerging Markets Fund Account had also reported an annual net loss. Between 2011 and 2016, the Master Trust Investment Accounts had a combined net gain of approximately $3.4 billion, of which the Non-Traditional Investments Accounts accounted for no more than 28%. As a result of the heavy allocations to the Non-Traditional Investments Accounts and their underperformance, the Intel Funds suffered corresponding underperformance and losses of investment returns.

261.    What added to the underperformance of the Master Trust Investment Accounts and further contributed to the poor investment returns of the Intel Funds were the high costs of investing

in hedge funds and private equity funds, which filled the Non-Traditional Investments Accounts. Hedge funds and private equity funds are generally structured as investment partnerships. Managers for these funds are typically paid under a "two and twenty" compensation structure, that is, a management fee equal to 2% of the assets under management, and an additional incentive or performance fee equal to 20% of any profits on the assets managed. Even without a performance fee, an annual flat fee of 2% or 200 bps on assets under management is excessive and unjustified in the defined contribution plan context where expenses are a key driver in the long-term performance of an investment option. An additional performance fee of 20% on the profits generated further significantly reduces any investment return. GAO Report at 8 n. 11 (reporting that, after fees are deducted, the two-and-twenty compensation structure would reduce a 12% return to only 7.6%). The hedge funds and private equity funds in the Non-Traditional Investments Account charge management and performance fees. As a result of the substantial allocations to the Non-Traditional Investments Accounts, approximately 30% of the assets of each of the Intel TDFs are subject to a performance fee, and approximately 45% of the assets of each of the Intel GDFs are subject to a performance fee. These management and performance fees consistently and substantially decreased the performance of the underlying hedge funds and private equity funds in the Non-Traditional Investments Accounts and reduced the net investment returns of the already-underperforming Non-Traditional Investments Accounts and thus of the Intel Funds.

**9.**      **The Ongoing Failure of Fiduciaries of the Plans to Conduct an Appropriate Investigation**

     a.      *The Performance of the Plans' Hedge Funds Portfolio in 2008 Was Poor.*

262.      According to *What's inside Intel's retirement plans? Hedge funds. Lots of 'em*, Steven Odell, Intel's Assistant Treasurer for retirement plan investments, and the Investment Committee members believe that hedge funds can reduce the ups and downs of traditional stock and bond markets.[43]

---

[43] Hunsberger, *supra* note 14.

263.     The Investment Committee purportedly included hedge funds in the Plans' asset allocation portfolios to increase diversification and reduce risk. However, hedge funds should not be considered an independent asset class for purposes of asset diversification. Instead, hedge funds are strategy diversification.

264.     Mr. Odell explained that he believes hedge funds have good risk-adjusted returns,[44] but conceded that the Plans' hedge fund portfolio did not meet expectations during the 2008 financial crisis—it lost 17% in 2008 as compared to a 5.2 percent gain in the Barclay's U.S. Aggregate Bond Index. This should have caused the Investment Committee to reconsider whether, to what extent, and in what form to continue its investments in hedge funds.

265.     Based on the Forms 5500 filed with the Department of Labor, the Investment Committee added hedge funds after 2008, raising the number of managers in the hedge fund portfolio from about 10 or 12 to 21 by 2011. Indeed, in 2009, the 401(k) Savings Plan had less than one million dollars in hedge fund investments and the Retirement Contribution Plan had approximately $550 million. By the end of 2011, the 401(k) Savings Plan held $680 million in hedge fund assets, and the Retirement Contribution Plan held approximately $1 billion. In short, the Investment Committee doubled down with the Retirement Contribution Plan and increased the 401(k) Savings Plan's investment from under a million to over $680 million.

b.     *The Intel Fiduciaries Should Have Been Aware or Discovered Published Reports Questioned the Value of Hedge Funds.*

266.     In addition to the poor performance of the Plans' hedge funds in 2008, numerous studies and reports published in the years *both* before and after the 2008 financial crisis questioned the value of hedge funds. In light of its own experience with respect to the Plans and the wealth of data available to it, the Investment Committee knew or should have known during the relevant periods that hedge funds were, at the amount of the investment made by the Plans, an imprudent investment for target date funds and balanced funds given the cost, performance and risk.

---

[44] Robert Steyer, *Intel's 401(k) reboot aims for better outcomes,* Pensions & Investments (March 5, 2012), http://www.pionline.com/article/20120305/PRINT/303059972/intels-401k-reboot-aims-for-better-outcomes/M.

267.     Unlike more traditional investment products, hedge funds typically charge both a management fee (typically 1-2% and sometimes more) based upon the amount of assets under management ("the Management Fee") and an annual performance fee (typically 20%) based on the success of the fund ("the Performance Fee").[45] Performance-based compensation arrangements with managers may create an incentive to make investments that are riskier or more speculative than would be the case if such arrangements were not in effect. In addition, because performance-based compensation is calculated on a basis that may include unrealized appreciation of assets, compensation may be greater than if such compensation were based solely on realized gains.

268.     By at least 2006, studies of the performance of alternative investments began to reveal that the returns produced by hedge funds – at least after 2000 – did not exceed the investment performance of index-tracking mutual funds (at least once fees were subtracted from performance). Reports of such studies were not buried in some obscure investment newsletter but were widely published in articles such as *Rolling in It: Why Investors should kick up a fuss about hedge-fund fees*, The Economist (Nov. 16, 2006), http://www.economist.com/node8173853 and *The New Money Men*, The Economist, Feb. 17, 2005 (citing studies). As a result, investors in hedge funds were taking greater risks and paying much higher fees for performance that could have been obtained for lower risk and lower fees.

269.     As the Economist succinctly explained in *Rolling in It*, by November 2006, hedge fund managers were receiving "Alpha pay for beta performance." As Narayan Naik of the London Business School noted in that Economist article, "pension funds ha[d] been advised to move into hedge funds by consultants," but those consultants had relied on outdated data from the 1990s and biased data regarding performance and returns.[46]

270.     As reported by *Reuters* on January 7, 2011, in *Hedge Funds Rise in 2010 but lag broader market*, both the Hennessee Group and Hedge Fund Research groups that track performance and asset flows, reported hedge funds gained approximately 10 percent in 2010, but lagged behind

---

[45] *The New Money Men*, The Economist (Feb. 17, 2005), http://www.economist.com/node/3666459.
[46] *Rolling in It: Why Investors should kick up a fuss about hedge-fund fees*, The Economist (Nov. 16, 2006), http://www.economist.com/node8173853.

---

the average stock market indexes and fell short of the average stock mutual fund's returns.[47] As reported by Reuters, the S&P 500 index gained 12.8 percent and the average stock mutual fund rose 17.48 percent, according to data from Lipper Inc.

271.    Surveys conducted of pension funds (both public and private) showed that fewer than half the pension funds surveyed have investments in private equity and about one quarter have investments in hedge funds.[48] Among those pension plans that do invest in hedge funds and/or private equity, the investments generally represent a small share of the total plan assets. According to the August 31, 2011 GAO Report, one survey showed that "the average allocation to hedge funds among plans with such investments was about 4 percent in 2007" and "among plans with investments in private equity, the average was about 5 percent."[49] The GAO Report summarized the level of pension plan investments in alternative investments as follows:

> Although the majority of plans with investments in hedge funds or private equity have small allocations to these assets, a few plans have relatively large allocations. . . . . Of the 62 plans that reported investments in hedge funds in 2007, 12 plans had allocations of 10 percent or more and, of those, 3 plans had allocations of 20 percent or more. The highest reported hedge fund allocation was 30 percent of total assets. Large allocations to private equity were even less common. A total of 106 surveyed plans reported investments in private equity in 2007, of which 11 plans had allocations of 10 percent or more and, of those, 1 plan had an allocation of about 20 percent.[50]

The data on hedge fund and private equity allocations set forth in the GAO Report was based on a survey conducted by Pension and Investments in 2007 of the largest 200 plans, ranked by combined defined benefit and defined contribution plan assets. Of the 200 plans surveyed, only 133 completed the survey and provided asset allocation information.

272.    As reported in a 2012 Economist article, *Rich Managers, Poor Clients: A Devastating Analysis of Hedge Fund Returns* (citing Simon Lack, *The Hedge Fund Mirage: The Illusion of Big Money and Why It's Too Good to Be True*, (2012)), "since 1998, the effective return to hedge-fund

---

[47] Svea Herbst-Bayliss, *Hedge funds rise in 2010 but lag broader market,* Reuters (January 7, 2011), http://www.reuters.com/article/2011/01/07/us-hedgefunds-performance-idUSTRE7063QR20110107.
[48] Borbjerg*, supra* note 22, at 13-19.
[49] *Id.* at 13.
[50] *Id.* at 13-14.

clients has only been 2.1% a year, half the return they could have achieved by investing in boring old Treasury bills."[51]

273.     As reported in a New York Times article, *How to Pay Millions and Lag Behind the Market* on October 19, 2013, many overseers of public pension funds, desperate to bolster returns and meet ballooning retiree obligations, have turned from traditional investments like stocks and bonds to hedge funds and private equity.[52]

274.     In 2013, Benchmark Financial Services, a forensic firm hired by a Rhode Island council of the American Federation of State, County and Municipal Employees, issued a report[53] that concluded that the Rhode Island Pension system's $2 billion investment in high-cost and opaque alternative investments in hedge funds, private equity and venture capital had failed to outperform the pension plan's peer plans.[54]

275.     Concerns about hedge fund investments, fees, reporting, and performance are not new but were widely reported before 2011. Hedge fund indices suffer from survivor bias. Hedge funds commonly shut down and experience relatively high attrition rates—about 8.5% fail each year. But these funds are routinely excluded from the indices. Thus, the indices primarily represent the returns of successful hedge funds, not those that fail, which biases returns upwards and lowers apparent downside volatility. Smoothed volatility also lowers correlations to other asset classes, thus falsely supporting the claim that hedge fund performance does not correlate to bonds and equities.

276.     Hedge fund returns are self-reported. Many of the worst performing hedge funds do not report returns for obvious reasons. And even successful hedge fund managers may choose only to report the returns of their most successful funds, but not the returns of poor-performers. This problem is described as membership bias. Even those funds and managers who do report returns may

---

[51] *Rich Managers, poor clients: A devastating analysis of hedge-fund returns,* The Economist: Buttonwood's notebook blog (January 7, 2012), http://www.economist.com/node/21542452.
[52] Gretchen Morgenson, *How to Pay Millions and Lag Behind the Market,* The New York Times (October 19, 2013), http://www.nytimes.com/2013/10/20/business/how-to-pay-millions-and-lag-behind-the-market.html?_r=0.
[53] http://www.ricouncil94.org/Portals/0/Uploads/Documents/Rhode%20Island%20X.pdf.
[54] Benchmark Financial Services, *Rhode Island Public Pension Reform: Wall Street's License to Steal,* Rhode Island Council 94 (October 17, 2013), http://ricouncil94.org/portals/0/uploads/documents/rhode%20island%20x.pdf.

---

1   not do so on a regular basis. Infrequent fund valuations mask volatility where reduced volatility is a

2   primary selling point of hedge funds. For example, a hedge fund that reports performance quarterly

3   can mask extreme swings in valuations over short periods of time.

4       277.    Hedge funds also may hold illiquid investments that are valued at the discretion of the

5   manager. Given that fees are based on assets under management, hedge fund managers have an

6   incentive to inflate valuations to increase fees as well as to boost performance.

7       278.    The various hedge fund indices do not have common standards. Indices differ on the

8   number of funds covered, inclusion criteria, strategy definitions, etc. They even account for

9   membership and survivorship bias differently. For instance, while Tremont Capital Management

10  segments funds into 9 strategies, Hedge Fund Research uses 20 strategies, and the Hennessee Group

11  uses 23 strategies. Inclusion criteria range from minimum assets to proof of an audited statement.

12  Such differences can result in significant variation in performance statistics. As such, even simple

13  comparisons among hedge funds can be misleading.

14      279.    In 2006, Vanguard published "Understanding Alternative Investments: A Primer on

15  Hedge Fund Evaluation." Among other things, the author concluded: "Reported hedge fund returns

16  contain significant biases that skew conventional mean-variance and regression analysis." The

17  Vanguard Report observed that generally hedge funds do not mitigate market risk to the extent

18  expected by investors.[55]

19      280.    Hedge funds can be classified into two basic categories: non-directional and

20  opportunistic. Opportunistic strategies generally seek to overweight or underweight exposure to

21  systematic risk factors to exploit general market trends. Non-directional strategies are closest to the

22  original intent of hedge funds, whereby long and short positions are established in securities that

23  bear similar risk factor exposure or securities that don't have similar risk factors, (*e.g.*, long the

24  companies bonds, short the equity). Consequently, security selection is critical.

25

26

27  [55] Christopher B. Phillips, *Understanding Alternative Investments: A Primer on Hedge Fund Evaluation,* Vanguard Investment Counseling and Research.
(2006), https://personal.vanguard.com/pdf/s554.pdf.

28

---

281.    Opportunistic strategies reveal similar mean returns, suggesting investors are exposed to greater than expected risk.[56]

282.    Certain non-directional strategies, including convertible arbitrage and fixed income arbitrage, have recorded steeper losses than gains, suggesting that the significant relative downside risk of volatility is asymmetric, which disproportionately costs investors in down markets.

283.    Hedge fund use of leverage and derivatives can cause disproportionate movements in hedge funds returns as compared to underlying asset class returns. These non-linear movements can distort interpretation of mean and variance. And event-driven, convertible arbitrage and fixed income arbitrage strategies have highly negatively skewed returns.[57] "The implications of this are important, because even with [hedge fund] index returns largely self-reported and concentrated on those funds that do not fail, investors remain exposed to significant levels of extreme returns, particularly to the downside. Accounting for survivorship bias and self-reporting would likely increase the non-normality represented in hedge fund indexes. In sum, the experiences of individual and institutional investors probably differ greatly from what might be expected from index-level analysis, with investors exposed to greater probabilities of extreme returns."[58]

284.    With respect to operational risk, financial experts were reporting as early as 2008 that operational risk associated with conflicts of interest within the fund and external to the fund can lead to reduced average annualized returns by 1.68%.[59]

285.    With respect to actual investor experience, the authors of a study presented in 2009 and published in 2011 concluded that "the real alpha of hedge fund investors is close to zero."[60] In other words, for all the active management and esoteric strategies employed by hedge fund managers, the hedge fund managers add little or no value. "[I]n absolute terms, the dollar-weighted

---

[56] *Id.* at 10.
[57] *Id.* at 11.
[58] *Id.* at 11.
[59] Stephen Brown, *et al.*, *Mandatory Disclosure and Operational Risk: Evidence from Hedge Fund Registration,* Journal of Finance (2008), http://depot.som.yale.edu/icf/papers/fileuploads/2472/original/06-15.pdf.
[60] Ilia D. Dichev & Gewn Yu, *Higher risk, lower returns: What hedge fund investors really earn*, 100 Journal of Financial Economics 248 (July 20, 2009) available at: http://www.people.hbs.edu/gyu/higherrisklowerreturns.pdf.

---

returns [of hedge funds] are reliably lower than the return of the S&P 500 index, and are only marginally higher than the risk-free rate as of the end of 2008."[61] These authors cite to other studies finding small and sporadic alpha in hedge funds, and conclude that actual investor returns are 3 to 7 percent lower than reported hedge fund returns. They responded in 2009 that the actual risk-return profile of hedge fund investors is much worse than investors would expect from observing hedge fund indices.

286.   In 2010, Vanguard published a report titled "Do hedge funds hedge? The experience of the Great Recession,"[62] that compared the performance of hedge funds to broad market indices and a 60/40 portfolio of equities and bonds from October 2007 through February 2010. During the first part of this period, October 2007 to February 2009, hedge fund strategies declined at about -2% to -1.3%, substantially better than the broader equity indices, but not much better than a 60/40 portfolio, which had monthly returns of -2.3% during the same period.[63] From March 2009 to February 2010, however, the 60/40 portfolio outperformed all hedge fund categories except one. And equity indices outperformed all hedge fund strategies substantially.[64] Moreover, the authors reported a high performance correlation between all hedge fund categories, except one, and a 60/40 portfolio. The monthly correlation of the fund-of-hedge-funds index (the Intel Hedge Fund is a fund-of-hedge-funds) to a 60/40 portfolio was 0.67 during the period, raising serious questions about whether there was any hedging at all.[65]

287.   Just as the Investment Committee was making huge bets on hedge funds with retirement savings, the Economist was reporting on the pitfalls of hedge funds.[66] Among other things, the Economist noted that hedge funds were performing poorly in volatile markets, "the very conditions in which hedge funds are meant to prosper." The Economist presented a line chart

---

[61] *Id.*

[62] Geetesh Bhardwaj, Ph.D., *Do hedge funds hedge? The experience of the GreatRecession,* Vanguard Research (2010), https://pressroom.vanguard.com/content/nonindexed/Do_hedge_funds_hedge_the_experience_of_the_great_recession.pdf.

[63] *Id.* at 3.

[64] *Id.*

[65] *Id.* at 3.

[66] *Many unhappy returns*, The Economist (Aug. 20, 2011), http://www.economist.com/node/21526326.

---

comparing hedge fund index returns with the S&P 500, which showed extremely high correlation in volatility and performance, thus prompting the caption "Unhedged?"

288. In sum, the downside performance of hedge funds in 2008, although superior to equity markets, nevertheless disappointed investors and did not provide the hedge that investors expected. Hedge funds failed to do much better than a 60/40 portfolio in 2008, and have done a lot worse since, including in the period March 2009 to 2011, when the Investment Committee significantly increased the Plans' investment in hedge funds.

289. Indeed, institutional investors were questioning the virtues of hedge fund investments just as the Investment Committee substantially increased and continued to substantially increase the Plans' investments in hedge fund investments. A survey of such investors revealed the following:

- 70% of institutional investors were demanding more transparency;

- 80% of respondents reported a desire for better transparency into valuation methodologies;

- Whereas the 2008 respondents ranked poor performance as their #1 concern, by Q1 2010, they ranked "lack of transparency" and "liquidity risk" as their top concerns;

- 72% of investors in hedge funds in 2010 were institutions, not individuals such as retirement plan participants, and the vast majority did so for short time horizons: 94% for 3 years; 52% for 6 years; and only 31% for 10 years or more;

- Only 8% of hedge fund investors sought decreased volatility by investing in hedge funds, suggesting that 92% of investors were well aware that hedge funds would likely introduce more volatility;

- Even amongst this institutional respondent base, nearly 50% allocated less than 10% to hedge funds.[67]

290. More recently, hedge funds have continued to badly underperform and fail to provide downside market protections. For example, as reported in the New York Times, hedge fund

---

[67] *Institutional Hedge Fund Investing Comes of Age,* SEI (2010), https://www.seic.com/IMS/ SEI_2011HedgeFundWhitePaper_US.pdf.

investors suffered deep losses in 2015.[68] Investors in prominent and lesser known hedge funds saw all of 2015's gains wiped out, and were in the red. Pershing Square Capitol Management lost 9.4%; Marcato International had lost 11.6%; Glenview Capital Management was down 13.5%. Because of continued poor performance, investors were withdrawing from hedge funds and causing many hedge funds to close. Preqin, which publishes quarterly reports on hedge fund performance, reported that the third quarter of 2015 was the worst quarter for hedge funds in several years, posting average losses in its benchmark of 4.08%.[69] Thus, the Plans and their respective participants whose accounts were invested in Intel TDFs and the Intel GDFs have continued to suffer substantial losses due to Defendants' breaches of fiduciary duty.

291. A prudent fiduciary would have, at the least, re-evaluated the selection of the investments in hedge funds and private equity, if not begun divesting.

292. Despite the significant risks inherent in investing the Plans' assets in hedge funds, private equity funds, emerging market funds, and commodities, and the high fees charged by hedge fund and private equity fund managers, the Investment Committee Defendants did not replace the allocation model that excessively allocated the Intel Funds' assets to the Non-Traditional Investments Accounts. Despite the underperformance of the Non-Traditional Investments Accounts and the excessiveness of the fees charged by the underlying hedge funds and private equity funds, the Investment Committee Defendants did not remove the Intel TDFs or replace them as the default investment options of the 401(k) Savings Plan and did not remove the Global Diversified Fund or replace it as the default investment option of the Retirement Contribution Plan.

293. The Investment Committee also failed to act prudently when as of April 30, 2015 it retained AllianceBernstein to help manage the Intel Funds. AllianceBernstein was one of the few mutual fund providers that embraced the inclusion of hedge fund-like alternatives in target date funds. According to a performance evaluation by Morningstar published in July 2014, among the

---

[68] Alexandra Stevenson, *Hedge Fund Assets Decline by Biggest Amount Since Financial Crisis*, New York Times (Oct. 20, 2015), http://www.nytimes.com/2015/10/21/business/dealbook/hedge-fund-assets-decline-by-biggest-amount-since-financial-crisis.html?_r=0.
[69] *The Preqin Quarterly Update*: *Hedge Funds, Q3 2015,* Preqin (2015), https://www.preqin.com/docs/quarterly/hf/Preqin-Quarterly-Hedge-Fund-Update-Q3-2015.pdf.

---

target date series provided by 45 target date fund providers, AllianceBernstein's series ranked last in security selection, that is, selecting securities and funds in designing, adjusting, and monitoring the asset allocation of target date funds. *Morningstar 2014 Target-Date Series Research Paper* ( July 1, 2014), at 27, *available at* http://corporate.morningstar.com/us/documents/methodologydocuments/ methodologypapers/2014-target-date-series-research-paper.pdf. In fact,  shortly after the Investment Committee hired AllianceBernstein to manage the Intel TDFs, AllianceBernstein announced in June 2015 that it was closing its own target date fund offerings after years of poor performance and failure to attract investors.[70] According to Morningstar, AllianceBernstein's entire target date fund family held little over $1 billion in total assets in 2015.[71]

294.     Morningstar reported that AllianceBertnstein's "long-term risk-adjusted returns rank among the target-date industry's worst."[72] Figure 8 compares the risk-adjusted returns of the AllianceBernstein TDFs to Vanguard's TDFs and the entire category.

**Figure 8**



295.     Further, of the three components that Morningstar evaluates to attribute TDF performance, AllianceBernstein ranked last in "Security Selection" of 45 fund families.[73] This means

---

[70] Morningstar AB Retirement Strategy Target-Date Fund Series Report (June 30, 2015).
[71] *Id.*
[72] *Id.*
[73] Morningstar 2014 Target-Date Series Research Paper, at 27 (July 1, 2014).

1  AllianceBernstein was the worst TDF provider of 45 providers covered by Morningstar at picking

2  funds or securities for a TDF fund which is exactly what the Investment Committee hired

3  AllianceBernstein to do for the Intel TDFs. Based on the foregoing and upon information and belief,

4  the Investment Committee did not engage in a prudent process in selecting AllianceBernstein and

5  hired the worst target date fund manager in the country to manage the Intel TDFs. The only possible

6  explanation is that AllianceBernstein alone had endorsed the use of hedge funds for TDFs.

7  Apparently, the Investment Committee replaced AllianceBerstein with GTC after the Intel Funds

8  continued to perform poorly.

9  296.    The conduct of the Investment Committee Defendants demonstrates that they

10  engaged in a defective process of selecting and monitoring the asset allocations for the Intel Funds.

11  It shows that they either did not understand and failed to give appropriate consideration to, or

12  disregarded, the risks of investing in hedge funds, private equity, commodities, and emerging

13  markets funds and heavy allocations of the Intel Funds' assets to the Non-Traditional Investments

14  Accounts. Had the Investment Committee Defendants conducted a proper and impartial investigation

15  of these allocations and their associated risks as well as the Plans' investment consultants including

16  AllianceBernstein, they would not have significantly deviated from prevailing standards by

17  excessively allocating assets of the Intel Funds to the Non-Traditional Investments Accounts. By

18  failing to conduct such investigation and properly monitor the Intel Funds and the Plans' investment

19  consultants on an ongoing basis and by failing to replace the Plans' default investment options, the

20  Investment Committee Defendants caused tens of millions of losses to the Plans and participants.

21  **D.    The Administrative Committee Defendants Made Inadequate Disclosures About the**

22      **Intel Funds and Provided Misinformation About Participants' Accounts and the Intel**

23      **Funds**

24  297.    The Administrative Committee did not adequately disclose to participants and

25  beneficiaries in the Plans information regarding the risks associated with the Intel Funds' significant

26  allocations to hedge funds and/or private equity or the accompanying risks associated with

27  investment in the Intel Funds. Specifically, the Administrative Committee did not disclose (a) that

28  hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these

investments lack liquidity; and (c) that they lack transparency; and (d) that investing in them carries significant valuation risk. The Administrative Committee did not disclose that, as a result of the Intel Funds' significant allocations to hedge funds and/or private equity, the Intel Funds posed those investment and valuation risks and suffered lack of liquidity and transparency.

298.     According to applicable regulations, 29 C.F.R. § 2550-404a-5(a), "[f]iduciary requirements for disclosure in participant-directed individual account plans" (the "Disclosure Regulation"), the administrator of a participant-directed retirement plan must disclose several types of information to participants in such a plan, both prior to the initial investment and also on an ongoing basis, if there are material changes to the plan's investment options.

299.     Under the Disclosure Regulation, the plan administrator – here, the Administrative Committee – must ensure that participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a). Until December 31, 2017, as asset allocation models or portfolios, the Intel TDFs and the Intel GDFs did not issue shares or units and were not actual funds of which participants in the 401(k) Savings Plan and the Retirement Contribution Plan held shares or units. Rather, each of the Intel Funds was effectively an investment strategy that, pursuant to the asset allocation adopted for that Intel Fund, directed the assets of the Plans invested in that Intel Fund to be allocated to certain underlying funds and provided each participant investing in the Intel Fund with a proportionate interest in those underlying funds.

300.     Because the Intel TDFs and GDFs were asset allocation models rather than actual share-issuing investments or "funds," the investment funds comprising the TDF and GDF portfolios were "designated investment alternatives" subject to the Disclosure Regulation.

301.     In order to comply with the Disclosure Regulation, the Administrative Committee Defendants had to make the following complete and accurate disclosures, among other things:

a) An explanation of any specified limitations on investment instructions under the terms of the plan, including any restrictions on transfer to or from a designated investment alternative;

b) An identification of any designated investment alternatives offered under the plan;

c) An identification of any designated investment managers;

d) An explanation of any fees and expenses for general plan administrative services which may be charged against individual accounts of participants and which are not reflected in the total annual operating expenses of any designated investment alternative and the dollar amount of such fees and expenses that are actually charged to an individual account, on a quarterly basis;

e) The name of each designated investment alternative and the type or category of investment; performance and benchmark data for such investment; detailed fee and expense information such as expense ratios; the internet web site address containing information about the designated investment alternative. 29 C.F.R. § 2550-404a-5(c)-(d).

302. Based on the documents provided to Plaintiffs, the Administrative Committee Defendants failed to make any of the required disclosures listed above, and failed to comply with their duties pursuant to the Disclosure Regulation as a whole, with respect to disclosure of the designated investment alternatives like the Investment Funds underlying the Intel TDFs and Diversified Fund.

303. Based on the documents provided to Plaintiffs, the Administrative Committee Defendants failed to disclose the required information regarding the hedge funds, commodities funds, and private equity funds. These failures to disclose left the majority of participants in the Plans unaware of the true content and character of their retirement savings, because the Intel TDFs were the primary investment options for Intel's 401(k) Savings Plan participants and the Intel GDP was the primary investment option for Retirement Plan participants. Even if participants were provided some information that the Intel Funds included investments in hedge funds and private

equity, the plan fiduciaries failed to provide participants with adequate and sufficient information, so that they could make informed intelligent decisions about whether investing in these particular hedge funds and private equity funds was prudent.

304. For participants whose accounts in the Plans were invested in any of the Intel Funds, the quarterly statements issued for their accounts did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. In the glossary provided in the quarterly statements, "stocks" was defined as representing ownership or equity in a company, "bonds" as representing a loan to a corporation or government agency, and "short-term investments" as including certificate of deposits, Treasury Bills, and money market instruments. The quarterly statements did not mention alternative investment types such as hedge funds and private equity funds or the risks associated with investment in them.

305. The Administrative Committee also failed to provide accurate information material to participants when making informed investment decisions with respect to the Intel Funds. The quarterly account statements issued to participants who invested in the Intel Funds misinformed and/or failed to inform them about the asset allocation of their account balances. Typically, in the form of a pie chart, the quarterly statements incorrectly represented that the participant's combined account balance between the Plans was allocated among three "asset classes" only, that is, stocks, bonds, and short-term investments, despite the fact that each of the Intel Funds also allocated its assets to other types of investments including hedge funds and/or private equity funds. For example, the quarterly statement for the October-December quarter of 2015 for Plaintiff Anderson's accounts represented that Anderson's combined account balance between the two Plans was allocated among stocks, bonds, and "short-term" investments only, in the percentages of 31%, 6%, and 63%, respectively. Anderson's account in the Retirement Contribution Plan was and has been invested in the Global Diversified Fund only, and his account in the 401(k) Savings Plan was and has been invested in the Intel Target Date 2030 Fund, the Intel Target Date 2035 Fund, and the Intel Target Date 2040 Fund only. As of the October-December quarter of 2015, the Intel Target Date 2030, 2035, and 2040 Funds each allocated more than 20% of its assets to the Defensive Oriented and

1  Growth Oriented Hedge Fund Accounts, which invested in hedge funds. As of the same quarter, the

2  Global Diversified Fund allocated about 30% of its assets to the Defensive Oriented and Growth

3  Oriented Hedge Fund Accounts and about 18% of its assets to the Alternative Investments Fund

4  Account, which invested in private equity funds.

5       306. Similarly, the quarterly account statements received by Plaintiff Sulyma from the

6  401(k) Savings Plan described the asset allocation of his 401(k) Savings Plan account as invested

7  approximately 63% in stocks, 16% in bonds, and 21% in "short-term/other" investments, as of

8  December 2011 and again as of December 2012. The term "short-term/other" was not defined on the

9  face of the statements Plaintiff Sulyma received.

10       307. By stating that Plaintiffs' Plan account balances were allocated to stock, bonds, and

11  short-term investments, the quarterly statements misleadingly represented that Plaintiffs' accounts

12  were allocated to these traditional asset classes only, not also to hedge funds and private equity

13  funds. The statements also misrepresented the percentages with respect to the asset classes to which

14  the Intel Funds in which Plaintiffs' accounts were invested were allocated. Upon information and

15  belief, for the same quarter and other quarters, the quarterly statements issued to Plaintiffs and other

16  participants in the Plans whose accounts were invested in the Intel Funds were similarly misleading

17  in that they misrepresented the mix of asset classes and investment types among which their account

18  balances were actually allocated, inaccurately stated the allocation percentages of their accounts, and

19  failed to disclose that their accounts were also allocated to hedge funds and/or private equity funds.

20       308. The quarterly statements for Plaintiffs' Plan accounts also misleadingly stated that the

21  specific Intel Funds in which Plaintiffs' accounts were invested were allocated to stocks and bonds

22  only. For example, the quarterly statement misinformed Plaintiff Anderson that the Intel Target Date

23  2030 Fund and the Intel Target Date 2040 Fund were each invested in traditional asset classes only,

24  with a 90% allocation to stocks and a 10% allocation to bonds. However, as of the October-

25  December quarter of 2015, the Intel Target Date 2030 and 2040 Funds each allocated more than

26  20% of its assets to the Defensive Oriented and Growth Oriented Hedge Fund Accounts. Upon

27  information and belief, for the same quarter and other quarters, the quarterly statements issued to

28  Plaintiffs and other participants in the Plans were similarly misleading in that they misrepresented

the mix of asset classes and investment types among which the specific Intel Funds in which the participants' accounts were actually allocated, inaccurately stated the allocation percentages of those specific Intel Funds, and failed to disclose that those specific Intel Funds were also allocated to hedge funds and/or private equity funds.

309.    Peer target date funds, if they allocate to hedge funds at all, do not allocate their assets to hedge funds in a percentage that is anywhere close to the allocations of the Intel TDFs to hedge funds. Similarly, peer balanced funds do not allocate their assets to hedge funds or private equity funds or do not allocate their assets to hedge funds and private equity funds in a percentage that is anywhere close to the allocations of the Intel GDFs to hedge funds and private equity funds. By representing that participants' accounts that were invested in the Intel Funds were allocated among traditional asset classes only and with respect to at least some of the specific Intel Funds that those Intel Funds were invested in stocks and bonds only, the quarterly statements issued to these participants misrepresented the true asset allocation mix of their accounts, and misleadingly presented the Intel Funds as investment options whose allocation models were in line with prevailing standards for peer target date and balanced funds, even though the allocation models for the Intel Funds significantly deviated from those prevailing standards.

310.    To the extent that they were provided to participants in the Plans, the "fact sheets" for the individual Intel TDFs did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. The "fact sheets" did not disclose (a) that hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant valuation risk.

311.    To the extent that they were provided to participants in the Plans, the "fact sheets" for the Intel TDFs inaccurately described those Intel Funds and their allocation models. For example, each of the "fact sheets" for the Intel TDFs for the third quarter of 2015 represented that "the Funds are managed to gradually become more conservative over time as they approach their target date." However, contrary to such representations, in 2015, the Intel Target Date 2015-2055 Funds were allocated to hedge funds more heavily, became less conservative, and deviated from prevailing

standards for target date funds more significantly as those Intel Funds approached their target dates, as Table 16 shows:

**Table 16**

| Intel Target Date Fund | Allocation to Hedge Funds |
|---|---|
| 2055 | 20.75% |
| 2050 | 19.36% |
| 2045 | 20.93% |
| 2040 | 19.87% |
| 2035 | 20.78% |
| 2030 | 22.15% |
| 2025 | 27.05% |
| 2020 | 26.87% |
| 2015 | 29.48% |

312.    In fact, as the Intel Target Date 2015 Fund reached its target date in 2015, the Intel Fund had the highest allocation to hedge funds (i.e., 29.48%) among all Intel TDFs. By representing the Intel TDFs as investment options that "are managed to gradually become more conservative over time as they approach their target date," the "fact sheets" misrepresented the allocation strategy adopted for the Intel TDFs, and misleadingly presented the Intel Target Date Funds as investment options whose allocation strategy was in line with prevailing standards for peer target date funds, even though the allocation strategy of the Intel TDFs significantly deviated from prevailing standards.

313.    The "fact sheets" dated after the third quarter of 2015 made similar misrepresentations about the allocation strategy adopted for the Intel TDFs. For example, each of the "fact sheets" for the Intel TDFs for the first quarter of 2017 represented that "the Funds are managed to gradually become more conservative over time as they approach their target date." However, contrary to such representations, in that quarter, the Intel Target Date 2015–2055 Funds were allocated to hedge funds more heavily, became less conservative, and deviated from prevailing

standards for target date funds more significantly as those Intel Funds approached their target dates, as Table 17 shows:

**Table 17**

| Intel Target Date Fund | Allocation to Hedge Funds |
|---|---|
| 2055 | 12.83% |
| 2050 | 12.51% |
| 2045 | 13.78% |
| 2040 | 13.58% |
| 2035 | 14.30% |
| 2030 | 16.04% |
| 2025 | 18.97% |
| 2020 | 20.38% |
| 2015 | 22.38% |

314.    To the extent that they were provided to participants in the Plans, the Summary Plan Descriptions for the Plans ("the SPDs") did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. The SPDs did not disclose (a) that hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant valuation risk.

315.    To the extent that they were provided to participants in the Plans, the SPDs made misrepresentations regarding the allocation strategy adopted for the Intel Target Date Funds. For example, the 2013 SPD represented the Intel TDFs as follows: "While a younger investor may be able to afford to take more risk in order to maximize returns, an investor approaching retirement should reduce his/her risk and choose investments that provide more stability in the portfolio. A Target Date Fund is designed to achieve this balance, because it is adjusted over time to reduce exposure to higher-risk assets, such as stocks and increase exposure to lower risk investments such

as bonds and stable value." The 2015 SPD made an almost-identical representation. However, contrary to these representations, the Intel Target Date 2015-2055 Funds were not adjusted over time to reduce exposure to high-risk investments including hedge funds, to which those Intel Funds were heavily allocated. For instance, in 2015, as they approached their target dates, the Intel Target Date 2015-2055 Funds were allocated to hedge funds more heavily, with the allocation of the Intel Target Date 2015 Fund to hedge funds that year culminating at 29.48%, the highest and least conservative among all Intel Target Date Funds. By representing the Intel TDFs as investment options that were "adjusted over time to reduce exposure to higher-risk assets," the SPD misrepresented the allocation strategy adopted for the Intel TDFs, and misleadingly presented the Intel TDFs as investment options whose allocation strategy was in line with prevailing standards for peer target date, even though the allocation strategy of the Intel TDFs significantly deviated from prevailing standards.

316.    To the extent that they were provided to participants in the Plans, the "Intel Retirement Plans Hedge Fund Portfolio Fact Sheets," did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds or the accompanying risks associated with investment in the Intel Funds. The "fact sheets" did not disclose (a) that hedge funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant valuation risk.

317.    To the extent that they were provided to participants in the Plans, the "Intel Retirement Plans Hedge Fund Portfolio Fact Sheets" provided inconsistent information about the hedge funds to which the Intel Funds were allocated. For example, the "fact sheets" for the quarters ending March 31, 2017 and June 30, 2017 provided inconsistent information about the historical annual performance of the hedge funds. The fact sheet for the quarter ending June 30, 2017 stated that the annual performance of the "Intel Hedge Fund Portfolio" for the years from 2011 through 2016 was -0.54%, 7.41%, 13.41%, 3.31%, 0.21%, and 6.71%, respectively, whereas the fact sheet for the quarter ending March 31, 2017 stated that the annual performance of the hedge funds for those years was 0.25%, 9.54%, 13.47%, 4.75%, 0.50%, and 6.09%, respectively. The two "fact sheets" also provided inconsistent background information about the individual hedge funds to which the Intel Funds were allocated. Without disclosing the names of the hedge funds, the two "fact

sheets" identified them by assigning to each of them a "Fund Identifier" such as "Fund A" and "Fund B," along with a general description of the hedge fund. While the March 31, 2017 fund sheet stated that Fund A and Fund B had fund inception dates of January 1994 and May 2005, respectively, the June 30, 2017 fact sheet stated that Fund A and Fund B had fund inception dates of August 1998 and January 1994, respectively.

318.    By failing to disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds, by misinforming participants about the allocations of their account balances and of the specific Intel Funds that their accounts were invested in, and by misrepresenting presenting the Intel TDFs as investment options whose allocation strategy was in line with prevailing standards for peer target date funds, the Administrative Committee failed to provide complete and accurate information material to participants when making informed decisions with respect to the Intel Funds.

## VI.  CLAIMS FOR RELIEF

### Count I
### (Violations of ERISA § 404(a) by the Investment Committee
### in Selecting and Monitoring the Investment Options for the Plans)

319.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

320.    The Investment Committee Defendants were fiduciaries of the Plans under ERISA § 402(a), 29 U.S.C. § 1102(a), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

321.    As fiduciaries of the Plans, the Investment Committee Defendants were required pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

322.     ERISA's duty of prudence required the Investment Committee Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plans and to act accordingly. 29 C.F.R. § 2550.404a-1.

323.     Specifically, the Investment Committee Defendants had ongoing duties to manage the Plans' assets by properly evaluating and monitoring the Plans' investment options on a regular and frequent basis and removing or replacing imprudent ones.

324.     The Investment Committee Defendants breached their duties of prudence and loyalty with respect to the Plans by, *inter alia*,

    a.   Failing to properly monitor and evaluate on a regular basis the performance and fees and expenses of the Intel Funds and the adverse impact of excessive fees and expenses on the long-term performance of the Intel Funds;

    b.   Failing to properly investigate the availability of, and give appropriate consideration to, lower-cost target date funds with comparable or superior performance as alternatives to the Intel Target Date Funds;

    c.   Failing to properly investigate the availability of, and give appropriate consideration to, lower-cost balanced funds with comparable or superior performance as alternatives to the Global Diversified Funds;

    d.   Failing to properly monitor and evaluate on a regular basis the appropriateness of designating the Intel Target Funds as the 401(k) Savings Plan's default investment options and the Global Diversified Fund as the Retirement Contribution Plan's default investment option, given the fees and expenses for and performance of the Intel Funds;

    e.   Failing to implement and employ an ongoing process to control the fees and expenses of the Intel Funds; and

    f.   Failing to promptly remove any imprudent Intel Target Date Funds or Global Diversified Funds whenever it was prudent to do so.

325.     In choosing and maintaining the Intel Funds as the investments options of the Plans, the Investment Committee Defendants employed disloyal and imprudent processes by favoring custom Intel Funds that, as alleged above, invest in certain underlying investments that help Intel Capital develop and maintain business relationships with certain investment companies to the benefit of Intel Capital and Intel.

326.     A prudent and loyal fiduciary who had taken these actions and omissions into consideration would have concluded that the Investment Committee Defendants did not select and monitor the Plans' investment options solely based on their merits and in the interest of the participants.

327.     The Investment Committee Defendants breached their fiduciary duties to the Plans during each of the meetings of the Investment Committee that took place periodically in the relevant period. At each of these meetings, the Investment Committee Defendants could have removed or replaced any of the Intel Funds on the basis of its performance or fees or a combination of both. At each of these meetings, the Investment Committee Defendants failed to do so.

328.     Through these actions and omissions, the Investment Committee Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

329.     As a result of the Investment Committee Defendants' breaches, the Plans, Plaintiffs, and the Plans' participants and beneficiaries have suffered substantial losses in retirement savings.

### Count II
### (Violations of ERISA § 404(a) by the Investment Committee
### and Investment Committee Defendants in Allocating the Intel Funds' Assets)

330.     Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

331. The Investment Committee Defendants were fiduciaries of the Plans under ERISA § 402(a), 29 U.S.C. § 1102(a), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

332. As fiduciaries of the Plans, the Investment Committee Defendants were required pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

333. ERISA's duty of prudence required the Investment Committee Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plans and to act accordingly. 29 C.F.R. § 2550.404a-1.

334. Specifically, the Investment Committee Defendants had ongoing duties to manage the Plans' assets by properly evaluating and monitoring the Plans' investment options, including the asset allocations of any custom funds, on a regular and frequent basis and removing or replacing imprudent ones.

335. The Investment Committee Defendants breached their duties of prudence and loyalty with respect to the Plans by, *inter alia*,

    a. Adopting and implementing asset allocation models and allocation percentages that excessively allocated assets of each of the Intel Funds to the Non-Traditional Investments Accounts;

    b. Adopting and implementing asset allocation models and allocation percentages that resulted in excessive fees charged to each of the Intel Funds;

    c. Failing to properly investigate and give appropriate consideration to the risks of allocating the assets of the Plans, with respect to each of the Intel Funds, to hedge funds, private equity, commodities, and emerging markets funds;

d. Failing to properly investigate and give appropriate consideration to the risks of allocating the assets of the Plans, with respect to each of the Intel Funds, to the Non-Traditional Investment Accounts pursuant to the allocation percentages adopted or implemented for the Intel Fund;

e. Failing to properly monitor and evaluate on a regular basis the asset allocation models and allocation percentages adopted or implemented for each of the Intel Funds;

f. Failing to explore and give appropriate consideration to prevailing standards for target date funds and balanced funds;

g. Failing to properly monitor and evaluate on a regular basis the appropriateness of designating the Intel Target Date Funds as the default investment options of the 401(k) Savings Plan and the Global Diversified Fund as the default investment of the Retirement Contribution Plan, given the asset allocation models and allocation percentages adopted for the Intel Funds;

h. Failing to properly monitor on a regular basis the performance and fees and expenses of the underlying investments in the Non-Traditional Investment Accounts and the adverse impact of the management and performance fees charged by any of the underlying investments on the long-term performance of the Intel Funds;

i. Failing to properly monitor and evaluate on a regular basis any consultant, including AllianceBernstein, with respect to the management of the assets of the Plans;

j. Failing to promptly remove or replace any consultant, including AllianceBernstein, that helped contribute to the Intel Funds' excessive allocations to the Non-Traditional Investments Accounts; and

k. Failing to promptly replace any imprudent asset allocation model or allocation percentages for any of the Intel Funds whenever it was prudent to do so.

336.    In determining and maintaining the asset allocations for the Intel Funds, the Investment Committee Defendants employed disloyal and imprudent processes by including numerous underlying investments in the Non-Traditional Investments Accounts because, as alleged above, investing in those underlying investments helped Intel Capital develop and maintain business relationships with certain investment companies to benefit Intel Capital and Intel.

337.    A prudent and loyal fiduciary who had taken these actions and omissions into consideration would have concluded that the Investment Committee Defendants did not select and monitor the Plans' investment options solely based on their merits and in the interest of the participants.

338.    The Investment Committee Defendants breached their fiduciary duties to the Plans during each of the meetings of the Investment Committee that took place periodically in the relevant period. At each of these meetings, with respect to each of the Intel Funds, the Investment Committee Defendants could have replaced its asset allocation model and allocation percentages on the basis of their imprudence. At each of these meetings, the Investment Committee Defendants failed to do so.

339.    Through these actions and omissions, the Investment Committee Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

340.    As a result of the Investment Committee Defendants' breaches, the Plans, Plaintiffs, and the Plans' participants and beneficiaries have suffered substantial losses through the loss of return that would have been earned by the prudent investment of the Plans' assets.

### Count III
### (Violations of ERISA §§ 404(a)(1)(A) and 404(a)(1)(B) by the Administrative Committee Defendants for Failure to Make Adequate and Accurate Disclosures)

341.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

342.    The Administrative Committee Defendants were fiduciaries of the Plans under ERISA § 402(a), 29 U.S.C. § 1102(a), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

343.    As fiduciaries of the Plans, the Administrative Committee Defendants were required pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

344.    An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform. Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also entail an obligation to convey complete and accurate information material to the beneficiaries' circumstances, even when the beneficiaries have not specifically asked for the information.

345.    A fiduciary's disclosure obligations in ERISA § 404(a) are informed by the common law of trusts. ERISA §404(a) incorporates the trust law duty to communicate to the beneficiaries all material facts in connection with the transaction which the trustee knows or should know and the duty imposed on a trustee to provide an accounting to the participants and beneficiaries. A fiduciary must furnish financial information to its principal upon demand. Restatement (Second) of Trusts §§ 172–73 (1959). A trustee has a duty to account to beneficiaries of the trust and may be compelled to render financial data upon failure to provide such information. Restatement (Second) of Trusts § 172 comment c (1959).

346.    The Administrative Committee Defendants knew or should have known that information provided to Plan participants contained affirmative misrepresentations about the composition of the Intel TDFs and GDFs and, moreover, also knew or should have known that their failure to provide accurate information about the composition of the Intel TDFs and GDFs might

cause harm to Plan participants. In particular, the Administrative Committee Defendants knew or should have known that the disclosure materials they provided to participants:

    a.   did not disclose (a) that hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; and (d) that investing in them carries significant valuation risk;

    b.   did not disclose that, as a result of the Intel Funds' significant allocations to hedge funds and/or private equity, the Intel Funds posed those investment and valuation risks and suffered lack of liquidity and transparency;

    c.   incorrectly represented that the participant's combined account balance between the Plans was allocated among three "asset classes" only, that is, stocks, bonds, and short-term investments, despite the fact that each of the Intel Funds also allocated its assets to other types of investments including hedge funds and/or private equity funds; and

    d.   contained misrepresentations regarding the allocation strategy adopted for the Intel Funds.

347.    The Administrative Committee Defendants breached their duties of loyalty and prudence with respect to the Plans by, *inter alia*, failing to disclose the following material information to participants and beneficiaries:

    a.   Failing to adequately disclose to participants in the Plans the risks associated with the Intel Funds' significant allocations to hedge funds and private equity funds and/or the accompanying risks associated with investment in the Intel Funds;

    b.   Providing in the quarterly statements issued to participants in the Plans whose accounts were invested in any of the Intel Funds (i) inaccurate information about the mix of asset classes and investment types among which the participants' accounts were actually allocated, and about the corresponding allocation percentages, and (ii) the misinformation that the specific Intel Funds in which the

participants' accounts were invested were allocated to stocks and bonds only, not also to hedge funds and/or private equity funds;

c.  In the "fact sheets" for the Intel Target Date Funds, misrepresenting the Intel Target Date Funds as investment options that "are managed to gradually become more conservative over time as they approach their target date," despite the fact that the Intel Target Date Funds were managed to become more heavily allocated to hedge funds and thus less conservative as they approached their target dates;

d.  In the SPDs, misrepresenting the Intel Target Date Funds as investment options that were "adjusted over time to reduce exposure to higher-risk assets," despite the fact that the Intel Target Date Funds were managed to become more heavily allocated to hedge funds and thus less conservative as they approached their target dates;

e.  In the quarterly statements issued to participants in the Plans whose accounts were invested in any of the Intel Funds, misrepresenting Intel Funds as investment options whose allocation models were in line with prevailing standards for peer target date and balanced funds;

f.  In the "fact sheets" for the Intel Target Date Funds and in the SPDs, misrepresenting the Intel Target Date Funds as investment options whose allocation models were in line with prevailing standards for peer target date funds;

g.  Providing in the "Intel Retirement Plans Hedge Fund Portfolio Fact Sheets" inconsistent information about the background and performance of the hedge funds to which the Intel Funds were allocated.

348.    Through these actions and omissions, the Administrative Committee Defendants have failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

1  matters would use in the conduct of an enterprise of a like character and with like aims, in violation

2  of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

3  349.  Consistent with their obligations under ERISA § 404(a)(1)(A) and (B), the

4  Administrative Committee Defendants were required to ensure that participants "are made aware of

5  their rights and responsibilities with respect to the investment of assets held in, or contributed to,

6  their accounts and are provided sufficient information regarding the plan, including fees and

7  expenses, and regarding designated investment alternatives, including fees and expenses thereto, to

8  make informed decisions with regard to the management of their individual accounts." 29 C.F.R.

9  § 2550-404a-5(a) (the "Disclosure Regulation").

10  350.  Because the Intel TDFs and GDFs were asset allocation models rather than actual

11  share-issuing investments or "funds," the investments funds comprising the TDF and GDF portfolios

12  were "designated investment alternatives" subject to the Disclosure Regulation.

13  351.  The Administrative Committee Defendants failed to comply with the requirements of

14  the Disclosure Regulation and ERISA §404(a) because they failed to, among other things:

15  a)  Provide an explanation of any specified limitations on investment instructions under

16  the terms of the plan, including any restrictions on transfer to or from designated investment

17  alternatives contained within the Intel Funds;

18  b)  Identify the hedge funds and the private equity funds contained within the Intel Funds

19  as designated investment alternatives offered under the plan;

20  c)  Identify designated investment managers for the hedge funds and the private equity

21  funds contained within the Intel Funds;

22  d)  Provide an explanation of any fees and expenses for general plan administrative

23  services which may be charged against individual accounts of participants and which are not

24  reflected in the total annual operating expenses of designated investment alternatives like

25  hedge funds and the private equity funds contained within the Intel Funds and the dollar

26  amount of such fees and expenses that are actually charged to an individual account, on a

27  quarterly basis, for investment in such funds;

28

e)     Provide the name of each of the hedge funds and the private equity funds contained within the Intel Funds and the type or category of investment; performance and benchmark data for each such investment; detailed fee and expense information such as expense ratios; the internet web site address containing information about such designated investment alternative.

*See* 29 C.F.R. § 2550.404a-5(c)-(d).

352.    The Administrative Committee failed to adequately disclose to participants and beneficiaries in the Plans information regarding risks, fees and expenses associated with such hedge funds and private equity funds. Although the Administrative Committee disclosed information regarding the allocation strategy of the Intel Funds, it failed to provide the required disclosure for the hedge funds and private equity funds in which the Plans invested pursuant to the allocation models for the Intel Funds. Among other things, the Administrative Committee failed to provide adequate disclosures about: the arrangements between the Plans and the hedge fund and private equity funds, including the fees and expenses and the investment strategies and holdings for each fund; and the identity of the private equity and hedge fund firms and individual managers.

353.    As a result of the Administrative Committee Defendants' actions and omissions, Plaintiffs and the Plans' participants (a) were not adequately informed about the risks associated with the Intel Funds' significant allocations to hedge funds and private equity funds or the accompanying risks associated with investment in the Intel Funds, and (b) were not provided accurate and consistent information about the asset mix and allocation percentages of their Plan accounts and about the Intel Funds' allocation models and their significant deviation from prevailing standards for target date and balanced funds. Plaintiffs and the Plans' participants were not provided accurate information that was material to making informed decisions with respect to the Intel Funds, and have suffered financial losses through the loss of returns that would have been earned on prudent investment of the Plans' assets. Where, as here, a fiduciary has breached its duty to provide accurate information about the holdings of a trust to the participants and beneficiaries of the trust, the participants and beneficiaries (and in fact, "any person financially interested in the trust

administration") are entitled to compel the trustee and other fiduciaries of the Plan to provide such financial information.

**Count IV**
**(Violations of ERISA § 404(a) by the Finance Committee**
**and Chief Financial Officer Defendants**
**for Failure to Monitor Other Fiduciaries)**

354.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

355.    The Finance Committee Defendants were fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because, pursuant to Section 13 of the Plan Documents, until at least March 2016, the Finance Committee Defendants were responsible for appointing and removing members of the Investment Committee and for periodically monitoring their performance.

356.    The Chief Financial Officer Defendants were fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because, pursuant to Section 13 of the Plan Documents and the resolution of Intel's Board of Directors, effective March 2016, the Chief Financial Officer of Intel was responsible for appointing and removing members of the Investment Committee and for periodically monitoring their performance.

357.    As fiduciaries of the Plans, the Finance Committee Defendants and the Chief Financial Officer Defendants were and/or continue to be required pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

358.    Under ERISA, a fiduciary charged with the authority to select and remove other fiduciaries or who, as a practical matter, in fact appoints other fiduciaries, has an ongoing duty to monitor the performance of those persons whom the fiduciary is empowered to remove. A monitoring fiduciary must, at reasonable intervals, ensure that the fiduciary it has appointed is acting in compliance with the terms of the applicable plan, acting in accordance with ERISA and applicable

law, and satisfying the needs of the plan. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the management and investment of the plan assets. A monitoring fiduciary must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their obligations.

359. The Finance Committee Defendants and Chief Financial Officer Defendants were and/or continue to be monitoring fiduciaries under ERISA. Each of the Finance Committee Defendants and Chief Financial Officer Defendants was and/or continues to be individually and collectively responsible for periodically monitoring the performance of each of the Investment Committee Defendants and for the removal of any of them who failed to perform his or her fiduciary duties.

360. The Finance Committees Defendants breached their fiduciary duties by, *inter alia*,

    a. Failing to monitor the Investment Committee and the Administrative Committee, to evaluate their performance, or to have a system in place for doing so, and standing by idly as the Plans suffered significant losses as a result of their appointees' imprudent actions and omissions with respect to the Plans;

    b. Failing to monitor the Investment Committee Defendants' fiduciary processes, which would have alerted any prudent fiduciary to the potential breach because of the excessive fees and consistent underperformance of the Intel Funds or because of the excessive allocations of the Intel Funds' assets to the Non-Traditional Investments Accounts;

    c. Failing to monitor their Investment Committee appointees to ensure that they considered the ready availability of comparable non-Intel custom funds, including lower-cost target date funds and balanced funds with similar or superior performance or the ready availability of other less expensive, better-performing asset allocation strategies for the Plans' assets invested in the Intel Funds;

    d.   Failing to monitor their Administrative Committee appointees to ensure that they provided adequate disclosure of material and accurate information to participants and did not misinform them about the allocations of their accounts in the Plans;

    e.   Failing to remove Investment Committee appointees whose performance was inadequate in that they continued to maintain imprudent investment options that charged excessive fees and did not perform as well as comparable alternatives, all to the determent of the Plans and participants' retirement savings; and

    f.   Failing to remove Investment Committee appointees whose performance was inadequate in that they continued to maintain an imprudent asset allocation strategy for the Plans' investment options, all to the detriment of the Plans and participants' retirement savings.

    g.   Failing to remove Administrative Committee appointees whose performance was inadequate in that they provided inadequate disclosures (i.e., no disclosures) to participants about the risks associated with the Intel Funds' heavy allocations to hedge funds and private equity funds, misinformed them about and mischaracterized the allocations of their account balances and the allocation strategy of the Intel Target Date Funds.

361.    Through these actions and omissions, the Finance Committee Defendants and the Chief Financial Officer Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

362.    As a result of the Finance Committee Defendants' and the Chief Financial Officers' breaches, the Plans, Plaintiffs, and the Plans' participants and beneficiaries have suffered substantial losses through the payment of excessive fees and the loss of return that would have been earned by the prudent investment of the Plans' assets.

**Count V**
**(Violation of ERISA § 102(a), 29 U.S.C. § 1022(a)**
**Against the Administrative Committee Defendants)**

363.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

364.    ERISA § 102(a), 29 U.S.C. § 1022(a), requires Summary Plan Descriptions (SPDs) to "be written in a manner calculated to be understood by the average plan participant" and to "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

365.    The DOL Regulations implementing ERISA § 102, 29 C.F.R. § 2520.102-2(a), reiterate that the SPD "shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan." 29 C.F.R. § 2520.102-2(a) specifies that in order to fulfill these requirements, the plan administrator must "tak[e] into account such factors such as the level of comprehension and education of the typical participants in the plan and the complexity of the terms of the plan." 29 C.F.R. § 2520.102-2(a) further explains that an SPD "will usually require … the elimination of long, complex sentence. . .[and] the use of clarifying examples and illustrations" to make the terms of the SPD understandable to the average participant. 29 C.F.R. § 2520.102-2(b) requires that "[t]he advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations."

366.    The Administrative Committee Defendants violated ERISA § 102(a), 29 U.S.C. § 1022(a) and the DOL Regulations implementing § 102 by preparing SPDs that failed to disclose and explain the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. Section 13(f) of the Plan Documents authorizes the Investment Committee to designate investment options offered to participants under the Plans and conduct periodic review of these investment options. The SPDs did not disclose (a) that hedge funds and private equity funds, to which the Intel Funds have been significantly allocated, often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant

valuation risk. The SPDs did not provide examples and illustrations to clarify any of these risks associated with the underlying hedge funds and/or private equity funds of the Intel Funds and thus with the Intel Funds themselves. The SPDs exaggerated the benefits of the Intel TDFs by misrepresenting the allocation strategy adopted for the Intel Target Date Funds as reducing exposure to higher risk investments over time, when in fact the actual allocations of the Intel TDF portfolios were not adjusted to reduce exposure to high-risk hedge funds as they approached their maturity dates.

367.    Because of the Administrative Committee's violations of ERISA § 102(a) and the DOL Regulations implementing it, Plaintiffs and the Class were prevented from ascertaining (a) the risks associated with the Intel Funds' significant allocations to hedge funds and private equity funds or the accompanying risks associated with investment in the Intel Funds and (b) whether these assets are being invested and managed in accordance with prevailing standards for target date and balanced funds. Because of Defendants' incomplete and affirmatively misleading disclosures, Plaintiffs and the Class have foregone opportunities to make alternative uses of their retirement savings, including by investing those savings in alternatives that have not borne the risks and suffered the losses incurred by the Intel Funds.

### Count VI
#### (Co-fiduciary Liability Under ERISA § 405 Against All Defendants)

368.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

369.    ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability, which he may have had under any other provision of ERISA, if

(1)     he participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2)     by his failure to comply with ERISA § 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     he knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

370.     Defendants were fiduciaries of the Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Defendants knew of each breach of fiduciary duty alleged herein arising out of the excessive and imprudent investment of the assets of the Plans in alternative investments. Yet, they knowingly participated in fiduciary breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

371.     The Finance Committee Defendants knew what the investment lineups of the Plans consisted of and what the fees charged for the Intel Funds were, were aware of the risks associated with the Intel Funds' heavy allocations to alternative investments including hedge funds, private equity funds, commodities, and emerging markets funds, and knew that the Intel Funds were heavily allocated to such alternative investments represented by the Non-Traditional Investments Accounts, because, until at least March 2016, the Finance Committee was responsible for reviewing the continued prudence of its Investment Committee appointments, and because the Investment Committee selected and maintained the Intel Funds and the asset allocation strategy for them, and was responsible for periodically reporting to the Finance Committee about its actions.

372.     The Finance Committee Defendants knew that the Administrative Committee did not disclose to participants the risks associated with the Intel Funds' heavy allocations to hedge funds and/or private equity funds and that the Administrative Committee provide misinformation about the allocation mix of participants' Plan accounts, the management and allocation strategy of the Intel Target Funds, and the hedge funds to which the Intel Funds were allocated, because, until at least March 2016, the Finance Committee was responsible for reviewing the continued prudence of its Administrative Committee appointments, and because the Administrative Committee was responsible for disclosing material and accurate information to participants and ensuring the accuracy of periodic account statements issued to participants, and was responsible for periodically reporting to the Finance Committee about its actions.

373.     The Chief Financial Officer Defendants knew what the investment lineups of the Plans consisted of and what the fees charged for the Intel Funds were, were aware of the risks associated with the Intel Funds' heavy allocations to alternative investments including hedge funds, private equity funds, commodities, and emerging markets funds, and knew that the Intel Funds were heavily allocated to such alternative investments represented by the Non-Traditional Investments Accounts, because, effective March 2016, the Chief Financial Officer of Intel was responsible for reviewing the continued prudence of its Investment Committee appointments, and because the Investment Committee selected and maintained the Intel Funds and the asset allocation strategy for them, and was responsible for periodically reporting to the Chief Financial Officer about its actions.

374.     The Chief Financial Officer Defendants knew that the Administrative Committee did not disclose to participants the risks associated with the Intel Funds' heavy allocations to hedge funds and/or private equity funds and that the Administrative Committee provide misinformation about the allocation mix of participants' Plan accounts, the management and allocation strategy of the Intel Target Funds, and the hedge funds to which the Intel Funds were allocated, because, effective March 2016, the Chief Financial Officer of Intel was responsible for reviewing the continued prudence of its Administrative Committee appointments, and because the Administrative Committee was responsible for disclosing material and accurate information to participants and ensuring the accuracy of periodic account statements issued to participants, and was responsible for periodically reporting to the Chief Financial Officer about its actions.

375.     Each member of the Investment Committee knew what the investment lineups of the Plans consisted of and what the fees charged for the Intel Funds were, and knew that the Plan assets invested in the Intel Funds were heavily allocated to the alternative investments represented by the Non-Traditional Investments Accounts, because the Investment Committee selected and maintained the Intel Funds and the asset allocation strategy for them.

376.     Each member of the Administrative Committee knew what the allocation models of the Intel Funds were and knew that the Intel Funds were not only allocated to stocks and bonds and were heavily allocated to non-traditional investment types including hedge funds and/or private equity funds, because the Administrative Committee was responsible for ensuring that periodic

account statements issued to participants did not misinform them about the allocations of their accounts and material and accurate information about the Plans' investment options were provided.

377.    Each member of the Investment Committee knew that the "fact sheets" for the Intel Target Date Funds provided misinformation about the management and allocation strategy of the Intel Target Date Funds because, starting in 2015, AllianceBernstein assisted in providing the contents of these "fact sheets" and the Investment Committee was responsible for monitoring and evaluating AllianceBernstein.

378.    Despite this knowledge, the Finance Committee Defendants, the Chief Financial Officer Defendants, the Investment Committee Defendants, and the Administrative Committee Defendants failed to act to remedy the violations of ERISA alleged in Counts I through IV.

379.    As such, each member of the Investment Committee is liable for the breaches by the other Investment Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

380.    As such, each member of the Administrative Committee is liable for the breaches by the other Administrative Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

381.    As such, each member of the Finance Committee is liable for the breaches by the other Finance Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

382.    As such, each member of the Finance Committee is liable for the breaches by the other Finance Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

383.    As such, each of the Chief Financial Officer Defendants is liable for the breaches by the other Chief Financial Officer Defendant pursuant to ERISA § 405(a)(1) and (2).

384.    As such, each of the Defendants is liable for breaches by the Investment Committee Defendants and the Administrative Committee Defendants pursuant to Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3).

### Count VII
**(Failure to Provide Documents Upon Request Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), & 29 C.F.R. § 2550.404a-5 Against the Administrative Committee Defendants) On Behalf of Plaintiff Anderson Individually**

385.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

386.     ERISA § 104(b)(4), 29 U.SC. § 1024(b)(4), provides that the administrator of an employee benefit plan "shall, upon written request of any participant or beneficiary, furnish a copy" of certain enumerated documents as well as "other instruments under which the plan is established or operated" to the requesting participant or beneficiary within 30 days of the Request.

387.     In the Ninth Circuit, the documents that a plan administrator must provide pursuant to ERISA § 104(b)(4) are those that allow the participant to "know[ ] exactly where he stands with respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted."

388.     Plaintiff Winston Anderson sent a letter to the Intel Corporation Retirement Plans Administrative Committee requesting that the Plan provide specified documents pursuant to ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A), and 29 C.F.R. §2550.404a-5 on April 19, 2017. The letter was sent by certified mail and was delivered to the Administrative Committee on April 25, 2017. On or about June 6, 2017, Mr. Anderson received a FedEx envelope containing two documents entitled "Intel 401(k) Savings Plan (As Amended and Restated Effective January 1, 2014)", and "Intel Minimum Pension Plan (As Amended and Restated Effective January 1, 2011)," respectively. None of the other documents requested by Anderson were included. Mr. Anderson received no further response from the Administrative Committee for six months.

389.     Mr. Anderson sent another letter to the Intel Corporation Retirement Plans Administrative Committee by certified mail on December 15, 2017. Mr. Anderson's December 15 letter reiterated that ERISA requires a response to his April 19, 2017 letter within thirty days, and that the April 19 letter requested "not only 'plan documents' but also, among others, the latest updated summary plan descriptions, any summaries of material modifications to the Plans, the latest full annual reports for the Plans, and documents setting forth the investment policies or guidelines concerning the investments of the Plans or appointing or removing any fiduciaries of the Plans, as well as documents relating to each of the investment options offered under either of the Plans and their fees and expenses." Because the Administrative Committee had not furnished these documents within thirty days of Anderson's April 19 letter, Plaintiff Anderson requested that the Committee

"*immediately* provide me with the rest of the documents requested in my April 19, 2017" letter. Nonetheless, the Intel Administrative Committee failed to provide the remainder of the requested documents for an additional two months, delaying its ultimate response until February 23, 2018.

390.     Pursuant to ERISA § 502(a)(1)(A) a participant may sue for the relief provided in ERISA § 502(c). Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish" by mailing the requested material to "the requesting participant . . . within 30 days after such request" may be liable for up to $110 per day in civil penalties. As a result of the failure to produce the requested documents, the Intel Retirement Plans Administrative Committee is liable for the penalties available under ERISA § 502(c).

## VII.  ENTITLEMENT TO RELIEF

391.     By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled to sue each of the fiduciary Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plans as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plans, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

392.     By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A declaration that the Defendants breached their fiduciary duties under ERISA;

B.     An order compelling each fiduciary found to have breached his/her/its fiduciary duties to the Plans to jointly and severally restore all losses to the Plans that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA § 405;

C.       An order requiring (a) the disgorgement of profit made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with his/her/its breach of fiduciary duties or violations of ERISA, (c) an order requiring the Plans to divest themselves of investments in hedge funds, private equity, commodity funds, and emerging markets funds, or (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plans;

D.       Ordering, pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1056(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plans;

E.       Removing any breaching fiduciaries as fiduciaries of the Plans and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiffs or any member of the Class is a participant or beneficiary;

F.       Awarding a surcharge against the Administrative Committee Defendants and requiring that an accounting of the Intel Funds' allocations to hedge funds and private equity funds be provided to all participants;

G.       Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plans and the management of the Plans' investments and/or selection of investment options and/or to oversee the divestment of the Plans' investments in the Non-Traditional Investments Accounts;

H.       Ordering the Plans' fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plans;

I.       Award Plaintiffs Winston Anderson and Christopher Sulyma statutory penalties in the amount of $110 per day, per violation, for the failure to provide each of the requested documents that the Administrative Committee failed to provide within the time periods prescribed by ERISA § 104, 29 U.S.C. §1104.

J.       Awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), the common benefit doctrine and/or the common fund doctrine;

K.       Awarding pre-judgment and post-judgment interest; and

1        L.        Awarding such other remedial or equitable as the Court deems appropriate.

2

3    Dated: June 24, 2020                              Respectfully submitted,

4                                                      /s/ Joseph Creitz
                                                       Joseph Creitz (Cal Bar. No. 169552)
5                                                      joe@creitzserebin.com
                                                       Lisa Serebin (Cal Bar No. 146312)
6                                                      lisa@creitzserebin.com
                                                       CREITZ & SEREBIN LLP
7                                                      100 Pine Street, Suite 1250
                                                       San Francisco, CA 94111
8                                                      Telephone: (415) 466-3090
                                                       Facsimile: (415) 513-4475
9
                                                       Vincent Cheng (Cal. Bar No. 230827)
10                                                     vincent@blockesq.com
                                                       BLOCK & LEVITON LLP
11                                                     100 Pine St., Suite 1250
                                                       San Francisco, CA 94111
12                                                     Telephone: (415) 968-8999
                                                       Facsimile: (617) 50-6020
13
                                                       R. Joseph Barton (Cal. Bar No. 212340)
14                                                     jbarton@blockesq.com
                                                       BLOCK & LEVITON LLP
15                                                     1735 20th St NW
                                                       Washington DC 20009
16                                                     Telephone: (202) 734-7046
                                                       Facsimile: (617) 507-6020
17
                                                       Gregory Y. Porter (*pro hac vice*)
18                                                     Ryan Thomas Jenny (*pro hac vice*)
                                                       gporter@baileyglasser.com
19                                                     rjenny@baileyglasser.com
                                                       BAILEY & GLASSER LLP
20                                                     1055 Thomas Jefferson Street, NW, Suite 540
                                                       Washington, D.C. 20007
21                                                     Telephone: (202) 463-2101
                                                       Facsimile: (202) 463-2103
22
                                                       Mark George Boyko (*pro hac vice*)
23                                                     mboyko@baileyglasser.com
                                                       BAILEY & GLASSER LLP
24                                                     8012 Bonhomme Avenue, Suite 300
                                                       Clayton, MO 63105
25                                                     Telephone: (304) 345-6555

26                                                     Major Khan (*to be admitted pro hac vice*)
                                                       mk@mk-llc.com
27                                                     MAJOR KHAN LLC

28

1120 Avenue of the Americas
Suite 4100
New York, NY 10036
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

*Attorneys for Plaintiffs*

R. Joseph Barton (Cal. Bar No. 212340)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., NW
Suite 500, East Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Joseph A. Creitz (Cal. Bar No. 169552)
Lisa S. Serebin (Cal. Bar No. 146312)
CREITZ & SEREBIN LLP
250 Montgomery Street, Suite 1410
San Francisco, CA 94104
Telephone: (415) 466-3090
Facsimile: (415) 513-4475

Gregory Y. Porter (admitted *pro hac vice*)
Ryan T. Jenny (admitted *pro hac vice*)
BAILEY & GLASSER LLP
1054 31st Street, NW, Suite 230
Washington, D.C. 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| CHRISTOPHER M. SULYMA, and all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>INTEL CORPORATION INVESTMENT POLICY COMMITTEE, FINANCE COMMITTEE OF THE INTEL CORPORATION BOARD OF DIRECTORS, INTEL RETIREMENT PLANS ADMINISTRATIVE COMMITTEE, CHARLENE BARSHEFSKY, FRANK D. YEARY, JAMES D. PLUMMER, REED E. HUNDT, SUSAN L. DECKER, JOHN J. DONAHOE, DAVID S. POTTRUCK, RAVI JACOB,<br><br>     Defendants,<br><br>and<br><br>INTEL 401(K) SAVINGS PLAN and INTEL RETIREMENT CONTRIBUTION PLAN,<br><br>     Nominal Defendants. | Case No: 15-cv-04977-NC<br><br>**DECLARATION OF GREGORY Y. PORTER IN SUPPORT OF MOTION TO BE DESIGNATED LEAD COUNSEL** |

I, Gregory Y. Porter, declare as follows:

1.     I make this Declaration of my own personal knowledge, and if called as a witness, I would and could testify competently to the matters stated herein.

2.     I make this declaration in support of Plaintiff's Motion For Appointment Of Interim Co-Lead Counsel And Lead Plaintiff.

3.     I am a partner of the law firm Bailey & Glasser LLP, one of the counsel for Plaintiff in this lawsuit.

4.     I have been actively involved in this lawsuit from the beginning of the investigation to the present, and I have worked closely with the other counsel to Sulyma in this action.

5.     Sulyma's counsel started its in-depth investigation in November, 2014. Bailey & Glasser devoted approximately 244, over 200 hours of which was attorney time, to investigating and preparing the complaint before it was filed on October 31, 2015. Bailey & Glasser reviewed plan documents, summary plan descriptions, investment brochures, retirement plan financial statements, investment fact sheets, account statements, and numerous articles, publications, reports, and studies about target date funds, balanced funds, private equity, and hedge funds. Bailey & Glasser, along with co-counsel, also consulted with experts on target date funds, hedge funds, and fiduciary processes to help prepare the complaint. Sulyma's counsel paid approximately $29,000 to the experts in investigating and developing the lawsuit. The investigation yielded a detailed and specific complaint delineating the relevant decision makers for the retirement plans, the structure of the asset allocation funds at issue, the fees associated with those funds, the investment returns of those funds, and the particular allocations to hedge and private equity funds. Sulyma's counsel also developed detailed factual allegations, including comprehensive demonstrative tables and charts, comparing the structure of the asset allocation models to prevailing industry norms; comparing the fees for the funds to the fees charged for similar funds in the market place; and comparing the returns of the funds to the returns to similar funds in the market place. Sulyma's counsel developed detailed allegations about uncertainties and pitfalls of investing in non-registered investment partnerships such as hedge funds and private equity funds.

1

Porter Declaration in Support of Lead Counsel Motion
15-cv-04977-NC

6.      Since filing the original complaint, Sulyma's counsel has continued to vigorously pursue their investigation and represent Sulyma and the class. Among other things, Sulyma's counsel has retained two additional consulting experts in the areas of private equity and target date funds. Sulyma's counsel has developed substantial new information on Defendants' hiring of Alliance Bernstein in April 2015 to manage the asset allocation funds at issue in the lawsuit. Sulyma's counsel sent over 50 letters by registered mail to the managers of the hedge and private equity funds in which the retirement plans invest advising them of the lawsuit and urging them to preserve relevant evidence. Sulyma's counsel conferred with Defendants' counsel on a proposed discovery plan and case management order and submitted a joint plan to the Court in advance of the February 24, 2016 case management conference.

7.      The work on this case constitutes original work by Sulyma's counsel. Sulyma's Counsel is not aware of any lawsuit filed before the Sulyma complaint that alleges imprudent asset allocation fund design and hedge and private equity fund investments by a defined contribution plan.

8.      I have been working on ERISA class actions since 1998. I have served as lead or co-lead counsel for plaintiffs in several important ERISA cases including *Diebold v. Northern Trust*, 09-1934 (N.D. Ill.) ($34 million cash settlement in 2015); *Anderson v. Principal Life Ins. Co.*, No. 15-0119 (S.D. Ia.) ($3 cash and $8.5 million in prospective relief in 2015); *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, No. 10-10588-FDS ($10 million cash settlement in 2014); *In re CMS Energy ERISA Litig.*, No. 02-CV-72834 (E.D. Mich.) ($28 million recovered); *Sherrill v. Federal-Mogul Corp. Retirement Programs Committee*, No. 04-CV-72949 (E.D. Mich.) ($14 million recovered); *Bilewicz v. FMR LLC*, No. 13-10636 (D. Mass.) ($12 million cash and substantial prospective relief in 2014); *Figas v. Wells Fargo*, No. 08-04546 (D. Minn.) ($17.5 million settlement in 2011).

9.      I have direct experience in cases involving complex financial products and services and fiduciary decision making about investments. All of the cases listed above were about retirement plan fiduciaries making imprudent investment decisions. The *Northern Trust* and *Glass Dimensions* cases involved complex securities lending transactions involving hundreds of retirement plans. In